IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

FEB 2 5 1999    EC

| | | |
|---|---|---|
| WILLIE TERION WASHINGTON, | § | MICHAEL N. MILBY, CLERK OF COURT |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | C.A. No. H-99-0140 |
| | § | |
| GARY JOHNSON, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

---

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

Andrew Hammel
Attorney-in-Charge
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00796698

Elizabeth Detweiler
Staff Attorney
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00793614

TEXAS DEFENDER SERVICE
412 Main Street, Suite 1150
Houston, TX  77002
TEL    (713) 222-7788
FAX    (713) 222-0260

Counsel for Petitioner Willie Terion Washington

**THIS IS A DEATH PENALTY CASE**

34

# TABLE OF CONTENTS
*Willie Terion Washington v. Gary Johnson, Director, TDCJ-ID*, H-99-0140
**Amended Petition for Habeas Corpus**

I.  **INTRODUCTION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  **Prior Proceedings**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  **Jurisdiction.**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.  **Exhaustion of Remedies.**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.  **Statement of the Case.**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. **PRELIMINARY STATEMENT CONCERNING STANDARD OF REVIEW**  . . . . 6

    A.  **The Fifth Circuit's interpretation of Section 2254(d)(1) is
        unconstitutional.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.  **The state habeas court's fact findings and legal conclusions are
        not entitled to a presumption of correctness.**  . . . . . . . . . . . . . . . . . . . . 11

        1.  **The state habeas judge who presided over the
            initial phase of Petitioner's state habeas engaged
            in repeated *ex parte* contact with the State
            concerning the substance of Mr. Washington's
            postconviction claims**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.  **The state habeas court denied the petitioner
            access to relevant factual development, including
            discovery, investigative and expert assistance,
            and an evidentiary hearing.**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        3.  **The judge who presided over the last phase of
            the Petitioner's state postconviction proceedings
            signed the state's proposed findings of fact and
            conclusions of law without reviewing them —
            unless his review was the result of their being
            provided to him *ex parte* by the attorney for the
            State**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        4.  **The "paper hearing" conducted by the state habeas
            court was not an adequate and fair hearing because the**

i

judge who denied habeas relief was not the judge who
had presided over the trial ................................. 26

5. The Supreme Court's holding in *Townsend v.
Sain*, which established exceptions to the
presumption of correctness normally accorded
state factfindings and set out situations in which
an evidentiary hearing is mandatory, requires an
evidentiary hearing in this case. ......................... 27

6. By maintaining a procedural double standard
between the State and the Applicant concerning
procedural rules, the state court violated due
process ................................................ 31

7. Because Mr. Washington's federal petition is
being filed after the AEDPA because of the
State's unreasonable delay in filing its findings of
fact and conclusions of law, the application of the
AEDPA to Mr. Washington's case would have
an impermissible retroactive effect ........................ 33

8. Because fundamental due process was violated
throughout state postconviction proceedings in
this case, several *Townsend* exceptions apply .............. 35

C. Exhaustion is excused in this case. ............................ 36

1. The intervening passage of a bar to the
consideration of successive state habeas corpus
applications in Texas capital cases has rendered
exhaustion in this case futile. ............................ 37

2. Exhaustion is excused because circumstances
exist which rendered and will render state
process ineffective to protect Mr. Washington's
federal rights .......................................... 39

3. Exhaustion should be excused because the State
subjected the Petitioner to unreasonable delay
during the state postconviction process. ................... 42

4. Exhaustion should be excused because Mr.

Washington was denied the assistance of counsel with relevant experience in state postconviction proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

5. Further factual development and *de novo* review are warranted because the Petitioner, during state habeas corpus proceedings, diligently sought to develop factual support for his claims, but was denied that opportunity by the court. . . . . . . . . . . . . . . . 54

D. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

III. CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

A. Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . 58

1. The State Court prevented relevant factual development on this issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2. Counsel's affidavits establish that he is not a credible source of information about the scope and adequacy of his representation of the Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

3. Financing of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

a. The representation of the Petitioner was financed by an unethical and possibly illegal act on the part of defense counsel. . . . . . . . . . . . . . . . 65

b. Counsel rendered deficient performance and guaranteed a conflict of interest by agreeing to represent the Petitioner for a sum grossly inadequate to assure reasonable performance in a death penalty case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

c. Counsel's performance was hindered by a conflict of interest caused by his unethical fee arrangement. . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

d. The Petitioner was prejudiced by the conflict of interest with his counsel. . . . . . . . . . . . . . . . . . . . 75

e.  The state court's findings of fact and conclusions of law on this issue are incorrect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

  i.  The assertions in trial counsel's affidavits are not "credible." . . . . . . . . . . . . . . . . . . 79

  ii.  The state court's fact-finding concerning trial counsel's reason for not hiring expert witnesses was simply invented . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

4.  Ineffective Assistance of Counsel – Voir Dire . . . . . . . . . . . . . . . . . . . . 81

  a.  Counsel failed to adequately lay the basis for challenges for cause and failed to adequately rehabilitate jurors. . . . . . . . . . . . . . . . . . . . . . 82

  b.  Counsel failed to strike with peremptory challenges jurors whose attitudes and experiences indicated a strong risk of bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

  c.  Counsel failed to ensure that the prosecution did not excuse African American jurors with peremptory challenges in violation of *Batson v. Kentucky*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    i.  A prima facie cases exists establishing the prosecution's discrimination on the basis of race in selecting Mr. Washington's jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    ii.  The defense failed to preserve any record of the prosecution's use of peremptory challenges. . . . . . . . . . . . . . . . . . . . . . 88

  d.  Counsel failed to preserve meritorious claims of error which arose during voir dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

iv

         e.       **Counsel failed to object to the State's improper voir dire.** ................................... 91

                 i.      **Trial counsel failed to object when the State repeatedly and impermissibly tried to water down its burden of proof at punishment by inviting the jurors to employ an unreasonably lenient definition of the word "probability"** ......................... 92

                 ii.     **Trial counsel failed to object when the prosecutor and the judge used incorrect hypothetical illustrations to demonstrate the difference between "intentional" and "deliberate" and incorrectly defined those terms** .......................... 96

                 iii.    **Miscellaneous errors** .......................... 100

         f.       **Conclusion** ........................................ 101

     5.     **Ineffective Assistance of Counsel – Guilt/Innocence Phase.** .................................... 102

         a.      **Trial counsel's failure to adequately investigate the State's case against his client, as conceded by his own affidavit, rendered his representation of Mr. Washington ineffective.** ........................... 102

         b.      **Counsel failed to adequately highlight the inconsistencies in the testimony of the State's key witness.** ................................. 104

         c.      **Counsel failed to put before the jury the fact that Mr. Kidane had waited over thirty minutes after the shooting before calling the police.** .................................... 113

         d.      **Counsel failed to exploit or obtain independent expert evaluation of the**

obvious discrepancies between the size of
the wounds suffered by Mr. Tareh and
Mr. Kidane and the State's argument
that Mr. Washington had inflicted those
wounds with a .38 or .357 caliber weapon . . . . . . . . . . . . . 115

e.   Counsel failed to elicit favorable, relevant
     information from State witnesses . . . . . . . . . . . . . . . . . . . . . . 120

f.   Trial counsel failed to exploit evidence
     directly contradicting the State's essential
     argument that Mr. Washington had
     changed clothes   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

g.   Counsel failed to present an available,
     credible defensive theory to capital
     murder charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

h.   The Petitioner was prejudiced by his
     counsel's failure to investigate his case. . . . . . . . . . . . . . . . 131

i.   The state court's findings of fact and
     conclusions of law on this point are
     incorrect.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

6.   Ineffective Courtroom Advocacy.  . . . . . . . . . . . . . . . . . . . . . . . . . 133

     a.   Counsel failed to make an opening statement at
          either phase of the trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

     b.   Counsel failed to object to improper testimony including
          improper bolstering, hearsay, and irrelevant evidence. . . . . 134

     c.   Counsel failed to ensure that bench conferences
          which resolved important points of law were
          recorded and transcribed for appellate review. . . . . . . . . . . 139

     d.   Counsel failed to object to the completely
          irrelevant testimony of Christopher Brock, M.D.,
          whose account of his treatment of Yemane
          Kidane constituted impermissible victim-impact
          evidence and which had a bolstering effect. . . . . . . . . . . . . . 141

vi

e.      Counsel's guilt-phase closing argument
        was meandering and incoherent. . . . . . . . . . . . . . . . . . . . . 144

f.      Counsel's failure to invoke relevant legal
        doctrines often prompted the trial judge
        to step in and "perform counsel's job for
        him" in order to avoid unfairness. . . . . . . . . . . . . . . . . . . 147

g.      Counsel's errors were prejudicial. . . . . . . . . . . . . . . . . . . 151

h.      The trial court's findings of fact and
        conclusions of law on this point are
        erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

7.   Ineffective Performance – Punishment Phase . . . . . . . . . . . . . . . . . 154

a.      Counsel failed to bring relevant
        impeachment evidence concerning
        convicted murderer and thief Ella Miller
        to the attention of the jury, and failed to
        adequately investigate the offense . . . . . . . . . . . . . . . . . . . 155

b.      Counsel failed to inform the jury that the
        juvenile reform institution from which the
        Petitioner allegedly "escaped" was
        notorious for abusive conditions at the
        time the Petitioner was incarcerated there . . . . . . . . . . . . . 159

c.      Trial counsel failed to take adequate steps
        to prevent the trial of the petitioner in a
        hostile and intimidating courtroom
        atmosphere . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

d.      The deficient performance of counsel at
        the punishment phase was prejudicial. . . . . . . . . . . . . . . . 164

e.      The state trial court's findings of fact and
        conclusions of law are incorrect . . . . . . . . . . . . . . . . . . . . 168

8.   Trial counsel, despite receiving information immediately
     after trial which would have alerted a reasonably
     competent attorney to the presence of prejudicial juror
     misconduct which would have guaranteed his client a

vii

new trial, took absolutely no action to protect his
client's rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

9.    Ineffective Performance – Cumulative
Deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

B.    The State deprived Mr. Washington of due process of law when it withheld
material evidence in violation of *Brady v. Maryland* and knowingly allowed
false testimony to be presented to the jury in violation of *Giglio v. United
States* and *Napue v. Illinois.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

1.    The State withheld from the defense criminal
convictions of its witnesses, in violation of *Brady
v. Maryland.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

2.    The State knowingly allowed false testimony to
be presented to the jury in violation of *Giglio v.
United States* and *Napue v. Illinois.* . . . . . . . . . . . . . . . . . . . . . . 181

3.    The State presented false testimony to the jury
concerning the caliber of the bullets that killed
Mr. Tareh and wounded Mr. Kidane. . . . . . . . . . . . . . . . . . . . . . 183

4.    The State argued to the jury that the Petitioner
had changed clothes without any good-faith
basis in the evidence to do so. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

5.    The state court's findings of fact and conclusions
of law on this claim are incorrect. . . . . . . . . . . . . . . . . . . . . . . . . 190

C.    The Petitioner is now incompetent to be executed. . . . . . . . . . . . . . . . . . 190

D.    The Petitioner's extended stay on death row has been solely
attributable to State action, and constitutes cruel and unusual
punishment in violation of the Eighth Amendment to the
United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

1.    The British Privy Council's Landmark Decision in *Pratt
& Morgan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

2.    Eighth Amendment Authority Supporting Mr.
Washington's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

E.     The Petitioner's right to due process of law was violated by the irrelevant and inflammatory in-court identification of the deceased by the deceased's tearful widow.  . . . . . . . . . . . . . . . . . . . . . . . . . 204

       1.    The evidence.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204

       2.    This evidence was introduced by the State in knowing violation of its duty to provide the defendant with a fair trial and had a significant impact on the jury.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

F.     Mr. Washington's Due Process rights were violated by the atmosphere of pervasive intimidation that marked his trial  . . . . . . . . . . 213

G.     Mr. Washington is actually innocent and therefore his execution would be a "fundamental miscarriage of justice".  . . . . . . . . . . . . . . . . . . 216

H.     The cumulative impact of the flaws in Mr. Washington's trial robbed Mr. Washington's state trial of fundamental due process . . . . . . 217

PRAYER FOR RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIE TERION WASHINGTON,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **C.A. No. H-99-0140** |
| | § | |
| | § | |
| | § | |
| **GARY JOHNSON, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

TO THE HONORABLE DAVID HITTNER, UNITED STATES DISTRICT JUDGE:

Petitioner Willie Terion Washington is currently confined in state custody on Death Row in Ellis Unit One of the Texas Department of Criminal Justice in Huntsville, Texas, in the custody of the Respondent, Gary Johnson.   Mr. Washington files this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 to demonstrate that his conviction and death sentence were obtained in violation of the Constitution of the United States, and that he is entitled to a writ of habeas corpus ordering his immediate release from confinement.

## I.   INTRODUCTION.

### A.   Prior Proceedings

Mr. Washington was convicted of capital murder on November 17, 1986, and sentenced to

1

death on November 21, 1986, in the 180th District Court of Harris County, Texas in Cause No. 449603-A. *See* Tr. at 174, 180-81.[1]  Mr. Washington was represented at trial by retained counsel Reo Harris, Jr. On direct appeal, Mr. Washington was represented by appointed counsel William K. Goode.  Direct appeal was denied by the Court of Criminal Appeals on March 1, 1989. *Washington v. State*, 771 S.W.2d 537 (Tex. Cr. App. 1989).  Certiorari was denied in the United States Supreme Court on June 26, 1989. *Washington v. Texas*, 492 U.S. 912 (1989).  Volunteer counsel Gary Neale Reger, of Orgain, Bell & Tucker, L.L.P., filed a Petition for Writ of Habeas Corpus on Mr. Washington's behalf in the 180th District Court of Harris County, Texas on April 12, 1990.  State habeas counsel filed a First Supplemental Petition for Writ of Habeas Corpus on March 28, 1995.  At a hearing held on Sept. 7, 1997, the Hon. Sam Robertson, visiting Judge, adopted the District Attorney's Proposed Findings of Fact and Conclusions of Law denying relief by writing a brief note on the reverse of the last page of the document. *See infra* Part II.B.3.  A Second Supplemental Petition for Writ of Habeas Corpus was filed on October 2, 1997.  The Texas Court of Criminal Appeals adopted most of the district court's findings of fact and conclusions of law and denied relief on January 14th, 1998. *See* Exhibit 1 (documents authorizing detention).[2]

---

[1] Throughout this pleading, the transcript from Mr. Washington's capital murder trial will be cited Tr. at (Page Number).  The statement of facts will be cited S.F. (Statement of Facts) (Volume Number):(Page Number).  References to documents in the state habeas corpus record will be noted by the title of the document and the date it was filed.  All references to state habeas records refer to the case of Ex Parte *Washington*, Trial Court No. 449,603-A (180th Dist. Ct. of Harris County); Court of Criminal Appeals Writ No. 69,737.

[2] These documents are, in order: (1) the trial court's judgment of conviction and sentence of death in *State v. Washington*, No. 449,603 (180th Dist. Ct. of Harris County, Tex., Nov. 21, 1986); (2) the Court of Criminal Appeals' opinion affirming Mr. Washington's conviction and death sentence, which can be found at *Washington v. State*, 771 S.W.2d 537, 540, 545 (Tex. Crim. App. 1989); and (3) the Court of Criminal Appeals' Order denying habeas corpus relief in *Ex Parte Washington*, No. 69,737 (Tex. Crim. App. Jan. 14, 1998).

On March 3, 1998, Mr. Washington filed a Motion for Appointment of Counsel and a Motion to Proceed *In Forma Pauperis* in this Court.  The undersigned counsel filed a Statement of Willingness to Accept Appointment on the same date.  The Motion for Leave to Proceed *In Forma Pauperis* was granted on March 17, 1998, and the undersigned counsel were appointed to represent Mr. Washington in federal proceedings pursuant to 21 U.S.C. § 848(q)(4)(B) on March 19, 1998.  On March 15, 1998, Mr. Washington filed a Motion for Leave to File Petition for Writ of Habeas Corpus Within Statutory One-Year Filing Deadline.  On August 7, 1998 Mr. Washington filed a Motion for Leave to Proceed *Ex Parte* on Requests for Investigative and Expert Assistance.  Both were granted on August 24, 1998.

**B.   Jurisdiction.**

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2241(d) because Mr. Washington was convicted by a Harris County, Texas jury.

**C.   Exhaustion of Remedies.**

Most of the claims presented below were presented to the state courts.  To the extent that relevant claims or facts were not presented to the state courts, exhaustion is excused owing to the inadequacy of the state postconviction forum provided to the Petitioner.  *See infra* Part II.

**D.   Statement of the Case.**

Shortly after 8:30 p.m. on December 19, 1985, two persons, Yemane Kidane and Kifelmariam Tareh, were shot at Mike's Food Market, a convenience store located at 4634 Market Street in Houston, Texas.  Mr. Kidane was a part-owner of the store, and Mr. Tareh was one of Mr. Kidane's employees.  S.F. XXVII:362, 366.  Police responded to the call and found Mr. Kidane walking along the street, bleeding profusely from a bullet wound to the jaw and neck.

3

S.F. XXV:70.  Moments earlier, Mr. Kidane, who was carrying a concealed blue-steel .25 automatic pistol the night of the crime, had apparently fired several shots from the pistol into the air.  S.F. XXVII:415.  At the store, police found Mr. Tareh unconscious on his back near the rear of the store.  S.F. XXV:46.  He had been shot once in the right temple, and died from his injuries.  S.F. XXVI:267. According to police testimony, Mr. Kidane told the officers that he and Mr. Tareh had been shot by a man whom he believed lived with a girl in an apartment across the street from Mike's.  S.F. XXVI:137.   The police visited that apartment, where they found a woman named Mary Drakes.  Ms. Drakes informed them that she had dated a man named Willie Washington in the past, and still received phone calls from him, but was no longer involved with him.  S.F. XXVII:342.  Mr. Washington was a frequent visitor to Mike's Food Market, and in fact had been in the store early on the evening of the 19th.  S.F. XXVII:368; S.F. XXVI:207.  While the police were at Ms. Drakes's apartment, she received a phone call from Mr. Washington.  S.F. XXVII:345.   She handed the telephone to Officer W. B. Smith, who spoke to Mr. Washington.  S.F. XXVI:140.  Officer Smith informed Mr. Washington that he was a suspect in a robbery-shooting, and that the police needed to interview him.  *Id.*  Officer Smith also claims that Mr. Washington gave him a false address.  *Id.* at 140.  Mr. Washington told the police it would take him about twenty minutes to reach the scene.  *Id.* at 142.

Mr. Washington arrived at the crime scene approximately fifteen to twenty minutes later, asking to speak to Officer Smith.  *Id.* at 144.  He was immediately handcuffed.  *Id.* at 183.  Officers put paper bags over Mr. Washington's hands, apparently to preserve evidence for a "trace metal" forensics test designed to determine whether a person has recently handled a metal object.  *Id.* at 188.  Mr. Washington removed the bags from his hands.  *Id.*  The trace metal

4

detection tests proved negative. S.F. XXVIII:522. There was no blood or gunpowder residue on any of the clothing Mr. Washington was wearing when arrested, and no gunpowder residue was present in the bags that had been placed on Mr. Washington's hands. *Id.* No shell casings were found in the store, and the murder weapon allegedly wielded by Mr. Washington was never recovered. S.F. XXVIII:484. Mr. Kidane testified that he gave $70-100 to the robber. S.F. XXVII:401. When Mr. Washington was arrested, he was carrying a twenty-dollar bill, two ten dollar bills, and thirty-seven one-dollar bills. S.F. Vol. XXVI:240. Mr. Kidane testified that this could have been consistent with the amount of money the robber took from him. S.F. XXVII:401. Franklin Hart, who owned a store near Mike's Food Market, testified that, early on December 19th, he had cashed a worker's compensation check for $150 for Mr. Washington in the early evening of December 19th, 1985, and had given the money to Mr. Washington. S.F. XXIX:599-600. No fingerprints were found on the money Mr. Washington had in his pocket when he was arrested, and his fingerprints were not found on any money, or on any surfaces, in Mike's Food Market. S.F. XXVIII:448. A Houston Police Department firearms examiner testified that two bullets were recovered from the victims. S.F. XXVIII:541. Both missiles were heavily mutilated, and the officer could not determine with precision what caliber gun they were fired from, or whether they were fired from the same gun. *Id.* at 544. The examiner surmised that the bullets were likely .357 or .38 caliber. *Id.*

Mr. Kidane was hospitalized for approximately two weeks for treatment of his jaw injuries. S.F. XXVII:419. He was shown a six-image photo lineup containing an image of Mr. Washington. S.F. XXVIII:467. He tentatively identified Mr. Washington from the photo lineup, but could not make a positive ID. *Id.*; *see also* Applicant's Submission of Additional Affidavits in

Support of Petition for Writ of Habeas Corpus (March 27, 1995), Exhibit R (Transcript of Conversation Between Jim Kinser and Sergeant [sic] Osterberg) at 1 (Mr. Kidane gave a "strong tentative" identification of Mr. Washington but "couldn't be sure."). James Kinser, who represented Mr. Washington for the first few weeks after his arrest for capital murder, recounts that the police department contacted him concerning a photo lineup in front of Mr. Kidane. Exhibit C to Petition for Writ of Habeas Corpus ("State Habeas Petition") (Affidavit of James Kinser), at 2. He recalls that when he "demanded to be present at the lineup, the police decided not to conduct the lineup." Nevertheless, on January 2, 1986, the police conducted a live lineup with Mr. Kidane in which Mr. Washington appeared, represented by attorney Ray Montgomery. S.F. XXVIII:498. Mr. Kidane identified Mr. Washington during this lineup. *Id.*  At trial, Mr. Kidane testified that Mr. Washington was the man who had shot him, and stated that he had always been "100% sure" of this fact. S.F. XXVII:422.

## II.   PRELIMINARY STATEMENT CONCERNING STANDARD OF REVIEW

### A.   The Fifth Circuit's interpretation of Section 2254(d)(1) is unconstitutional.

Until Congress adopted the AEDPA, it was black letter law that federal habeas courts were required to resolve the petitioner's legal claims de novo in the strictest sense of the term.  Under the AEDPA's amended Section 2254(d)(1), however, a federal court may only grant relief if its review of the state decision on the basis of clearly established Supreme Court law reveals one of two defects: (1) the state "decision ... was *contrary to* ... clearly established [Supreme Court] law"; "or" (2) the decision "involved an *unreasonable application[] of*" that law. 28 U.S.C. § 2254(d)(1) (emphasis added).  Mr. Washington respectfully submits that the Fifth Circuit's

6

interpretation of this statutory language, as stated in *Drinkard v. Johnson*, 97 F.3d 751 (5th Cir.

1996), *cert. denied*, 117 S.Ct. 1114 (1997), is unconstitutional.[3]

The Fifth Circuit was one of the first federal circuits to interpret the amended Section

2254(d)(1).   The court perceived a dichotomy between "pure" questions of law and "mixed"

questions of law and fact. *Drinkard*, 97 F.3d at 767-68.  The Fifth Circuit first observed that the

questions judges decide in adjudicating cases can be divided into three categories – fact, law and

mixed.  *Id.* at 767.  Noting that subsection (2) of § 2254(d) applies to questions of fact, the court

then asserted – entirely by way of *non sequitur* – that somewhere embedded within subsection (1)

of § 2254(d) must be "standards of review for questions of law and mixed questions of law and

fact."  *Id.*  Proceeding from that premise, the court set forth the pure/mixed question dichotomy

as follows:

> The second clause of subsection (d)(1), by its own language, refers to mixed questions
> of law and fact because it speaks of an "unreasonable application of [] clearly established
> law."  Thus, when reviewing a mixed question of law and fact, a federal court may grant
> habeas relief only if it determines that the state court decision rested on "an unreasonable
> application of [] clearly established Federal law, as determined by the Supreme Court,"
> to the facts of the case.  We read the first clause, on the other hand, as referring to
> questions of law.  When reviewing a purely legal question, a federal court may grant
> habeas relief only if it determines that a state court's decision rested on a legal
> determination that was "contrary to ... clearly established Federal law, as determined by
> the Supreme Court."

*Id.* at 767-68.  The *Drinkard* court held that the "contrary to law" clause could only come into

play in the rare event that the state court recited the wrong legal standard.  *Id.* at 768.  It then

---

[3] Petitioner of course recognizes that this Court is bound to apply the holdings of the Fifth Circuit.
However, there is currently a circuit split on the question of the proper interpretation of Section 2254(d)(1).
Therefore, to avoid any potential waiver, Mr. Washington raises this challenge to the Fifth Circuit's interpretation
of the statute.  "Postconviction counsel should seek to present to the appropriate court or courts all arguably
meritorious issues, including challenges to overly restrictive rules governing postconviction proceedings."
AMERICAN BAR ASS'N, STANDING COMMITTEE ON LEGAL AID AND INDIGENT DEFENDANTS, GUIDELINES FOR THE
APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 98 (Feb. 7, 1989).

adopted a highly deferential gloss on the "unreasonable application" standard:

> [W]e hold that an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect.  In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.

*Id.* at 769.  The Seventh and Eleventh Circuits adopted an approach similar to that of the Fifth.

*See Lindh v. Murphy*, 96 F.3d 856, 868-71 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521

U.S. 320 (1997); *Neelley v. Nagle*, 138 F.3d 917 (11th Cir. 1998), *cert. denied*, 67 U.S.L.W. 3435

(U.S. Jan. 11, 1999).[4]

However, as the First Circuit has noted, "[t]ime often lends perspective." *O'Brien v.*

*Dubois*, 145 F.3d 16, 23 (1st Cir. 1998).   A circuit split has now developed, with more recent

court opinions moving away from the dichotomy expressed in *Drinkard*.  Instead, the courts are

moving toward a distinction between claims governed by clearly established Supreme Court law,

which are analyzed under the "contrary to" prong of Section 2254(d)(1), and claims as to which

the state court had to fashion a rule from analogous or relevant precedent, which are analyzed

under the statute's "unreasonable application" prong.[5]

In *O'Brien*, the First Circuit recognized that a standard of deference to state court decisions,

---

[4] In fact, however, while *Neelley* purports to adopt the pure/mixed question dichotomy articulated in *Drinkard*, *Neelley* rejects that dichotomy by expressly identifying situations in which federal courts must conduct plenary "contrary to law" review of what concededly are mixed questions.  *See id.* at 923 (a state court decision is "contrary to" clearly established Supreme Court law, and habeas relief is required, if the "state court faces a set of facts that is essentially the same as those the Supreme Court has faced earlier, but given those facts the state court reaches a different legal conclusion than that of the Supreme Court").

[5] *O'Brien* specifically criticized the Firth Circuit for adopting a bifurcated standard distinguishing between "questions of law" and "mixed questions of law and fact," noting that a similar formulation had been proposed by the House of Representatives but ultimately rejected.  *O'Brien*, 145 F.3d at 22.  "It would be unseemly – and wrong – for a court to scavenge discarded language from the legislative scrap heap and graft such language onto the version of the bill that Congress ultimately enacted."  *Id.* (citing *Lonchar v. Thomas*, 517 U.S. 314 (1996)).

8

such as that adopted by the Fifth Circuit in *Drinkard*, "portends a serious constitutional conflict." *Id.* at 21.  The Court interpreted the review procedure required by Section 2254(d)(1) of federal habeas courts as follows:

> First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

*Id.* at 24.  In other words, the state court was required to fashion a standard as best it could from the rules the Supreme Court had previously developed for analogous or somewhat related claims. Section 2254(d)(1)'s second clause then tells federal habeas courts that when there was no governing Supreme Court rule to which the state court decision could be "contrary," they should ask whether the rule the state court fashioned was an "unreasonable application" of such analogous or relevant Supreme Court precedent as was available.[6]

The First Circuit's opinion in *O'Brien* does not derogate the proper power of the federal habeas courts.  By contrast, the *Drinkard* Court's interpretation of Section 2254(d)(1) brings the statute into square conflict with Article III and the Supremacy Clause of the United States Constitution.  To see how *Drinkard* eviscerates "[t]he judicial power" and the federal courts'

---

[6] Similarly, in *Green v. French*, 143 F.3d 865, 870 (4th Cir. 1998), *cert. denied*, 67 U.S.L.W. 3436 (U.S. Jan. 11, 1999), the Fourth Circuit rejected a pure/mixed dichotomy, concluding that the phrases "contrary to" and "unreasonable application" embody no such distinction "in common legal parlance and practice."  Rather, "a decision [may be] 'contrary to' precedent ... either [when it is] a decision of *pure law* or [when it involves] the *application of law to facts* ...." *Id.* (emphases added). *See also, e.g., Nevers v. Killinger*, 990 F. Supp. 844, 853 (E.D. Mich. 1997); *Zuern v. Tate*, 938 F. Supp. 468, 475 (S.D. Ohio 1996); *Buehl v. Vaughn*, 1996 WL 752959, at *7 (E.D. Pa. Dec. 31, 1996), *aff'd*, 1999 WL 20823 (3d Cir. Jan. 20, 1999); *United States ex rel. Wilhoite v. Washington*, 1996 WL 650444 (N.D. Ill. Nov. 6, 1996); *Jones v. Vacco*, 944 F. Supp. 229, 233-35 (S.D.N.Y. 1996).

capacity to keep national law supreme over contrary state law, consider a hypothetical. Suppose that this Court – or the Supreme Court itself – is presented with that claim on habeas and ascertains that the facts of the case are different from any the Supreme Court has previously encountered. As amended by AEDPA, the habeas statute provides that the court (1) "shall entertain an application for a writ of habeas corpus ... on the ground that [the state prisoner] is in custody in violation of the Constitution," (2) "shall forthwith award the writ" if unconstitutional custody is found, and (3) in deciding that question shall review the state court "decision" that denied the claim to determine whether the decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. §§ 2254(a), 2243, 2254(d)(1); *see also id.* § 2241(c)(3). Suppose, finally, that the reviewing federal court considers the case close but, upon independently applying the clearly established Supreme Court rule to the facts, concludes both that the state prisoner *is* "in custody in violation" of the Constitution, and that the state court decision to the contrary is constitutionally erroneous. In this situation, the *Drinkard* interpretation of § 2254(d)(1) would require the Article III court that reached this conclusion to deny relief, and to leave the unconstitutional state court decision and the custody imposed under it in force and effect. On its face, it is hard to square such congressionally mandated judicial impotence with a meaningful notion of either "the judicial Power" or a government of "supreme" national law. The First Circuit's interpretation in *O'Brien*, however, would recognize the Article III court's power to grant relief.

For the foregoing reasons, Mr. Washington maintains that the Fifth Circuit's holding in *Drinkard* is unconstitutional, and urges this Court to interpret the language of Section 2254(d) as articulated in *O'Brien*.

10

**B.   The state habeas court's fact findings and legal conclusions are not entitled to a presumption of correctness.**

Regardless of which interpretation of Section 2254(d) this Court applies, however, the fact findings and legal conclusions reached by the state habeas court are not entitled to deference from this Court. Mr. Washington was consistently and repeatedly denied the resources and discovery required for an adequate development of the facts. Further, the state trial court judges who presided over Mr. Washington's state postconviction action were not neutral arbiters of his claims. The judge who initially presided over Mr. Washington's postconviction action engaged in repeated *ex parte* discussion of the substance of Mr. Washington's postconviction claims, and, upon information and belief, completely abandoned a position of neutrality by assisting the state in procuring factual development favorable to the State's position. The judge who presided over the final phase of Mr. Washington's state postconviction proceedings denied Mr. Washington due process by permitting the State outrageously long, unexplained delays in its filings – a luxury which was never afforded the Petitioner – and by abdicating his impartial adjudicatory responsibility by adopting the State's proposed findings of fact and conclusions of law verbatim. At every turn, biased decisionmakers conferred with the State in secret and denied Mr. Washington access to the basic tools he needed to support his claims.

**1.   The state habeas judge who presided over the initial phase of Petitioner's state habeas engaged in repeated *ex parte* contact with the State concerning the substance of Mr. Washington's postconviction claims.**

Judge Pat Lykos presided over Mr. Washington's trial and over the initial phase of his state habeas proceedings. During the factfinding proceedings in state habeas, Judge Lykos assisted the State in procuring from Mr. Washington's trial counsel an affidavit that explained and justified his

11

representation of Mr. Washington at trial. This action by Judge Lykos not only interfered with

the proper development of a factual record in state habeas but also, since Mr. Washington's

habeas counsel was completely unaware of the contact between the Judge and the State,

amounted to secret *ex parte* proceedings. The Judge's *ex parte* actions were in violation of due

process, and denied Mr. Washington a full and fair hearing in state habeas court. Under *Townsend*

*v. Sain*,[7] therefore, this Court must set aside the state court's findings of fact and conclusions of

law and conduct *de novo* review.

After Mr. Washington filed a petition for habeas corpus in state court asserting that his trial

counsel had rendered ineffective assistance, Judge Lykos ordered Mr. Harris to submit an affidavit

"summarizing the actions taken to represent Applicant in cause number 449603 and responding to

the allegations of ineffective assistance of counsel contained in the application for writ of habeas

corpus." Order (July 24, 1990). Mr. Harris filed his affidavit on September 25, 1990. The

affidavit was littered with errors in grammar and spelling. Even more troubling, the affidavit

contained information about Mr. Harris's representation that raised questions about the integrity

of Mr. Washington's conviction for capital murder. Among other things, Mr. Harris stated in his

affidavit that he "spent approximately [sic] *seventeen* hours in preparing for the trial of Mr.

Washington's case." Exhibit 2 (Affidavit of Reo Harris, Jr., Sept. 25, 1990), at ¶ 13 (emphasis

added) (1990 Affidavit). Mr. Harris also divulged that he had agreed to represent Mr.

Washington on capital murder charges with the understanding that he would be compensated by

the proceeds from a pending workers' compensation case earlier filed on Mr. Washington's

---

[7] *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

behalf. *Id.* at ¶ 2; *see infra* Part III.A.3.  Moreover, even though Mr. Harris stated that his client had confessed to him, he revealed that he was willing to allow Mr. Washington to testify at his trial that the shooting was the result of a "drug deal gone bad," *id.* at ¶16 – therefore admitting that, if Mr. Washington had indeed confessed to him, he was willing to allow his client to take the stand and commit perjury.

The Court and the attorney for the State conferred *ex parte* concerning the affidavit.  Exhibit 3 (Declaration of Gary Neale Reger) at ¶13 (Reger Dec.).  The Court issued an order directing Mr. Harris to file another affidavit.  On April 3, 1991, in response to this order, Mr. Harris filed a second affidavit which was markedly different from the first.  Not only was the second affidavit nearly free of grammatical errors, but its content differed substantially from the first affidavit.  Rather than stating that he had spent only seventeen hours preparing for Mr. Washington's trial, the second affidavit stated that he had spent "approximately seventeen hours walking the neighborhood surrounding the crime scene in an attempt to contact potential witnesses," and that he had spent a "great deal of time" preparing Mr. Washington's case.  Exhibit 4 (Affidavit of Reo Harris, Jr., April 3, 1991), at ¶¶ 6-7 (1991 Affidavit).  The second affidavit also eliminated any mention of Mr. Washington's alleged confession to Mr. Harris, therefore removing the suggestion that Mr. Harris had been willing to allow his client to provide perjured testimony, and deleted any reference to the unorthodox fee agreement that Mr. Harris had with his client.  Further inconsistencies are set out more fully in Part III.A.2, *infra.*  State habeas counsel filed a motion to strike the second affidavit, pointing out that it was radically different from the first one and had obviously not been prepared by Mr. Harris alone.  The court denied state habeas counsel's motion to strike the second affidavit.  *See* Petitioner's Motion to Strike Second Affidavit of Reo Harris

13

(May 7, 1991); Transcript of Post-Conviction Writ Hearing, September 9, 1997, at 10-11.

State habeas counsel has confirmed that the attorney for the State in state habeas corpus proceedings revealed to him that she had had repeated *ex parte* conversations about the substantive issues of Mr. Washington's state postconviction appeal, including the two affidavits submitted by trial counsel. Reger Dec. at ¶¶13, 29. The District Attorney also confirmed that her office had assisted Mr. Harris in the creation of the second affidavit. *Id.* at ¶16 & Tab G. The District Attorney later approached state habeas counsel about the possibility of "removing" trial counsel's 1990 Affidavit from the record, but state habeas counsel declined. *Id.* at ¶20. Upon the undersigned counsel's own personal information and belief, counsel alleges the following: (1) that Harris County Assistant District Attorney Shirley Cornelius had *ex parte* conversations with Judge Pat Lykos concerning Mr. Harris's 1990 affidavit; (2) that the substance of that conversation was the fact that Mr. Harris's first affidavit contained facts that were not helpful to the State's position; (3) that specifically, the unhelpful facts were Mr. Harris's admission that he spent only 17 hours preparing for the case and that he was willing to permit Mr. Washington to testify "falsely" (if the confession allegation is believed)[8]; (4) that Judge Lykos issued the order for the second affidavit to be created by Mr. Harris at least in part in order to help the state neutralize the unhelpful portions of the initial affidavit. If given access to the fact development procedures which will be requested in a later Motion for Evidentiary Hearing, the Petitioner will prove these allegations.

By engaging in *ex parte* contact with the Assistant District Attorney, and by actively

---

[8] *See* State's Supplemental Answer at 9 n.3 (assuming truth of Harris's assertion that Mr. Washington confessed to him, and noting State's "dismay" at trial counsel's willingness to allow defendant to testify "with knowledge of the falseness of the Applicant's story").

14

directing that a revised affidavit be filed with certain substantive changes, upon the undersigned counsel's own information and belief, Judge Lykos used her authority to materially assist a party engaged in pending litigation in her court.

The judge's assistance of the prosecution through these secret proceedings establishes that she lacked the neutrality required of an impartial decisionmaker and clearly impeded the proper factfinding process of state habeas corpus.  The lack of neutrality is even clearer considering that she actively assisted the prosecution in framing the facts to respond to the Applicant's claims, yet (1) denied Mr. Washington any compensation whatsoever for his lawyer; (2) denied him any compensation for reasonable expert and investigative expenses; (3) denied him access to any but a tiny fraction of requested, relevant court-ordered discovery (including access to the crucial District Attorney's file on this case – much of which had *already* been disclosed to trial defense counsel – which contained copious relevant information); (4) inflicted upon Mr. Washington a fundamentally unfair state habeas corpus proceeding in which the trial court's signed the prosecutor's Findings of Fact and Conclusions of Law verbatim during a grossly unfair hearing-by-ambush.  The actions of Judge Lykos, especially when viewed in conjunction with the actions of Judge Robertson, violated due process and denied Mr. Washington a full and fair hearing in state habeas court. Under *Townsend*, therefore, the state habeas corpus court's Court must set aside the state court's findings of fact and conclusions of law and conduct *de novo* review.

**2.    The state habeas court denied the petitioner access to relevant factual development, including discovery, investigative and expert assistance, and an evidentiary hearing.**

Almost as soon as state habeas counsel began work on Mr. Washington's case, he realized that there were serious, unresolved questions from Mr. Washington's capital murder trial.  He

15

realized that there had been little or no investigation of the case at the trial level. *See, e.g.*, First Pre-Habeas Petition Motion for Discovery and Appointment of Expert Assistance at 2 (Sept. 19, 1989); Affidavit of Gary Neale Reger at 3 (Oct. 2, 1989); October 9, 1997 Hearing at 9-11. He also realized that the assistance of trained investigators and experts would be necessary to adequately represent Mr. Washington. *Id.* Soon after being appointed as counsel, state habeas counsel filed a motion for discovery and appointment of expert assistance, which requested the appointment of an investigator, forensic experts, and an expert witness in criminal defense. *See* First Pre-Habeas Petition Motion for Discovery and Appointment of Expert Assistant (September 19, 1989). The motion also requested appointment of a competent criminal defense attorney. *Id.*[9] State habeas counsel's motion pointed out to the court that pre-petition discovery was crucial to his preparation of a habeas corpus petition, noting that trial counsel had never formally associated co-counsel, that he had not retained investigators or expert witnesses, and that his file from Mr. Washington's case was only 56 pages long and contained no evidence of pre-trial preparation. *Id.* Nevertheless, state habeas counsel's requests for assistance were denied by the state habeas court.[10]   During an Oct. 6, 1989 hearing on state habeas counsel's requests for appointment and

---

[9] State habeas counsel informed the state habeas court of his lack of experience in criminal matters. Affidavit of Gary Neal Reger (October 2, 1989), at ¶ 2 ("I practice general commercial law, with emphasis on banking and bankruptcy. Although I have been an attorney of record in civil litigation, I have never personally tried a jury trial. My primary litigation experience has been in bankruptcy court. I have had no significant criminal experience and only had one criminal course in law school, which was a course on pre-trial criminal procedure.")

[10] By way of explanation of the trial court's refusal to appoint experts and investigators to assist counsel, the state habeas findings on page 29 recite:

> The Texas Resource Center [was] a federally funded organization created to represent death row inmates and recruit and assist counsel to represent death row inmates pro bono. The Court finds that the applicant fails to demonstrate that the resources he desired were not available to him through the Texas Resource Center.

16

for expert and investigative assistance, the court denied all of his requests except for court-ordered discovery of the autopsy records of the surviving victim.  The court attacked counsel's competency, suggesting that he had been "persuaded by what [he saw] on television" and that his requests "border[ed] on fantasy."  The court revealed that it already had firm opinions about the case, and apparently about Mr. Washington's guilt.  *See id.* at 8-9 (dismissing applicant's allegations concerning the substance of his trial counsel's conversations with him because the judge did not personally witness in open court such conversations between defendant and his counsel); *id.* at 11-12, 15 (stressing purported reliability of eyewitness identification and dismissing applicant's requests for expert assistance to review forensic evidence because the case was about "a man who was identified by an eyeball witness, who was acquainted with him, [and] who fled the scene and returned sometime later" and therefore forensic evidence would have been irrelevant).

As later developments illustrate, there was in fact reason to doubt the accuracy and reliability of the state's forensic evidence.  In fact, the state failed to perform adequate tests in order to rule out Mr. Kidane as a suspect, failed to collect blood evidence on the scene, and offered misleading testimony by its own experts.  *See* Exhibit J to State Habeas Petition (Affidavit of Thomas Bevans); Exhibit H to State Habeas Petition (Affidavit of Larry Fletcher).  Further, expert analysis

---

State habeas counsel informed the court during the Oct. 6, 1989 hearing on his pre-habeas motions for discovery and expert assistance that the Resource Center had offered to "review pleadings that I file[] and offer general guidance." *Id.* at 7.  Assistant District Attorney Caprice Cosper then said: "I am not certain what [the Resource Center]'s funds are utilized for.  I do know that they have expended some of their funds in hiring expert witnesses in particular cases[.]" Because the state court's factfindings were created by the District Attorney, this brief snippet of in-court conversation from an Assistant District Attorney was transmuted into the Court's official "finding" on the topic of whether state habeas counsel could have obtained expert and investigative resources from the Resource Center.  As state habeas counsel's affidavit demonstrates, the Resource Center in fact did not provide such assistance to him. Reger Dec. at ¶7.

would have established a key point – that the bullet wounds on both victims were *inconsistent* with the State's adamant assertion that they were caused by a .38 or .357 revolver. *See* Exhibit 5 (Affidavit of Lloyd White, M.D., Ph.D). Further, an investigator could have established that key trial witnesses had relevant information helpful to Mr. Washington, and that trial counsel had never thoroughly interviewed them (or, in some cases, even contacted them), despite the obvious importance of their testimony. *See, e.g.*, Exhibit 6 (Affidavit of Mary Drakes); Exhibit 7 (Affidavit of Alfred Brooks).

The state habeas trial judge denied state habeas counsel access to necessary resources because she claimed state habeas counsel was trying to "retry" the case. *See, e.g.*, Oct. 6, 1989 Hearing at 15, 20. However, as state habeas counsel's filings make clear, this was not the point of his requests. Rather, he was attempting to develop a claim of ineffective assistance of counsel by demonstrating that trial counsel, had he retained and investigator and expert witnesses to help him prepare his case, could have mounted a much more effective challenge to the State's case. *See, e.g.*, First Pre-Habeas Petition Motion for Discovery and Expert Assistance at 3-4 (filed Sept. 19, 1989) (alleging that trial counsel tried case for total possible fee of $5000, was not afforded the assistance of investigators and expert witnesses, that trial counsel's file was only 56 pages long and reflected no pretrial investigation whatsoever). State habeas counsel's requests were obviously geared to securing the resources necessary to demonstrate the required prejudice stemming from counsel's errors.

State habeas counsel also requested numerous depositions and document discovery, but was allowed access to only certain medical records on the victims. Oct. 6, 1989 Hearing at 25. He continued to ask the court for necessary assistance and factual development. On December 26,

18

1990, he filed a post-habeas motion for appointment of counsel and expert assistance, as well as a renewed motion for discovery and for an evidentiary hearing. *See* Petitioner's First Post-Habeas Motion for Appointment of Counsel and Expert Assistance, filed December 26, 1990; Petitioner's First Post Habeas Motion for Discovery, filed December 26, 1990; Petitioner's First Post Habeas Motion for Habeas Corpus Hearing, filed December 26, 1990. He would later file a First Supplement to Discovery Motion (May 7, 1991), a Reurged Motion for Evidentiary Hearing and Discovery (March 1, 1995), a Post Findings Motion to Appoint Habeas Counsel (September 30, 1997), and a Motion for Rehearing on His Motions for Evidentiary Hearing and Pleadings Further Supplementing Petition (October 6, 1997). Each of these pleadings re-urged counsel's requests and pointed to what contested factual issues could be resolved by the requested factual developments. None of these requests was granted.

The assistance requested by state habeas counsel was crucial to proper development of Mr. Washington's in state habeas:

> I firmly believe that Willie Washington received an unfair trial and that had he received the full assistance of forensic and other experts at trial and during his habeas proceeding, the defects in his trial would have been proven even to a greater degree than they were in the Petition that was filed.

Reger Dec. at ¶28. Without this necessary assistance, state habeas counsel's representation of Mr. Washington was crippled.

An applicant in state habeas proceedings is entitled to an evidentiary hearing when there are "controverted, previously unresolved factual issues material to the legality of the applicant's confinement." TEX. CODE CRIM. PROC. ANN. art. 11.071 § 9(a) (Supp. 1996). The state habeas court denied Mr. Washington an evidentiary hearing despite his repeated filings requesting a

19

hearing and calling the court's attention to unresolved factual disputes. *See, e.g.*, Reurged

Motion for Evidentiary Hearing and Discovery (March 1, 1995); Motion for Rehearing on His

Motions for Evidentiary Hearing and Pleadings Further Supplementing Petition (October 6,

1997). The factual issues were crucial to Mr. Washington's claims for relief, and included, for

example, the following:

- Mr. Washington's state habeas petition presented and offered support for a credible theory that was available to the defense, referred to as the "drug deal gone bad" theory. State Habeas Petition, at 11-12; Exhibit I to State Habeas petition (Affidavit of Investigator Sam Roy); Exhibit J to State Habeas Petition (Affidavit of Investigator Thomas M Bevans). The State's Answer repeatedly contested that any defensive theory was available. *See, e.g.*, State's Supplemental Answer, at 20 (in this case, no defense was available to present to the jury); *id.* at 23 (arguing that Mr. Washington "falsely presumed that trial counsel had [the 'drug deal gone bad' defense] available to develop and present"); *id.* at 48 ("this 'dope deal gone bad' defense is a product of Applicant's fertile imagination and is totally unsupported by even a scintilla of evidence"). This factual dispute, highly material to Mr. Washington's ineffective assistance of counsel claim, was never properly resolved.

- Mr. Washington argued that the trial counsel's 1991 Affidavit was not credible, given the clear change in writing style and the substantive differences when compared with his 1990 Affidavit. *See, e.g.*, Petitioner's Motion to Strike Second Affidavit of Reo Harris (May 7, 1991). In the State's Answer to Mr. Washington's petition, it relied on this affidavit as credible and as a factual basis for its arguments. *See, e.g.*, State's Supplemental Answer (Dec. 11, 1990), at 5 (relying upon affidavit to defend trial counsel's failure to investigate). Trial counsel was not called to testify.

- Mr. Washington argued in his petition that there were many available witnesses who were neither investigated by the police nor interviewed by trial counsel, including persons from the neighborhood who were on the street at the time of the shooting. State Habeas Petition, at 25-26, 75; Exhibit G to State Habeas Petition (Affidavit of Franklin Hart); Exhibit I to State Habeas Petition (Affidavit of Investigator Sam Roy); Exhibit J to State Habeas Petition (Affidavit of Investigator Thomas M. Bevans). The State refuted these facts by presenting two of its own affidavits and arguing that there were no such available witnesses. State's Supplemental Answer, at 56. The state habeas court did not call these witnesses to testify so as to assess their credibility, but merely found in favor of the State without resolving these contradictions.

These and many other factual disputes were left unresolved by the state habeas court.

20

The state court's denial of the necessary representation, investigators, experts, and discovery, as well as its denial of Mr. Washington's repeated requests for an evidentiary hearing to resolve contested factual issues, was in violation of due process and deprived Mr. Washington of a full and fair hearing in state habeas court.

**3.   The judge who presided over the last phase of the Petitioner's state postconviction proceedings signed the state's proposed findings of fact and conclusions of law without reviewing them — unless his review was the result of their being provided to him *ex parte* by the attorney for the State.**

In late summer, 1997, a visiting Judge, Sam Robertson, was appointed to hear Mr. Washington's case.[11] Shortly thereafter, state habeas counsel was informed that Judge Robertson had scheduled a hearing for September 9, 1997.  The purpose of the hearing was not announced, and was unclear since several motions were pending at the time.  State habeas counsel, personally and through his secretary, asked the court several times what the hearing would be about, but were not told.  Reger Dec. at ¶¶22, 24.  State habeas counsel arrived for the hearing before the district attorney handling Mr. Washington's case, and as soon as the district attorney arrived, she handed Judge Robertson a document entitled "Respondent's Proposed Findings of Fact and Conclusions of Law and Order."  *Id.* at ¶23.  This document was 31 pages long.

Both the district attorney and state habeas counsel had been ordered to submit proposed findings of fact and conclusions of law on March 28, 1995.  *See* Order (Granting Motion for Extension) (Jan. 25, 1995).  State habeas counsel timely filed Proposed Findings of Fact and

---

[11]   While Mr. Washington's state habeas case was pending, Judge Lykos was succeeded on the bench by Judge Debbie Mantooth Stricklin.  Because Judge Stricklin had previously served as a Harris County Assistant District Attorney and had participated in the prosecution of a man who testified at the punishment phase of Mr. Washington's trial, Judge Stricklin recused herself from the case.  Reger Dec. at ¶¶19, 21.

Conclusions of Law on behalf of Mr. Washington on March 28, 1995. *See id.* The State did not

serve any findings or conclusions on counsel for Mr. Washington on the agreed due date, and had

not in the more than two years that had elapsed since.  Reger Dec. at ¶23.  Moreover, when the

district attorney handed her proposed findings and conclusions to Judge Robertson on September

9, 1997, the document had not, as of that time, been filed with the clerk or served on state habeas

counsel.  *Id.*

   Because of a delay in Mr. Washington's appearance at the courthouse, Judge Robertson, the

district attorney and state habeas counsel spent approximately two to four hours conversing about

topics unrelated to the case.  *Id.*  Although state habeas counsel asked the judge repeatedly to tell

him the purpose of the upcoming hearing, the judge refused, asserting that he had a policy of

never addressing substantive legal issues outside the record.  *Id.* at ¶23.  During these two and a

half hours, Judge Robertson did not "carefully read or study" the State's Proposed Findings of

Fact and Conclusions of Law.  *Id.*  After the hearing was underway, the judge never closely

examined the State's proposed findings.  *Id.* at ¶¶23, 25.

   The hearing then commenced.  Judge Robertson never mentioned the fact that one party to

the proceedings had flouted the court's order requiring findings of fact and conclusions of law to

be filed on March 28, 1995, and had, without explanation, disobeyed the court's order for almost

*two and one-half years*.  The judge complained about the delay in the case, but never

acknowledged the fact that the State was responsible for it.  Sept. 9, 1997 Hearing at 4.  He did

not ask the State to explain the delay.  In fact, all the court's hostile remarks were directed toward

state habeas counsel.[12]   Judge Robertson never discussed the substance of Mr. Washington's

claims, except to the extent that he attacked state habeas counsel for his incompetence and

dismissed Mr. Washington's claims as mere "games."

The only discussion of the parties' proposals was at the conclusion of the hearing, when

Judge Robertson stated that there was "no way" he could agree to Mr. Washington's proposed

findings and conclusions, and announced that he intended to sign the State's proposal.  Exhibit 8

(Transcript of Post-Conviction Writ Hearing, September 9, 1997), at 18-19.  Judge Robertson

gave no reasons for this ruling.  State habeas counsel stated on the record that he had only

received the State's proposal that morning and had not had a chance to review them.  *Id.* at 19.

Far from striking the state's proposed findings of fact and conclusions of law because of the

egregious disobedience of the Court's order and the lack of explanation for the delay, the court

adopted them verbatim in their entirety.  Because the district attorney had not attached a

proposed Order to the document, Judge Robertson entered his order by flipping to the back of the

Respondent's Proposed Findings of Fact Conclusions [sic] of Law and Order and writing the

following in longhand:

September 9, 1997

The foregoing "Respondent's Proposed Findings of Fact and Conclusions of Law"
are hereby adopted as the Court's Findings of Fact and Conclusions of Law.

---

[12] Judge Robertson spent much of the hearing berating Mr. Washington's counsel. He stated that he found it "offensive" that "it took some 126 pages of pleadings" to raise the claims in Mr. Washington's habeas petition. Exhibit 8 (Transcript of Post-Conviction Writ Hearing, September 9, 1997), at 6.  He accused state habeas counsel of "playing games" with the habeas petition.  *Id.* at 12.  He stated that he found it "reprehensible that this matter has languished here in the trial court for almost seven and a half years," *id.* at 15, seemingly blaming state habeas counsel for this delay when in fact state habeas counsel had made all filings in a timely fashion and had been waiting seven years for the court to rule on Mr. Washington's habeas petition. He denied Mr. Washington's reurged motions for discovery, for an attorney, for an investigator, for an evidentiary hearing, and to strike Mr. Harris's second affidavit.  *Id.* at 9-10.

23

/s/ Sam Robertson
Judge

*See* Exhibit 9 (Respondent's Proposed Findings of Fact Conclusions [sic] of Law and Order, adopted by the court) ("Findings and Conclusions"), at 30; Reger Dec. at ¶¶25-27.

As state habeas counsel states in his declaration, Judge Robertson never closely examined the thirty-one page document before signing it and, if Judge Robertson was served with the document before the hearing, state habeas counsel was never made aware of that fact. Reger Dec. at ¶¶25-27. In either situation – whether the judge accepted the State's version of the case as his own without scrutiny or review, or whether the State had filed the document for the Court's *ex parte* review – the fundamental requirements of due process were violated. State habeas counsel timely and vigorously contested the fairness of the 1997 proceedings, observing that Judge Robertson had no familiarity with the case, had not presided over any part of Mr. Washington's trial, was not "formally assigned to sit or hear" the proceeding, made no independent factfinding effort, did not adequately review the Respondent's proposed findings (or if he did, did so *ex parte*), failed to reasonably inform Mr. Washington's counsel of the purpose of the September 1997 hearing, permitted counsel for Mr. Washington no opportunity to "read, study, or object to" the findings, and permitted the State an opportunity to inexcusably flout the Court's deadline and ambush Mr. Washington with findings on the same day of the hearing, "compound[ing] the unfair surprise and prejudice to [the] Applicant." *See* Applicant's First Fundamental Objections to Findings of Fact and Conclusions of Law at 2-4 (filed Oct. 2, 1997). These objections were ignored.

In countless cases, courts have strongly criticized a trial court's practice of adopting verbatim

24

one party's proposed findings of fact and conclusions of law.[13]  The risk to the process has been

perceived even when the judge first announces a decision for a party, then asks that party to

prepare findings of fact and conclusions of law, and adopts those findings and conclusions.  Even

in these circumstances there has been profound concern for the integrity of the factfinding

process.  In *Roberts v. Ross*, 344 F.2d 747 (3d Cir. 1965), the Third Circuit Court of Appeals

explained in compelling terms this threat to the integrity and reliability of the factfinding process:

> Counsel who is called upon to articulate and write out the findings and conclusions must
> do so without any knowledge of the fact findings and reasoning processes through
> which the judge has actually gone in reaching his decision.

> We strongly disapprove this practice.  For it not only imposes a well-nigh impossible
> task upon counsel but also flies in the face of the spirit and purpose, if not the letter, of
> Rule 52(a).  The purpose of that rule is to require the trial judge to formulate and
> articulate his findings of fact and conclusions of law in the course of his consideration
> and determination of the case and as a part of his decision making process, so that he
> himself may be satisfied that he has dealt fully and properly with all the issues in the case
> before he decides it and so that the parties involved and this court on appeal may be fully
> informed as to the bases of his decision when it is made.  Findings and conclusions
> prepared ex post facto by counsel, even though signed by the judge, do not serve

---

[13] *See, e.g., Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) (stating that "[w]e, too, have
criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties") (citing, *e.g., United
States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-657 (1964); *United States v. Marine Bancorporation Inc.*,
418 U.S. 602, 615 n.13 (1974)); *FMC Corp. v. Varco Internat'l*, 677 F.2d 500, 501 n.2 (5th Cir. 1982) (noting that
"[w]e have consistently expressed our disapproval of the practice of unconditionally adopting findings submitted by
one of the parties to a litigation"); *Cuthbertson v. Biggers Bros., Inc.*, 702 F.2d 454, 458-59 (4th Cir. 1984) (citing
cases); *Ramey Construction Co. v. Apache Tribe*, 616 F.2d 464, 466-69 (10th Cir. 1980); *Tyler v. Swenson*, 427
F.2d 412 (8th Cir. 1970); *Holbrook v. Institutional Insurance Co.*, 369 F.2d 236 (7th Cir. 1966); *Roberts v. Ross*,
344 F.2d 747, 750-752 (3d Cir. 1965); *Card v. State*, 652 So.2d 344 (Fla. 1995) (remanding for evidentiary
hearing to determine whether the trial court "abdicated [its] sentencing responsibility to the prosecution, depriving
[Appellant] of an independent weighing of the aggravating and mitigating circumstances during the sentencing
phase of his trial," by signing sentencing order drafted by the prosecution); *Phillips v. Phillips*, 464 P.2d 876, 878
(Colo. 1970); *Kentucky Milk Marketing & Anti-Monopoly Com. v, Borden Co.*, 456 S.W.2d 831, 834-35 (Ky.
1969); *Krupp v. Krupp*, 236 A.2d 653 (Vt. 1967); *Nashville , C. & S. L. Ry. v. Price*, 148 S.W. 219 (Tenn. 1911).
*See generally* Judge Skelly Wright, THE NON-JURY TRIAL – PREPARING FINDINGS OF FACTS, CONCLUSIONS OF
LAW AND OPINIONS, Seminars for Newly Appointed Federal Judges, at 166 (1963); Judge Gunnar Nordbye,
*Improvements in Statements of Findings of Fact and Conclusions of Law*, 1 F.R.D. 25, 30 (1940); Henry
Monaghan, *Constitutional Fact Review*, 86 COLUM. L. REV. 229, 272 (1986); Annotation, *Propriety and Effect of
Trial Court's Adoption of Findings Prepared by Prevailing Party*, 54 A.L.R.3rd 868 (& Supp.) (collecting state
cases).

25

adequately the function contemplated by the rule. At most they provide the judge with an opportunity to reconsider the bases of his original decision but without affording the parties any information as to what those bases were or which of them are being reconsidered. At worst they are likely to convict the judge of error because, as here, they are inadequate to support his decision or because, as we have observed in other cases, they are loaded down with argumentative over detailed partisan matter much of which is likely to be of doubtful validity or even wholly without support in the record.

*Id.* at 751-52.[14]

The Florida Supreme Court recently perceived a similar problem in the context of allegations that the trial judge "abdicated [his] sentencing responsibility to the prosecution, depriving [appellant] of an independent weighing of the aggravating and mitigating circumstances during the sentencing phase of his trial," by signing a sentencing order drafted by the State's Attorney. *Card v. State*, 652 So.2d 344, 344 (Fla. 1995). The trial judge in *Card* submitted an affidavit explaining that:

> [I]t was customary for [him] to receive sentencing orders in capital cases from the State Attorney; that this customary practice was followed in the capital cases assigned to [him]; that [he] did not dictate findings to or request that the State Attorney submit the orders before the orders were prepared and given to [him]; that the prosecutors in [his] division provided the orders to [him] as a matter of course...[and] that [t]he orders would then have been issued as [the State's Attorney] provided [it] to [him].

*Id.* at 345. The court held that these allegations were "sufficient to require an evidentiary hearing on the question of whether [appellant] was deprived of an independent weighing of the aggravators and the mitigators." *Id.*

### 4. The "paper hearing" conducted by the state habeas court was not an adequate and fair hearing because the judge who denied habeas relief was not the judge who had presided over the trial.

In some habeas actions, the state habeas court may adequately resolve factual disputes by

---

[14] In *Roberts*, the court vacated the judgment and remanded the case to the trial court to make its own findings. *Id.* at 753.

conducting a "paper hearing." However, when the habeas judge who makes the factual findings was not the trial judge, a paper hearing often is not an adequate and fair hearing. *See Perillo v. Johnson*, 79 F.3d 441, 446 (5th Cir. 1996) (refusing to accord presumption of correctness to factfindings because state habeas judge was not same as trial judge); *Nethery v. Collins*, 993 F.2d 1154, 1157 n.8 (5th Cir. 1993), *cert. denied*, 511 U.S. 1026 (1994) (same). When the same judge both presides over the trial and renders the ruling on habeas, the judge has the opportunity to observe the demeanor and credibility of witnesses, and can "'compare the information presented in the various affidavits against his own firsthand knowledge of the trial.'" *Perillo*, 79 F.3d at 446-47 (quoting *May v. Collins*, 955 F.2d 299, 314 (5th Cir.), *cert. denied*, 504 U.S. 901 (1992)). When, however, the judge cannot call on his or her own recollection of the trial, "there is a danger of 'trial by affidavit.'" *Id.* at 447 (quoting *Amos v. Scott*, 61 F.3d 333, 347 (5th Cir.), *cert. denied*, 516 U.S. 1005 (1995)).

In Mr. Washington's case, when Judge Robertson signed the proposed findings of facts and conclusions of law that had been drafted by the district attorney, he adopted multiple findings of credibility based only on affidavits – including findings that trial counsel's second affidavit was credible. *See, e.g.*, Findings and Conclusions, Ineffective Assistance of Counsel ¶¶ 2, 21, 32, 33 & 36. Given that Judge Robertson had no opportunity to observe trial counsel or any other witness, this paper hearing deprived Mr. Washington of a full and fair hearing. *Cf. Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996) (because state habeas judge had presided over the trial, he was "in an optimal position to assess the credibility of the affidavits"), *cert. denied*, 117 S. Ct. 1489 (1997).

**5.   The Supreme Court's holding in *Townsend v. Sain*, which**

> established exceptions to the presumption of correctness
> normally accorded state factfindings and set out situations in
> which an evidentiary hearing is mandatory, requires an
> evidentiary hearing in this case.

In *Townsend v. Sain*, the Court stated that where a petitioner has alleged facts that, if proved, would entitle him to relief, the district court has the discretion to hold an evidentiary hearing on disputed material facts. *Townsend*, 372 U.S. at 312. In addition, the Court held that an evidentiary hearing is required where the petitioner did not receive a full and fair hearing on the relevant facts in state court. *Id.* at 313. The *Townsend* Court recognized six situations in which a federal court's deference to state court's factfindings would be inappropriate, and in which an evidentiary hearing would be mandatory:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313. "There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant." *Id.* at 313-14; *Goodwin v. Johnson*, 132 F.3d 162, 182 (5th Cir. 1998). Congress soon codified *Townsend*'s holding in the federal habeas statute, recognizing eight exceptions to the "presumption of correctness" generally afforded to state court judgments. *See* 28 U.S.C. § 2254(d) (1966).[15] In

---

[15]    The prior version of §2254(d) provided that there was an exception to the presumption of correctness when it was established:

(1)    that the merits of the factual dispute were not resolved in the State court hearing,
(2)    that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing,
(3)    that the material facts were not adequately developed at the State court hearing,
(4)    that the State court lacked jurisdiction of the subject matter or over the person of the applicant in

28

1996, Congress amended Section 2254(d) with the passage of the Anti-Terrorism and Effective

Death Penalty Act (AEDPA).

The amended version of Section 2254(d) does not enumerate exceptions to the presumption

of correctness.[16]  However, the congressional enactment of the AEDPA did not, and cannot,

overrule the Supreme Court's holding in *Townsend*.   "The judicial authority to determine the

constitutionality of laws, in cases and controversies, is based on the premise that the 'powers of

the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the

constitution is written.'" *City of Boerne v. Flores*, 117 S. Ct. 2157, 2162 (1997) (quoting

*Marbury v. Madison*, 1 Cranch 137, 176, 2 L. Ed. 60 (1803)).

---

the State court proceeding,

(5)   that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding,

(6)   that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding, or

(7)   that the applicant was otherwise denied due process of law in the State court proceeding,

(8)   or unless that part of the record of the State court proceeding in which the determination of such factual issues was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d) (1994).

[16]  The amended version of Section 2254(d) provides as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1998).

29

>Our national experience teaches that the Constitution is preserved best when each part of the government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. *Marbury v. Madison*, 1 Cranch, at 177, 2 L.Ed. 60. *When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including stare decisis, and contrary expectations must be disappointed.*

*Boerne*, 117 S.Ct. at 2172 (emphasis added). The judicial pronouncement in *Townsend*, grounded as it was in the constitutional guarantee of due process, is the background against which the amended version of Section 2254(d) must be interpreted, regardless of the expectations or intent of Congress when enacting the AEDPA. Had Congress intended to alter the substantive scope of the due process clause announced by the Supreme Court in *Townsend* and never abandoned, it would have been acting beyond its powers.

The Tenth Circuit, in deciding a recent habeas case under the AEDPA, correctly applied the amended Section 2254(d) in harmony with *Townsend*. In considering a habeas petitioner's claim of ineffective assistance of counsel, the Court recited the requirement of Section 2254(d)(1) that petitioner demonstrate that his conviction is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998) (quoting § 2254(d)(1) as amended by the AEDPA). The Court then held that the petitioner's ineffective assistance claim presented a mixed question of law and fact and that, "[b]ecause our analysis of this claim primarily involves consideration of legal principles, we review this claim *de novo*." *Miller*, 161 F.3d at 1254. The Court further held that its review of the factual record would also be *de novo*:

>[W]e note that because the state court did not hold any evidentiary hearing, we are in

the same position to evaluate the factual record as it was.  Accordingly, to the extent the state court's dismissal of Mr. Miller's petition was based on its own factual findings, we need not afford those findings any deference.

*Id.* As required by *Townsend*, the Tenth Circuit held that the "'presumption of correctness does not apply . . . if the habeas petitioner did not receive a full, fair, and adequate hearing in the state court proceeding on the matter sought to be raised in the habeas petition.'" *Id.* (quoting *Nguyen v. Reynolds*, 131 F.3d 1340, 1359 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998)).  Other federal courts have recognized that *Townsend*'s holding remains undisturbed by the AEDPA.  *See, e.g.*, *Cardwell v. Green*, 152 F.3d 331, 336 (4th Cir. 1998) ("If . . . the applicant has not "failed to develop" the facts in state court [pursuant to AEDPA's revision to 28 U.S.C. § 2254(e)(2)], the district court may proceed to consider whether a hearing is appropriate, or required, under *Townsend*."), *cert. denied*, 119 S. Ct. 587 (1998); *Lawrie v. Snyder*, 9 F. Supp. 2d 428, 439 (D. Del. 1998) (aside from the deliberate bypass factor, which has been superseded, "[t]he remainder of *Townsend* . . . appears to have been left intact, including the other five factors under which an evidentiary hearing is mandatory, as well as the court's overriding ability to hold a hearing in its discretion.").

**6.  By maintaining a procedural double standard between the State and the Applicant concerning procedural rules, the state court violated due process.**

The State's proposed findings of fact and conclusions of law were due on March 28, 1995.  The State, without explanation of any kind, delayed over two years before finally submitting its proposed findings.  The trial court, throughout Mr. Washington's state postconviction litigation, imposed strict deadlines on Mr. Washington, in one case using its power to schedule Mr. Washington's execution to compel the creation of a briefing schedule.  Reger Dec. at ¶6.

31

Throughout state postconviction proceedings, state habeas counsel complied with every deadline, or timely requested reasonable extensions, and complied with the resulting modified deadlines.

The State, however, was not held to deadlines. In fact, it was permitted to flout a clear court order without explanation of any kind. Had state habeas counsel deliberately – and without explanation – violated the state habeas court's deadlines, it is inconceivable that the court would have treated him so indulgently. Indeed, the Texas Court of Criminal Appeals has routinely refused to even review claims filed by habeas petitioners because they inexcusably flouted deadlines. *See, e.g., Ex Parte Smith*, 977 S.W.2d 610 (Tex. Crim. App. 1998) (habeas petition alleging twenty constitutional claims for relief dismissed pursuant to TEX. CODE CRIM. PROC. Art. 11.071 § 5(a) (Vernons' 1998) dismissed without merits review because of late filing of petition); *Ex Parte Colella*, Writ No. 37,418-01 (Tex. Crim. App. July 15, 1998) (same); *Ex Parte Skinner*, No. 20,203-03 (Tex. Crim. App. Dec. 2, 1998) (per curiam) (same); *Ex Parte Gardner*, 959 S.W.2d 189, 190 (Tex. Crim. App. 1996) (denying merits review of claim because of habeas applicant's unreasonable, unexplained delay in asserting it); *Ex Parte Carr*, 511 S.W.2d 523, 525 (Tex. Crim. App. 1974) (Texas habeas procedure requires "all contentions of merit be presented and ruled upon as expeditiously as possible").

The double standard is obvious. The State never showed good cause – much less any cause – for the delay, and the delay affirmatively harmed Mr. Washington because it delayed the commencement of his federal habeas proceedings until after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, which enacted substantive restrictions on habeas

petitioners' entitlement to relief on their federal claims. *See infra* Part II.B.7.[17]   The State's late-filed findings of fact and conclusions of law should have been stricken because they were tendered in flagrant, unexplained violation of the state habeas corpus court's scheduling order.   The fact that they were not only considered on their merits but signed unaltered further establishes the state habeas corpus court's actual pro-State bias, which robbed the state habeas proceedings of fundamental fairness. *Tumey v. State of Ohio*, 273 U.S. 510, 532 (1920) (tribunal which does not "hold the balance nice, clear, and true between the state and the accused denies the latter due process of law").[18] Mr. Washington timely and adequately objected to the unfair double standard applied to him in state habeas proceedings, but his complaints were ignored. *See* Applicant's First Fundamental Objections to Findings of Fact and Conclusions of Law at 3-4 (filed Oct. 2, 1997).

> **7.   Because Mr. Washington's federal petition is being filed after the AEDPA because of the State's unreasonable delay in filing its findings of fact and conclusions of law, the application of the AEDPA to Mr. Washington's case would have an impermissible retroactive effect.**

Mr. Washington's petition is being filed after the effective date of the AEDPA because of the state habeas trial court, in violation of its duty of neutrality, permitted the State to file its proposed findings of fact and conclusions of law over two years after March 28, 1995, when they

---

[17] Applying the AEDPA to the Petitioner's case would have an impermissible retroactive effect, as explained *infra* Part II.B.7. In the event the AEDPA is applied to the petitioner's claims, prejudice from the State's delay is established. Had the State tendered its proposed findings and conclusions on March 28, 1995, as ordered, Mr. Washington would have been in a position to file his initial federal habeas corpus petition before the April 24, 1996 effective date of the AEDPA, thus ensuring review of his claims under pre-Act standards. *See infra* n.18.

[18] The state habeas trial court also held to a double standard when it came to court-ordered factual development and discovery. The Applicant was denied virtually all the court-ordered discovery he asked for. *See supra* Part II.B.2. However, the state habeas trial court obligingly ordered trial defense counsel to file another affidavit when the State realized that the first affidavit he had filed raised grave questions about the adequacy of his representation. *See supra* Part II.B.1.

33

were due. *See supra* Part II.B.6.  But for the State's delay in filing this document, and the state habeas court's tolerance of that delay, Mr. Washington's federal habeas action would have begun before April 24, 1996, the effective date of the AEDPA.[19]  The imminent enactment of the AEDPA was widely expected in 1995, and was the subject of involved Congressional debate. *See, e.g.* 141 Cong. Rec. S7803-7867 (June 7, 1995).  Indeed, on the very day state habeas pleadings were due in this case, Texas' then-Attorney General, Dan Morales, advocated passage of the bill that would become the AEDPA before the Senate Committee on the Judiciary.  *See Federal Habeas Corpus Reform: Eliminating Prisoners' Abuse of the Judicial Process, 1995: Hearings on S. 3 Before the Comm. on the Judiciary*, 104th Congress, 1st Sess. (1995) (statement of Dan Morales, March 28, 1995).  In that Statement, Texas' chief law enforcement officer specifically approved the changes made by the AEDPA to 28 U.S.C. § 2254(d), declaring that they "accord appropriate deference to state court decisions which fully and fairly resolve federal issues" and that they prevent "unnecessary and inappropriate " relitigation of federal issues.  *Id.* at 5.

The Petitioner alleges that the State delayed in filing its fact findings and conclusions – knowing that the trial court would not punish them for doing so – *precisely in order* to subject the Petitioner's claims to the AEDPA which, as the Supreme Court has observed, "change[s] standards of proof and persuasion in a way favorable to [the] state." *Lindh v. Murphy*, 117 S. Ct.

---

[19] This assertion is borne out by the procedural course of state habeas review in this case.  The state's proposed findings of fact and conclusions of law were adopted on the very same day that they were submitted, on September 9, 1997.  The case was then transferred to the CCA, which denied relief slightly over four months later. Assuming the same events had begun when they should have begun – on March 28, 1995 – Mr. Washington would have been out of the state court system by early August of 1995, leaving him almost nine months to prepare and file a federal writ of habeas corpus by the all-important April 24, 1996 enactment date of the AEDPA.  Even assuming the state habeas trial court had taken two months to carefully review and compare the Applicant's and State's proposed findings of fact and conclusions of law and create its own independent opinion adjudicating the case – something it was obviously not disposed to do – seven months would have been left.

2059, 2063 (1997).

But for the State's delay, state habeas proceedings would have been concluded in this case before the effective date of the AEDPA. Therefore, applying the AEDPA's standards of review retroactively to Mr. Washington's state habeas corpus claims would have an impermissible retroactive effect, because the "triggering event" for retroactivity analysis purposes should have occurred in 1995, before the AEDPA was enacted. As the Supreme Court has observed, the AEDPA's standards of review – which require greater deference to state court factfindings and legal conclusions than pre-AEDPA standards do – unquestionably affect substantive rights and may not be applied retroactively in order to attach "new legal consequences" to events which occurred before their enactment. *Id.*; *see also Landgraf v. USI Film Prods., Inc.*, 511 U.S. 244 (1994) (absent specific Congressional statement requiring retroactive application, new legislative enactments will not be applied in such a way as to attach new legal consequences to events completed before their enactment).

### 8. Because fundamental due process was violated throughout state postconviction proceedings in this case, several *Townsend* exceptions apply.

Several of the constitutional defects described in *Townsend* exist in this case, rendering deference to the state court's findings and conclusions inappropriate. *Townsend* states that exercise of the federal court's plenary power is appropriate under circumstances in which, first, "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing"; second, when "the material facts were not adequately developed at the state-court hearing"; and third, when "for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend*, 372 U.S. at 313.

35

The fact-finding procedure in state habeas court was clearly inadequate for proper factual development, or to afford a "full and fair hearing." The state court consistently and repeatedly denied state habeas counsel access to the necessary tools for adequate development of the factual record – such as investigators, experts, and experienced counsel – and further denied him such crucial fact-finding vehicles as depositions and evidentiary hearings.

Due process was violated by the judicial conduct in Mr. Washington's case. There was pervasive *ex parte* contact between the attorney for the state and the judge who decided the case, and Petitioner alleges on information and belief that Judge Lykos used her judicial power to help the state try to neutralize information in the record which was unfavorable to its case. Judge Robertson's apparent "procedure" for fact-finding was to sign the State's proposed findings of fact and conclusions of law, which had not been served on Mr. Washington's counsel, without having had the opportunity to properly review them himself. *See supra* Part II.B.3 Two factors aggravating the unfairness of the state court proceedings are the fact that the state court factfindings incorrectly resolve numerous disputed issues of fact, and that the judge who actually signed them had not presided over Mr. Washington's trial. *James v. Collins*, 987 F.2d 1116, 1122 & n.8. (5th Cir.), *cert. denied*, 509 U.S. 947 (1993) (state court factfindings resulting from unethical collaboration between State's attorney and judge entitled to credibility nonetheless when (1) judge who presided over trial signed factfindings; (2) most claims were "without legal support"; and (3) Petitioner did not "seriously" dispute correctness of most state factfindings).

Due process was violated repeatedly in Mr. Washington's case. All findings of fact and conclusions of law by the state habeas court should be rejected.

**C. Exhaustion is excused in this case.**

36

To the extent that any claims or factual development presented in this Petition are unexhausted, exhaustion is excused for the following reasons.

**1.   The intervening passage of a bar to the consideration of successive state habeas corpus applications in Texas capital cases has rendered exhaustion in this case futile.**

Normally, a state prisoner must present all claims and obtain or seek all factual development in state court proceedings before a federal court may consider and grant relief on a claim of federal constitutional error. However, the "exhaustion" requirement is "not a jurisdictional or inflexible bar to the grant of federal habeas review." *Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996) (citing *Granberry v. Greer*, 481 U.S. 129 (1987)). Exhaustion may be excused if "there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981). The Fifth Circuit "has not addressed whether the futility exception to exhaustion survived the AEDPA's enactment." *Jones v. Jones*, 163 F.3d 285, 298 (5th Cir. 1998).

Assuming the futility exception has survived the enactment of the AEDPA, it would be futile for Mr. Washington to return to state court to attempt to exhaust any unexhausted claims or facts in this Petition. In 1997, the Texas Legislature passed a comprehensive revision to its death penalty habeas corpus review procedures, codified at TEX. CODE CRIM. PROC. Art 11.071. Section 5(a) of 11.071 provides that:

> If a . . . subsequent application is filed after filing an initial application, a court may not consider the merits of grant relief based on the subsequent . . . application unless [it] contains sufficient specific facts establishing that (1) the current claims and issues have not been and could not have been presented previously; [or] (2) [that] by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no

37

rational juror [could have sentenced the defendant to death]."  Art. 11.071 § 5 (a).
Thus, the Texas Court system would likely deny merits review to any of Mr. Washington's claim
were he to attempt to return to state court to present them.

The Petitioner acknowledges that the Fifth Circuit has held that the enactment of Art. 11.071
mandates the conclusion that any unexhausted claims in petitions challenging Texas death
sentences would automatically be procedurally defaulted.  *(Tyrone) Fuller v. Johnson*, 158 F.3d
903 (5th Cir. 1998).  However, as Petitioner will show, his case is distinguishable from *Fuller*.

In *Fuller*, the Fifth Circuit declined to base its decision solely on Art. 11.071, which did not
exist when Fuller filed in state court.  The court observed that Fuller had filed his initial state
habeas application in 1995.  *Id.* at 906.  The Fifth Circuit noted that it had earlier determined that
"this Court recognized that although the abuse of writ doctrine historically had not been strictly
and regularly applied, the irregularity was cured in 1994 when the Texas Court of Criminal
Appeals announced that the doctrine would thereafter be strictly applied."  *Id.* Because the State
of Texas had articulated an "abuse of the writ" doctrine very similar to that found in Art. 11.071
as early as 1994, the court found, Fuller had defaulted the claims not presented in his state habeas
corpus application in 1995.  *Id.*  The *Fuller* court thus clearly considered the time of the filing of
the state habeas application to the relevant "triggering event" for purposes of evaluating the
applicability of any procedural bars.

Mr. Washington's state habeas corpus application was filed in 1989.  As the Fifth Circuit
acknowledged in *Fuller*, the bar on successive habeas corpus applications was not "strictly and
regularly" followed in 1990.  *Id.*; *see also Lowe v. Scott*, 48 F.3d 873, 875 (5th Cir. 1995) (holding
that spotty application of Texas's abuse of the writ doctrine rendered it inadequate to bar federal

merits review when applied to allegations contained in 1990 state habeas application). Thus, at the time Mr. Washington's state habeas application was filed, no successor bar was in place, and *Fuller's* reasoning does not apply.

**2.  Exhaustion is excused because circumstances exist which rendered and will render state process ineffective to protect Mr. Washington's federal rights.**

Subsection 2254(b) of the AEDPA reads:

(b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

(A)  the applicant has exhausted the remedies available in the courts of the State;  or

(B)(i)  there is an absence of available State corrective process;  or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

The *Jones* court observed that "the language of § 2254(b)(1)(B) is substantially identical to the language of the pre-AEDPA § 2254(b)." *Jones*, 163 F.3d at 298.

Circumstances that "render such process ineffective" clearly exist in this case.  The state of Texas never provided Mr. Washington with even a minimally fair forum in which to litigate his postconviction claims.  The exhaustion requirement is meaningless if the state court either provides no forum for the litigation of federal claims or provides an obviously inadequate forum. *Young v. Ragen*, 337 U.S. 235, 238 (1949) ("The doctrine of exhaustion of state remedies, to which this Court has required the scrupulous adherence of all federal courts, presupposes that some adequate state remedy exists.") (citation omitted).  The exhaustion requirement is merely a