flexible equitable tool which extends respect to state courts on the understanding that the state courts will exercise a reciprocal respect for federal prerogatives by considering an inmate's federal claims in good faith. *Murray v. Carrier*, 477 U.S. 478, 487 (1986) (deference owed to states' "good-faith attempts to honor constitutional rights"). If a State administers its postconviction forum in a manner that violates due process and denies petitioners fair hearings on federal claims, the State may not demand that a later federal forum respect its right to initially adjudicate federal claims: "Upon the state courts, equally with the courts of the Union, rests the obligation to guard and enforce every right secured by th[e] Constitution." *Mooney v. Holohan*, 294 U.S. 103, 113 (1935); *see also Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution–and, in particular, in accord with the Due Process clause."); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The duty of the State under our cases is . . . to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process."); *Welch v. Beto*, 355 F.2d 1016, 1020 (5th Cir.) ("Having invoked the Texas statutes granting post-conviction hearings, [the petitioner] had the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment."), *cert. denied*, 385 U.S. 839 (1966).

Mr. Washington's state habeas corpus proceedings were inadequate. The decisionmaker who presided over the first phase of the proceedings engaged in repeated *ex parte* conversations with counsel for the State on the substance of Mr. Washington's postconviction claims. Reger Dec. at ¶29. Upon the undersigned counsel's own personal information and belief, during those conversations, the trial judge expressed dismay at the improprieties contained in trial counsel's

1990 affidavit, and ordered him to supply a new affidavit in whole or in part because the trial

court wished to provide the state with an opportunity to neutralize or downplay the harmful

admissions in trial counsel's earlier affidavit.

This evidence, coupled with the remarks of the judge at the Oct. 6, 1989 hearing in which the

judge repeatedly dismissed the defense's claims based on her own recollection of the purportedly

solid and reliable trial eyewitness identification, compels an inference that the state court had

*already* decided that Mr. Washington had received a fair trial, and was determined to assist the

State in demonstrating that fact. *See, e.g., Dyer v. Calderon*, 151 F.3d 970, 978 (9th Cir. 1998)

(rejecting state court factfindings when trial judge, presented with "credible allegations" of juror

misconduct, prevented adequate factual development out of "an ostrich-like desire to avoid

learning anything that would jeopardize the verdict."), *cert. denied*, 119 S. Ct. 575 (1998).

Presenting further factual allegations to such a tribunal would be futile. Of course, the state

habeas trial court's role was *not* to shore up a verdict against attack, but rather to neutrally, fairly

adjudicate Mr. Washington's habeas claims, permit factual development from *both sides* adequate

to resolve the contested issues, and to grant Mr. Washington guilt-innocence or punishment phase

relief if warranted. The trial court's failure to observe this neutral, detached role demonstrates

bias in favor of the State. Bias on the part of the decisionmaker violates Due Process, and

decisions made by the biased decisionmaker be ignored. *Bracy v. Gramley*, 117 S. Ct. 1793,

1796 (1997); *Tumey v. Ohio*, 273 U.S. 510, 533 (1927).

Judge Robertson's conduct at the 1997 hearing also demonstrates that the habeas forum

offered to the petitioner was ineffective. Without carefully evaluating their content, the judge

simply signed findings of fact and conclusions of law ghostwritten by the state. Reger Dec. at

41

¶¶25-27.  These findings, this Petition will demonstrate, are littered with factual and legal errors, statements that contradict or go outside the record, and tendentious, adversarial characterizations of disputed evidence.  They amply bear out the *Roberts* court's prediction that findings drafted by an adversary and adopted verbatim are likely to be replete with "partisan matter much of which is likely to be of doubtful validity or even wholly without support in the record." *Id.* at 1752.  The Court of Criminal Appeals later specifically rejected some of those findings. *See* Exhibit 1 (Court of Criminal Appeals opinion, January 14, 1998, denying habeas relief), at 2 n.1.

As state postconviction counsel's affidavit demonstrates, Judge Robertson – who did not preside over the Petitioner's trial – could have had time only to briefly skim the 30-page, single-spaced document.  If his claim at the evidentiary hearing that he "read" the state's proposed findings indicates that he actually carefully studied them, then he must have been provided with a copy of them in *ex parte* proceedings before the hearing.  The Applicant, Mr. Washington, played by the rules and obeyed ethical guidelines when he submitted his Proposed Findings of Fact and Conclusions of Law on March 28, 1995 – he served a true and correct copy on the State.  If the judge was presented with the findings prior to the hearing, this consisted of *ex parte* communication about the substance of the case.

### 3. Exhaustion should be excused because the State subjected the Petitioner to unreasonable delay during the state postconviction process.

The significant delay in this case also warrants excusal of the exhaustion requirement.  Petitioner first filed his petition in April of 1989.  As set out in Motion for Leave to File Petition for Writ of Habeas Corpus Within Statutory One-year Filing Deadline, the case then languished in the state trial court for *over eight years*. *Id.* at 10-12.  Every filing by the Petitioner was timely;

however, the State asked for extensions for many of its filings, and only filed proposed Findings

of Fact and Conclusions of Law after an unexplained delay of *over two years. Id.* This delay has

exposed the Petitioner to unnecessarily long death row confinement. Additionally, in that period,

the memories of witnesses have faded, evidence has dispersed, and several intervening changes of

the law have restricted the scope of postconviction review. "Inordinate, unjustifiable delay in a

state-court collateral proceeding excuses the requirement of petitioners to exhaust their state-

court remedies before seeking federal habeas corpus relief." *Jackson v. Duckworth*, 112 F.3d

878, 880 (7th Cir. 1997), *cert. denied,* 118 S.Ct. 380 (1997) (citations omitted). This delay is

especially egregious because it resulted from the trial court's decision to permit the State to avail

itself of unexplained, years-long delays while ordering the Petitioner to obey strict deadlines. *See*

*infra* Part III.D (Petitioner's extended stay on death row is caused by State action and violates the

Eighth Amendment)

### 4. Exhaustion should be excused because Mr. Washington was denied the assistance of counsel with relevant experience in state postconviction proceedings.

In 1989, when Mr. Washington entered state habeas corpus proceedings, the State of Texas

had no scheme for the appointment and compensation of state postconviction counsel, and

customarily used its ability to set execution dates to coerce the federally-funded Texas Resource

Center into locating counsel on extremely short notice. Not only did the State of Texas not lift a

finger to assist indigent Texas death row inmates to locate qualified state postconviction counsel,

it actively undermined the Resource Center's attempts to do so.

Many other states with relatively large death row populations, recognizing the need for fair

and orderly state postconviction review in capital cases, had long ago created centralized state-

funded organizations to provide postconviction representation to those on death row. *See, e.g.,* *In re Parker*, 49 F.3d 204, 209 (6th Cir. 1995) ("Kentucky provides counsel to indigent capital defendants not only during the actual trial and the direct appeal but also during any post-conviction collateral attacks, including federal habeas corpus."); *Hill v. Butterworth*, 941 F. Supp. 1129, 1141 (N.D. Fla. 1996) (describing creation of Florida Capital Collateral Representative Office by statute in 1985), *rev'd*, 147 F.3d 1333 (11th Cir. 1998); *Cf.* Sheila R. McCann, *Who Should Pay for Killer's Appeals?*, SALT LAKE TRIB., Dec. 1, 1996, at B1 (noting that Utah Attorney General Jan Graham will lobby the 1997 Utah Legislature for "a new law requiring the state to pay reasonable costs and attorneys' fees for Death Row inmates filing their first [state] habeas corpus appeal"). Some states, in addition to having state-funded appellate resource centers, established statewide standards for counsel competency in capital cases. *See, e.g.,* *Ashmus v. Calderon*, 935 F. Supp. 1048, 1072 (N.D. Cal. 1996) (describing California standards for counsel in death penalty postconviction proceeding), *aff'd*, 123 F.3d 1199 (9th Cir. 1997), *rev'd*, 523 U.S. 740 (1998).

Not Texas. In the late 1980s and early 1990s Texas, despite having the largest death row and the most frequent executions of any state in the union, had no policy recommending the appointment of counsel in state death penalty postconviction proceedings and generally provided no compensation or assistance to volunteer state postconviction counsel. The Texas Resource Center, a federally-funded death penalty resource center, bore the responsibility of locating lawyers to handle the steady stream of inmates who weekly entered the phase of the appellate process requiring the appointment of state habeas counsel. Texas actively undermined the Resource Center's efforts to locate volunteer lawyers in several respects. First, Texas guaranteed

no funding for postconviction representation.[20]  Second, Texas followed a practice of

postconviction litigation propelled by execution dates.  Following a statewide policy, trial court

judges typically imposed execution dates forty-five days after an inmate's conviction and sentence

were affirmed on direct appeal.  *See* Linda Greenhouse, *Court Confronting Results of Limiting*

*Death Row Appeals,* N.Y. TIMES, March 30, 1994, at B7 ("Last year, Texas judges set 100

execution dates under a state policy calling for scheduling an execution some 45 days after a death

sentence has been upheld on direct review.  By contrast, other states either delay setting an

execution date or routinely grant stays until an inmate has had a second level of appeal through a

habeas corpus petition.").  These dates were assigned regardless of whether the inmate in question

had counsel.  Some  execution dates were set while this Court was still considering a petition for

certiorari on direct review.  *See, e.g., Cole v. Texas,* 499 U.S. 1301 (granting stay, reasoning that

"I will not . . . permit the State's execution date to interfere with the orderly processing of a

petition on direct review by this Court.") (Scalia, J., in chambers).  As the execution date

approached, the inmate himself, aided by the staff of the Texas Resource Center, would resort to

increasingly desperate entreaties in order to recruit volunteer counsel.[21]  Often the prospect of

---

[20]In 1993, a Report commissioned by the State Bar of Texas Committee on Representation for Those on Death Row commissioned a thorough study of death row representation in Texas.  *See* Exhibit 10 (reprinting Introduction and Findings sections of THE SPANGENBERG GROUP, A STUDY OF REPRESENTATION IN CAPITAL CASES IN TEXAS (1994)).  The Report noted that "Texas is the only death penalty state in which representation in capital cases is provided almost exclusively by private counsel and primarily not by public defender programs." *Id.* at 154.

[21] "The volume of warrants filed in Texas far exceeds that of any other state."  Exhibit 10 (SPANGENBERG REPORT) at 6.  "When [execution] warrants are issued in cases where there is no counsel, the results may be dire.  An attorney may be recruited hastily and often the recruited counsel have no familiarity with the highly technical capital case legal issues; [thus] important constitutional issues are often not raised or properly litigated."  Texas' practice of substituting orderly postconviction review with haphazard filing governed by execution dates attracted the scorn of Federal appellate judges, who had to resolve the legal and procedural difficulties created by Texas' system.  *See, e.g.,* Hon. Edith Jones, *Death Penalty Procedures: A Proposal for Reform,* 53 TEX. BAR J. 850, 851 (1990) (referring to the practice as "[d]ocket control by execution date"); Mark Ballard, *Death Penalty System*

litigating under a series of urgent execution-date deadlines intimidated prospective volunteer counsel out of taking the case.

State habeas counsel responded to a solicitation by the President of the State Bar urging commercial attorneys to represent indigent death row inmates. *See* Oct. 6, 1989 Hearing. State habeas counsel somewhat reluctantly stepped in, after being informed that there was a "shortage" of lawyers willing to represent death row inmates *pro bono*, and that the trial court's imminent scheduling of an execution date made Mr. Washington's case an "emergency." Reger Dec. at ¶¶4-5. It is clear that state habeas counsel put a great deal of effort into the task of representing the petitioner. His willingness to spend vast amounts of time to represent an indigent death row inmate for free in a wholly alien area of law on short notice and at considerable personal expense represents the very highest aspirations of the profession.

Counsel is not to be faulted for agreeing to represent Mr. Washington in an unfamiliar area of the law. As the Fifth Circuit's solicitation makes clear, the number of experienced criminal defense attorneys willing to represent death row inmates in state postconviction proceedings had long ago been utterly swamped by the numbers of death row inmates needing representation. Extremely difficult litigation conditions led many otherwise-qualified lawyers to refuse these cases. The Spangenberg Group, which interviewed over 250 lawyers and judges with experience in the relevant areas, described Texas' state habeas scheme as it existed in the late 1980s and early 1990s in the following dire terms:

> The publication of this report marks the completion of the most comprehensive study of capital representation ever conducted in Texas. It is the professional judgment of the

---

*Ridiculed*, TEX. LAW., May 11, 1992, at 4 (quoting Fifth Circuit Judge Thomas Reavley's description of Texas' system of premature execution dates as "vaudeville").

research team, which has conducted studies of capital representation on the national level and in a number of other states, that the problems in Texas far outweigh those in any other death penalty state in the country. The primary reasons for this conclusion are the following:

* Compensation for counsel at trial and direct appeal is uneven across the state, with wholly inadequate compensation provided in many counties.

* The constant search for qualified volunteer pro bono counsel in state habeas cases is becoming increasingly difficult, particularly when cases are under an active execution warrant.

* Although by statute appointment of counsel in state habeas is at the discretion of the district judges, it seldom occurs, unlike all other death penalty states with similar discretionary appointment rules.

* Compensation at state habeas is seldom provided either for attorneys fees or experts expenses in districts throughout the state of Texas.

* Funding for capital representation, where it does exist, is wholly a county responsibility. The state provides no funds whatsoever for indigent defense in Texas. This is true for only seven other states.

* Few defender programs in Texas provide representation in capital cases. Virtually every other state has full-time experienced public defenders who specialize in capital cases.

* * *

* A significant number of attorneys and judges responding to this study have indicated that the quality of representation in capital cases in Texas is adversely affected by the level of compensation provided.

* While there are experienced attorneys in Texas who have yet to accept appointment in capital cases, the study shows that there is a major gap between conditions they would expect and current provisions for compensation and support.

* *Results of the study show that more and more experienced private criminal attorneys are refusing to accept court appointments in capital cases because of the time involved, the substantial infringement on their private practices, the lack of compensation for counsel fees and experts /expenses and the enormous pressure that they feel in handling these cases.*

47

Exhibit 10 (SPANGENBERG REPORT) at 151-52. The authors of the REPORT "believe[d], in the strongest terms possible, that Texas has already reached the crisis stage in capital representation and that the problem is substantially worse than that faced by any other state with the death penalty." *Id.* at 152.    The Report observed that, despite efforts by the Bar and by the Texas Resource Center, "Texas [was] running out of volunteer lawyers and law firms willing to provide pro bono representation in capital cases in state habeas." *Id.* at 161-62. The reasons were clear:

> It is unfair to require attorneys to provide representation in state habeas cases on a pro bono basis. The results of the study and our previous work in state habeas capital cases leads to the clear conclusion that it takes a great deal of time to prepare a state habeas case and to provide quality representation: at least several hundred hours. To require attorneys to put in this kind of time in matters that are fraught with procedural complexity and require keeping up with death penalty law which evolves almost on a weekly basis, and to put aside a large percentage of their time from fee-generating cases is totally unfair to both the attorneys and their clients. In addition, many attorneys reported to us a uniquely troubling and unparalleled intensity of pressure resulting from the fact that their clients were facing the possibility of execution.

*Id.* at 163. Thus, state habeas counsel's action in agreeing to represent a client in an unfamiliar area of the law were completely proper, given the very real possibility that had state habeas counsel not taken the case, Mr. Washington might have received no representation at all.[22]

Nevertheless, as state habeas counsel repeatedly protested to the state habeas court, he lacked relevant criminal experience and only took on the case because he was advised that it was an emergency situation. *See* Affidavit of Gary Reger re: Motion for Discovery and Expert Assistance (Oct. 2, 1989) (reciting that state habeas counsel has practiced exclusively in the area

---

[22] Indeed, various Southern District and Fifth Circuit Justices, recognizing the urgent need for lawyers of any description to represent death row inmates, repeatedly implored attorneys in large civil litigation firms (who, it may be assumed, have no particular experience in death penalty habeas corpus) to represent indigent death row inmates in state postconviction. *See, e.g.*, Kathy Fair, *Lawyers Hear Appeal to Help on Death Row*, HOUSTON CHRONICLE, Feb. 23, 1993, at A18 (describing presentation by Houston and Fifth Circuit federal judges to group of attorneys from large Houston civil litigation firms).

48

of banking and commercial law and has no trial, habeas corpus or criminal experience whatsoever). The state habeas trial court apparently agreed, as two separate judges stridently derided the quality of state habeas counsel's representation in procedural hearings held during state post-conviction proceedings. For instance, in a 1990 hearing concerning the Petitioner's requests for discovery and expert assistance, the judge characterized counsel's theory concerning the significance of hair evidence as "border[ing] on fantasy," accused counsel of trying to sow "utter chaos" by "retr[ying]" the case before her, and asked him incredulously "Surely you are familiar with jury selection in Harris County, Texas[?]" (to which counsel truthfully replied he was not). Oct. 6, 1989 Hearing at 15, 20, 23.

The court's attacks were even more stark during the 1997 hearing on the parties' findings of fact and conclusions of law: "I find it offensive in a way and I don't mind stating it on the record – I want it on the record – that to raise the matters that have been raised in this petition, it took some 126 pages of pleadings." Hearing, *Ex Parte Washington*, No. 449,603, at 6 (180th Dist. Ct. of Harris County, Texas, September 7, 1997). In fact, the judge asked state habeas counsel whether he had ever represented anybody accused of a capital crime, to which state habeas counsel responded that not only had he never done so, he was not even a "criminal lawyer." The court responded that he was not surprised, given that, in the judge's estimation, habeas counsel had made many allegations without a "real basis" in fact. *Id.* at 7. Later, the court accused state habeas counsel of "playing games" when habeas counsel attempted to get the court to rule on the petitioner's pending motion to fire state habeas counsel. *Id.* at 12. In fact, the court opined, "many games have been played in the petition for writ of habeas corpus." *Id.*

State habeas counsel implored the state court repeatedly to provide him with expert

49

assistance, including the assistance of an experienced criminal defense attorney. *See, e.g.,* Applicant's Motion for Rehearing on his Motions for Evidentiary Hearing and Pleadings Further Supplementing Petition at 3 (Oct. 6, 1997). State habeas counsel's request to examine the District Attorney's file on this case was likewise denied. Reger Aff. (Oct. 2, 1989), at 2; Applicant's Motion to Docket Cause and for Further Briefing at 2 (Oct. 6, 1997). State habeas counsel was never paid anything for his efforts, and was denied an evidentiary hearing and all but a small portion of the discovery he requested. As the state court judge noted, and as state habeas counsel readily agreed in pleadings filed with the court, most of the work done on this case in state court was done by a lawyer with almost no relevant experience.

*Coleman v. Thompson,* 501 U.S. 722 (1991), held that, because an inmate has no right to the effective assistance of counsel in postconviction proceedings, counsel's ineffective performance in such proceedings could not constitute "cause and prejudice" for procedural defaults caused by a postconviction attorney's late filing of an appeal from a habeas corpus trial-court disposition. *Id.* at 750. However, in *Coleman,* one question was specifically left undecided. Coleman noted that (1) this Court had guaranteed indigent appellants constitutionally effective counsel during the "one and only appeal" to which they were entitled by state law, even though the appeal itself was not required by the Federal Constitution, *Evitts,* 469 U.S. at 396 (citing *Douglas v. California,* 372 U.S. 353, 357 (1963)); and that (2) Virginia allowed defendants to attack the effectiveness of their trial counsel only in postconviction proceedings. *Coleman,* 501 U.S. at 755. Thus, Coleman asserted, there must be a guarantee of effective assistance of counsel in "the first forum in which a federal claim can be raised" in state court. *Id.* This Court found it unnecessary to "answer this question broadly, however, for one state court has addressed Coleman's claims: the state habeas

50

trial court." *Id*. Coleman

> has had his 'one and only appeal,' if that is what a state collateral proceeding may be
> considered; the Buchanan County Circuit Court, after a 2-day evidentiary hearing,
> addressed Coleman's claims of trial error, including his ineffective assistance of counsel
> claims. What Coleman requires here is a right to counsel *on appeal* from that
> determination. Our case law will not support it.

*Id*. at 756 (emphasis added). Thus, it would "defy logic for us to hold that Coleman had a right to

counsel *to appeal* a state collateral determination of his claims of trial error." *Id*. at 756-57

(emphasis added).

When *Coleman* was decided, a general consensus had emerged that federal habeas should be

streamlined, and that respect for good-faith state court attempts to apply federal constitutional

principles should be assured. The two most carefully thought-out proposals urged the creation of

specific deadlines to speed state and federal decisions. *See Lonchar v. Thomas*, 517 U.S. 314,

328 (1996). However, *both* proposals stressed that, in return for expediting and limiting access to

federal habeas courts, states should provide consistent, high-quality representation in state capital

postconviction proceedings.[23] This insight – that federal proceedings could be made more limited

---

[23]The Judicial Conference of the United States convened an ad hoc committee, chaired by then-Associate
Justice Lewis Powell, to study the death penalty review process in 1988. The committee recommended imposing a
six-month statute of limitations on federal habeas corpus review. *See* 135 Cong. Rec. S13481-S13486 (1989)
(reprinting JUDICIAL CONFERENCE OF THE UNITED STATES, AD HOC COMMITTEE ON FEDERAL HABEAS CORPUS IN
CAPITAL CASES (Powell, J., presiding)). However, the Committee also observed a "pressing need for qualified
counsel to represent inmates in collateral review," noting that "provision of competent counsel for prisoners under
capital sentence throughout both state and federal collateral review is crucial to ensuring fairness and protecting
the constitutional rights of capital litigants." *Id*. at S13482. The provision of adequate counsel in state
proceedings is especially vital, the Committee maintained, because when prisoners do not "present promptly or
properly exhaust their constitutional challenges in the state forum," federal collateral procedures are "delayed or
ineffective." *Id*.

In 1989, the American Bar Association's Criminal Justice Section appointed a distinguished panel to
consider similar issues. That panel issued Recommendations to the ABA's House of Delegates supported by a
169-page Report. *See generally* PROJECT ON DEATH PENALTY HABEAS CORPUS, AMERICAN BAR ASS'N, TOWARD
A MORE JUST AND EFFECTIVE SYSTEM OF REVIEW IN STATE DEATH PENALTY CASES (1990). Recommendation
number 13 proposed that "A one-year limitations period should be employed . . . to move the case toward

and efficient if states provided competent counsel to death row inmates – animated Congress's passage of the AEDPA. *See* House Comm. on the Judiciary, Effective Death Penalty Act of 1995, H.R. Rep. No. 23, 104th Cong., 1st Sess., at 16 (AEDPA creates "a quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review *in return for strengthening the right to counsel for indigent capital defendants*" (emphasis added)).

The legal landscape has changed drastically since *Coleman* was decided. The AEDPA has greatly increased the importance of state postconviction proceedings: "[T]he AEDPA's terms shift the focus of hearings to state courts where it belongs." *Hernandez v. Johnson*, 108 F.3d 554, 558 (5th Cir.), *cert. denied*, 118 S. Ct. 447 (1997). The undersigned counsel believe in good faith that the Supreme Court, or a lower federal court, will soon address the issue left open in *Coleman*, and will hold that habeas petitioners under sentence of death do have a right to the effective assistance of counsel in the trial-court phase of state postconviction litigation. The recent Texas experience provides a dramatic illustration of why the Court may feel compelled to address the issue. In the past two years, many Texas death row inmates have been appointed incompetent state postconviction lawyers who filed skeletal habeas writs on behalf of their clients, or who completely failed to file a timely state habeas petition. In each of these cases the Texas Court of Criminal Appeals (CCA) has dismissed the applications on procedural grounds, often over outraged dissents and to the disgust of commentators who point to the fact that the CCA itself was obligated by TEX. CODE CRIM. PROC. Art. 3(a) to ensure that only "competent" counsel

---

reasonably prompt completion . . . ." *Id.* at 2. Recommendation 1 notes that "many defect and delays" are caused by inadequate counsel, and thus it advises that "competent and adequately compensated" counsel assist death row inmates "at all stages of capital punishment litigation." *Id.* at 1. Recommendations 6 and 7 urge that federal courts not enforce procedural defaults if those defaults were the product of the "ignorance or neglect" of counsel. *Id.* at 2. The panel observed that "[t]he key to the entire package of American Bar Association recommendations is competent and adequately compensated counsel." *Id.* at 25.

were appointed to represent indigent death row inmates.[24]  Under the strict exhaustion and

---

[24] In *Ex Parte Wolfe*, Judge Baird wrote:

> Applicant is represented by counsel appointed by this Court. The instant application appears to allege ineffective assistance of trial counsel, but also includes a wish list of discovery, research, and hearings necessary to represent applicant.  No cases are cited.  No analysis of the law is presented.  Indeed, even the State recognizes this "application" appears to be a motion for discovery.
>
> Under these circumstances, the merits of the instant application should not be reached.  Instead, this matter should be remanded to the habeas court to determine whether applicant has been afforded effective assistance of counsel on this habeas application as required by TEX. CODE CRIM. PROC. Ann. art. 11.071 § 2.  Because the majority does not, I dissent.

*Ex Parte Wolfe*, 1998 WL 278960, *1 (Tex. Crim. App. May 20, 1998) (Baird, J., dissenting).  Other cases present similar troubling pictures.  *See, e.g., Ex Parte Martinez*, 977 S.W.2d 589 (Tex. Crim. App. 1998) (Baird, J., dissenting) (counsel spent fewer than fifty hours on case, performed no investigation, did not request expert assistance; substantive portion of writ is seventeen lines long, cites three cases, contains no citations to trial record); *Ex Parte Smith*, 977 S.W.2d 610 (Tex. Crim. App. 1998) (Baird, J., dissenting) (writ containing "twenty claims for relief which allege serious constitutional violations" dismissed because counsel filed application nine days late), *petition for cert. filed*, (Oct. 13, 1998) (No. 98-6458); *Ex Parte Kerr*, 977 S.W.2d 585 (Tex. Crim. App. 1998) (Overstreet, J., dissenting); *Ex Parte Colella*, No. 37,418-01 (Tex. Crim. App. July 15, 1998) (writ dismissed for late filing).

In *Mata v. Johnson*, 99 F.3d 1261, 1266 (5th Cir. 1996), *vacated in part on other grounds*, 105 F.3d 209 (1997), the Fifth Circuit observed:

> The Texas statute, on its face, delegates the task of developing competency standards to Texas's highest criminal court. . . . [S]o far, however, the Texas Court of Criminal Appeals has failed to fulfill its delegated task.  Moreover, Texas has failed to comply fully with § 2265's requirements, as it has not "establishe[d] by statute, rule of court of last resort, or by another agency authorized by State law" specific, mandatory standards for capital habeas counsel.  Therefore, we conclude that Texas is not yet eligible to take advantage of the provisions afforded opt-in states under the AEDPA.

The United States District Court for the Western District of Texas, presented with a case in which the CCA dismissed a writ even though state habeas counsel had utterly failed to perform any investigation and filed a petition devoid of challenges to the inmate's conviction or sentence, observed:

> This Court is dismayed to learn that petitioner's state habeas corpus proceeding appears to have been a mere sham, rather than a good faith effort to exhaust all available grounds for state habeas relief . . . .  This Court is also dismayed to discover that, at present, the State of Texas has apparently adopted no uniform standards or other rational criteria for determining which attorneys are qualified to represent prisoners sentenced to death in state habeas corpus proceedings.

*Kerr v. Johnson*, No. SA-98-CA-151-OG, slip op. at 1-2 (W.D. Tex. Apr. 21, 1998) (Order).

procedural default rules created by the AEDPA and the decisions interpreting it, these inmates face the possibility that not only their state but also their federal habeas proceedings will be reduced to a charade unless the *Coleman* exception is addressed. If the law is changed to recognize a right to the effective assistance of postconviction counsel in death penalty cases, the undersigned counsel contend that this right was clearly violated in Mr. Washington's case, and that procedural default or lack of exhaustion, if any, must be excused in view of the failure of the State of Texas to ensure that Mr. Washington was represented by appropriately experienced counsel in State proceedings.

> **5.    Further factual development and *de novo* review are warranted because the Petitioner, during state habeas corpus proceedings, diligently sought to develop factual support for his claims, but was denied that opportunity by the court.**

Mr. Washington is entitled to have facts not entered in the state court record considered in this case, and is further entitled to an evidentiary hearing under the doctrine of *McDonald v. Johnson*, 139 F.3d 1056 (5th Cir. 1998). McDonald, an indigent inmate, filed a petition under 28 U.S.C. § 2254 and a request for an evidentiary hearing. *Id.* at 1057. The State urged the district court to deny the hearing on the basis of 28 U.S.C. § 2254(e)(2), which provides that a "court shall not hold an evidentiary hearing" on a petitioner's claim if "the applicant has failed to develop the factual basis of a claim in State court proceedings." The Fifth Circuit noted that it was undisputed that McDonald had not developed the factual basis for his claim during State proceedings, because the state court had deemed McDonald's claim procedurally barred. *Id.* at 1059. The Fifth Circuit, however, emphatically rejected the State's assertion that McDonald must be barred from further factual development of his claims because he had "failed to develop" the

54

facts in state court.  The court noted that every other federal court to address the issue had found

that the phrase "failed to develop" cannot bear a strict-liability reading: further factual

development is only barred when the facts were not developed in state court because of "some

sort of omission by the petitioner;  in other words, he cannot be deemed to have failed to develop

a factual basis for his claim if the basis was left undeveloped through no fault of his own."  *Id.*

(citing *Love v. Morton*, 112 F.3d 131 (3d Cir.1997) and *Burris v. Parke*, 116 F.3d 256, 258 (7th

Cir.), *cert. denied*, 118 S.Ct. 462 (1997)).

   The rationale for the court's decision is important here: If a petitioner could be held to have

"failed to develop" a claim when the only reason for the lack of development was state action, "'a

state could insulate its decisions from collateral attack in federal court by refusing to grant

evidentiary hearings in its own courts.'"  *Id.* at 1059; *Burris*, 116 F.3d at 259.  Every federal

appellate court to consider the issue has unanimously endorsed this reasoning.  *See Cardwell v.*

*Greene*, 152 F.3d 331, 336 (4th Cir. 1998); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).

The Fourth Circuit observed that:

> [W]here the lack of factual development is caused by the state's decision to deny an
> applicant the opportunity to develop the basis of a federal habeas claim[,] Section
> 2254(e)(2) should not be interpreted to deny a petitioner *meaningful review* of a federal
> claim by refusing to permit development of the factual record at the state level.

*Cardwell*, 152 F.3d at 337 (citation omitted, emphasis added).

   As set out more fully above, Mr. Washington vigorously, actively tried to obtain expert and

investigative assistance in state court, and requested copious discovery, depositions and an

evidentiary hearing on all of his claims.  The state court denied him discovery on all counts,

except for limited discovery of medical records of the surviving victim, Yemane Kidane.  The

court's speculation that such assistance would be available from the Resource Center was incorrect. *See* Reger Dec. at ¶7. State habeas counsel was denied access to the District Attorney's case file on Mr. Washington's capital murder conviction. Oct. 6, 1989 Hearing, at 22-23. Because the Court denied an evidentiary hearing and denied depositions of key trial figures, there is no evidence in the record as to trial counsel's reasons for dozens of disputed actions and episodes of apparent ineffective assistance. *See infra* Part III.A.2. Thus, there is simply no way to determine whether trial counsel had plausible strategic reasons for many key trial decisions. In addition, there is no way to address the scope or reasonableness of his investigation. His affidavits contain puzzling, vague accounts of meeting several mystery witnesses whose names, addresses, descriptions, and relations to the actors are all unknown. *See infra* Part III.A.2 (describing affidavits). All of these mystery witnesses were unable to provide helpful information. *Id.* However, independent investigation has determined that several important trial witnesses could have provided helpful information, but were never interviewed by defense counsel. *See* Exhibit 6 (Affidavit of Mary E. Drakes); Exhibit 7 (Affidavit of Alfred Brooks). Thus, the extent and the adequacy of trial counsel's investigation is as yet unknown, as is trial counsel's reason for not retaining expert witnesses.

Because the state habeas court did not allow proper development of facts essential to Mr. Washington's claims, this Court must review Mr. Washington's claims *de novo*, "considering not only the evidence developed in state court, but also other evidence which comes to light afterward." *Dyer v. Calderon*, 151 F.3d 970, 979 (9th Cir.), *cert. denied*, 119 S. Ct. 575 (1998). Given the inadequate record before the state habeas court, that court's factfindings are not entitled to a presumption of correctness. *Miller*, 161 F.3d at 1254; *Dyer v. Calderon*, 151 F.3d

970, 979 (9th Cir. 1998).  As in all cases in which the petitioner did not receive a full and fair

hearing in state habeas court, *Townsend* mandates an evidentiary hearing.  *Stouffer v. Reynolds*,

1999 WL 14046 *12 (10th Cir. January 15, 1999) (vacating and remanding for failure to hold

evidentiary hearing on petitioner's claims of ineffective assistance of counsel, for which "the

adequacy of the record is essential").  *See supra* Part II.B.5 (discussing *Townsend*).

### D.  Conclusion

Exhaustion is a flexible, equitable doctrine designed to foster comity between the state and

federal judicial systems.  The state justice system, in this case, acted in bad faith and deprived Mr.

Washington of a reasonably fair and adequate postconviction forum in which to litigate his claims.

It has therefore sacrificed what would ordinarily be its prerogative – to insist that a federal court

require presentation of an inmate's claims to the state system before raising them in a federal

forum.  For this reason, exhaustion may be excused, and this Court may adjudicate claims and

consider factual development not presented to the state court, if any.  Further, because (1) Mr.

Washington did not fail to develop the facts in state court; (2) alleged claims which, if proven,

would entitle him to relief; and (3) was subjected to a state postconviction process that violated

several *Townsend* factors, the state habeas corpus findings of fact must be ignored and Mr.

Washington must be granted a federal evidentiary hearing.  *See, e.g., Cardwell v. Green*, 152 F.3d

331, 337 (4th Cir. 1998) (once petitioner has satisfied § 2254(e)(2)'s burden of proving that he did

not "fail to develop" facts in state court, *Townsend* takes over, and *Townsend* factors mandate

evidentiary hearing when petitioner has alleged facts which, if proven, would entitle him to relief

and when the state habeas factfinding process was inadequate).

## III. CLAIMS FOR RELIEF

### A.   Ineffective Assistance of Counsel

> "With . . . reservations about the effectiveness of counsel, I join the
> judgment of the Court." – *Washington v. Texas*, 771 S.W.2d 537,
> 548 (Tex. Crim. App. 1989) (Clinton, J., concurring).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court recognized a criminal

defendant's Sixth Amendment right to effective assistance of counsel.  The Court stated:

[A] fair trial is one in which evidence subject to adversarial testing is presented to an
impartial tribunal for resolution of issues defined in advance of the proceeding.  The
right to counsel plays a crucial role in the adversarial system embodied in the Sixth
Amendment, since access to counsel's skill and knowledge is necessary to accord
defendants the ample opportunity to meet the case of the prosecution to which they are
entitled.

*Strickland*, 466 U.S. at 685 (internal citations and quotation marks omitted).  A defendant

claiming ineffective assistance of counsel must show that (1) counsel's performance was deficient,

falling below an "objective standard of reasonableness," and (2) the deficient performance

prejudiced the defense.  *Id.* at 687; *see Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994); *Vela v.*

*Estelle*, 708 F.2d 954, 963-64 (5th Cir. 1983), *cert. denied*, 464 U.S. 1053 (1984).  Trial counsel

failed to ensure that Mr. Washington's trial was a genuine adversary contest.[25]  As there is

certainly a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different," *Strickland*, 466 U.S. at 694, Mr. Washington is entitled to

habeas relief.

### 1.   The State Court prevented relevant factual development on this issue.

---

[25] Trial counsel Reo Harris, Jr., has been the subject of multiple disciplinary cases before the Texas bar,
resulting in three Judgments of Public Reprimand.  *See* Exhibit 11 (Judgment of Public Reprimand for Cases No.
04H-1663-1091 and 04H-21-0192); Exhibit 12 (Judgment of Public Reprimand for Case No. 04H-180-0192);
Exhibit 13 (Agreed Judgment of Public Reprimand for Cases No. H0119201755 and H0119201697).  At least one
of these public reprimands was for neglect of a legal matter.  *See* Exhibit 11 (Case 04H-1663-1091).

58

As argued previously, *see supra* Part II.B (discussing appropriate standard of review), the state habeas court interfered with proper factual development in this case.   The state court's conduct prevented the development of a record sufficient to support accurate evaluation of trial counsel's performance.  The first affidavit filed by counsel virtually established Mr. Washington's claim of ineffective assistance of counsel.  However, the state court attempted to minimize the effect of this affidavit by ordering trial counsel to file another, with the assistance of the district attorney.  In addition, the state habeas court's consistent denial of resources and factual development prevented Mr. Washington from adequately investigating his case and securing necessary expert assistance.

> **2.    Counsel's affidavits establish that he is not a credible source of information about the scope and adequacy of his representation of the Petitioner.**

Mr. Washington filed his state habeas petition in the trial court on April 12, 1989.  Many of the claims in the Application revolved around allegations of trial counsel's inadequate representation of Mr. Washington.  *See* State Habeas Petition at 17-18, 21-22, 23-30, 33-50, 53, 55, 57, 60.  In response to Mr. Washington's claims, the district court ordered trial counsel to submit an affidavit describing his representation of Mr. Washington.  Counsel submitted his first such affidavit on September 25, 1990.  *See* 1990 Affidavit.  This document is riddled with spelling and grammatical mistakes.  In it Harris confirms his unorthodox funding of Mr. Washington's representation.  *See infra* Part III.A.3.  Counsel states that he "spent approrimately [sic] seventeen hours in preparing for the trial of Washington's case."  1990 Affidavit, at ¶13.  Counsel repeatedly insists that he was aware of a letter Mr. Washington wrote to Mary Drakes, a former

girlfriend, in which he purportedly confessed to the capital murder. *Id.* at ¶¶15-16. Counsel

never states that he saw the letter, only that he heard about it.[26] Even though counsel states that

his client confessed to him (even to the point of telling him "of the whereabouts of the gun and his

other clothes and the facts prior to the murder and afterwards," *id.* at ¶9),[27] he nevertheless also

states that he was willing to allow Mr. Washington to take the stand and testify (presumably

perjuriously, if his account of Mr. Washington's confession is to be believed) that the shooting

was the result of a "drug deal gone bad." *Id.* at ¶16. Counsel did not hire an investigator to

prepare for Mr. Washington's death penalty trial, and explained his decision thus:

> I did not hire a private investigator it [sic] is my sincere belief that an investigator should
> be hired in instances where you do not have and [sic] eye-witness to the facts or
> otherwise don't know what took place in connection with the crime, Washington [sic]
> was an eye-witness and had informed me of the whereabouts of the gun his [sic] other
> clothes and the facts prior to the murder and afterwards.

*Id.* at ¶ 9. Counsel also obliquely accuses Mr. Washington's wife of stealing his file on his

representation of Mr. Washington. *Id.* at ¶ 6. Trial counsel did eventually send his file to Mr.

Washington's state postconviction counsel, after repeated requests. The file contained only fifty-

six pages, and was less than one-quarter of an inch thick. *See* Affidavit of Gary Neale Reger

(Oct. 5, 1989), at 2 ("The bulk of [counsel's] file appears to be notes that Mr. Harris made *during*

voir dire and trial. There is nothing in the file that evidences any pretrial preparation or

investigation.").

---

[26] Assuming this letter exists, neither party has yet introduced it into evidence at any stage of these
proceedings. The letter was not present in the excerpts of the District Attorney's file which were reviewed by
counsel.

[27] Mr. Washington maintains his innocence of capital murder, and denies having confessed his guilt of
capital murder to trial counsel. Exhibit B to State Habeas Petition (Affidavit of Willie Terion Washington) at 1-2,
13.

60

The Assistant District Attorney charged with responding to Mr. Washington's Petition conferred *ex parte* with the trial judge concerning trial counsel's first affidavit. *See* Reger Dec. at ¶10, 13. Upon the undersigned counsel's own personal information and belief, the substance of these conversations included expressions of concern over at least two admissions in the affidavit: (1) that trial counsel spent only seventeen hours preparing to represent a defendant in a capital murder case in which the State was seeking the death penalty; and (2) he was willing to allow Mr. Washington to testify to the "drug deal gone bad" defense even though Mr. Washington purportedly made statements to trial counsel which indicated that this account would have been perjurious. The clear inference is that the district attorney *and the judge* were concerned that Mr. Harris's initial affidavit threatened the integrity of Mr. Washington's capital murder conviction by casting doubt on the effectiveness of trial counsel's assistance. Judge Lykos sometime later issued an order requiring trial counsel to fill out another affidavit. This time, the State took no chances – the Harris County District Attorney's Office coached trial counsel in the preparation of another affidavit. *See* Reger Dec. ¶ 16.

The resulting affidavit appeared in the record on April 25, 1991. *See* 1991 Affidavit. Although it addresses the same general topics as the first affidavit, it differs considerably in style and content. *See* Motion to Strike Second Affidavit of Reo Harris (May 7, 1991), at 1 (comparing the two affidavits filed by trial counsel, "one readily can see a dramatic and glaring difference in the substantive facts related, writing style, and form. From a comparison, it is obvious that the Second Affidavit . . . is *not* the personal recollection or work product or affidavit of Reo Harris") (emphasis original). First, the 1991 affidavit is almost free from grammatical or typographical errors. Second, several crucial content changes appear. In the second affidavit, trial counsel

61

omits any mention that Mr. Washington confessed to him.  Similarly, he never mentions any letters purportedly written from Mr. Washington to Mary Drakes.  He does not explain these omissions.  In the first affidavit, trial counsel affirmed that he had spent seventeen hours total preparing for the case.  In this affidavit, he changes his account to having spent seventeen hours "walking the neighborhood," and contends that he spent more time doing other tasks to prepare for the case.  1991 Affidavit, at ¶¶ 6-8.  The second affidavit also features several shadowy figures from the neighborhood who allegedly told trial counsel of seeing Mr. Washington with a gun near the time and place of the crime.  *See id.* at ¶¶ 6-7.  Trial counsel does not identify these people, nor does he explain why he failed to mention them in his initial affidavit.

Further, trial counsel's testimony about a key element of his defense strategy changes.  In his first affidavit, trial states that he was well aware of Mr. Washington's assertion that the shootings occurred during a drug deal gone bad.  *See* 1990 Affidavit, at ¶10 (noting that he felt that the identification of Mr. Washington by Mr. Kidane was irrelevant given that the defense theory was a "drug deal gone bad") *and* 1990 Affidavit, at ¶7 ("Mr. Washington himself was suppose [sic] to tell the jury about a dope deal going bad . . . .").  However, in the 1991 Affidavit, trial counsel maintains that he "was not aware that Mr. Washington used drugs"!  *Id.* at 2 ¶11.  The first affidavit makes clear that trial counsel was *counting on Mr. Washington* to testify in order to assert the "dope deal gone bad" defense, and that his strategy was crippled when Washington decided not to testify.  *See id.* at ¶¶ 7, 16, 17.  The second affidavit, by contrast, states that trial counsel "would not have presented evidence of [Mr. Washington's drug use because] it is my opinion that juries are not sympathetic to defendants who abuse drugs and commit violent crimes."  *Id.* at ¶11.  Both of these assertions cannot be true.  Attempts to determine which

62

theory, if any, explained trial counsel's strategy were blocked by the state habeas court's refusal to grant fact development.

Considering the glaring contradictions between the first affidavit and the second affidavit, it is clear why the District Attorney approached defense counsel about removing the first affidavit from the record. Reger Dec. at ¶20. State habeas counsel refused. *Id.* Mr. Washington's state postconviction counsel attempted to get the trial court to strike Harris's second affidavit, but this order was never ruled on. *See* Motion to Strike Second Affidavit of Trial counsel (May 7, 1991). In addition to the contradictions which detract from the affidavits' credibility, the affidavits leave dozens of questions about counsel's strategy unanswered. Among other things, the affidavits do not address (1) why defense counsel failed to retain any expert witnesses to probe the inconsistencies in the State's ballistics evidence; (2) why defense counsel failed to request a *Batson* hearing even though the prosecutor used five of his peremptory challenges to strike all minorities from Mr. Washington's jury, leaving it all-white (*See infra* Part III.A.4.c); (3) why defense counsel failed to impeach crucial punishment-phase witness Ella Miller with her criminal record; (4) why defense counsel never adequately interviewed any of the State's witnesses prior to trial; (5) why defense counsel waived appellate review of almost every claim of trial error by failing to lodge a timely, relevant, and specific objection and pursue it to an adverse ruling; (6) why defense counsel never contacted Alfred Brooks, despite the fact that he was allegedly present during the purported 1978 sexual assault of Ella Miller by Mr. Washington and could have testified that no rape occurred; and (7) why defense counsel failed to have bench conferences which resolved important legal questions transcribed for appellate review.

Trial counsel's 56-page file on the case consists almost exclusively of notes jotted down

63

during voir dire and trial, and sheds virtually no light on any of these decisions.  State habeas counsel repeatedly requested factual development in the form of discovery, depositions, or an evidentiary hearing in order to probe the dozens of questions left unanswered by the affidavits, but was denied at every turn.  *See, e.g.*, First Pre-Habeas Petition Motion for Discovery and Appointment of Expert Assistance, (filed Sep. 19, 1989) (requesting deposition of trial counsel, Jr.); First Supplement to Discovery Motion (May 7, 1991) (requesting deposition of co-counsel Mike Goberman, and of attorneys with whom trial counsel allegedly conferred prior to trial); Applicant's Motion for Rehearing on his Motions for Evidentiary Hearing and Pleadings Further Supplementing Petition (dated Oct. 6, 1997) (re-urging request for evidentiary hearing).  Because of the lack of adequate factual development, the District Attorney, who ghostwrote the state court's Findings of Fact and Conclusions of Law, repeatedly had to invent strategic reasons for counsel's decisions in order to defeat the applicant's ineffective assistance claims.  *See, e.g., id* at 10, ¶47 (declaring that trial counsel's decision not to object to prejudicial hearsay testimony about Mr. Washington's alleged "threats" to Mary Drakes was dictated by "reasonable trial strategy" of not calling attention to testimony); *id.* at 2-3 (prosecutor invents various justifications for not calling Mr. Washington's father to the stand).  Because Mr. Harris never addressed these specific questions in his affidavits, the District Attorney's fabricated "strategic" reasons are worthless speculation.  *See, e.g., Freeman v. Class*, 95 F.3d 639, 643 n.9 (8th Cir. 1996) ("For whatever reason, the state did not call petitioner's trial counsel as a witness in the habeas hearing in federal court.  Any reliance on the trial counsel's strategy for failure to object is pure speculation.").

Trial counsel's affidavits are inadequate to permit resolution of key factual issues.  To begin with, the second affidavit was clearly not written by trial counsel, and came into existence under

64

suspicious circumstances.  The affidavits clash on key points, and the trial court permitted no

factual development on the issue of why the two documents give different accounts of identical

topics.  Because the state habeas corpus court denied Mr. Washington access to relevant,

adequate factual development, the record concerning Mr. Washington's claims of ineffective

assistance of counsel remains too sparsely developed to afford a reasonable basis for examining

trial counsel's representation.

### 3.   Financing of the Case

Mr. Washington attempted to find a privately retained lawyer willing to represent him for a

total fee comprised of some portion of the proceeds of a $5,000 worker's compensation claim due

to be paid to Mr. Washington.  At least one lawyer approached on Mr. Washington's behalf

turned down the offer, noting that competently defending an accused in a capital murder case in

which the State was seeking the death penalty would require at least six to eight times that

amount.  However, Mr. Washington did eventually locate a lawyer willing to represent him for

that sum.  The financial constraints imposed on trial counsel's representation by the fee

arrangement deprived Mr. Washington of a fair trial in many important respects.

#### a.   The representation of the Petitioner was financed by an unethical and possibly illegal act on the part of defense counsel.

Before his arrest on capital murder charges, Mr. Washington had retained a Houston attorney

named James G. Kinser to pursue an unrelated worker's compensation claim on his behalf.  *See*

Exhibit C to State Habeas Petition (Affidavit of James Kinser), at 1.  When Mr. Washington was

arrested, and for several months thereafter, Kinser negotiated with the worker's compensation

insurance carrier about the possibility of settling the case for about $5000.  Kinser agreed to

65

represent Mr. Washington in the pending capital murder proceeding, but only until other counsel could be found.  In a handwritten retainer agreement made on December 20, 1985 between Kinser and Mr. Washington, Kinser refused to represent Mr. Washington any further than the preliminary phase of his capital murder trial because a full death penalty capital murder trial would cost "$30,000-$40,000," and Mr. Washington's only source of funds was the pending settlement.  *See* Exhibit 14 (Agreement and Power of Attorney).

In late December 1985, Mr. Washington fired Kinser as his attorney in the pending capital murder case and replaced him with trial counsel.  Exhibit 15 (excerpts from worker's compensation case file), at 3 (Letter from trial counsel to Industrial Accident Board).   Trial counsel, apparently believing that $5000 was an adequate total fee for representing a person in a capital murder case in which the State was seeking the death penalty, agreed to represent Mr. Washington, who was otherwise indigent, in return for the all of the $5000 worker's compensation settlement.  *See* 1990 Affidavit, at ¶2 ("[Washington] informed me that he had a workmen's compensation case pending, and that he would discharge his current attorney Kinser from the handling of the case and sign the case and all proceeds from the case over to me if I would handle his Capital Murder defense.").[28]

A dispute between Harris and Kinser over the attorney's fees portion of the settlement, and how much money Kinser himself was entitled to retain over and above the statutory attorney's fees, delayed payment of the claim.  Kinser Aff. at 1.  Harris mailed a letter to the Industrial

---

[28] Worker's compensation settlements cannot be assigned.  *Butler v. Comm'n for Lawyer Discipline*, 928 S.W.2d 659, 663 n.1 (Tex. App. – Corpus Christi 1996, no writ) (citing TEX. REV. CIV. STAT. ANN. art 8603, § 3 (Vernon's 1994)).  Such assignments may violate Rule 1.14(c) of the Texas Disciplinary Rules of Professional Conduct, which provides in relevant part: "All funds in a trust or escrow account shall be disbursed only to those persons entitled to receive them by virtue of the representation or by law."  *Butler*, 928 S.W.2d at 662-664.

66

Accident Board (IAB) concerning Mr. Washington's worker's compensation claim on February 5, 1986. In this letter, Harris asserted that he now "represent[s] the above named claimant in connection with a claim for workmen's compensation benefits." *See* Exhibit 15, at 3. Kinser wrote the IAB on March 13 and April 1, 1986 to make sure they were aware of his claim to a portion of any settlement. *Id.* at 7, 9 (Kinser advises IAB on April 1 that "our law firm retains our statutory 25% attorney's fee interest in and to any settlement of the above captioned claim in addition to an assignment of claim proceeds for services rendered which assignment value is $1,160.00 above and beyond the 25% statutory attorney's fees."). A Compromise Settlement Agreement relating to the claim was received by the IAB on March 17, 1986. *Id.* at 8. A handwritten note on this agreement recites that "Fee is to be split between Atty Reo Harris & Atty James Kinser." *Id.*[29] On April 11, 1986, the workers' compensation carrier for the firm Mr. Washington worked for issued a check payable to trial counsel, Willie Washington, *and* James Kinser, and forwarded this check "to Mr. Harris for distribution." *Id.* at 10.

Thus, the first money paid to trial counsel for his representation of Mr. Washington came over three months after Mr. Washington was arrested for capital murder. Even then, apparently, counsel still did not receive the entire $5000. Although the check was made payable in part to Mr. Kinser, he refused to endorse it because he believed he was being cheated out of his fee. Kinser Aff. at 1. The worker's compensation carrier, Standard Fire Insurance Company, put a stop payment order on the $1250 attorney's fees portion of the check. *Id.* The correspondence

---

[29] This Compromise Settlement Agreement was executed when trial counsel was representing Mr. Washington in the worker's compensation matter. The settlement agreement recites that Mr. Washington is entitled to compensation at the rate of $153.85 per week for the "time lost" from work. *Id.* This time lost extends from 10-30-85 to 3-6-86. *Id.* Further, the form states that Mr. Washington *"returned to work"* on April 1, 1986. Considering that Mr. Washington was incarcerated in Harris County Jail without bond from December 19, 1985 forward, it is difficult to see how those statements could have been made in good faith.

from the IAB appears to indicate that a single $5000 check was issued, as does Mr. Kinser's

reference to "check" in the singular.  It is unclear whether or how the check was cashed, as Mr.

Kinser adamantly denied providing his necessary endorsement signature.  *Id.*  "Where, as here, a

check is made payable to more than one payee jointly and not in the alternative, it can be

negotiated, discharged or enforced only by all of the joint payees. *Longview Nat'l Bank & Trust*

*Co. v. First Nat'l Bank of Azle*, 750 S.W.2d 297, 299 (Tex. App. – Fort Worth, 1988) (citing

TEX.BUS. & COM.CODE ANN. sec. 3.116(2) (Vernon 1968)).

Mr. Kinser's affidavit was attached to the state habeas petition, which trial counsel appears

to have read.  However, neither affidavit addresses the fee dispute, how Mr. Kinser's signature

came to be on the worker's compensation check, or the stop payment order. *See* State Habeas

Petition at 19 (describing fee dispute); Kinser Aff. (Mr. Kinser denies signing check and maintains

he has never received his fee).  Harris to this day has refused to produce his file on the worker's

compensation lawsuit, despite state habeas counsel's having sent him *in 1989* a timely and proper

request for the file, along with a notarized release signed by Mr. Washington.  Exhibit D to State

Habeas Petition, at 1.  Because the state habeas corpus court denied Mr. Washington's request to

depose Mr. Harris or to convene an evidentiary hearing, no further factual development could

take place as to this claim.

The IAB apparently sent trial counsel a check for $5000 made payable jointly to himself,

Willie Washington, and James Kinser.  Mr. Kinser denies having endorsed the check.  However,

Mr. Harris appears to have been paid some portion – possibly all – of the check amount.  If one

check was issued, the record as it stands provides no explanation how Mr. Kinser's signature

68

appeared on the check.[30]  If there is an innocent alternative explanation for this chain of events, the search for that explanation was aborted by (1) Mr. Harris's unethical failure to turn over the file on Mr. Washington's worker's compensation claim (which, of course, is Mr. Washington's property); (2) Mr. Harris's failure to address the issue in the affidavits he filed in this case; and (3) the state trial court's refusal to permit factual development.

> **b.   Counsel rendered deficient performance and guaranteed a conflict of interest by agreeing to represent the Petitioner for a sum grossly inadequate to assure reasonable performance in a death penalty case.**

The fee trial counsel agreed to accept from Mr. Washington was simply nowhere near adequate.  According to Mr. Kinser, the worker's compensation insurance carrier stopped payment on the $1250 portion of the settlement Mr. Kinser claimed as his own fee.  *See* Kinser Aff. at 2.  Mr. Kinser also claimed $1,160.00 of the settlement proceeds, but apparently did not receive them.  Therefore it appears that the most trial counsel could have received for his representation of Mr. Washington was $3750.00.  Trial counsel mentions no source of funding except for the worker's compensation settlement, and no evidence whatsoever from his own file indicates that he received anything more than this amount for his representation of Mr. Washington.

Voir dire took place in the afternoons from September 29, 1986 to October 30, 1986.  There are 25 weekdays in this period.  At 4 hours a day, this adds up to 100 hours of in-court time.  The trial on the merits lasted eight full days from Nov. 10 to Nov. 20.  Eight 8-hour days is 64 additional hours.  The time spent on in-court pretrial proceedings can be estimated at 3.5 hours.

---

[30] If two checks were issued, split between the settlement amount and the attorney fee portion, the attorney fee of $1250 was apparently never collected, according to Mr. Kinser.

trial counsel himself claimed in his first affidavit to have spent seventeen hours in (apparently out-of-court) pretrial preparation. Thus, a low estimate – one that excludes any time spent on the worker's compensation case, or any conferences with Mr. Washington or his family members – is that trial counsel spent 185 total hours representing Mr. Washington. This works out to an hourly fee of $20.27. In trial counsel's second affidavit, which was synthesized with the input of the District Attorney's office, Mr. Harris contradicts his earlier affidavit and states that the 17-hour estimate now only applied to the time he spent "walking the neighborhood." Now he remembers that the 17 hours was spent *only* "walking the neighborhood," and that he spent a "great deal" *more* time, including "many hours" talking to other attorneys, to prepare for Mr. Washington's trial. Assuming conservatively that a "great deal" of time is 30 extra hours, Mr. Harris has now spent 215 hours on the case, and his hourly rate has dropped to $16.27. Had Mr. Harris spent $500 to hire an investigator who would have uncovered critical evidence about state witnesses, and had he spent $500 to hire an expert witness to subject the state's questionable forensic evidence to meaningful adversarial testing, his rate of hourly compensation would have dropped to *$12.79*.

Courts called upon to review the reasonableness of fees paid for the representation of indigents in death penalty cases have routinely labeled similar fees unconscionably, unreasonably low, and have pointed to the crippling effect unreasonably low fee caps have on the quality and thoroughness of representation. The Florida Supreme Court in *White v. Board of County Comm'rs*, 537 So.2d 1376 (1989), considered a case in which an appointed attorney spent a total of 134 hours representing a defendant in a death penalty case, and was denied compensation in excess of the statutory fee cap of $3500.00. The attorney received $26.12/hour. *Id.* at 1379.

The court observed that in light of the "increasing[] complex[ity]" of capital cases, "we are hard pressed to find any capital case in which the circumstances would not warrant an award of attorney's fees in excess of the . . . cap." *Id.* at 1378 & 1379 n.1. The court found it impossible to ignore the bottom-line reality that there is a "relationship between an attorney's compensation and the quality of his or her representation." *Id.* at 1380.

> It may be difficult for an attorney to disregard that he or she may not be reasonably compensated for the legal services provided due to the statutory fee limit. As a result, there is a risk that the attorney may spend fewer hours than required representing the defendant or may prematurely accept a negotiated plea that is not in the best interests of the defendant. A spectre is then raised that the defendant received less than the adequate, effective representation to which he or she is entitled, the very injustice appointed counsel was intended to remedy.

*Id.* The court declared that henceforth *every* capital case, regardless of apparent "complexity," would be deemed to involve the "extraordinary circumstances" required to justify deviation from the fee cap: "Capital cases require an extraordinary and unusual amount of time, energy, and effort by counsel . . . ." *Id.*

Of course, lawyers are obliged to provide competent representation regardless of the fee. However, to imagine that reasonable compensation for time, overhead, investigation, and expert assistance is irrelevant to the quality of a lawyer's representation is to deny reality. As the Kansas Supreme Court noted in a decision striking down arbitrary fee caps for indigent criminal defense cases, severely inadequate funding "creates an inherent conflict interest between the attorney and client because the more hours an attorney spends on the case, the greater the personal cost to the attorney." *State ex. rel. Stephan v. Smith*, 747 P.2d 816, 831 (Kan. 1987). The court observed that the "financial burdens" created by such inadequate representation "could well create a conflict of interest of the type proscribed by DR 5-101(A) of the Code of Professional

71

Responsibility, [which provides that] "a lawyer shall not accept employment if the exercise of his

professional judgment on behalf of his client will be or reasonably may be affected by his own

financial, business, property, or personal interests." *Id; see also* Anthony Paduano and Clive A.

Stafford-Smith, *The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in*

*Capital Cases*, 43 Rutgers L. Rev. 281, 333 (1991) ("Only the hopelessly romantic deny that

'[i]n our pecuniary culture the calibre of personal services rendered usually has a corresponding

relationship to the compensation provided.'" (quoting *Makemsom v. Martin County*, 491 So.2d

1109, 1114-15 (Fla. 1986), *cert. denied*, 479 U.S. 1043 (1981))); *Federal Trade Comm'n v.*

*Superior Court Trial Lawyers' Ass'n*, 493 U.S. 411, 422 (1990) (assuming that public-defender

boycott which resulted in raising of "unreasonably low" attorney compensation rates "has

produced better legal representation for indigent defendants").

Nowhere is the risk greater than in death penalty cases: "[T]here exists a vast body of case

law, especially concerning eighth amendment analysis, which emphasizes the need for greater

reliability in capital cases than in non-capital. Few deny that greater care should be taken when

the judicial path leads to the execution chamber." Anthony Paduano and Clive A. Stafford-Smith,

*The Unconscionability of Sub-Minimum Wages Paid Appointed Counsel in Capital Cases*, 43

Rutgers L. Rev. 281, 292 (1991) (footnotes omitted); *see also id.* at 292-301 (describing

complexities which distinguish death penalty case from non-capital cases, and citing numerous

court decisions permitting higher fees in death penalty cases in view of the extra premium on

reliability they involve). *See also Wilson v. State*, 574 So.2d 1338, 1338-39 (Miss. 1990)

(striking down Mississippi's absolute fee cap of $1000 in death penalty cases and ordering that

attorney be paid at least $25/hour in order to cover basic overhead); *Martinez-Macias v. Collins*,

72

979 F.2d 1067 (5th Cir. 1992) ("We are left with the firm conviction that Macias was denied his constitutional right to adequate counsel in a capital case in which actual innocence was a close question. The state paid defense counsel $11.84 per hour. Unfortunately, the justice system got only what it paid for."); *Cockrum v. Johnson*, 119 F.3d 297, 298 (5th Cir. 1997) (decrying fact that trial counsel were paid, respectively, "$3,500 and $3,200" for their efforts in a capital case as part of a "perverse allocation of government resources").

      c.   **Counsel's performance was hindered by a conflict of interest caused by his unethical fee arrangement.**

Trial counsel could have represented Mr. Washington on a privately-retained basis until the $3750 was depleted, and then requested appointment by the court once Mr. Washington became eligible for it. Article 26.05(e) of the Texas Code of Criminal Procedure provides that a court may appoint counsel if there exists a "material change in circumstances" in a defendant's ability to pay his lawyer. Had he done so, trial counsel would have become entitled to compensation for "reasonable expenses incurred with prior court approval for purposes of investigation and expert testimony" and would have become entitled to payment of a "reasonable attorney's fee" for his representation. This action would have been in trial counsel' interests for obvious reasons. It would also have been in Mr. Washington's interests because it would have ensured that trial counsel's decision to employ experts or investigators would not be affected by the knowledge that doing so would decimate his fee. This Petition demonstrates the many ways in which the assistance of expert witnesses and investigators could have raised a reasonable doubt as to Mr. Washington's guilt.

Trial counsel declared in his first affidavit that he did not hire an investigator because there is

73

no need for an investigator in cases in which the defendant is an "eye-witness" to the crime.  1990

Affidavit, at 2.  In addition, there was no need for an investigator because, long before trial, trial

counsel was convinced of his own client's guilt and therefore believed that "[a]ll the investigator

could have done was dug up other evidence of Mr. Washington's guilt."  *Id.*  Trial counsel then

buttressed this assertion by declaring that Mr. Washington confessed to him – an allegation he

conspicuously omitted from the affidavit the Harris County District Attorney's Office helped him

create.  Trial counsel's reasons for not hiring an investigator are nonsense.  One is reminded of

*Amadeo v. Zant*, 486 U.S. 214, 226 (1988) in which the Supreme Court found two trial lawyers'

testimony concerning an implausible "strategic reason" for a trial decision "not credible" because

"petitioner's trial lawyers, who were no longer representing him when they testified at the

evidentiary hearing, had significant incentive to insist that they had considered every possible

angle: they had lost a capital murder trial, and another lawyer had uncovered evidence of serious

constitutional error in the proceedings."  In any event, assuming trial counsel really did think no

benefit could be gained from hiring an investigator, he was wrong.  Any reasonable lawyer,

presented with the information trial counsel had available to him prior to trial, would have

concluded that investigation and expert analysis would be crucial to the case.  An investigator

could have yielded copious evidence to bolster the defense.  *See infra* Part III.A.5.  Expert

witnesses could have roundly attacked the state's investigation of the case and raised questions

about the state's ballistic evidence.  *See infra* Part III.A.5.d.  Trial counsel's decision to forego

hiring investigators and experts crippled his representation of Mr. Washington.

　　　A much more credible explanation for why counsel failed to hire investigators or experts is

that he did not want to reduce his fee by paying for them himself, and did not want to petition the

74

court for resources because doing so would have invited scrutiny of his prior fee arrangements. An attorney's fear of taking action on behalf of his client because it would expose his own wrongdoing constitutes a conflict of interest. *See, e.g., Wood v. Georgia*, 450 U.S. 261, 267 (1982); *United States v. Tatum*, 943 F.2d 370 (4th Cir. 1991). This was the allegation set out in the state habeas corpus petition. *See* State Habeas Petition at 22-25. Harris did not specifically deny this allegation, and his only response to it was the remark in his first affidavit that he didn't think an investigator was necessary because Mr. Washington was a "witness" to the incident. Harris never explained why he declined to subject the state's considerable forensic evidence to any independent testing by defense experts. Because the state court stymied all other factual development related to trial counsel's trial representation, and because his file sheds no light on the issue, no further information is forthcoming.

### d. The Petitioner was prejudiced by the conflict of interest with his counsel.

Because counsel's independent judgment was hampered by a conflict of interest between his own financial well-being and zealous advocacy on his client's behalf, his claims must be reviewed under the prejudice standard of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Under *Cuyler*, a conflict of interest which results in ineffective assistance is subject to a lower standard of prejudice than a conventional ineffective assistance of counsel claim. To prevail under *Cuyler*, a defendant need only demonstrate that an actual (as opposed to potential or inchoate) conflict of interest adversely affected the representation of his client. *Id.* at 348-50.

An "actual conflict" of interests exists under *Cuyler* if the defense attorney "was required to make a choice advancing his own interests to the detriment of his client's interests." *Stoia v.*

75

*United States*, 22 F.3d 766, 771 (7th Cir. 1994) (quoting *United States v. Ziegenhagen*, 890 F.2d

937, 939) (quoting *United States v. Horton*, 845 F.2d 1414, 1419 (7th Cir. 1988)).   There are

two ways in which Mr. Washington's and trial counsel's interests were adverse.   First, every

additional hour trial counsel spent on the case reduced his already-paltry fee, and paying the

substantial sums required for investigative or expert assistance would have submerged trial

counsel in a bath of red ink.   Second, it was manifestly in Mr. Washington's interest for counsel to

request a changed circumstance hearing in order to have Mr. Washington declared indigent.   Such

a move would have entitled Mr. Washington to court financing of his defense.   Counsel refused to

request such a hearing because he wished to avoid scrutiny of the myriad ethical problems tainting

his fee arrangement.   To quote a court which found an actual conflict arising from a contingent-

fee agreement in a criminal case, "[Mr. Washington's] interests in effective representation were

pitted against trial counsel's monetary interest."  *Winkler v. Keane*, 7 F.3d 304, 307 (2nd Cir.

1993), *cert. denied*, 511 U.S. 1022 (1994).[31]

   "'[T]o establish an adverse effect on the basis of what an attorney failed to do, a defendant

must demonstrate that some plausible alternative defense strategy or tactic – 'a viable alternative'

– might have been pursued.'"  *Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996) (collecting

federal circuit court cases endorsing identical test) (quoting *Beets v. Scott*, 65 F.3d 1258, 1288

(5th Cir. 1995) (King, J., dissenting), *cert. denied*, 517 U.S. 1157 (1996)).   The Court

emphasized in *Cuyler* that the standard it announced did not require a traditional showing of

---

[31] In neither of his affidavits does trial counsel explain why he failed to request a changed circumstance hearing.  He does state a "reason" why he did not hire an investigator, but this reason, in addition to being implausible on its face, was made by an attorney who was attempting to evade a charge of conflict of interest, and is thus inherently suspect. *Wood v. Georgia*, 450 U.S. at 267.

prejudice. *Cuyler*, 446 U.S. at 349-350. In practice, this distinction means that, so long as a petitioner establishes that a "plausible" or "viable" strategy was "likely" left unpursued because of a conflict, it is completely irrelevant whether the strategy would have changed the outcome of the case. *See, e.g., Perillo*, 79 F.3d at 449; *Winkler*, 7 F.3d at 309 (2nd Cir. 1993) ("Even if it is *likely to be unsuccessful*, the negotiation of a plea bargain in a case in which the evidence is strongly against a defendant is a viable alternative."); *McConico v. Alabama*, 919 F.2d at 1543, 1548 (11th Cir. 1990) (petitioner "need not show that the result of the trial would have been different without the conflict of interest"); *United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995), *cert. denied*, 117 S.Ct. 185 (1996) ("The strength of the prosecution's case is not relevant to whether counsel's performance was adversely affected."); *Lopez v. Scully*, 58 F.3d 38, 42 (2d Cir. 1995) (conflict which prevented counsel from requesting lower sentence for defendant had adverse effect even though judge had earlier declared he would not lower sentence even if "Jesus Christ came and did a break dance on this desk").

The evidence of adverse effect is abundant. First, counsel could not have made an impartial decision whether to accept or reject the judge's offer of a mistrial after a police officer was seated on Mr. Washington's jury. Counsel had just spend the better part of a month selecting the jury in this case. To have accepted the judge's offer of a mistrial, without any prospect of additional payment, would have meant at least a hundred more hours of uncompensated representation. Considering the fact that the jury was all-white, and that many empaneled jurors had pro-prosecution biases, it would have been in Mr. Washington's interest to select a new jury. *See infra* Part III.A.4.b & c.

Trial counsel also failed to hire an investigator. His attempts at investigating the case appear

77

ineffectual, and he soon became convinced that investigating the case was pointless because it could only have "dug up more evidence" of Mr. Washington's guilt.[32]  Nothing could be further from the truth.  In fact, proper investigation, including contacting the state's witnesses and people who allegedly witnessed acts of misconduct committed by Mr. Washington, could have turned up evidence to corroborate the potential defensive theory that the shootings occurred during a botched drug deal, and could have revealed to the jury that a key piece of prosecution punishment-phase evidence was fabricated by a convicted murderer and thief, among other things. *See infra* Parts III.A.5, III.A.7.

Especially disturbing is the failure to obtain expert analysis of the adequacy of the state's investigation and of the ballistics evidence in this case.  The discrepancies between the state's evidence and its theory concerning the caliber of the murder weapon warranted independent expert analysis, but none was obtained.  To this day, despite state habeas counsel's consistent efforts to expand the record in this respect, trial counsel has not come forward with an explanation for not hiring expert witnesses.  Contacting the State's witnesses and obtaining independent analysis of the forensic evidence were at least two "plausible" options which would have yielded valuable information.  Even if Mr. Washington cannot demonstrate prejudice under the more exacting *Strickland* standard – and he most certainly can – he can show prejudice under the "adverse effect" rubric of *Cuyler*, and his conviction must be reversed.

### e.   The state court's findings of fact and conclusions of law on this issue are incorrect.

The state court's findings of fact 1, 2, 4, 7, 8 under the heading "Ineffective Assistance of

---

[32] Mr. Washington never made any inculpatory remarks to co-counsel Mike Goberman. *See* Exhibit 16 (Affidavit of Mike Goberman, Esq.) at ¶5.

Counsel" deal directly with this aspect of Mr. Washington's case. As explained in Part II.B, *supra*, the fact findings and legal conclusions "entered" by the state trial court in this case lack credibility because they consist simply of the District Attorney's partial adversarial characterizations of the evidence. The following fact findings are unsupported by or contradicted by the evidence:

### i. The assertions in trial counsel's affidavits are not "credible."

Trial counsel's affidavits are not credible because: (1) they are riddled with internal and mutual inconsistencies; (2) they do not address many significant allegations contained in the petition; (3) they establish trial counsel' willingness to violate ethical guidelines; and (4) the second affidavit was created as a result of the trial judge's improper involvement in the case. The judge who signed the State's proposed findings did not preside over the trial and there was no evidentiary hearing held in state habeas, so the judge's conclusions about counsel's representation is not entitled to the deference it would be had it been entered after a live adversarial hearing. Further, the second affidavit was the product of coaching by the employees of the very office in which the drafter of the state habeas findings worked. Thus, the prosecutor's ascription of "credibility" to the assertions in the second affidavit is laughably self-serving.

Specifically, the trial court's assertion that trial counsel's made the decision to forego crucial investigative and expert help for valid reasons of "trial strategy" is untenable. First, there is no evidence to support this notion. Even if counsel honestly believed that the services of an investigator are unnecessary when the defendant is an "eye-witness" to the crime, that still does not explain why an investigator would not have been helpful in, for instance: (1) locating the

79

criminal records of prosecution witnesses; (2) contacting and interviewing prosecution witnesses in order to determine whether their testimony could have supported a viable defense; and (3) interviewing witnesses to alleged misconduct introduced against Mr. Washington at the punishment phase of his trial. Trial counsel's uninformed assumption that no other factual development would be helpful has been proven wrong by postconviction investigation – based mostly on leads which were available to counsel at the time of the trial.

Secondly, trial counsel's reason for not hiring an investigator is simply not as plausible as the conflict theory. Every dollar paid to an investigator would literally have taken a dollar out of trial counsel' pocket. Asking the court to certify Mr. Washington as indigent and appoint an investigator had risks of its own. Trial counsel arranged for funding in this case in a manner that appears to have violated many ethical guidelines and which may have involved fraudulent activity. In order to prove the "material change in circumstances" that would have been required to qualify for court appointment, he would have had to demonstrate that the client could no longer afford to pay him, which would have entailed an inquiry into how much money counsel had already been paid, where that money came from, what additional sources of funding might be available to Mr. Washington, and why counsel undertook a job that he should have known was too complex for the fee. It is not difficult to understand why trial counsel would have been unwilling to invite these inquiries.

The more plausible interpretation of the record is that trial counsel did not retain an investigator or take steps to have one appointed for the reasons noted above. This left him with the only remaining option: to do whatever investigation he could on his own, knowing that each additional hour put into the task reduced his effective fee.

80