ii.  **The state court's fact-finding concerning trial counsel's reason for not hiring expert witnesses was simply invented.**

In neither affidavit does trial counsel provide *any* reason for not hiring expert witnesses, even though the state habeas corpus petition alleges that he failed to hire experts for the same economic reasons that dictated his decision to forego hiring an investigator.  Because the state trial court denied the defense's repeated requests for a deposition or evidentiary hearing at which trial counsel' testimony could be probed by live adversarial proceedings, there is simply no explanation from trial counsel for this decision.  The state court ignores the deficiency prong of the *Strickland* test and simply declares that the input of any experts would not have been helpful in light of the "non-inculpatory nature of the forensic evidence presented by the State."  Findings and Conclusions at 2, ¶8.  It is true that most of the forensic evidence presented by the State did not link Mr. Washington to the crime scene.  However, this Finding does not address the allegation in the state habeas petition – amply supported by exhibits attached to this Petition – that elements of the State's forensic evidence were misleading and actually *exculpatory*.  *See* State Habeas Petition (noting inconsistency in gun-caliber evidence); Exhibit 5 (Affidavit of Dr. Lloyd White); Exhibit 17 (Affidavit of Ronald Singer).  Because this "fact finding" was merely invented by the prosecutor and does not address the allegation in the state habeas petition, it is not entitled to deference.

4.  **Ineffective Assistance of Counsel –Voir Dire**.

Jury selection in capital cases is unlike that in conventional criminal cases.  Jurors are examined individually rather than en masse, and a complex set of precedents and principles applies to death penalty jury selection that have no play in a noncapital case.  As the CCA has noted,

"voir dire examination of those persons who compose the jury panel in a capital murder case is conducted under the most demanding of conditions" and is "extremely tedious, costly, and time consuming to the litigants, the jurors, and the trial judge." *Perillo v. State*, 656 S.W.2d 78, 79 (Tex. Crim. App. 1983).

Throughout the questioning, it was apparent that this was trial counsel's first capital murder case. *See* Exhibit 16 (Affidavit of Mike Goberman ) at ¶2. Trial counsel routinely displayed ignorance of legal principles and strategies governing jury selection. Among other things, trial counsel: (1) failed to object to the prosecutor's misleading or prejudicial misstatements of the law; (2) often confused or alienated jurors with disjointed, opaque questioning; (3) challenged jurors for cause without any basis in Texas law to do so; (4) failed to preserve, by timely objection, a *single* claim of error relating to jury selection, although several strong challenges could have been preserved; (5) explained the law to jurors erroneously; (6) failed to attempt to rehabilitate potential defense jurors; (7) failed to arrange for the court reporter to record numerous bench conferences during which important decisions appear to have been made; and (8) failed to develop any record about the race of any challenged jurors or the prosecution's reasons for striking them, thereby sacrificing any potential *Batson* challenges.

Trial counsel' incoherent voir-dire strategy and his ignorance of death penalty jury-selection law allowed the prosecution to select an all-white jury more predisposed to believe the State's case than it would have been had Mr. Washington received competent representation.

### a.   Counsel failed to adequately lay the basis for challenges for cause and failed to adequately rehabilitate jurors.

Throughout the voir dire, trial counsel failed to adequately follow up on comments by jurors

82

which indicated they harbored preconceptions and biases that would have justified striking them for cause.  His attempts to question the jurors often confused them, and his objections were meandering and often did not cite the proper legal principles.

Juror Walter Bohannon made repeated comments indicating potential challenges for cause. He declared that if someone is guilty of murder, that person "doesn't deserve to live."  S.F. Vol. VIII:971.  When asked whether he could imagine giving the death penalty in a proper case, he enthusiastically responded "definitely."  *Id.* at 972.  The judicial system is "lax," and "there's too many people that get off for too many things.  You know, murder being one of them."  *Id.*  He agreed with the statement that "any time somebody takes a life, they deserve to have their life taken."  *Id.* at 996.  Statistics, the juror said, "seem to prove" that blacks "are more prone to commit crimes" than other groups in society.  *Id.* at 997.  Mr. Bohannon accused defense counsel of trying to make this case "racial."  *Id.* at 999.

Defense counsel did not adequately explore Mr. Bohannon's statements that he would automatically sentence someone to death upon convicting them of capital murder, thereby waiving challenges based on *Pierce v. State*, 604 S.W.2d 185 (Tex. Cr. App. 1980) (juror who demonstrates inability to consider full range of punishment for capital murder is subject to challenge for cause), *overruled on other grounds, Hernandez v. State*, 757 S.W.2d 744, 751-52 n. 15 (Tex. Cr. App. 1988), and *Morgan v. Illinois*, 504 U.S. 719 (1992) (federal constitution guarantees defendant right to strike for cause any juror who would automatically sentence defendant to death upon conviction for capital murder).  The defense counsel's only attempt to rehabilitate Mr. Bohannon on this topic is one half-page of confusing questioning.  *Id.* at 1044-45.

Mr. Bohannon also affirmed that he believed that police officers would not lie on the witness

stand. S.F. Vol. VIII:1011. A juror who automatically finds police officers more credible than

other witnesses should be challenged for cause. *Trevino v. State*, 572 S.W.2d 336 (Tex. Crim.

App. 1978). Trial counsel at first challenged the juror on this basis, but the judge scolded him:

"[Y]ou need to develop it a little more thoroughly, sir." *Id.* After the state rehabilitated Mr.

Bohannon with leading "you-can-be-fair-can't-you" questions, trial counsel returned to the theme,

asking questions which were so artless and improper that the judge repeatedly sustained the

prosecution's objections to them. *Id.* at 1018-20. Eventually, the judge was required to give trial

counsel an impromptu lecture on capital murder voir-dire:

> THE COURT: You never did define what a proper case [warranting disbelief of a police officer] was, for one thing.
>
> MR. HARRIS: Well, I thought –
>
> THE COURT: A proper case is a term of art.
>
> MR HARRIS: Right. Yes, ma'am, that's correct. That's correct.
>
> THE COURT: Well, when you give somebody an example, to be perfectly fair you have to define the terms.
>
> MR HARRIS: Okay.
>
> THE COURT: And that's the whole reason for the misunderstanding here –
>
> MR. HARRIS: Okay. I follow you.
>
> THE COURT: – that the term hadn't been defined and the prospective juror was using one definition and one or more of the lawyers was using the other definitions.
>
> MR. HARRIS: Okay. Okay. I think I understand the Court's

84

> ruling.  I need to define a proper case to the
> prospective juror before I ask that question, is that
> the Court's ruling?

*Id.* at 1021-22.  Trial counsel kept questioning the juror on this topic in a manner so confusing and frustrating that the juror began to display open hostility, asking the judge "What is he looking for? . . . he's asking me the question over and over again." *Id.* at 1027-28.  The juror later complained to trial counsel that "[I]t seems to be the same question [you're asking me] over and over again.  I must not be answering it right, so, I must not understand it." *Id.* at 1029.  The vague and confusing examination continued, with the juror repeatedly expressing confusion at trial counsel' questions and displaying mounting frustration. *Id.* at 1031-35.

Counsel accepted this juror, even though the juror (1) had deep-seated pro-law enforcement and pro-death penalty attitudes; (2) appeared disposed to believe police officers; and (3) was alienated by trial counsel's voir-dire techniques.  The reasons for counsel's decision is not in the record, as counsel did not address his jury-selection strategy in either of his affidavits and the state court denied habeas counsel's requests to depose trial counsel or question him at an evidentiary hearing.

Prospective Juror Bobby Lynn Fuller stated that he would not consider the defendant's background in assessing his future dangerousness, but would consider any previous crimes he had committed.  S.F. Vol. VII:861-61.  This suggestion was never followed up by the defense, who eventually had to use a peremptory challenge to excuse the juror, and announced the strike out of turn, before the State had even expressed its own position.  S.F. Vol. VII:890.

**b.  Counsel failed to strike with peremptory challenges
jurors whose attitudes and experiences indicated a
strong risk of bias.**

85

The defense allowed many jurors to be seated on Mr. Washington's trial jury despite the fact that they had experiences or views which indicated that they should have been struck with peremptory challenges. Counsel failed to challenge juror Bohannon, despite his numerous areas of potential bias and the open hostility he displayed toward defense counsel. Counsel failed to peremptorily challenge juror Lloyd after he revealed that daughter and her fiancé had recently been robbed by black men, and stated that he felt some ethnic groups "do not have high standards." S.F. Vol. III:195, 197. Counsel failed to even question juror Waters concerning the robbery she reported on her questionnaire. S.F. Vol. IV:386-404. Counsel also failed to challenge juror Forbis after he expressed clear reservations about a defendant who failed to testify, endorsed the death penalty because people get out of prison all the time and commit more crimes and the death penalty means you "ain't got to worry" about them anymore, and indicated that his definition of the term "probability" in the future dangerousness special issue was closer to "possibility." S.F. Vol. XV:1852, 1863. As with Juror Bohannon, these jurors eventually rehabilitated themselves by promising to be "fair" under leading questioning by the State. However, such general assertions are inadequate to judge a juror's true potential for bias. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992) (observing that most jurors consider themselves fair and are likely to respond affirmatively to "general questions of fairness and impartiality" even when probing about "specific concerns" would likely uncover bias).

      c.    **Counsel failed to ensure that the prosecution did not excuse African American jurors with peremptory challenges in violation of *Batson v. Kentucky*.**

          i.    **A prima facie cases exists establishing the prosecution's discrimination on the basis of race in selecting Mr. Washington's jury.**

In 1989, the Court of Criminal Appeals of Texas held that the prosecutor in a Harris County rape case tried in 1985 had unlawfully used State peremptory challenges to exclude black jurors from a jury selected in his court. *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1989). Whitsey, as well as the victim in the case, were both black. *Id.* at 714. No black jurors served on Whitsey's trial. One had been removed for cause, while the other six were removed by the prosecution using peremptory challenges. *Id.* at 709. The prosecutor denied the allegation of discrimination and proffered reasons for his peremptory strikes. *Id.* at 711.

The CCA disbelieved his testimony. First, the prosecutor admitted striking two black jurors whom his notes reflected had only "pro-state" characteristics (including friendships with law enforcement officers), and he could not convincingly explain why that would be so. *Id.* at 714. Second, he noted in his own handwritten notes the race of all black jurors. *Id.* Third, he claimed to have removed several black jurors because of their race or occupation; yet his notes reflected concern about these characteristics only in the case of nonminority jurors – his only notes about the black jurors purportedly struck because of their religion or occupation simply designated their race. *Id.* at 714-715. Finally, the prosecutor struck several black jurors for characteristics – such as the fact that they were the "same approximate age" as the defendant – which were identical to white jurors who were allowed to serve. *Id.* at 715. The CCA concluded that the prosecutors' purported explanations were "merely a sham," that his explanations often relied on impermissible "group bias[es]" and that "the prosecutor exercised peremptory challenges *based solely on race*." *Id.* at 716-17 (emphasis added).

That prosecutor was *Bob Stabe* – lead counsel for the State in the prosecution of Mr. Washington. *Id.* at 710-11. Mr. Stabe, just months after engaging in intentional racial

discrimination in the selection of Mr. Whitsey's jury, personally participated in the selection of Mr. Washington's jury. The jury that tried Mr. Washington, who is African American, was all-white. *See* Exhibit 16 (Goberman Affidavit ), at 2 (second-chair counsel at Mr. Washington's trial remembers no African Americans on jury). The prosecution struck *five* qualified minority venirepersons with peremptory challenges, resulting in an all-white jury. *See* S.F. Vol. II:153 (juror Dwalla Ann Knight struck with peremptory by state); S.F. Vol. VIII:1166 (Juror Mable L. Lewis struck with peremptory by state); S.F. Vol. XIII:631 (Juror Ann Hathaway Dykes struck with peremptory by state); Exhibit 18 (public records drivers' license database information indicating that jurors Knight, Dykes, and Lewis – all of whom were stricken with state peremptories – were of African-American descent). Two other jurors stricken with State peremptories had Hispanic surnames. *See* S.F. Vol. V:616 (juror Willie Hernandez, Jr.); S.F. Vol. XIV:1842 (Yolanda Navarro Flores).[33]

### ii. The defense failed to preserve any record of the prosecution's use of peremptory challenges.

Obviously, trial counsel cannot be charged with knowledge of the *Whitsey* decision, which was handed down approximately three years after Mr. Washington was tried. However, only six months before Mr. Washington's trial, the Supreme Court decided the landmark case of *Batson v. Kentucky*, 476 U.S. 79 (1986), which overruled established precedent and, for the first time in American history, declared that racially discriminatory use of peremptory challenges in individual trials was unlawful and that the reasons for the prosecution's exercise of them could be

---

[33] For *Batson* purposes, the fact that a person has an Hispanic surname is considered adequate proof that they are of Hispanic descent. *Salinas v. State*, 888 S.W.2d 93, 98 (Tex. App. – Corpus Christi, 1994), *cert. denied*, 516 U.S. 823 (1995)

scrutinized by the defense.

Nevertheless, counsel took no steps whatsoever to preserve *Batson* error.  He did not, for instance, note the race of the jurors whom the state excluded with peremptory challenges or ask for a hearing regarding the state's reasons for its peremptory strikes.  In fact, Harris *never even mentioned Batson* once during the jury selection in this case.  The findings of the CCA in *Whitsey* strongly suggest that the prosecution's case file will contain information concerning the race of the prospective jurors, as well as his reasons for striking them.  Mr. Washington's state postconviction counsel repeatedly requested access to the District Attorney's trial file in this case, but all such requests were denied.  Using a change in the law brought about by intervening legislation, the undersigned counsel requested and received access to most of the District Attorney's file on Mr. Washington's capital murder prosecution.  However, counsel for the District Attorney specifically refused, on work-product grounds, to disclose any of Bob Stabe's handwritten notes.  *See* Exhibit 19, at 3 (Letter from Assistant General Counsel Joni M. Vollman to Hon. Daniel C. Morales regarding Public Information Act requests of Willie Terion Washington (June 25, 1998)).  The District Attorney's office specifically admitted that some of the information it wished to conceal from the undersigned counsel were "*jury questionnaires and information cards, which contain handwritten notes of prosecutors and 'reflects the mental impressions or legal reasoning of an attorney representing the state.'*"  *Id.* (emphasis added).  In fact the District Attorney went so far as to obtain an affidavit from Mr. Stabe himself to bolster the work-product assertion.  *See id.*  The undersigned counsel allege that these handwritten notes, which the District Attorney has so far fought hard, and successfully, to conceal from the defense, will establish that Robert Stabe, as in the *Whitsey* case, intentionally discriminated on the basis of

89

race when selecting Mr. Washington's jury.

A defendant's right to the effective assistance of counsel includes the right to counsel who will implement the protections set out in *Batson*. *See, e.g., Government of the Virgin Islands v. Forte*, 865 F.2d 59, 62-63 (3d. Cir. 1989), *Ex Parte Yelder*, 575 So.2d 137, 139 (Ala.), *cert. denied*, 502 U.S. 898 (1991). Most courts to consider the issue have held that failure to preserve *Batson* error in a situation in which a *prima facie* case of intentional racial discrimination exists is presumptively prejudicial error under *Strickland*. *See, e.g. Forte*, 865 F.2d at 63 (holding that in case where lawyer had not objected and made record concerning *Batson* issues at trial, thus causing appellate review to be waived, defendant was thereby "denied a just result on appeal" and should receive *Batson* hearing); *Yelder*, 575 So.2d at 139 ("We . . . hold that prejudice is presumed where *Batson* violations are established in the context of a charge of ineffective assistance of counsel."). Mr. Washington has a prima facie *Batson* case: the prosecution used five of its ten peremptory challenges to excuse *all* qualified minority jurors from service on his trial. Particularly telling is the fact that Mr. Washington's jury ended up being *all-white*, largely as the result of the prosecution's use of its peremptory challenges. *See, e.g., Thompson v. Cain*, 161 F.3d 802 (5th Cir. 1998) (no prima facie case where prosecution struck five African American jurors but left four on panel). When counsel's ineffective assistance results in structural error, *Strickland* prejudice must be presumed. *McGurk v. Stenberg*, 163 F.3d 470 (8th Cir. 1998). Racial discrimination in jury selection is structural error not subject to harmless error review. *Vasquez v. Hillery*, 474 U.S. 254 (1986). Counsel, while acting below reasonable professional standards by forfeiting the protection of a recently-decided landmark Supreme Court decision, permitted the prosecution to remove jurors from his petit jury on the basis of race, resulting in his

case being heard by an all-white jury.  Mr. Washington's conviction must be reversed.

### d. Counsel failed to preserve meritorious claims of error which arose during voir dire.

In order to preserve objections to the erroneous denial of defense challenges for cause, a defense lawyer in a capital case must state the basis for the challenge for cause by alleging some fact that renders the prospective juror unsuitable under TEX. CODE CRIM. PROC. Art. 35.16 or the federal constitution, must obtain an adverse ruling on the challenge, must exhaust all of his peremptory challenges before the twelfth juror is seated, obtain an adverse ruling on a request for additional peremptories, identify at least one objectionable juror among the twelve seated, and tell the court that he would have used the additional peremptory to strike that juror.  *See Cooks v. State*, 844 S.W.2d 697, 718, 713 n.7 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 927 (1993). In addition, the defendant must specifically object to State challenges for cause which he feels were not appropriate.  Trial counsel did neither.  He repeatedly waived any opportunity to rehabilitate jurors who had anti-death penalty views by not even questioning them.  *See, e.g.*, S.F. Vol. XX:2415 (elects not to question juror Susan D. Young); S.F. Vol. IV:468 (fails to question juror Earlene Crane Bell).  Counsel's  decision not to use all of his peremptory strikes and request more, in addition to his decision to ignore *Batson* and his constant neglect of his obligation to pursue objections to a definite adverse ruling, waived appellate review of every possible claim of error relating to the selection of Mr. Washington's jury.

### e. Counsel failed to object to the State's improper voir dire.

At the punishment phase of Mr. Washington's trial, the jury was required to answer the two questions, or "special issues," then designated by TEX. CODE CRIM. PROC. Art. 37.071:

(1) whether the conduct of the defendant that cause the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; and

(2) whether there is a probability that the defendant would commit acts of criminal violence that would constitute a continuing threat to society[.]

The first question is commonly called the "deliberateness" special issue, the second the "future dangerousness" special issue. Because none of the vague terms in the above statutes is defined for the jury, the way jurors define them is crucial, and can make the difference between a death sentence and life imprisonment in a given case. Attorneys for the State repeatedly misled the jurors about the law of capital murder and the death penalty, but trial counsel failed to object in a timely and sufficient fashion.

> **i.  Trial counsel failed to object when the State repeatedly and impermissibly tried to water down its burden of proof at punishment by inviting the jurors to employ an unreasonably lenient definition of the word "probability."**

The Court of Criminal Appeals has held that a juror must consider the term "probability" in its ordinary dictionary meaning. "In its usual acceptation, a 'probability' is something more than a 'possibility.'" *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992), *cert. denied*, 511 U.S. 1152 (1994); *Cuevas v. State*, 742 S.W.2d 331, 347 (Tex. Crim. App. 1987) (pointing to dictionary definitions of that term that include "likelihood" and "likely to become true or real"), *cert. denied*, 485 U.S. 1015 (1988), *overruled on other grounds*, *Woodridge v. State*, 827 S.W.2d 900 (Tex. Cr. App. 1992). Probability can be compared to a "likelihood" or "good chance," and the impanelment of a juror who would apply a more lenient definition to that word risks the "freakish and wanton assessment of the death penalty." *Id.* A juror who "cannot differentiate

92

'probability' and 'possibility' . . . would be impaired in evaluating the evidence offered to prove future dangerousness" and is properly challengeable. *Patrick v. State*, 906 S.W.2d 481, 489 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996).

The State, however, routinely insinuated that term "probability" could legitimately be interpreted in a manner at odds with its dictionary definition and prohibited by Texas law. Kenneth Ray Forbis, who was seated on the jury, was questioned as follows by the State:

> B:  When you look at the word probability, in your mind, do you feel it's closer to a possibility or closer to a certainty?
>
> A:  *Possibility*.

S.F. Vol. XV:1862-63 (emphasis added). Seated juror Pamela Pulliam was asked the same question, and gave the same response. S.F. Vol. XXII:2610 ("Q: Do you see probability as being something closer to a possibility or closer to a certainty? A: Possibility."). When questioning Lucille Van Allen, who also was seated, the prosecutor discussed the term probability and represented, without any objection from trial counsel, that "[m]athematically speaking that might be *one in a million*." S.F. Vol. II:64 (emphasis added). Another prospective juror was presented with similar questions:

> Q:  Special Issue No. 2, just reading that question over, is it one that you think is capable of being answered or do you think that the term probability causes some sort of problem with answering that question?
>
> A.  No.
>
> Q.  Okay. Well, you majored in math, did you not?
>
> A.  Yes.
>
> Q.  And mathematically you know it could be *one in a million*?

93

A.   Yes.

Q.   I don't know if you interpret it that way or you interpreted it some other way, but there's not going to be any definition given to you for that.  It says a probability.  Do you look at that term as being something closer to a possibility or do you look at it as being something closer to a certainty?

A.   *Possibility*.

S.F. Vol. IX:1145-46 (emphasis added).[34]  Trial counsel raised no objection to any of this

questioning.

Based on the law at the time of Mr. Washington's trial, the defense could have argued that all

questioning on this subject should have been foreclosed.  *See Esquivel v. State*, 595 S.W.2d 516,

525 (Tex. Cr. App. 1980), *cert. denied*, 449 U.S. 986 (1980); *Battie v. State*, 551 S.W.2d 401,

405 (Tex. Cr. App. 1977), *cert. denied*, 434 U.S. 1041 (1978).  The defense should have objected

to the prosecution's advice to the juror that a "one in a million" chance could equal a

"probability," but no objection was raised, and the defense never attempted to clarify the meaning

of the term with these prospective jurors.[35]

---

[34] *See also* S.F. Vol. XII:1546 ("Q:  It says a probability and it doesn't say a possibility.  It says a probability.  Do you think that term is closer to a possibility or to a certainty? A.  Possibility.")  Once again, no objection was raised to the question or to the response.

[35] Instead of defusing the prosecution's harmful suggestions concerning the meaning of "probability," the defense concentrated on attempting to convince prospective jurors of the unlikely notion that there might be some "acts of criminal violence" which would not constitute a "threat to society."  In fact, this was one of the key points trial counsel felt the need to address during jury selection:

[Def.]:   Now, when the State was questioning you about that they kept saying, "criminal acts of violence," and stopping at that point; is that correct?

A.   Yes.

Q.   Okay, but that sentence is not designed to be stopped at that point, though, is it?

94

A.    No, it's a full sentence.

. . .

Q.    [In fact, the sentence continues] that would constitute a continuing threat to society, correct?

A.    Correct.

Q.    Okay, now do you think that all acts of violence constitute a continuing threat to society?

A.    Yes.

Q.    Okay.  Rock throwing is an act of violence.  Is that a continuing threat to society?

A.    Well, it's a threat to society.

Q.    Huh?

A.    It's a threat to society.

Q.    Okay.  Okay and what about kicking the can?

A.    Kicking a can?

Q.    M-h'm?

A.    No.

Q.    Well, if you throw a rock, you hit somebody; you kick a can, you can hit somebody, also?

A.    Yeah, it would.

Q.    Still violence, you know.

A.    Well, no.

Q.    Put your foot into it.

A.    That's not exactly violence.  That's different, you know.  If you throw a rock at somebody, then that's an act of violence.  Somebody could be hurt.

95

Because jurors are presumed to apply the word "probability" in its ordinary meaning, no later instruction from the judge cleared up the jurors' misconceptions that the term could mean as little as "possibility."

> **ii.   Trial counsel failed to object when the prosecutor and the judge used incorrect hypothetical illustrations to demonstrate the difference between "intentional" and "deliberate" and incorrectly defined those terms.**

---

Q.     Okay.

A.     That's a threat to society. But kicking a can, a lot of people kick cans.

Q.     In your mind, that would be a continuing threat to society?

A.     An act of violence, you know. This sentence says that this person would commit criminal acts of violence that would constitute a continuing threat to society and I take it to mean that would this person do it again or do something else? Is the person criminally inclined?

Q.     Okay. Okay. Okay. I understand. My question to you is: Suppose you found out the person had thrown a rock before. Would that go to continuing threat to society? Would you believe he was a continuing threat to society? You already found him guilty of capital murder.

A.     Right.

Q.     Now, you found out that he has thrown a rock before and hit somebody.

A.     Well –

[State]: Object to that as that requires this juror to commit himself as to whether –

[Def.]: Withdraw the question.

S.F. Vol. XIV:1804-06 (voir dire of Joseph Winston Walker, Jr.). Similar exchanges – often delayed by the juror's attempt to figure out what the point of the question is – recur frequently. *See, e.g.*, S.F. Vol. XV:1955-56 (voir dire of Mildred Livingston); S.F. Vol. IX:1164-65 (voir dire of Mable Lewis); S.F. Vol. XII:1512-14 (voir dire of Ann Elizabeth Fowler). Trial counsel never attempted to argue at the punishment phase the proposition that Mr. Washington should not be sentenced to death because any future acts of "criminal violence" he committed would not pose a danger to society.

In order to convict a defendant of capital murder, a jury must find that he engaged in conduct intended to cause the death of the victim or victims. *See* TEX. PEN. CODE § 19.03(a). After the defendant has been convicted upon such a showing, the case moves to the punishment phase, in which the jury is asked whether the defendant acted "deliberately." Jurors are frequently unable to distinguish these terms. *See, e.g., Gardner v. State*, 730 S.W.2d 675, 689 (Tex. Crim. App. 1987) (dismissing as "hardly [] tenable" the notion that most jurors enter a courtroom prepared to recognize distinction between terms), *cert. denied*, 484 U.S. 905 (1987). Nevertheless, "[a] capital venireman who cannot distinguish between an 'intentional' and a 'deliberate' killing has demonstrated an impairment in his ability meaningfully to reconsider guilt evidence in the particular context of special issue one [and should be challenged for cause]." *Martinez v. State*, 763 S.W.2d 413, 419 (Tex. Crim. App. 1988). The defense failed to object when the prosecution – and, at least once, the judge – propounded hypotheticals which tainted the jury with inappropriately lenient definitions of both terms.

In an attempt to explain the difference between "intentional" and "deliberate," Texas prosecutors often posited hypotheticals distinguishing two cases. In the first, a defendant impulsively shoots a convenience store clerk in the leg during a robbery, and the clerk later dies of blood loss. In the second, a defendant carefully aims the gun at the victim's head at point-blank range and "blows his brains out." *See, e.g., Morrow v. State*, 753 S.W.2d 372, 374 (Tex. Crim. App. 1988). According to the prosecutor, the first killing might be capital murder, but would not be "deliberate." Such hypotheticals mislead the jury, deprive the defendant of a fair trial, and result in reversible error – *if preserved*. Capital murder is a "result of conduct" offense – the state must prove that the defendant specifically intended to kill the victim in order to even be guilty of

capital murder. *Id.* at 375 n.3. A defendant who, for instance, merely shot the clerk in the leg, or shot into the ceiling (and the ricocheting bullet killed the clerk), or waited outside in the car could *not* be convicted of capital murder in the first place – because he or she would not have *actually intended* to kill the victim by their actions. *Id.* at 373-75; *see also Lane v. State*, 743 S.W.2d 617 (Tex. Crim. App. 1987); *Gardner v. State*, 730 S.W.2d 675 (Tex. Crim. App. 1987); *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex. Cr. App. 1986), *cert. denied*, 482 U.S. 920 (1987). Suggesting to the jury that a person could be convicted of capital murder under such circumstances destroys the defendant's opportunity to receive a fair trial because it "dilut[es] what is required of the State to prove an 'intentional' killing, [and] concomitantly endorses an artificially low threshold of proof to establish the killing was 'committed deliberately.'" *Morrow*, 753 S.W.2d at 376. The effect of such hypotheticals is so damaging that harm may be presumed even when the defense later "rehabilitates" jurors on this point. *Id.* at 376.

In Mr. Washington's case, the prosecution and the judge each resorted to these misleading hypotheticals during voir dire while trial counsel did nothing. For instance, the trial judge, in her preliminary examination of prospective juror Robert Trout, suggested that:

> [Crt.:]   [T]he definition of intentionally is defined in such a way that, for instance, you may not wish to intentionally do a specific thing, but because of the conduct that you engaged in and you had the conscious desire to engage in that conduct, you caused the result.
> . . . .
>
> Say you decide to lay a metal rod across a railroad track and you just wanted to see what that would do if a train ran over it, okay? – and the train ran over it and it came derailed. Now, your intent wasn't to *derail that train*, but you *did put the rod there*. See what I'm saying?
>
> A.   M-h'm. Yes.

S.F. Vol. XXI:2470 (emphasis added).  During the examination of Temple Ann Weiskopf, the judge declared that "[a] person acts intentionally or with intent with respect to nature of his or her conduct or to a result of his or her conduct . . . when it is his or her conscious objective or desire to *either* engage in the conduct *or* cause the result." S.F. Vol. IV:446 (emphasis added).  These statements – delivered to help a juror understand the difference between intentional and deliberate in a capital murder case – instilled in the juror an inappropriately low threshold of proof as to both findings.   A defendant *cannot* be convicted of capital murder based merely on proof that the defendant intended to engage in conduct resulting in death.  The defendant's "conscious objective or desire" must be to "cause the result" of death.  *Morrow*, 753 S.W.2d at 375 n.3. (citing *Demouchette*, 731 S.W.2d at 80, and *Lugo-Lugo v. State*, 650 S.W.2d 72, 88 (Tex. Crim. App. 1983) (Clinton, J., concurring)).  The State promptly compounded the error in Mr. Trout's case by proposing a misleading hypothetical of its own:

> An example or hypothetical example might involve where if someone was in a location, say, robbing the place there with a gun.  Let's say during the commission of that robbery he hears a loud noise and as he turns and just kind of *reflexively* fires the gun, and the gun goes off and kills the individual.

*Id.* at 2484.  The prosecution repeated the error – again without objection – in the voir dire of David Kappus:

> Let me just give you kind of a hypothetical situation or example, Mr. Kappus.  You could have a situation where an individual goes to a building, robs someone at gunpoint, and during the commission of that robbery shoots that individual, aims down and shoots him in the foot.  Turns out the person is a hemophiliac, you know, bleeds to death there at the store and dies from that injury.
>
> . . .
>
> Now, a jury could certainly find that to be an intentional act . . . and find him guilty of capital murder.

99

S.F. Vol. XVII:2106.  This fundamental error affected the examination of at least one juror who was selected.  *See* S.F. Vol. XVIII:2203-2204 (prosecution misleads seated juror Linda Mae Cashiola with hemophiliac-shot-in-foot example).

In fact, even trial counsel himself misled the jury with an incorrect hypothetical, ironically drawing an objection from the State:

[Def.]:  [S]uppose there was a burglary case and someone had broken into someone's house and the man of the house awakened.  Okay?  And saw the burglar and pulled his gun and shot at the burglar.  Okay?  And the burglar shot up in the air.  Okay?  But the bullet hit the ceiling, ricocheted down and killed the man that owned the house.  Now would that be a deliberate –

A.  I see.

Q.  – act that caused the death?

A.  No.

Q.  Okay.

A.  I see what you're telling me.

[St.] We object to that question . . . because that doesn't involve capital murder, just an intentional  . . . act [that] caused the death of the deceased . . . .

S.F. Vol. II:148 (examination of Dwalla Allan Knight).

### iii.  Miscellaneous errors.

The defense failed to object when the state allowed juror Cashiola to believe that the phrase "criminal acts of violence" in the second special issue could apply to a defendant who did "anything to break the law, basically."  S.F. Vol. XVIII:2165.  Counsel likewise failed to object when the prosecution suggested to prospective juror Bobby Lynn Fuller that a juror could find that a person who had been "rehabilitated" would nevertheless still probably commit continuing

100

acts of criminal violence.  S.F. Vol. VII:863.  Mr. Washington attempted to challenge a juror

because he was not "able-minded" and his "mental process [was too] slow" to understand the

terms in the Court's charge.  S.F. Vol. XVII:2126.  The Court denied the attempted challenge for

cause as having no legal basis, and opined that the confusion expressed by the juror was caused by

trial counsel's own incoherent voir-dire tactics, which had caused even the judge to have

"problems following [his] questions."  *Id*. at 2127.

### f.   Conclusion.

Criminal defendants are not entitled to a perfect jury, or one that precisely matches the racial

profile of the jurisdiction in which they are tried.  Nevertheless, a defendant is entitled to an

advocate who is familiar with all relevant doctrines of jury selection, and who will aggressively

employ his advocacy skills to secure a jury as open-minded, sympathetic, and racially balanced as

possible.  The record reflects that trial counsel simply did not know enough about the law,

procedure and practice of death penalty jury selection to adequately protect his client's interests.

As a result, the jury selected to hear Mr. Washington's case (1) was all-white; (2) had members

whom trial counsel had alienated during voir dire; (3) had members who harbored anti-defendant

prejudices and whose family members had recently been victims of crimes; and (4) had been fed

inaccurate and distorted definitions of key legal terms by the prosecutor and the judge.  This

outcome could have been avoided had counsel thoroughly familiarized himself with basic

principles of capital jury selection, devised an adequate strategy for establishing key points with

the jury, and lodged specific, relevant, timely objections the many times they were called for.

Each of the errors made by defense counsel, standing alone, might not justify reversal of Mr.

Washington's conviction.  However, an analysis of the jury selection, taken as a whole, indicates

that trial counsel did not effectively advance Mr. Washington's interests during the jury-selection phase of the trial. Mr. Washington's Sixth Amendment right to the effective assistance of counsel was violated, and he must be released from his unconstitutional confinement.

### 5.   Ineffective Assistance of Counsel – Guilt/Innocence Phase.

At the guilt/innocence phase of Mr. Washington's capital murder trial, trial counsel's failure to adequately investigate the State's case against his client, in combination with his deficient courtroom advocacy, deprived Mr. Washington of effective assistance of counsel.

> **a.   Trial counsel's failure to adequately investigate the State's case against his client, as conceded by his own affidavit, rendered his representation of Mr. Washington ineffective.**

While *Strickland* holds that courts must give deference to counsel's strategic decisions, such deference is due only when counsel has first fulfilled his or her duty to make "reasonable investigations" or "a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91.

> Counsel's function . . . is to make the adversarial testimony process work in the particular case. Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, . . . counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (internal citations and quotation marks omitted). Although the courts give great deference to *informed* strategic choices, they "closely scrutinize an attorney's preparatory activities." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993) (citing *Chambers v. Amrontrout*, 907 F.2d 825, 831, 835 (8th Cir.) (en banc), *cert. denied*, 498 U.S. 950 (1990)). "An attorney's strategic choices made after less than complete

investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Foster*, 9 F.3d at 726 (quoting *Strickland*, 466 U.S. at 690-91).

Trial counsel failed to challenge – or even to closely examine – the ballistics evidence that was crucial to the State's case against his client. The State introduced expert testimony that Mr. Tareh was killed with a .38 or .357 caliber weapon, and that he could not have been killed with a .25 caliber weapon. Trial counsel failed to challenge that piece of the State's evidence against his client. *See infra* Part III.A.5.d. This failure abandoned a strong, available defense for no adequate reason, and amounted to ineffective assistance of counsel that severely prejudiced to Mr. Washington's defense. *See DeLuca v. Lord*, 77 F.3d 578 (2d Cir.), *cert. denied*, 117 S.Ct. 83 (1996) (by abandoning an important defense at an early stage and for no adequate reason, counsel failed to deliver effective representation); *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995), *cert. denied*, 117 S.Ct. 273 (1996) (given the "utmost importance" of the forensic issue, "a reasonable defense lawyer would take some measures to understand the laboratory tests performed and the inferences that one could logically draw from the results").

Trial counsel also failed to investigate Yemane Kidane, the only surviving eyewitness to the offense for which his client was on trial. The failure to investigate eyewitnesses to a crime provides strong support for a claim of ineffective assistance. *Bryant v. Scott*, 28 F.3d 1411, 1418-19 (5th Cir. 1994); *Kemp v. Leggett*, 635 F.2d 453, 454 (5th Cir. Unit B 1981) (counsel's failure to interview the single eyewitness to the crime supported successful claim for ineffective assistance of counsel). *See Driscoll*, 71 F.3d at 709-10 (counsel ineffective for failure to impeach key State's witness with inconsistent prior statements). This is especially true in cases in which there is no physical evidence connecting the defendant to the crime scene – as was true in Mr.

103

Washington's case – since this renders the eyewitness identification "the cornerstone of the state's case in chief." *Bryant*, 28 F.3d at 1418.

Trial counsel also failed to independently investigate the facts of the case, and therefore was unable to present Mr. Washington's jury with any logical, coherent account of events that could counter the State's presentation of its case. *Compare Foster*, 9 F.3d 722 . Among other things, there was no reasonable basis for trial counsel's decision not to challenge the State's ballistic evidence or adopt a theory of the case.[36]  Given that these decisions were not based upon adequate investigation of the facts of the case, the decisions are not entitled to deference. *See Strickland*, 466 U.S. at 690-91.[37]

> **b.  Counsel failed to adequately highlight the inconsistencies in the testimony of the State's key witness.**

In a case which revolves around eyewitness identification by a victim, trial counsel must highlight every relevant inconsistency and error in the witness's testimony. *See, e.g., Berryman*, 100 F.3d at 1098 (trial attorney's performance deficient and prejudicial when he failed to adequately cross-examine rape victims concerning her prior inconsistent statements).  As every party to this case recognized, the credibility of the eyewitness identification of Mr. Washington by Yemane Kidane was the key piece of evidence against Mr. Washington.  The prosecution conceded during closing arguments at the guilt-innocence phase of Mr. Washington's trial, the

---

[36]  The low fee accepted by trial counsel for representation of Mr. Washington on capital murder charges, *see supra* Part III.A.3, does not excuse counsel's failure to investigate the case . *See Porter v. Gramley*, 122 F.3d 351, 353 (7th Cir. 1997) (petitioner's "failure to pay the agreed-upon fee is no excuse [for counsel's failure to investigate] because a lawyer in such a situation should withdraw as counsel before prejudicing the client with an inadequate investigation or a lackluster defense"), *cert. denied*, 118 S. Ct. 886 (1998).

[37]  Trial counsel's inattention to Mr. Washington's case was not an anomaly.  In fact, trial counsel has been disciplined several times by the Texas bar, at least once for neglect of a legal matter. *See supra* note 25.

104

testimony of Yemane Kidane was essential to the state's case: "[I]t's going to boil down primarily to Mr. Kidane's testimony." S.F. Vol. XXX:9 "Mr. Kidane [the surviving victim] is the only eyewitness to all the events that took place and I submit to you it's going to come down to: Do you believe Mr. Kidane or not?" *Id.* Mr. Kidane gave several statements to the police concerning this crime before he testified at trial. Every one of these statements contains differing descriptions of how the crime occurred and what Mr. Kidane did after the crime. Mr. Washington's trial counsel developed some of the inconsistencies in the various stories that Mr. Kidane gave of the night in question. *See* S.F. XXVIII:506-509. However, it is clear that there were many more inconsistencies in Mr. Kidane's various versions of the events in question that trial counsel could have raised before the jury.[38]

Mr. Kidane was first interviewed by officer G.L. Powers directly after the officer appeared at the crime scene. *See* Exhibit 20 (Houston Police Department Offense Reports) at 2.004.

---

[38] The State asserted that it had followed an "open file" policy in this case, and that the defense was free to review the offense reports. S.F. Vol. XXVII:428. When ordered by the court to provide defense counsel with *all* statements made by Mr. Kidane, the prosecution turned over only the Osterberg statement. The record does not indicate whether the first two statements from Mr. Kidane were actually in the "open file" available to trial counsel. For the purposes of this claim, it will be assumed that the reports actually were in the State's open file, and that defense counsel either overlooked them or did not recognize their significance.

State postconviction counsel repeatedly requested access to the police reports and witness statements located in the District Attorney's case file on Mr. Washington's conviction. *See, e.g.*, Applicant's Motion to Docket Cause and for Further Briefing at 2 (Oct. 6, 1997). The requests were denied. Requesting access to the state's file under the Texas Public Information Act (formerly known as the Texas Open Records Act) would have been futile, as the Act forbade access to records dealing with the "detection, investigation or prosecution of crime," and district attorneys' case files were held to qualify as such. *See Holmes v. Morales*, 924 S.W.2d 920 (1996) (holding that district attorneys' files on closed criminal cases were protected from required public disclosure under the Public Information Act). In 1997. the Texas Legislature amended the relevant statute, TEX. GOV'T CODE § 552.108, to provide that district attorneys' files were guarded from disclosure "only in relation to an investigation that did not result in conviction or deferred adjudication." Thus, district attorneys' files on closed criminal cases for the first time became available for public inspection. *See Kirkpatrick v. Whitley*, 992 F.2d 491, 495-96 (5th Cir. 1992) (finding cause for not advancing claims based on police reports in state's case file based on state law prohibiting access to that information). The undersigned counsel requested and reviewed portions of the State's file on this case.

Although Mr. Kidane had recently been injured, his demeanor was rational and he was able to answer the officer's questions. S.F. Vol. XXV: 97-98. During this interview, Mr. Kidane stated that when the suspect entered the store, both Mr. Kidane and Mr. Tareh were "at the back of the store by the beer cooler." *Id.* The suspect then, according to Mr. Kidane, " walked up to [Mr. Tareh] and put a gun in his back and walked him to the front of the store." Then the suspect "told [Mr. Kidane] to give him all the money from the cash register." *Id.* After Mr. Kidane gave the suspect the money, the suspect "shot [Mr. Kidane] in the face and [Mr. Kidane] fell to the ground." *Id.* at 2.005. After he fell to the ground, Mr. Kidane "heard another shot and when he got up [Mr. Tareh] was lying on the floor in front of the counter." *Id.* In this version of the events, Mr. Kidane does not reveal the exact phrasing of the suspect's request for the money, does not mention leaving the store, does not mention the suspect holding Mr. Tareh around the chest, and does not mention firing any rounds from his own personal weapon, the .25 automatic.

A second account of Officer Powers's interview with Mr. Kidane appears later in the HPD file. This account of the crime differed both from the previous account and from future versions. Here, Mr. Kidane stated that he was "working behind the counter in the store" when the suspect entered, not "at the back of the store near the beer cooler." Exhibit 21 (Houston Police Department Offense Reports), at 2.012. The suspect then "produced a gun and stuck it in the back of Tareh," then "walked Tareh up to the front counter where Mr. Kidane was working." The report continues: "While still holding the gun to the back of Tareh, the suspect told Kidane to 'give me all the money'. Kidane replied 'OK', and gave the suspect all the bills in the cash register, which amounted to approximately $100.00." *Id.* Mr. Kidane then stated that the suspect "shot him as he [Mr. Kidane] stood behind the counter without provocation." *Id.* While Mr.

106

Kidane was on the floor, he heard a second shot.  Mr. Kidane then "ran to the 4500 block of

Market Street and told someone to call the police." *Id.*  This version alters Mr. Kidane's position

when the suspect first entered the store.  Furthermore, Mr. Kidane states that the suspect told him

simply to "give me all the money," and once again mentions nothing about the suspect holding

Mr. Tareh, only stating that he pointed a gun at Mr. Tareh's back.

On January 2, 1986, Mr. Kidane gave yet another version of the events of December 19th.

HPD Sergeants D.B. Osterberg and C.R. Williams interviewed Yemane Kidane at his home at

6233 Gulfton #1028.  Exhibit 22 (Houston Police Department Offense Report), at 2.036.  During

this interview, which the officers transcribed shortly afterward, Mr. Kidane gave yet another

inconsistent account of what happened at Mike's Food Market on December 19, 1985.  Now, Mr.

Kidane maintains that he was "behind the front counter counting the money in the cash register"

when the suspect entered the store.  He "looked up" and saw "the suspect with his left arm

around [Mr. Tareh's] chest.  The suspect was standing behind [Mr. Tareh] was [sic] holding a

pistol in his right hand." *Id.*  In this version, Mr. Kidane asserts that the suspect "told [him] to

give him the money out of the cash register and to put the money on the counter." *Id.*  After Mr.

Kidane put the money on the counter, "the suspect shot him in the face and he fell to the ground."

*Id.*  He then heard another shot and waited a few moments before "he got up and went towards

the front of the store." *Id.*  After noticing Mr. Tareh injured on the floor of the store, Mr. Kidane

says he "ran out the front door of the store and he saw a man on the telephone  outside [his

store] and he told this unknown male to call the police." *Id.*  After this, Mr. Kidane now declares,

"he was afraid the suspect was still close by so he took his pistol out of his pocket and shot it up

in the air two times." *Id.*

107

Once again, inconsistencies emerge.  In the version of events Mr. Kidane gave shortly before this one, Mr. Kidane directly handed the money to the suspect; now he puts the money on the counter and watches the suspect collect it.  In this version, the suspect does not simply point the gun in Mr. Tareh's back – he actually holds Mr. Tareh across the chest.  Now Mr. Kidane remembers specifically that he told someone at a payphone to call the police.  Most importantly, Mr. Kidane here *for the first time* asserts that he actually fired his gun during the robbery.  This version of the events lacks at least two elements which would later surface at trial – the fact that the suspect allegedly said "Give me the money – *I'm going to hurt you*" and the fact that Mr. Kidane, according to the trial version of the events, ran to Vivian's Lounge after the crime.

At trial, Mr. Kidane gave a fourth version of the events: When the suspect came in, Mr. Kidane was standing behind the cash register.  S.F. XXVII:370.  The suspect walked toward the back of the store.  *Id.*  Mr. Kidane was facing toward the wall behind the counter as the suspect walked to the back of the store, near where Mr. Tareh was filling the beer cooler.  *Id.* at 373.  Mr. Kidane was "checking [the] cigarettes" behind the counter.  *Id.* at 374.  The phone then rang.  *Id.* When he picked up the phone, he "felt something behind" him and turned around.  *Id.*  When he turned around, he saw the suspect holding Mr. Tareh at gunpoint.  *Id.*  The overall size of the gun the defendant was holding was "medium."  *Id.* at 377.  At this point the prosecutor had a .38 caliber weapon entered into evidence for "demonstrative purposes," so that Mr. Kidane could demonstrate the motions of the suspect.  *Id.* at 380-85.  *See* Exhibit 23 (photograph of weapon introduced as State's Exhibit 30 at trial); Singer Affidavit, at ¶ 6.  Mr. Kidane confirmed that this gun closely resembled the one used the commit the robbery.  He asserted that the suspect's "left arm [was] all the way around Tareh."  *Id.* at 392.  He was pointing the gun at Mr. Kidane while

holding Mr. Tareh. *Id.* at 393. At this point, Mr. Kidane reports that the suspect said "Give me all the money. I'm going to hurt you." *Id.* The suspect then told Mr. Kidane to hang the phone up, which he did. *Id.* at 394. The pistol was very close to Mr. Kidane's face as the suspect held it on him. *Id.* at 396. It was very bright inside the store. *Id.* at 396. Mr. Kidane then gave the defendant all the money and food stamps from the cash register. *Id.* at 401. He tried to hand it directly to the defendant, but the defendant told him to place the money on top of a portable beer cooler and newspaper rack. *Id.* at 402-03. The suspect then ordered Mr. Tareh to move a few steps, then shot Mr. Kidane, then Mr. Tareh. *Id.* at 407. Mr. Kidane then heard the sound of the door opening and closing. *Id.*

After summoning his strength for a few moments, Mr. Kidane got up, stepped over the prone body of Mr. Tareh, and exited the store. *Id.* at 409. Mr. Kidane's gun was inside his pocket during this incident. *Id.* at 412. After he left the store, Mr. Kidane fired his gun two times. *Id.* at 413. He saw two people, a man and a woman, standing at the telephone in front of his store, but he was afraid of them and ran around them. *Id.* at 413-414. He fired his gun into the air, he testified, because he was "scared" that the suspect might still be nearby. *Id.* at 414. He ran to Vivian's Lounge and asked the people there to call "emergency and police." *Id.* at 415. He waited, presumably bleeding profusely, inside Vivian's Lounge until the police came. *Id.* at 416.

The account Mr. Kidane gave of this crime at Mr. Washington's trial differed markedly from all previous versions of the event. In this version, Mr. Kidane is stocking cigarettes when the suspect enters the store, rather than counting the money (Account No. 3) or standing at the back of the store near the beer cooler (Account No. 1). His back is now turned to the store, whereas in Account No. 3 he was counting the money in the cash register, and thus facing forward. Also

109

new in this version is the telephone call to the food market during the incident, which was never mentioned previously. The suspect now asks Mr. Kidane to place the money on top of a beer cooler and newspaper rack, not on the counter itself (Account No. 3); and does not simply take the money directly from Mr. Kidane's hands, as in Accounts Nos. 1 and 2. A crucial change occurs in the words the suspect spoke to Mr. Kidane. In *all* previous versions of the story, the suspect merely orders Mr. Kidane to give him all the money. Now, he says: "Give me all the money. I'm going to hurt you."[39]

Most crucially, Mr. Kidane adds several new details to his explanation of what he did upon leaving the store. Mr. Kidane repeats his assertion that he fired twice into the air outside the store. Account No. 3 had Mr. Kidane asking a single male who was standing at the payphone to call the police. Now there is a couple standing at the payphone, and far from asking them to call the police, Mr. Kidane declares that he was so scared of them that he gave them a wide berth.[40]

---

[39] The apparent callousness of this demand was so striking that the prosecution repeatedly harped on it during its closing at guilt-innocence:

> So he holds Tareh in front of him as a shield and then stands on the other side of the counter and cooler combination, pointing that revolver at Mr. Kidane and what does he tell Mr. Kidane? "Give me the money. I'm going to hurt you." And something you recall about that phrase is there's no "or" in between there. It's not: "Give me the money or I'm going to hurt you." It's: "Give me the money. I'm going to hurt you." And I suggest to you that's not a slip of the tongue or poor English. That's because the defendant, again, already had in his mind the fact Mr. Kidane, Tareh, weren't living after this robbery.

S.F. XXX:64. The Court of Criminal Appeals singled this purported statement out twice when it affirmed Mr. Washington's convictions. *See Washington v. State*, 771 S.W.2d 537, 540, 545 (Tex. Crim. App. 1989).

[40] The prosecution massaged this inconsistency during its closing argument at the guilt/innocence stage:

> Now, Mr. Kidane's testimony was that he ran out of the store, saw some people by these phones, a man on the phone, kind of ran around them because he's a little leary of them. Well, he agreed from the stand, "Yeah, I yelled for one to call the police," because Mr. Harris asked him from Sergeant Osterberg's statement, "Well, didn't you tell Sergeant Osterberg that you asked that man to call the police?" Mr. Kidane said "Yes." There's nothing inconsistent in his testimony.

110

Now, for the first time ever, Mr. Kidane asserts that he ran to "Vivian's Lounge," asked the help there to call the police for him, and waited there, bleeding profusely from a bullet wound to the jaw, while the police made their way to the crime scene. The record contains no indication whatsoever to confirm this new detail, nor does it contain any information as to the identity of the person who supposedly called Mr. Kidane during the robbery. It appears likely that the police never attempted to verify these details of Mr. Kidane's story (the telephone call and the trip to Vivian's Lounge) because they never considered him as a suspect and, in any event, *he never mentioned them until trial* despite being interviewed several times before then.

Each of Mr. Kidane's statements contains elements which are inconsistent with *every* other statement Mr. Kidane gave. Simply put, Mr. Kidane was asked to describe the events of December 19, 1985 at least three different times, and he could not give a consistent account. It is a truism that jurors are likely to distrust witnesses who change their stories. *See, e.g., United States v. Allen*, 76 F.3d 1348, 1359-60 (5th Cir.), *cert. denied*, 117 S.Ct. 721 (1996) (observing that jury had "ample ground" to disbelieve defendants' version of events when stories "changed over time" as defendants were "confronted . . . with emerging details"). It has long been recognized that pointing to material inconsistencies and omissions in a witness's various accounts is a powerful method of casting doubt on his credibility:

> The witness who now relates a different story about the events in question must necessarily assume a position as to the truth value of his prior statement, thus giving the jury a chance to observe and evaluate his demeanor as he either disavows or qualifies his

---

S.F. XXX:69. In fact, Mr. Kidane's two accounts were flatly contradictory on this point. In his direct examination, rather than indicating that he had considered the persons on the phone to be possible sources of help, he repeatedly stated that he was scared of them and that he intentionally kept far away from them. S.F. Vol. XXVII:413 ("When I went outside I saw two – two people standing. They were in front at the telephone – outside our store at the telephone and *I scared. I think maybe they are together. Maybe they are together.* . . I make round – *I go far from them.* I make round.").

earlier statement.  The jury is alerted by the inconsistency in the stories, and its attention is sharply focused on determining either that one of the stories reflects the truth or that the witness who has apparently lied once, is simply too lacking in credibility to warrant its believing either story.

*California v. Green*, 399 U.S. 149, 160 (1970).[41]

Trial counsel cross-examined Mr. Kidane on the inconsistencies between the Osterberg statement and his trial testimony, but *did not* cross-examine Mr. Kidane on the statements he made to Powers or the second account, which appears to incorporate what Mr. Kidane told to Officer Smith.  There is no conceivable justification for trial counsel not to have used them to impeach Mr. Kidane's credibility while Mr. Kidane was on the stand.  Mr. Kidane was the linchpin of the State's case.  If the jury credited his account, Mr. Washington's conviction was a foregone conclusion.  The defense had already chosen to attack Mr. Kidane's credibility, as it had to.  Once that strategic decision was made, there was no justification for doing anything less than the utmost to demonstrate to the jury that Mr. Kidane's account of the events of December 19th was not reliable, and that Mr. Kidane had something to hide.  Trial counsel argued the inconsistencies in Mr. Kidane's story during his closing argument, but did so in a disjointed manner, and, most importantly, failed to knit them into a coherent defense theme.  *See infra* Part III.A.5.g.

Coupled with defense counsel's decision to forego presentation of the botched drug deal

---

[41]  There were other inaccuracies in Mr. Kidane's various accounts, which trial counsel also failed to discover or exploit.  For example, although he feigned not to know Mr. Washington and said he only recognized him as a "boyfriend of a lady by the name of Mary," *see, e.g.*, Exhibit 20 (HPD Reports), at 2.005, he in fact Mr. Kidane had frequent contact with Mr. Washington, and Mary Drakes says she would find it hard to believe Mr. Kidane did not know Mr. Washington's name, given the fact that Mr. Washington had repeatedly sold janitorial supplies to Mr. Kidane.  Exhibit 6 (Drakes Affidavit), at ¶5.  Although Mr. Kidane stated that neither he nor Mr. Tareh had struggled with the assailant, S.F. Vol. XXVII:412, police reports noted signs of struggle in the store.  Exhibit 24 (HPD Reports), at 2.010.  Although he initially told police that $100-20 in U.S. currency was missing from his cash register, Exhibit 25 (HPD Reports), at 2.018, he stated at trial that the robber had taken a total of $70-100 including $20 in food stamps.  S.F. XXVII:402

defense and allow the State's ballistic evidence to go unchallenged, the decision not to use all available means to attack Mr. Kidane's credibility constituted ineffective assistance of counsel which prejudiced Mr. Washington's defense. *See, e.g., Driscoll,* 71 F.3d at 710 ("there is no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony . . . took on such remarkable detail and clarity over time"); *Moffett v. Kolb,* 930 F.2d 1156 (7th Cir. 1991) (trial counsel ineffective in murder case for failing to introduce prior inconsistent statements of state witness who told investigating detective two times that defendant's brother and not defendant fired the gun at victim).

> **c.**   **Counsel failed to put before the jury the fact that Mr. Kidane had waited over thirty minutes after the shooting before calling the police.**

The State's only eyewitness to the crime, Yemane Kidane, testified at Mr. Washington's trial that the shooting had occurred at 8:30 p.m. S.F. XXVII:418.   The Houston Police Department received a call reporting the shooting at 9:03 p.m. Exhibit 20 (HPD Reports), at 2.004.   At trial, Mr. Kidane testified to the series of events as follows:   After he was shot, he fell to the floor. S.F. XXVII:406. He heard another shot, then heard the door open and close. S.F. XXVII:407.   He got up and saw Mr. Tareh laying on the ground. S.F. XXVII:409.   He jumped over Mr. Tareh, who was blocking the doorway, and went outside. S.F. XXVII:409-10, 413.   He saw two people standing in front of a telephone outside the store and got scared, so ran far around them. S.F. XXVII:413-14.   He fired his gun into the air two times because he was scared that the robber was hiding between buildings. S.F. XXVII:414.   He then went straight to Vivian's Lounge "asking for some people for help, to call emergency and police." S.F. XXVII:415.   He stayed inside the

lounge until the police arrived, then went outside and spoke to the police.  S.F. XXVII:416-17.[42]

This entire chronology related by Mr. Kidane should have taken no more than two or three minutes.  However, the police were not called for *over thirty minutes*.  Even if it took ten minutes for Mr. Kidane to run out of his store and go "straight" to Vivian's Lounge, at least twenty minutes remain unaccounted for.  Had this unexplained delay been properly emphasized, the jury would have been left with many questions.  What was Mr. Kidane doing in those 20-30 minutes between the shooting and his call to the police?  Given that he was bleeding from a gunshot wound to his jaw, and that his employee was fatally wounded, why did he delay calling the police and an ambulance?  Why did he not use the phone in his own store – which, he testified, he had just been using (S.F. Vol. XXVII:374) – to call for help immediately?  For that matter, why did he not call from the pay phone just outside his store?  Why did he go to Vivian's Lounge – 420 yards away from Mike's Food Mart – in order to place the call?  Mr. Kidane testified that he heard the robber leave the store, and that he was scared the assailant was hiding outside in the alley, ready to shoot again.  S.F. XXVII:407, 414-15.  Considering this, it is difficult to understand why he would venture outside into danger when he could have simply locked the store and called the police from the phone behind the counter.[43]

Had trial counsel investigated effectively and presented the available defensive theory, he could have provided the jury with a version of the night's events which (1) was inconsistent with

---

[42] This testimony is inconsistent with the accounts of the first officers to arrive on the scene, who stated that Mr. Kidane was walking down the street when they arrived.  S.F. Vol. XXV:70.

[43] Mr. Kidane testified that he was scared when he saw the two people because he thought "they were together," presumably meaning that they were confederates of the assailant.  S.F. XXVII:413.  Again, his fear raises the question of why he did not stay in his store – or, upon seeing persons who scared him, retreat to his store – to call for help.

Mr. Washington's guilt of capital murder; and (2) explained the implausibilities and

inconsistencies in Mr. Kidane's account *better* than the State's theory did.  *See infra* Part

III.A.5.g.

> **d.  Counsel failed to exploit or obtain independent expert evaluation of the obvious discrepancies between the size of the wounds suffered by Mr. Tareh and Mr. Kidane and the State's argument that Mr. Washington had inflicted those wounds with a .38 or .357 caliber weapon.**

Both Mr. Tareh's autopsy report and Mr. Kidane's hospital records were entered into

evidence at trial.  *See* Exhibit 26 (Autopsy Report, Kiflemariam Tareh, December 20, 1985)

(State's Exhibit 33-A at trial); Exhibit 27 (Discharge Summary, Yemane Kidane, December 31,

1985) (part of State's Exhibit 42 at trial).  However, there is no indication that trial counsel had

reviewed them adequately prior to their use at trial.  This was a grievous oversight.  The

documents raised critical questions about the caliber of the weapon used, given the size of Mr.

Tareh's fatal wound, and of the wound to Mr. Kidane's jaw.  Although the State argued at trial

that Mr. Washington had used a .38 or .357 to shoot Mr. Tareh and Mr. Kidane, in fact there

were strong indications in the record that this was false.  Trial counsel, however, never raised this

argument and failed to secure an expert to independently evaluate the evidence.

Developments during the police investigation of the crime indicated that the bullet that killed

Mr. Tareh was of small caliber. Police officers who evaluated the crime scene *uniformly*

concluded that the bullet wound in Mr. Tareh's head was made by a small caliber projectile:

> Recovery of Weapon
> *****************
> The suspects weapon was not recovered at this time.  It is unknown at this time the
> actual location of the weapon.  All that is known is that the weapon appears to be a

115

small caliber weapon.

Exhibit 24 (HPD Reports), at 2.010.  Detectives who examined Mr. Tareh's body immediately prior to the autopsy noted that: "This wound [in Mr. Tareh's head] was believed to be a contact gunshot wound because there were powder burns around the wound.  The wound also appeared to be made by a small caliber gun."  Exhibit 28 (HPD Reports), at 2.011.  The police officers also noted that Mr. Kidane was in possession of a .25 caliber weapon during the crime.  Exhibit 20, at 2.005.

The doctor who performed Mr. Tareh's autopsy measured the bullet entrance in Mr. Tareh's temple as only 3/16" in diameter, with a 1/16" margin of abrasion.  Exhibit 26 (Autopsy Report, Kiflemariam Tareh).  The doctor who performed Mr. Tareh's autopsy stated that the bullet caliber appeared large, but conceded that "[t]he missile was so deformed a caliber could not be given . . . .," *id.*, his measurement demonstrates that the entire wound was *less than one-quarter inch* in diameter.  Mr. Kidane's hospital records stated that the entrance wound to his jaw was only *0.1 centimeter* in diameter.  Exhibit 27 (Discharge Summary, Yemane Kidane), at 1.  As explained below, it would be unusual for a .38 or .357 caliber weapon to inflict wounds of these sizes, and, in fact, the size of the wound to Mr. Tareh's head was more consistent with a .25 caliber weapon than with the weapon the State claimed was used to inflict the wounds.

Trial counsel was also alerted by the prosecution during pretrial proceedings that (1) at one point, the State's ballistics experts said they had no possible way of determining what caliber the bullet wounds were; and that (2) that initial opinion had changed for reasons that are not in the record.  The State changed its theory and argued that Mr. Washington had used a .38 or .357 caliber weapon to kill Mr. Tareh. When discussing conversations he had with the State's firearms

116

examiner, trial counsel stated:

> And we also examined the bullets and one firearm taken off the No. 1 witness for the
> State and an examiner there assured me there was no way he could even begin to tell me
> what caliber the bullets were or which gun they were fired from.

S.F. Vol. I:13.  The prosecutor quickly joined in:

> Well, he said that they – we don't have a pistol or a gun to compare the bullets to.  The
> most recent supplement that I received indicates that the two fired lead bullets are either
> .38 Special or .357 Magnum revolver bullets and that's about all they can do with them.

*Id.*  Trial counsel ignored the State's announcement, and did not ask the State to produce the

"most recent supplement" to which the prosecutor was referring.  *Id.*  Because trial counsel did

not address the topic of the State's change of theory in his affidavits, it is unknown why he did

not ask to review the supplement or question the examiner regarding the change in his theory.

At trial, the prosecution argued that Mr. Washington had used a .38 or .357 caliber weapon

to commit the crime.  The only forensic support for the State's position was provided by the

testimony of HPD Firearms Examiner C.E. Anderson.  Officer Anderson testified that the bullet

that killed Mr. Tareh, as well as the bullet that wounded Mr. Kidane, was a .38 or .357 caliber

bullet.  S.F. Vol. XXVIII:542.  He based this conclusion upon "the shape of [the bullet] and the

size and the measurements of the lans [sic] and grooves."  *Id.*  Officer Anderson's testimony was

misleading: the lands and grooves and shape of bullet are insufficient grounds upon which to base

a conclusion as to caliber.  *See* Exhibit 17 (Singer Affidavit), at ¶ 5.  In order to rebut any

inference that Mr. Kidane might have inflicted Mr. Tareh's wound with the .25 caliber weapon

that was in his possession, the prosecution elicited testimony from Officer Anderson that the

bullet which killed Mr. Tareh could not possibly have come from a .25 caliber pistol.  S.F.

XXVIII:545.  This testimony was unchallenged by trial counsel, who cross-examined Officer

117

Anderson solely on distinctions between .38 and .357 caliber weapons. S.F. Vol. XXVIII:547-552.

Despite the State's pretrial announcement that it would argue that a .38 or .357 caliber weapon had been used to commit this crime, trial counsel apparently failed to exploit the evidence casting doubt on the State's theory, or subject the theory to independent expert analysis. The HPD reports and the wound size of both Mr. Kidane and Mr. Tareh would have alerted a reasonably diligent criminal defense attorney to the fact that there were serious questions as to (1) whether a .38 or .357 caliber weapon could have been used to commit the crime; and (2) whether the wound-size evidence was actually more consistent with the wounds having been inflicted by a .25 caliber weapon. A reasonably diligent defense attorney would have concluded that independent expert evaluation was necessary. Had trial counsel in fact secured expert evaluation of the evidence, he would have discovered that there were multiple factors suggesting that a .38 or .357 caliber weapon had not inflicted Mr. Tareh's fatal wound.

Dr. Lloyd White, Medical Examiner for Nueces County, Texas, reviewed the evidence for purposes of these habeas proceedings. As Dr. White states in his affidavit, Mr. Tareh's wound size is unusual for a wound inflicted by a .38 or .357 caliber weapon:

> [I]t would be very unusual for a .38 or .357 caliber bullet to cause a wound that is only 3/16 of an inch in diameter. Rather, I would expect the wound from a .38 or .357 caliber bullet to be approximately twice that size, or 3/8 of an inch.

> The size of the wound to Mr. Tareh's temple is typical for a wound inflicted by a .25 caliber bullet.

Exhibit 5 (White Affidavit), at ¶¶ 4-5 . In other words, while it would be surprising for a .38 or .357 caliber weapon to have inflicted the fatal wound, as the State argued, the wound is a typical

118

size for one inflicted by a .25 caliber weapon – the caliber of Mr. Kidane's pistol.  Other factors

observed by Dr. White also raise questions about whether a .38 or .357 could have inflicted Mr.

Tareh's wound:

> If the wound to Mr. Tareh's temple had been inflicted by a .38 or .357 caliber weapon, I
> would expect to see more fragmentation of the skull than was seen in Mr. Tareh's case

> If Mr. Tareh's wound was caused by a .38 or .357 caliber bullet fired from a gun at close
> range, I would expect to see more soot and more stippling surrounding the wound.

> The bullet that killed Mr. Tareh was retrieved from his brain during the autopsy.  If the bullet
> had been a .38 or .357 caliber bullet, I would expect to find at least an incomplete exit, or
> injury to the skull on the side opposite to the entrance.  It would be very unusual for the .38
> or .357 bullet to have a loss of energy sufficient to cause it to stop in the brain.

> If the bullet that killed Mr. Tareh was a .25 caliber bullet, I would expect it to have stopped
> in Mr. Tareh's brain, as did the bullet observed at autopsy.

Exhibit 5 (White Affidavit), at ¶¶ 6-9.  There were, therefore, multiple indications that Mr. Tareh

had not been killed by a .38 or .357 caliber weapon, and that his wounds were more consistent

with a .25 caliber bullet.  In addition, the wound to Mr. Kidane, which Officer Anderson testified

was also inflicted by a .38 or .357 caliber bullet, is reflected in his hospital records to have

measured only 0.1 centimeter.  Exhibit 27 (Discharge Summary, Yemane Kidane), at 1.  As Dr.

White states in his affidavit, "If this measurement of 0.1 centimeter is correct, Mr. Kidane's

entrance wound is inconsistent with a wound inflicted by a .38 or .357 caliber bullet."  Exhibit 5

(White Affidavit), at ¶ 11.

Expert testimony such as Dr. White's would have struck at the heart of the State's case

against Mr. Washington.  It would also have supported the theory that was available to the

defense – that of a "drug deal gone bad."  At the time of the crime Mr. Kidane was in possession

of a weapon that would typically inflict the size wound that Mr. Tareh suffered.  Nevertheless,

119

trial counsel never once mentioned the wound sizes during trial. His neglect of this crucial issue, and his failure to request or obtain any expert assistance, was ineffective assistance of counsel.[44] *See DeLuca*, 77 F.3d at 579; *Driscoll*, 71 F.3d at 709.[45]

### e. Counsel failed to elicit favorable, relevant information from State witnesses.

Had counsel performed adequate pretrial investigation, he would have become aware that State's witnesses Franklin Hart and Mary E. Drakes were in a position to provide information from neutral sources which independently corroborated Mr. Washington's account of the events of December 19th. In particular, these witnesses could have testified to the fact that known drug users hung around Mike's Food Market constantly, and that the store had a reputation for being a place where drugs could be bought. *See infra* at Part III.A.5.e.

---

[44] Because Mr. Harris does not address this issue in his affidavits, and because the state habeas court prevented relevant factual development on this issue, it is unknown whether trial counsel recognized the discrepancy. Assuming trial counsel did recognize the discrepancy, the Petitioner alleges that trial counsel's failure to obtain the necessary expert assistance stemmed from the conflict of interest caused by his funding arrangement with Mr. Washington. *See supra* Part III.A.3.c.

[45] The district attorney, ghostwriting for the state habeas court, made two findings pertaining to this issue. First, as to the bullet caliber, the court found that "the caliber of the bullets which entered both the deceased and Kidane were not determined by the wound size but rather by an examination of the retrieved bullets or bullet fragments." *See* Findings and Conclusions, at 9 ¶41. This finding does not address the issue raised by Mr. Washington. Because no defense expert has ever had access to the bullets, it is impossible to determine whether the prosecution expert correctly analyzed the bullets themselves. The wound size indicates that the caliber as asserted by the State was open to question, and certainly should have been probed by a defense expert. Second, the district attorney wrote that since the testimony of the State's forensic experts did not inculpate Mr. Washington, "the applicant cannot demonstrate any harm arising from any alleged deficient cross-examination of those witnesses." *See id.*, at 9 ¶ 42. This finding is incorrect. While the forensic experts did not inculpate Mr. Washington, Officer Anderson's testimony did allow the State to argue that Mr. Tareh's fatal wound had been inflicted by a .38 or .357 caliber weapon, thereby foreclosing the possibility that Mr. Kidane had committed the offense with his .25 caliber weapon. An independent expert evaluation would have been extremely valuable to Mr. Washington's case. At the very least, such an evaluation would have supported the argument that the wound-size evidence was inconsistent with the State's theory. What further challenges could have been developed by a defense expert who was granted access to te bullets themselves remains a matter of speculation until the bullets are made available for testing by an independent expert. Trial counsel's failure to recognize the significance of this information and to properly cross-examine Officer Anderson was ineffective and highly prejudicial.