### f.   Trial counsel failed to exploit evidence directly contradicting the State's essential argument that Mr. Washington had changed clothes.

The State argued that Mr. Washington's clothes and hands were completely free of inculpatory trace metal or other evidence because he had changed clothes and carefully washed his hands between the time of the robbery and murder and the time of his arrest. At the time of his arrest, Mr. Washington was wearing a gray jumpsuit.   S.F. XXVII:296; S.F. XXVIII:489; Exhibit 29 (HPD Reports), at 2.016.   The State presented testimony that earlier in the day he had been wearing a blue jumpsuit.   Yemane Kidane testified that when Mr. Washington robbed the store "[h]e was wearing kind [sic] of jumping suit . . . . Light blue – blue.   Light. . . . Blue one-piece jumping suit.   It was one-piece."   S.F. XXVII:400; *id.* at 403-04.   Claude Johnson also addressed this point.   S.F. XXVI:208; S.F. XXVI:210-211.   Mr. Johnson testified on direct that he was "not for sure" about the color of Mr. Washington's jumpsuit when he was arrested.   S.F. XXVI:210.   During cross-examination, when asked for details about Mr. Washington's dress, Mr. Johnson's testimony became even more equivocal, and, although the testimony is far from clear, he appeared to state that Mr. Washington was wearing a *gray* jumpsuit when arrested:

Q   Tell me about the blue jumpsuit then?
A   I really can't tell you that much because I really wasn't paying that much attention to him.   I just seen him.
Q   You weren't paying much attention to the jumpsuit, okay, is that what you're telling me?
A   What I'm saying, he had changed clothes.
Q   Okay.   Well, tell me about the jumpsuit he had on.   First the blue one that you claim he had first?
A   I can't say.   It's been a year ago.   I really couldn't tell you too much.
Q   Did he have on a shirt with the jumpsuit?
A   No, he didn't.
Q   So, he was just bare?   He had nothing under here?
A   No, I think he had a sweater or something?

121

Q   What color was the sweater?
A   Gray.
Q   So, he had on a blue jumpsuit with a gray sweater?
A   No.  He had on a gray jumpsuit with a gray – a gray T-shirt with a gray jumpsuit.
Q   Okay.  A gray sweater and a gray jumpsuit –
A   Right.
Q   – when he got arrested?
A   Like I say, I might have – it's been a year.
Q   I understand.
A   You know.
Q   But I'm asking you did he have on a gray sweater and gray jumpsuit when he got arrested?
    *That's okay, Mr. Johnson.*

S.F. XXVI:217-18 (emphasis added).  Rather than continuing to explore Mr. Johnson's actual

knowledge of Mr. Washington's clothing, which from all appearances was vague and superficial,

trial counsel dropped the matter, and allowed this important issue to go unresolved.

Based upon the testimony from Mr. Kidane and Mr. Johnson, the State argued that Mr.

Washington could be guilty of Mr. Tareh's murder even though all of the forensic tests –

including testing of fingerprints lifted from the crime scene, trace metal and nitrate testing on Mr.

Washington's hands, and testing for traces of blood – had come back negative. In his closing

argument at the guilt-innocence phase of trial, the State argued:

> The fact that Miss Hilleman examined this gray clothing the defendant was wearing
> when he was arrested, found no blood, I think everyone probably would have been
> surprised and shocked as all get out to find blood on that gray jumpsuit because we
> know the defendant was not wearing that gray jumpsuit when he robbed and shot Mr.
> Tareh and Mr. Kidane. He had on a blue jumpsuit. He changed his clothes before he
> returned back to the scene. So, you wouldn't expect there to be any blood on this gray
> jumpsuit.

S.F. XXX:12-13; *see also* S.F. XXX:77-78.[46]

---

[46] Of course, if Mr. Washington changed clothes to foil law enforcement, it is hard to fathom why he
would have transferred the $77.62 in alleged robbery proceeds from the blue jumpsuit to the gray.  The State's
theory assumes that Mr. Washington, after carefully changing clothes and washing his hands, endangered his

The State's theory was flatly contradicted by HPD's own records from the day of the crime. Mr. Kidane had told HPD Officer Powers *immediately after the incident* that the suspect had been wearing a "blue grey colored jumpsuit." *See* Exhibit 21 (HPD reports), at 2.012 (December 20, 1985 supplement reports that when Officer Powers obtained this information when interviewing Mr. Kidane after arriving on the crime scene on December 19, 1985 at 9:04 p.m.). Even assuming that Mr. Johnson's confused testimony about Mr. Washington's clothing somewhat influenced the jury, the impeachment of Mr. Kidane on this point – demonstrating that his story was not always as clear as it became when he took the stand – would have helped Mr. Washington's defense. *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (testimony from "two unshaken witnesses possesses many times the power of such an identification by one only, and [] the destruction by cross-examination of the credibility of one of two crucial witnesses – even if the other remains untouched – may have consequences for the case extending far beyond the discrediting of his own testimony").[47]

Had trial counsel properly reviewed the HPD reports, this impeachment evidence would have been immediately evident. Instead, trial counsel allowed Mr. Kidane's to go unimpeached, leaving the jury with little alternative but to accept the State's version.[48]

---

scheme by keeping the alleged robbery proceeds on his person, proceeds which for all he knew could have born blood, hair, fingerprint, or trace evidence linking him to the robbery. To explain this, the prosecution speculated that Mr .Washington for some reason could not have stowed the supposed robbery proceeds with the gun and clothes, and that he "perhaps" believed the money could not have been linked to him. S.F. Vol. XXX:78.

[47] *Compare Monroe v. Blackburn*, 607 F.2d 148, 152 (5th Cir. 1979), *cert. denied*, 446 U.S. 957 (1980) (discussing indications that trial testimony "has been 'improved' by the erroneous addition of what the prosecution needed to support its theory").

[48] The state habeas court made the following finding:

The Court finds that the record reflects that identification of the applicant by the surviving victim was not based on clothing; rather such identification was based on Kidane's previous contacts

### g.   Counsel failed to present an available, credible defensive theory to capital murder charges.

As trial counsel himself recognized, the identification of Mr. Washington by Mr. Kidane was strong, given Mr. Kidane's previous knowledge of Mr. Washington as a customer (and supplier), and given Mr. Kidane's identification of Mr. Washington in pretrial lineups.  Attacking Mr. Kidane's identification as erroneous was, as counsel recognized, unlikely to bear fruit.  *See* Exhibit 2 (1990 Affidavit) at 2, ¶10 ("Yes, I did advise the court there was no issue of identification . . . and all parties and witnesses agreed that Mr. Washington knew both complaints [sic].").  Trial counsel conceded the issue of identification because he believed the issue was irrelevant in light of the fact that Mr. Washington's "drug deal gone bad" defense involved admitting being in the store during the events.  *Id.*

Trial counsel gave two completely different accounts of his reason for not presenting the botched drug deal defense.  *See supra* Part III.A.2.  In his 1990 Affidavit, trial counsel insisted that he was well aware of the botched drug deal defense, and intended to present it, until Mr. Washington frustrated the plan by refusing to testify.  *Id.*  In the 1991 Affidavit, trial counsel's story changes completely: he claims never to have been aware that Mr. Washington used drugs at all, and also declares that he would never have presented any testimony relating to drug use

---

with the applicant in the store. Accordingly, the Court finds that the applicant fails to demonstrate that trial counsel was ineffective for failing to more aggressively cross-examine Kidane on the color of the clothing worn by the applicant at the time of the shooting or that such failure prejudiced the applicant to the extent that but for trial counsel error, the result of the proceeding would have been different.

*See* Findings and Conclusions, at 9 ¶44.   This fact finding is irrelevant to the issue raised by Mr. Washington since, as explained above, the State's assertion as to Mr. Washington's changed clothing was relevant not to his identification by Mr. Kidane, but to explain the lack of forensic evidence linking Mr. Washington to the crime. Because the change-of-clothes issue was the only way of explaining the lack of evidence linking Mr. Washington to the crime, significant damage to the theory undermines confidence in the outcome of the trial.  No evidence in the record indicates why trial counsel did not cross-examine Mr. Kidane on this point.

because of the adverse reaction the testimony might have provoked from the jury. *Id.* Because the state habeas court denied Mr. Washington's requests for further factual development on this issue, the record to this day does not explain the inconsistency between the two theories.

Assuming that the second affidavit is accurate, trial counsel apparently dismissed the "drug deal gone bad" theory out of hand, without performing any meaningful investigation, on the basis that trial juries do not have sympathy for persons who buy drugs and commit violent crimes. However, the dismissal of this defensive theory came *before* counsel had made a meaningful attempt to assay its validity, and its potential usefulness. Had trial counsel looked further, he would have found support for the defensive theory. Most crucially, had trial counsel obtained expert input, he would have been able to point out that the sizes of the entrance wounds in the victims were more consistent with the .25 caliber weapon Mr. Kidane was carrying than the .38 or .357 caliber weapon which the State insisted was the murder weapon. *See supra* Part III.A.5.d. Moreover, in light of the affidavits presented in state and federal court, trial counsel's assertion that he was unable to locate adverse information about Mike's Food Market reflects inadequate investigation. There were many neighborhood residents, including two disinterested persons who lived in the community and one who lived directly across the street, who were familiar with the reputation of Mike's Food Market and believed that narcotics were sold from the store, and that winos and drug users hung out there frequently. *See* Exhibit I to State Habeas Petition (Affidavit of Sam Roy), at 3; Exhibit G to State Habeas Petition (Affidavit of Franklin Hart), at ¶ 4; Exhibit 6 (Drakes Affidavit), at ¶ 4.[49]

---

[49] Ms. Drakes, by the time of trial, was no longer seeing Mr. Washington, and in fact expressed frustration at his repeated contacts with her. S.F. Vol. XVII:342. Mr. Hart was a neighborhood merchant. Neither had any discernible motive to lie on Mr. Washington's behalf, or to invent testimony about the reputation of Mike's Food

In addition, Mr. Kidane's behavior suggested that he had something to hide. He gave several different statements to police officers which were laden with inconsistencies. He made several inaccurate statements on the witness stand – for instance, he denied knowing Mr. Washington in any capacity other than as a customer,[50] stated that he did not know Mr. Washington's name, and affirmed that he had been "100% sure" of his identification of Mr. Washington. The 33 minute lapse between the time of the shooting and the time that Mr. Kidane called police, *see supra* Part III.A.5.c. (discussing time of crime), was unexplored by trial counsel. Mr. Kidane's delay in calling for medical help for himself[51] and his fatally wounded employee, as well as his failure to immediately summon law enforcement despite his claim of extreme fear that his assailant would strike again, S.F. Vol. XXVII:414, are difficult to explain.

The drug-deal-gone-bad theory would have provided several powerful tools to the defense. First, it explained the evidence of a struggle at the store,[52] which was inconsistent with Mr. Kidane's story of the victims being shot and falling directly to the ground. Second, it explains Mr. Kidane's unusual behavior after the crime. Why would a merchant, having just been robbed and painfully shot, run *away* from a working telephone (which he had just used, according to his trial

---

Market. Ms. Drakes's recollection that alcoholics and drug addicts hung around Mike's Food Market regularly is corroborated by Yemane Kidane's 1986 conviction for allowing alcohol to be consumed on the premises of the store. *See* Exhibit 30 (copy of certified copy of Harris County criminal history report).

[50] Mr. Washington and Mr. Kidane knew each other, and saw each other rather frequently. Exhibit 6 (Drakes Affidavit), at ¶ 5.

[51] When police arrived on the scene, Mr. Kidane was bleeding badly. S.F. Vol. S.F. Vol. XXV:169.

[52] Both the initial police officers to arrive at the scene and the investigator hired during state habeas corpus concluded that a struggle had occurred in Mike's Food Market before the shootings. *See* Exhibit 24 (HPD Reports) at 2.010; Exhibit I to State Habeas Petition (Affidavit of Sam Roy). Trial counsel did not have the clothing of Mr. Kidane or Mr. Tareh examined for fiber evidence, which could have shed light on the struggle in the store.

testimony) into the street, fire his weapon twice, wait up to 33 minutes to report the crime and (depending on which version of his story is at issue) run to a neighborhood bar and ask someone *there* to report the crime?   The state recognized that Mr. Kidane's account had problems: the prosecution spent much of its guilt-phase closing trying to neutralize the inconsistencies and implausibilities in Mr. Kidane's account, often stretching the evidence to, and sometimes past the point of, reasonable inference. *E.g.*, S.F. Vol. XXX:15-16 (declares that inconsistent accounts of whether Mr. Kidane fired gun as an innocent mistake); *id.* at 69-71 (explaining why Mr. Kidane left the store and didn't call the police himself, asserting without basis in the evidence that disarray in store was caused by Mr. Kidane stumbling as he left store rather than by struggle).   The defense pointed out some of these inconsistencies, but, without an overall theory of the case, could not suggest a broader meaning to them. *See, e.g., Gravley v. Mills*, 87 F.3d 779, 790 (6th Cir. 1996) (appropriate to consider plausibility of victim's account of crime in prejudice analysis; deficient assistance found harmful when victim's account of crime had several implausible and inconsistent elements).   The botched drug deal defense explains why Mr. Kidane would leave the store after the crime -- he needed to remove contraband from his store, which would shortly be overrun with police officers.

The theory would also have provided an explanation for Mr. Washington's post-arrest demeanor.   The Fifth Ward, in which Mr. Washington had lived his entire life, is a racially segregated area racked with poverty and crime.   Like many fellow residents of the Fifth Ward, Mr. Washington viewed police with suspicion and distrust to begin with. *See* Exhibit 6 (Drakes Affidavit), at ¶ 7.   If, as the police contend, Mr. Washington behaved evasively toward them after the crime, the defense could have argued that the behavior was consistent merely with Mr.

127

Washington's desire to avoid being linked to *a* crime – the drug deal – and did not at all establish

that he had committed capital murder.  To be sure, the drug deal gone bad theory would have

involved an attack on Mr. Kidane's credibility.  However, Mr. Kidane's credibility was

incontrovertibly diminished by his prior inconsistent statements, and trial counsel had *already*

chosen to attack Mr. Kidane's credibility during cross-examination and during closing argument.

S.F. Vol. XXVII:459-63; S.F. Vol. XXX:40-43. .

As *Strickland* counsels, strategic decisions made *after full investigation* are "virtually

unchallengeable." *Strickland*, 466 U.S. at 690.  Trial counsel's decision to reject Mr.

Washington's claims that the shootings occurred during a botched drug deal were made *before*

trial counsel had made a good-faith attempt to substantiate Mr. Washington's account.  Had trial

counsel done so, he would have found out that several trial witnesses corroborated Mr.

Washington's assertion about illegal activities in the store, that an independent expert witness

would have concluded that the wound in Mr. Tareh's head was more consistent with Mr.

Kidane's gun than Mr. Washington's, and that none of Mr. Washington's activities were

inconsistent with the account.

A three-step inquiry governs counsel's choice of a defense theory.  Deficient performance is

shown where counsel "(1) makes some exploration of the . . . defense but fails to take an obvious

and readily available investigatory step which would have made the defense viable; (2) does not

produce reasonable tactical reasons for not pursuing further investigation; and (3) raises no other

plausible defense." *Profitt v. Waldron*, 831 F.2d 1245, 1247 (5th Cir. 1987).  These three factors

are satisfied here.  Here, all trial counsel had to do in order to confirm Mike's Food Market's

reputation as a place where drug deals happened was to interview potential state witnesses and

128

ask them. *See, e.g. Bryant*, 28 F.3d at 1419 (noting that thoroughly interviewing important witnesses is generally an essential element of pretrial preparation). Trial counsel knew that Mary Drakes was a key witness, since her statement was in the DA's open file. Trial counsel also, apparently independently, located Franklin Hart, who provided defense testimony confirming that Mr. Washington had cashed a worker's compensation check shortly before the crime. Had counsel attempted to verify Mr. Washington's story by asking those witnesses about the reputation of Mike's Food Market in the community, he would have determined that an element of the botched drug deal defense had independent support from those witnesses.

Reasonably careful review of the autopsy report of Kifelmariam Tareh, as well as the offense reports in the DA's file which described the caliber of the murder weapon as small, would have revealed the inconsistency between the size of the bullet hole in Mr. Tareh's head and the State's theory. Counsel should have been alerted to the need to probe this point further by the State's change in theory. *See* S.F. Vol. I:13 (at pretrial hearing, prosecutor asserts that a "supplemental report" has been generated which definitively concludes both victims were shot with .38 or .357 caliber rounds). The inconsistency in the size of the wound in Mr. Tareh's head would have prompted a reasonable criminal defense attorney to attempt to determine what the size of the bullet wound in Mr. Kidane's head was. The size of the bullet wound in Mr. Kidane's head, which was absurdly small to have been inflicted with a .38 caliber weapon, would surely have alerted a reasonable criminal defense attorney to the possibility that there was a significant weakness in the State's theory of the case, and that the bullet wounds in the victims were more consistent with having been inflicted by Mr. Kidane's gun than the gun purportedly used by Mr. Washington. These were all "readily available investigatory steps" which could have been taken

129

on the basis of existing evidence and known witnesses, and which would not have required stunning leaps of insight or lucky coincidences.

Trial counsel's reasons for not pursuing these steps are still unknown. He has given two inconsistent reasons for not developing the botched drug deal theory. The final prong of the *Profitt* test is the most devastating. When he failed to develop the botched drug deal theory, trial counsel was left with no theory at all. *See, e.g., Berryman v. Morton,* 100 F.3d 1089, 1096 (3rd Cir. 1996) (noting importance of establishing an overall defense theme where possible and granting relief on ineffective assistance grounds when counsel failed to use available defensive theory); *United States v. Mansfield,* 24 M.J. 611, 617-18 (1987) (defense counsel's abandonment of insanity defense, which left defendant with no defense at all, caused a "fatal breakdown in the adversarial process"); *Gaines v. Hopper,* 575 F.2d 1147, 1149 (5th Cir. 1978) (performance deficient and prejudicial when counsel's failure to adequately investigate case left viable defense theory undeveloped and left client with "no defense") (citation omitted). As all parties have recognized, by far the most vital piece of inculpatory evidence in the case was the eyewitness identification by Mr. Kidane. By dismissing the botched drug deal theory out of hand, trial counsel deprived himself of the best available means of undermining this identification, and conceded a crucial piece of evidence which could have, and should have, been contested. *Compare DeLuca,* 77 F.3d 578 (2d Cir. 1996) (counsel's early abandonment of an important defense theory for no adequate reason amounted to ineffective assistance). Without the botched drug deal theory, trial counsel was relegated merely to pointing out the inconsistencies in the accounts of police officers and State witnesses *without tying them into a larger theme.* Counsel's error is at its most obvious in his guilt-phase closing argument, *see infra* Part III.A.6.e, in which

130

he highlights inconsistencies in Mr. Kidane's various accounts of the crime, but suggests no plausible framework for them.[53]

### h. The Petitioner was prejudiced by his counsel's failure to investigate his case.

While courts evaluating ineffective assistance claims give great deference to an attorney's strategic choices, they "closely scrutinize" an attorney's preparatory choices – especially an uninformed decision to forego investigation of the State's case against his or her client. *See Foster*, 9 F.3d at 726. In *Baylor v. Estelle*, 94 F.3d 1321 (9th Cir. 1996), *cert. denied*, 117 S. Ct. 1329 (1997), the court held that trial counsel's failure to follow up on a forensic report that was exculpatory of the defendant was deficient performance. The court proceeded to find that the defense had been prejudiced by counsel's performance, because "even in the face of the strong evidence provided by Baylor's *taped confession*, there is a reasonable probability that the evidence that would have been presented but for counsel's ineffective assistance would have injected reasonable doubt in the jurors' minds . . .". *Id.* at 1323 (internal quotations omitted).

The defense's objective, of course, was reasonable doubt. Had trial counsel conducted a proper exploration of the defense which Mr. Washington informed him of, the jury could have been presented with a complete picture of the facts relevant to the defense: (1) drug dealers hung out around Mr. Kidane's store constantly; (2) Mike's Food Market had an established reputation

---

[53] The district attorney, ghostwriting for the state habeas court, found that Mr. Washington had failed to establish what "relevant, admissible evidence was available to trial counsel" to develop his defense theory. *See* Findings and Conclusions, at 2 ¶ 9. This fact finding is clearly incorrect. State habeas counsel consistently highlighted Mr. Kidane's possession of a .25 caliber weapon, his inconsistent statements, his suspicious behavior at the time of the offense, and to the testimony of persons in the neighborhood that Mr. Kidane's store was a center of drug activity. To the extent that the court's finding relies upon trial counsel's affidavits, these affidavits are generally not credible for the reasons set out in Part III.A.2, *supra*. In any event, trial counsel's affidavits do not resolve this issue because (1) they do not adequately address counsel's attempts to investigate the defense; and (2) they establish two mutually inconsistent reasons for foregoing the presentation of a defensive theory.

131

in the community as a place where drugs could be bought and sold; (3) Mr. Kidane actually knew Mr. Washington well from prior extensive dealings with Mr. Washington as a customer and supplier; (4) Mr. Kidane was being less than forthright when, on the witness stand, he denied knowing Mr. Washington's name and denied having dealings with him as a supplier; (5) there was a struggle in the store, a fact which Mr. Kidane denied on the witness stand; (6) Mr. Kidane's account of his actions immediately following the events is unsatisfactory; (7) Mr. Kidane had given several inconsistent accounts of his activities during and after the crime; and (8) the wounds in the victims were more consistent with a wound from the caliber gun Mr. Kidane was carrying than with the one Mr. Washington was carrying. This coherent theory would have sown reasonable doubt in the jurors' minds. There is, therefore, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Prejudice to Mr. Washington's case also resulted from trial counsel's conflict of interest. *See supra* Part III.A.3. Because of trial counsel's woefully insufficient funding, he failed to adequately investigate his client's case – whether by expending his own hours or by retaining investigators and experts to review the evidence. His resulting failure to present Mr. Washington's jury with a credible defense theory, and to point out problems in the State's case, "adversely affected" his performance. *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *See supra* Part III.A.3.d. Under both the *Strickland* standard for ineffective assistance and the lower *Cuyler* standard for an actual conflict of interest, Mr. Washington has established that he was prejudiced by his counsel's performance and that his Sixth Amendment right to counsel was violated.

### i.   The state court's findings of fact and conclusions of law

132

on this point are incorrect.

As argued previously, *see supra* Part II.B, the court's findings of fact and conclusions of law are entitled to no deference from this court.  Mr. Washington was denied the resources necessary for adequate factual development of his claims, and the findings and conclusions were drafted by the district attorney and signed by the court without adequate review.  Particular factfindings have been addressed throughout.  In any event, the court's general conclusion that "Trial counsel rendered reasonably effective assistance of counsel during his pre-trial representation of the applicant in the instant case," *see* Findings and Conclusions at 4 ¶ 14, *id.* at 13 ¶ 2, is unsupported by and contradicted by the evidence.  Because this "legal conclusion" is merely a conclusory statement, any analysis of its correctness must focus on the fact-findings which purport to support it.  Those findings, as argued above, are either irrelevant, inadequate to support the legal conclusion, or simply wrong.

### 6.   Ineffective Courtroom Advocacy.

#### a.   Counsel failed to make an opening statement at either phase of the trial.

Trial counsel inexplicably failed to make an opening statement on behalf of Mr. Washington, forfeiting his opportunity to introduce jurors to an available defensive theory of the case and to provide them with a context for the evidence they would hear.  After trial counsel had called two witnesses to the stand, the judge raised his failure to make an opening statement, warning him that she had previously informed the jurors that the defense had the right to such a statement:

The Court:   Are you going to make an opening statement to them?

Mr. Harris:   No, ma'am.

The Court:   Do you want me to ask them [sic], in their presence, whether you're going to

133

|              | make an opening statement?                                                                                 |
| Mr. Harris:  | No, ma'am.                                                                                                  |
| The Court:   | Well, you know I told them you have a right to do that.<br>Do you object to me asking you on the record in front of them? |
| Mr. Harris:  | Yes, ma'am, Your Honor.                                                                                     |
| The Court:   | All right, then, I won't.                                                                                   |

S.F. Vol. XXIX:593.

The "absence [of an opening statement] serves to underscore the lack of any discernible effort by Petitioner's counsel to present a defense." *Stouffer*, 1999 WL 14046 at *7. While the decision to waive an opening statement often can be attributed to reasonable trial strategy, in Mr. Washington's case there was no strategic reason to have foregone the opportunity to address the jurors.[54] Trial counsel's failure to use an opening statement to present jurors with an alternative to the prosecution's version of the facts was especially harmful when viewed in combination with his failure to present any coherent defensive theory, *see supra* Part III.A.5.g, and his woefully deficient closing argument, *see infra* Part III.A.6.e. *Compare Quartararo v. Fogg*, 679 F. Supp. 212, 246 (E.D.N.Y.), *aff'd*, 849 F.2d 1467 (2d Cir. 1988).

### b. Counsel failed to object to improper testimony

---

[54] Trial counsel's affidavits do not offer any reason for the failure to make an opening statement. *See* Exhibits 2 & 4. The district attorney drafted, and the state habeas court signed, a finding of fact stating that the failure to make an opening statement actually worked to the benefit of Mr. Washington because trial counsel's affidavit, which was deemed credible, stated that Mr. Washington decided during trial not to testify and this decision forced counsel to change his strategy and not present the "drug deal gone bad" defense. Findings and Conclusions, at 8 ¶ 36. This finding is not worthy of deference because Judge Robertson, who had not presided over the trial, was in no position to judge the credibility of trial counsel without a live hearing, and because Mr. Washington had been denied the opportunity to adequately develop the factual record before findings and conclusions were made. *See supra* Part II.B.2 - II.B.4. Moreover, had trial counsel adequately investigated the case, he would have found that there was significant support for the "drug deal gone bad" defense, *see supra* Part III.A.5.g, and therefore that a decision by Mr. Washington not to testify did not justify the decision to forego an opening statement.

**including improper bolstering, hearsay, and irrelevant evidence.**

In order to preserve error for appellate review, a lawyer must lodge a timely objection, cite relevant authority, pursue the objection to an adverse ruling by the judge, and, where necessary, perfect a bill of exceptions or offer of proof. *See, e.g., McGinn v. State*, 961 S.W.2d 161, 165 (Tex. Crim. App.), *cert. denied*, 119 S. Ct. 414 (1998) (citing authorities). It is virtually impossible to locate any point in the record of Mr. Washington's trial when this procedure was adequately followed by trial counsel. Indeed, the only relevant authority specifically cited by defense counsel in the entire case was one precedent relating to misdemeanor convictions discussed at the punishment phase, and that authority was primarily argued by second-chair counsel Mike Goberman. S.F. Vol. XXXII:56-61. Time and again, trial counsel failed to follow rules of error preservation which are considered one of the fundamental areas of competency required by trial counsel in a serious criminal case. *See, e.g., Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983) (rules on how to preserve error for appellate review in Texas criminal cases "the most elementary of blackletter rules of procedure"). By neglecting the vital task of error preservation, trial counsel sacrificed review of dozens of claims of error relating to improper and prejudicial tactics, depriving his client not only of a trial regulated by all relevant rules of procedure but also of appellate review of violations of those rules. The defense did not object when:

## Guilt/Innocence Witnesses

- Officer Davis testified that the officers had no reason not to believe Mr. Kidane. S.F. Vol. XXVI:200 (bolstering; door arguably opened by defense's question. S.F. Vol. XXVI:194).

135

- The prosecutor, on direct examination, coaxed helpful testimony out of Claude Johnson with leading questions.  S.F. Vol. XXVI:213.

- Sgt. C.R. Williams testified that it was "unusual" for someone to have 37 $1 bills on him.  S.F. Vol. XXVII:298 (speculation).

- Mary Drakes testified that the defendant "seemed to need money" S.F. Vol. XXVII:349 (irrelevant, prejudicial, speculative).

- Mary Drakes testified that the defendant came by her house all the time and threatened her.  S.F. Vol. XXVII:342 (inadmissible extraneous offense).

- The prosecution led Drakes on direct.  S.F. Vol. XXVII:349-351.

- Christopher Brock, M.D., gave irrelevant victim impact testimony at a key point in the examination of Yemane Kidane.  *See infra* Part III.A.6.d.

- Yemane Kidane testified that the deceased was a good employee.   S.F. Vol. XXVII:366 (inadmissible, inflammatory guilt-phase victim impact testimony; *see infra* Part III.E).

- The prosecution, in order to inflame the minds of the jury, required the victim to brandish a .38 caliber pistol – which was unrelated to the offense and which was not even the same color as the alleged murder weapon – to demonstrate the defendant's actions on the night of the crime.  S.F. Vol. XXVII:392-93.

- The prosecution asked highly suggestive leading questions of Mr. Kidane and repeated his answers, sometimes inaccurately.  S.F. Vol. XXVII:392-93; *see also* State Habeas Petition, at 68-71 (pointing out inaccuracy of repeated testimony).

- D.B. Osterberg improperly bolsters testimony about Mr. Kidane's identification of the defendant during a lineup.  S.F. Vol. XXVIII:498; *see also Washington v. State*, 771 S.W.2d 537, 545 (Tex. Crim. App. 1989) ("Appellant is correct that Osterberg's testimony was improper bolstering evidence.").

## Prosecution's Closing Argument

- The prosecution incorrectly asserted that the defense had vouched for Claude Johnson's credibility.  S.F. Vol. XXX:62.

- The prosecution asserted without any basis in the evidence that the surviving victim had "knock[ed] things down" as he left the store (in order to defuse evidence that struggle took place).  S.F. Vol. XXX:69.

136

- The prosecution asserted without any basis in the evidence that the reason no trace metal detection tests were performed on Mr. Kidane was because he needed emergency treatment. S.F. Vol. XXX:71-72.

- The prosecution asserted that Mr. Washington was guilty because "[y]ou've heard absolutely no evidence of [sic] testimony to indicate otherwise." S.F. Vol. XXX:81 (shifts burden of proof, indirect comment on failure to testify).

- The prosecution argued that there was no evidence of the exact denominations of the money purportedly stolen from the cash register, S.F. Vol. XXX:66, then moments later argues defendant is guilty because money found on him "matches the same denominations" as the money taken from the cash register. S.F. Vol. XXX:79.

- The prosecution described Mr. Kidane as a praiseworthy student and businessman just trying to make a living in a rough neighborhood; refers to Mr. Tareh's lost dream of a land of opportunity. S.F. Vol. XXX:61 (victim-impact testimony; vouches for the credibility of Mr. Kidane).

**Punishment Phase**

- Alan Belcher testified to hearsay statements made by Mr. Washington about his alleged escape from Gatesville. S.F. Vol. XXXIV:90.

- The prosecution led Ben Linton during direct examination. S.F. Vol. XXXIV:257.

- The prosecutor led David Illingworth during direct examination. S.F. Vol. XXIV:276.

- The prosecutor made references to facts outside the record during his closing argument. *See, e.g.*, S.F. Vol. XXXIV:51 & 59 (vouching for prosecution's witnesses and dismissing as "ludicrous" the argument that the witnesses were wrong); S.F. Vol. XXXIV:54-55 (assuming facts not in evidence by arguing that Mr. Washington was "nonchalant" when he called Mary Drakes and when he reported to police officers at Mike's Food Market); S.F. Vol. XXXIV:59 (assuming facts not in evidence by criticizing defense counsel for not cross-examining Ella Miller with offense report)

The opinion affirming Mr. Washington's conviction declared at least seven claimed errors waived by failure to object, even as it notes that some of the evidence that should have been objected to was improper. *See, e.g. Washington v. State*, 771 S.W.2d 537, 542 & n.3 (Tex. Crim. App. 1989) (observing that defense counsel "did not move for a mistrial" and failed to "show

137

harm by perfecting a bill of exception" after inflammatory testimony by deceased's widow); *id.* at 543 ("Appellant concedes . . . that there was no objection to [testimony concerning victim's peaceful nature] except in one instance, but there appellant's trial counsel failed to pursue the objection to an adverse ruling. Therefore, the error, if any, is waived and nothing is presented for review."); *id.* at 544 ("Appellant again acknowledges, however, that his trial counsel did not object to [testimony of defendant's alleged nervousness after being arrested and handcuffed] and no error is preserved for appellate review."); *id.* at 544 ("Appellant's trial counsel did not object to this testimony."); *id.* ("[A]ppellant concedes that his counsel did not object to any of this [bolstering] testimony"); *id.* at 545 (acknowledging that bolstering testimony defendant's counsel did not object to was "improper bolstering evidence"); *id.* at 546 (trial counsel "did not file a motion to quash the indictment" despite questionable joinder of offenses and "did not object to the charge as submitted.").

Further proof can be found in the State's Proposed Findings of Fact and Conclusions of Law, in which the Court waives review of literally dozens of claims based on counsel's failure to object. *See, e.g., id.* at 9, 10, 11, 12, 15, 17 (five times); 18 (twice). Naturally, because the Findings of Fact and Conclusions of Law were prepared by an adversary, every single failure to object is conveniently labeled harmless or proper. Nevertheless, the sheer number of times the failure-to-object doctrine is invoked indict the adequacy of counsel's representation. *See id.* at 18-19 ("Because the applicant did not object at trial to the complained of closing remarks, or when an objection was made, failed to pursue it to an adverse ruling, the applicant is procedurally barred from presenting this claim for review.").

Further, the evidence and remarks complained of were improper. The CCA specifically

138

rejected the trial court fact finding which declared that the failure to object to the guilt-phase

victim-impact testimony in the case (as well as the prosecution's repeated references to it in

closing) were not ineffective assistance of counsel because the remarks were proper or harmless

"deductions from the evidence." *See* Exhibit 1 (Court of Criminal Appeals opinion, January 14,

1998, denying habeas relief), at 2 n.1. (rejecting factfinding).  Also rejected were the trial court's

finding that the prosecution's improper conduct during closing arguments at both phases –

personally vouching for the credibility of Claude Johnson and various punishment phase

witnesses, referring repeatedly to evidence outside the record, and improperly criticizing trial

counsel – were appropriate.  *Id.*  The CCA's explicit rejection of the fact findings indicates that

the prosecution's tactics were improper and should have been objected to.  A lawyer's consistent

failure to preserve error for appellate review is evidence that his client received ineffective

assistance of counsel.  *See Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) ("[C]ounsel's

mistakes at trial were exacerbated after the trial when counsel failed to preserve any of the errors

committed by the prosecution for appeal.").

  c. **Counsel failed to ensure that bench conferences which**
    **resolved important points of law were recorded and**
    **transcribed for appellate review.**

  "The Rules of Appellate Procedure provide that it is counsel's affirmative duty to see that a

sufficient record is presented to the appellate court to show error requiring reversal." *Ex Parte*

*Coy*, 909 S.W.2d 927, 928 (Tex. Crim. App. 1995) (citing TEX. R. APP. PRO. 50(d)).  The effect

of an attorney's failure to arrange for the transcription of important trial events is to "place

appellant in the position of having no appeal at all." *Vicknair v. State*, 702 S.W.2d 304, 306

(Tex. App. – Houston [1st Dist.], no pet.). *Every time* the attorneys approached the bench, trial

counsel failed to have the discussion transcribed and made a part of the record for appellate review.  Some of these discussions appeared to have resolved important legal points.  *See, e.g.,* S.F. Vol. XXIV:46 (immediately after doctor has testified to establish purported medical excuse for juror Linda Cashiola); S.F. Vol. XXVI:171 (immediately after Officer Darin Davis describes state of victim); *Id.* at 269 (during medical examiner's testimony); S.F. Vol. XXVII:350 (during testimony of Mary Drakes regarding Mr. Washington "seeming" to need money); S.F. Vol. XXVII:427 (during discussion of whether surviving victim gave written statement to police); S.F. Vol. XXVIII:553 (immediately after testimony of state's firearms expert C.E. Anderson); S.F. Vol. XXXII:93 (immediately after testimony of Gatesville employee); S.F. Vol. XXXIII:321 (unrecorded bench conference which apparently resulted in limitation on scope of state punishment phase witness's testimony); *Id.* at 338 (during testimony of state's punishment phase witness); *Id.* at 373 (during testimony of state's punishment phase witness).

If these bench conferences were not trial related, Mr. Washington would not be prejudiced by the failure to have them recorded.  A petitioner who alleges ineffective assistance of counsel because of his trial attorney's failure to transcribe portions of his trial must prove resulting prejudice.  *Goodwin v. Johnson,* 132 F.2d 162, 176 (5th Cir. 1997) (no harm occurred to defendant from failure to transcribe bench conferences because reviewing court's ultimate decision could not possibly have been changed by facts contained in untranscribed hearing).  In this case there is evidence that at least one of the bench conferences resolved a vital point of law.  The second-chair attorney at Mr. Washington's trial, Mike Goberman, relates that there was a crowd of people who appeared to be family members or friends of the victims who were seated near the front of the courtroom, glaring at the defendant.  *See* Exhibit 16 (Goberman Affidavit), at

1.  Their behavior was so threatening that Mr. Goberman believed they might actually harm Mr. Washington.  During a bench conference, Mr. Goberman approached the bench and asked the judge to remove the people from the courtroom, which the judge did.  It is unknown how much of the trial took place before this happened.

This ruling does not appear in the record at any point – it took place during an unrecorded bench conference.  It is well-settled that due process is violated when criminal defendants are tried in a courtroom in which the hostility to the defendant is so palpable that it necessarily influences the jury.  *Woods v. Dugger*, 923 F.2d 1454 (11th Cir.) (reversing defendant's conviction upon proof that large number of uniformed prison guards created a threatening and hostile atmosphere in the courtroom), *cert. denied*, 502 U.S. 953 (1991).  Because trial counsel failed to transcribe this conference, Mr. Washington was deprived of the right to appellate review of the claim that his trial was tainted by the threatening, intimidating atmosphere created by the victims' family members.  The context of many of the unrecorded bench conferences described above – as well as trial counsel's failure to have transcribed obviously key discussions concerning the threatening influence of the family members – strongly suggests that important rulings were made during the conferences.  There is simply no way to know how many more important rulings were lost to appellate review by counsel's action.

> **d.  Counsel failed to object to the completely irrelevant testimony of Christopher Brock, M.D., whose account of his treatment of Yemane Kidane constituted impermissible victim-impact evidence and which had a bolstering effect.**

Christopher Brock, M.D., an emergency physician who treated Mr. Kidane, was allowed to testify in the middle of Mr. Kidane's cross-examination by defense counsel. S.F. Vol. XXVII:438-

141

444.  The District Attorney, ghostwriting for the state habeas corpus court, contended that Dr. Brock's testimony was relevant to establish the "res gestae" of the offense and to establish Mr. Washington's intent to kill Mr. Kidane.  Findings and Conclusions at 10 ¶49.  Therefore, the state habeas court concluded, it was not ineffective for trial counsel to fail to object to the testimony. The District Attorney provided no citations to support these assertions, and they are in fact not supported by Texas law.

First, Mr. Brock's testimony about his emergency treatment of Mr. Kidane was not admissible as "res gestae" evidence.  "Res gestae" generally refers to the background or circumstances of the crime, but its precise meaning is unclear.  *See, e.g., Mayes v. State,* 816 S.W.2d 79, 86 (Tex. Crim. App. 1991) ("'res gestae' . . . merely serves to obscure thought and confuse principle.") (quoting 2 WIGMORE, EVIDENCE § 365 (Chadbourn Ed. 1979).  To the extent that it permits evidence of the "background" of the crime, it may be admitted, but the mere invocation of the term cannot trump established rules of evidence.  *Id.* at 87-88 ("To justify admission of character evidence on the rationale that it is 'helpful' as 'background' would break new ground, fertile for evidentiary exploitation, and rich in its potential for unsettling the law of character evidence.").

Mr. Brock's graphic description of the emergency surgery performed on Mr. Kidane was not admissible as "res gestae" evidence because it was merely cumulative of evidence already before the jury, and bore a strong risk of prejudice.  Mr. Kidane had already testified that Mr. Washington had pointed the gun at his neck and fired, and that the bullet had entered his neck and caused him severe injury.  S.F. Vol. XXVII:413, 419-22.  Confirmation of Mr. Kidane's account, if any was needed, was provided by officers who testified that Mr. Kidane was bleeding profusely

142

from a gunshot wound to the neck and jaw when they arrived, and that he told them Mr.
Washington had caused the wound. *See, e.g.*, S.F. Vol. XXVI:170-71 (testimony of Officer
Darin Davis).

Therefore, because Rule 401 of the Rules of Evidence would have prohibited the
introduction of Dr. Brock's testimony because it was cumulative and potentially prejudicial
victim-impact testimony, the mere invocation of the words "res gestae" cannot save it. Dr.
Brock's graphic testimony was also unnecessary to prove the assailant's intent to kill. Under
Texas law, a pistol is a deadly weapon per se, and firing a shot into someone's neck establishes
intent to kill. *See White v. State*, 647 S.W.2d 71, 74 (Tex. App. – Tyler 1983). The jury had
ample evidence on those two points before it before Dr. Brock testified. Had Dr. Brock's
testimony been objected to, it would have been excluded, except to the extent that it was
necessary to establish a chain of custody for the bullet found in Mr. Kidane's body.

The admission of the testimony was especially harmful in that defense counsel, without
objection, allowed it to interrupt his cross-examination of Mr. Kidane. S.F. Vol. XXVII:436.
The testimony – which describes in graphic detail Mr. Kidane's difficulty breathing, the wounds
caused by the bullet, and the removal of the bullet and bone chips from Mr. Kidane's neck – could
have had only one effect: to engender sympathy and concern for Mr. Kidane. The very next day,
trial counsel began attacking the credibility of the very witness whose plight had just been
described so compellingly by Dr. Brock. This circumstance created an obvious risk that the jury
would view attacks on Mr. Kidane's credibility not as a fair-minded attempt to discover the truth
about the events of December 19th, but as unjustified badgering of a helpless victim. Trial counsel
was ineffective in not objecting to the testimony. Because the inadmissible testimony – coupled

143

with its unusual timing – bolstered the credibility of the key prosecution witness, this error, along

with the myriad other errors of trial counsel, undermines confidence in the outcome of the guilt

phase of Mr. Washington's trial, and his conviction must be reversed.

### e. Counsel's guilt-phase closing argument was meandering and incoherent.

Closing argument is an essential part of representation in a criminal trial.

> It can hardly be questioned that closing argument serves to sharpen and clarify the issues
> for resolution by the trier of fact in a criminal case. For it is only after all the evidence is
> in that counsel for the parties are in a position to present their respective versions of the
> case as a whole. Only then can they argue the inferences to be drawn from all the
> testimony, and point out the weaknesses of their adversaries' positions. And for the
> defense, closing argument is the last clear chance to persuade the trier of fact that there
> may be reasonable doubt of the defendant's guilt. . . . . In a criminal trial, which is in the
> end basically a factfinding process, no aspect of such advocacy could be more important
> than the opportunity finally to marshal the evidence for each side before the submission
> of the case to judgment.

*Herring v. New York*, 422 U.S. 853, 862 (1975) (citing *In re Winship*, 397 U.S. 358 (1970)).

The guilt-phase closing argument proffered by trial counsel for Mr. Washington was a

disjointed series of speculative attacks on various aspects of the state's case. *Compare Stouffer*,

1999 WL 14046 at *9. Counsel started by apologizing to the jury for not speaking to them in the

halls, S.F. Vol. XXX:19-20, then praised them for listening to the evidence. *Id.* at 20. What he

said next is hard to interpret:

> I am going to argue the facts of this case, evidence that you heard; and thinking back
> when you were out there and the State called off all these witnesses that they were going
> to have to testify against Mr. Washington, some of you were sort of taken back by all
> those witnesses, and then when you got up here and he asked you about one-witness
> testimony and some of you told him, say, I would have a problem with it and I don't
> blame you, anybody would, and you told him, say, but I can believe one witness if it's
> proved to me beyond a reasonable doubt that it happened. If I believe him, I can bring
> back a verdict of guilty – and you remember me asking you about the surrounding
> circumstances and what I mean by that is what I understood you to mean when you said

144

> I can convict on one-witness testimony.  What I understood you were saying is that if you-all could corroborate this one witness's testimony and corroborated that with the surrounding circumstances of the case.

S.F. Vol. XXX:21.  The point trial counsel was trying to make, as well as how it helped Mr. Washington, is difficult to determine.  After that, trial counsel appeared to announce that his theory of the case was that several police officers lied on the witness stand, but then immediately appeared to retract that statement:

> After sitting through this trial I'm sure you realize why I asked you about police officer testimony and I asked you could you believe a police officer could lie?  And let me say this: Even if at this point, even if you don't believe that police officers can and will lie, at this point you certainly must agree with me that you have seen police officers sit on that stand and directly attempt to evade answering a question.

*Id.*  After this, counsel highlighted minor inconsistencies in the statements of various police officers.  *Id.* at 22-28.  Trial counsel then asserted, without support in the record, that Mr. Kidane had another, larger caliber gun at the crime scene because "liquor store security guards" would realize that a .25 was an insufficient caliber gun for self-protection, and that Mr. Kidane actually shot this mystery gun – not his own .25 caliber weapon – into the air after the crime.  *Id.* at 29.[55]  Counsel then attempted to explain Mr. Washington's conduct directly after the crime.  *Id.* at 29-34.  Throughout the summation, the defense switched from topic to topic in an abrupt, confusing fashion, without signaling his changes of topic or knitting the subjects of his presentation together:

> If they would have went back in there and looked in that alley back there they would

---

[55] This argument appears to have been an attempt to deflect the impact of the State's ballistics evidence which purported to conclusively demonstrate that the fired rounds found in the victims could not have come from Mr. Kidane's .25.  Had the defense adequately reviewed the offense reports of this crime and the autopsy report of Mr. Tareh, and retained his own ballistics expert, he would not have had to rely on this unconvincing "mystery gun" argument.  *See supra* Part III.A.5.d.

> have found some. If they checked Mr. Kidane's hands they would have found
> something, but they were mislead, totally mislead, and now they got to try to -- they still
> got to try to make the case with what they have and let me say something to you: You
> notice the State wants to make a big deal he had $77 in his pocket. Thirty-seven dollars
> in one-dollar bills and, ladies and gentlemen, because of that, convict him of capital
> murder, because the man just shouldn't have money in his pocket, definitely shouldn't
> have one-dollar bills and they want you to think that this money came out of that store.

*Id.* at 34-35. These examples are characteristic of the overall argument, which was disjointed and

rambling. Not only did this surely make it harder for the jury to understand, it also exposed the

defense to the State's rejoinder that the confused nature of trial counsel's closing exposed the

bankruptcy of his defense:

> You can kind of tell the quality of the Defense in the case by looking at the argument,
> looking at the nit-picky things that the Defense goes after, jumping from one thing to
> another. What you heard and saw is the Defense gasping for air, Mr. Harris throwing
> everything out to you that he can, kind of like baiting a hook and just throwing this in
> front of you, trying to get one of you to nibble for anything and everything he can think.
>
> Mr. Harris' arguments seems to involve a conspiracy theory of the police department
> and a second gun theory that would rival the Kennedy assassination conspiracy. This is
> ludicrous. There's absolutely no evidence they discussed the evidence. Mr. Harris seems
> to change some recollection of the evidence and you are the one that decides what was
> said from the stand, but the one thing that Mr. Harris seems to agree with me on is that
> this is not a case of mistaken identity, because obviously Mr. Kidane knows the
> defendant -- did not know him by name, but knew him as a customer. . .

S.F. Vol. XXX:59-60. Later, the prosecution pointed out that the defense "boil[ed] down to"

trial counsel "asking you[] to find Mr. Kidane was lying." *Id.* at 60. The prosecution then asked:

"[H]ave you heard anything to tell you why Mr. Kidane would be lying?" *Id.* at 61.

The prosecution's critique was devastating – but it did not have to be. Having chosen to,

essentially, assert that Mr. Kidane was lying, trial counsel had already neglected to collect proof

to back up his claims. Had that proof been collected, the jurors would have been provided with

the key missing piece of evidence: a reason for Mr. Kidane to lie. Having no other explanation

146

before them, the jury may have considered the changes in Mr. Kidane's story to be nothing more than the understandable mistakes of someone who suffered a traumatic experience. Had the botched drug deal theory been advanced at trial, and had the discrepancies between the wound sizes and the State's theory of the case been appropriately stressed, the changes in Mr. Kidane's story would have looked more like the errors of someone who had trouble remembering the details of a cover story because it bore no relationship to what actually happened. Trial counsel utterly failed in his adversarial role, squandering Mr. Washington's "last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt." *Herring*, 422 U.S. at 862.

> **f.   Counsel's failure to invoke relevant legal doctrines often prompted the trial judge to step in and "perform counsel's job for him."**

Pre-trial "'investigation and preparation are the keys to effective representation.'" *Rummel v. Estelle*, 590 F.2d 103 (5th Cir. 1979) (quoting ABA PROJECTS ON STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION 224 (App. Draft 1971)). Such preparation must involve, at the minimum, becoming familiar with the legal and evidentiary principles which are likely to play a role in a trial. The fact that a trial judge must step in and ensure that basic legal principles are observed, coupled with a pattern of other obvious tactical and legal missteps on the part of counsel, can indicate that a defendant has received the ineffective assistance of counsel. *Collier v. Turpin*, 155 F.3d 1277, 1293 n.22 (11th Cir. 1998) (citing as evidence of counsel's ineffectiveness the fact that the judge actually prompted defense counsel to ask other questions of his witness); *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983) (finding ineffective assistance when "[o]n at least four occasions, the court had

147

to intervene and do counsel's job for him.").

During Mr. Washington's trial, the judge repeatedly watched trial counsel stumble as he tried to frame proper objections or to lay foundations for or exclude evidence, then stepped in to complete the job herself. For instance, during Officer Powers's testimony, the State claimed the right to introduce hearsay statements made by Mr. Kidane to Officer Powers under the "excited utterance" doctrine of TEX. R. EVID. 803(2), relying on the fact that Mr. Kidane had been shot sometime before the officers had arrived. *See* S.F. Vol. XXV:89. The judge ordered a hearing outside the jury's presence. Trial counsel briefly questioned Officer Powers, and then objected, for almost a full page of the record, mainly on the basis that the hearsay statements are inadmissible under rule 803(3), which admits statements of a person's "then existing mental, emotional, or physical condition." S.F. Vol. XXV:96-97.

The judge then stepped in, telling trial counsel "[l]et me put you off a second," *id.* at 97, and asked Officer Powers a brief series of questions which established that the information was elicited by a series of questions, and that Mr. Kidane responded rationally to those questions. *Id.* at 97-98. After securing this information herself, the judge then sustained trial counsel's objection. Mr. Stabe then asked the judge to let the officer repeat the answer to the first question Officer Powers asked him, arguing that at least that initial response was admissible as an "excited utterance under [TEX. R. CRIM. EVID.] 803(2)." Again, trial counsel failed to grasp the significance of what was occurring in front of him, as his response to the prosecution's argument confirms:

> Your Honor, 803(2), who shot him goes to memory, not as to – if he had asked him what is wrong with him and he said, "I'm shot. I'm in pain. I'm hurt. I'm injured." That goes to 803, not as to go into shot him, that goes to memory, and 803 specifically

excludes memory.

Secondly, Your Honor, I would show that the man's own report, first thing on his report that he asked him, according to the report, shows he didn't ask him anything.  He just started talking to him.  Doesn't show he asked anything; and further, we would show from this officer's own testimony, Mr. Kidane had been seen by the paramedics.  We don't know how long he had been seen by the paramedics.

S.F. Vol. XXV:101.  The objection continues for another half page.  The objection provides further proof of counsel's lack of preparation and inadequate knowledge of the relevant rules of evidence.  Trial counsel again mistakes Rule 803(2) for Rule 803(3), and then, in the next sentence, undercuts his own prior argument by suggesting that Mr. Kidane blurted out the relevant information; whereas counsel and the court had just attempted to establish that it had been *volunteered as a result of questioning*.  In any event, the court simply ignored trial counsel's objection, and once again questioned the witness herself, satisfied herself that the testimony was inadmissible, and then sustained her prior ruling excluding the testimony identifying the defendant.  S.F. Vol. XXV:102-03.

During the punishment phase, a police officer was examined concerning a 1984 incident in which Mr. Washington discharged a weapon at a person who had entered his property late at night and driven off with a truck that belonged to Mr. Washington's roommate.  Trial counsel attempted to establish that Mr. Washington could have thought the truck was being stolen, and therefore could have been justified in using force to prevent the theft:

[By trial counsel]:     Is it safe to assume that as far as Mr. Washington knew, the truck was being stolen?

[By the State]:     Object to that as calling for speculation on the part of this officer and this witness.

The Court:     Rephrase your question.

149

| | | |
|---|---|---|
| [By trial counsel]: | | Officer Cannon, based on the facts as they happened out there that night, the truck being driven off, Mr. Washington inside the house, is it conceivable that Mr. Washington thought he was shooting at a burglar? |
| [By the State]: | | Object. It's calling for speculation on the part of the witness. |
| The Court: | | You're getting closer to the question. Do you want to rephrase it again? |
| [By trial counsel]: | | Officer, you made an offense report of this, didn't you, sir? |
| | A. | Excuse me, sir? |
| | Q. | You made an offense report? |
| | A. | No, I didn't. |
| | Q. | Did you read your offense report? Did you read an offense report? |
| | A. | I read an offense report, yes, sir. |
| | Q. | Prior to coming down here to testify? |
| | A. | Yes, sir. |
| The Court: | | Tender the report, would you, sir, so we don't have to go through all of this. |
| [The State]: | | I will, Your Honor. |
| The Court: | | Officer, based on the facts that you knew at the time, the actions of Mr. Washington, were they compatible with someone defending property that he thought belonged to the woman in the house? |
| [The Witness]: | | Would you repeat the question? I'm sorry. |
| The Court: | | Based upon your knowledge of the facts at the |

150

|                   | time of this incident -- |
|-------------------|--------------------------|
| [The Witness]:    | Yes, ma'am. |
| The Court:        | Would it be your testimony that Mr. Washington's actions could comport with someone defending property that he thought legitimately belonged to the person with whom he was with? |
| [The Witness]:    | They could. |
| The Court:        | *Is that the question you want to elicit?* |
| Trial counsel:    | Yes, ma'am, that's the question. Your Honor, I have no other questions of this witness, Your Honor. |

S.F. Vol. XXXII:234-26 (emphasis added).

These incidents illustrate the overall impression the trial record conveys, which is of an overall lack of preparedness and coherence on the part of defense counsel. *See also* S.F. Vol. XXII:103-04 (trial counsel falsely accuses punishment phase witness Ida Thomas of being an embezzler, apparently because of a records mix-up). Especially during the punishment phase, it is obvious when Mr. Harris is cross-examining state witnesses that he is speaking to them for the first time, and had no idea what they would say before they testified.

### g.   Counsel's errors were prejudicial.

Ineffective assistance of counsel claims must be considered in light of the record as a whole. In determining whether an attorney's deficient performance at trial amounts to prejudice under the *Strickland* standard, "a court hearing an ineffectiveness clam must consider the totality of the evidence before the judge or jury . . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record

151

support." *Strickland*, 466 U.S. at 695-96.

By the prosecutor's own concession, the State's case against Mr. Washington "boil[ed] down primarily to Kidane's testimony." S.F. Vol. XXX:9 (State's closing argument); *see also id.* (prosecutor argues "it's going to come down to: Do you believe Kidane or not?"). As the State acknowledged, it had absolutely no physical evidence implicating Mr. Washington. S.F. Vol. XXX:10-14; *see* Exhibit 17 (Singer Affidavit), at ¶ 3; Exhibit H to State Habeas Petition (Affidavit of Larry Fletcher), at ¶¶ 4, 7-9, 11. The murder weapon allegedly used by Mr. Washington was never recovered. The ballistics evidence that the State argued was inculpatory of Mr. Washington actually was highly suspect and, had trial counsel adequately investigated the case, he could have presented a strong argument that Mr. Kidane's .25 caliber weapon would produce a wound more consistent with Mr. Tareh's fatal wound than the .38 or .357 caliber weapon that the State argued Mr. Washington had. *See supra* Part III.A.5.d.

Against this backdrop, trial counsel's errors at the guilt-innocence phase were highly prejudicial under *Strickland*. Given that the State's case rested so heavily on Mr. Kidane's credibility, trial counsel's failure to object to the inadmissible victim-impact testimony presented through Dr. Brock was highly prejudicial. Dr. Brock served to bolster Mr. Kidane, whose credibility was open to question, *see supra* at III.A.5.b, and to interrupt trial counsel's critical cross-examination. Counsel's repeated failure to object to the State's multiple and improper attempts to heighten Mr. Kidane's credibility – such as the use of police officers to bolster his testimony, suggestive leading questions of Mr. Kidane on direct examination, and a closing argument that both vouched for Mr. Kidane and offered baseless explanations for the police's failure to treat him as a suspect – also was highly prejudicial. *See Crotts v. Smith*, 73 F.3d 861,

152

867 (9th Cir. 1996) (since prosecution's case was "less than overwhelming" and turned on the credibility of the witnesses, trial counsel's failure to object to inflammatory testimony diminishing the defendant's credibility was prejudicial); *cf. Gravley v. Mills*, 87 F.3d 779, 789-90 (6th Cir. 1996) (holding that *Doyle* error was not harmless given that there was no physical evidence supporting the prosecution's theory of the case and the victim's testimony contained inconsistencies). This failure to object harmed Mr. Washington at both the trial and appellate levels. "[T]he purpose of an objection is not simply to preserve an error for appellate review of uncertain outcome, but to prevent prejudicial error and a resultant conviction." *Quartararo v. Fogg*, 679 F. Supp. 212, 242 (E.D.N.Y.), *aff'd*, 849 F.2d 1467 (2d Cir. 1988). Furthermore, given the backdrop of the case, trial counsel's unfocused and incoherent closing argument became even more harmful to Mr. Washington's chances of convincing the jury of reasonable doubt. As observed by a New York court in a similar case:

> In a case in which [trial counsel] failed to make an opening statement and in which petitioner did not take the stand, [trial counsel's] failure to review the evidence and coherently detail the weakness of the case against petitioner must have left the jury as confused as to petitioner's defense as it was when the trial commenced . . . . Such a summation was simply an abdication of his responsibility to petitioner.

*Quartararo*, 679 F. Supp. at 246 (citing cases).

Each of these errors alone is sufficient to establish prejudice under *Strickland*. Cumulatively – especially when considered in conjunction with trial counsels' myriad errors in investigation, voir dire, and at the punishment phase – their impact is so great as to have rendered the proceeding fundamentally unfair. *Harris by and through Ramseyer v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (finding prejudice under *Strickland* due to the "cumulative impact" of trial counsel's multiple deficiencies). *See infra* Part III.A.9 (claim for relief based on cumulative

153

deficiencies).

### h. The trial court's findings of fact and conclusions of law on this point are erroneous.

As argued previously, *see supra* Part II.B, the court's findings of fact and conclusions of law are entitled to no deference from this court. Mr. Washington was denied the resources necessary for adequate factual development of his claims, and the findings and conclusions were drafted by the district attorney and signed by the court without adequate opportunity for review. Particular factfindings have been addressed throughout. Mr. Washington further notes that the court's conclusions that "Trial counsel rendered reasonably effective assistance of counsel during his representation of the applicant in the guilt/innocence phase of trial," *see* Findings and Conclusions at 13 ¶ 3, and that Mr. Washington had failed to demonstrate that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," *see id.* at 12 ¶ 61, are conclusory and are based on erroneous fact-findings.

### 7. Ineffective Performance – Punishment Phase

During the punishment phase of a death penalty case, defense counsel bears the responsibility of thoroughly investigating the defendant's background and the state's case. A jury cannot "perform its function" of weighing the "aggravating and mitigating factors" relevant to the defendant's fate if defense counsel fails in this task. *Loyd v. Whitley*, 977 F.2d 149, 160 (5th Cir. 1992), *cert. denied*, 508 U.S. 911 (1993). As the Supreme Court has recently reaffirmed, "capital proceedings [must] be policed *at all stages* by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Monge v. California*, 118 S.Ct. 2246, 2252 (1998) (citing *Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and

154

dissenting in part)) (emphasis added).

Because the death sentencing decision involves an unpredictable mix of factors, "the law's sensitivity to failures in the [death] penalty phase is a given." *Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9ᵗʰ Cir.), *cert. denied*, 517 U.S. 1111 (1996).  Texas law requires punishment-phase jurors to agree unanimously to both punishment-phase questions in order to hand down a death sentence, and the failure of a jury to reach a unanimous agreement results in the automatic imposition of a life sentence. *See* TEX. CODE CRIM. PROC. Art. 37.071 (Vernon's 1984). Therefore, the proper prejudice analysis is whether one juror would have chosen to vote "no" to either punishment phase special issue had constitutional error not occurred. *See, e.g. Motley v. Collins*, 18 F.3d 1223, 1227 & n.3 (5ᵗʰ Cir.), *cert. denied*, 513 U.S. 960 (1994) (citing *Landry v. Lynaugh*, 844 F.2d 1117, 1120 (5ᵗʰ Cir.), *cert. denied*, 488 U.S. 900 (1988)).  The harm standard does not require a petitioner to demonstrate that the outcome of the sentencing phase of the trial would have been different in the absence of constitutional error; it requires only a showing that the error "undermined confidence in the outcome" of the trial. *Strickland v. Washington*, 466 U.S. 668, 693, 694-696 (1984) (rejecting this formulation in favor of one that focuses on whether counsel's performance "undermined confidence" in verdict).

> **a. Counsel failed to bring relevant impeachment evidence concerning convicted murderer and thief Ella Miller to the attention of the jury, and failed to adequately investigate the offense.**

During the punishment phase of Mr. Washington's trial, a convicted murderer and thief named Ella Miller testified that Mr. Washington and another man named Alfred Brooks abducted her and that Mr. Washington took the lead role in sexually assaulting her. S.F. XXXII:166-173.  Her

155

account is startlingly graphic and disturbing: she claims Mr. Washington raped her, beat her, threatened to kill her, and "threatened to cut me in my privates with the knife that I was carrying in my purse." *Id.* at 170. Mr. Washington threatened to "carve this bitch" and "kill this bitch." *Id.* at 172. During this time, Mr. Brooks was allegedly "pleading" with Mr. Washington not to harm Ms. Miller, and pretended to have sex with her in order to placate Mr. Washington. *Id.* at 170-71. This shocking, vicious incident of predation obviously made a significant impact on the jury, as they sent a note out during deliberations specifically requesting to view Ms. Miller's testimony. *See* S.F. XXXIV:68. At least two of the jurors remembered the incident, down to specific details, *almost thirteen years* after the case. Exhibit 31 (Affidavit of Gerald Bierbaum) at ¶¶10, 12.

Mr. Washington was never convicted of rape, robbery, or indeed *any felony* for this alleged conduct. The charges were reduced to a misdemeanor. Mr. Brooks was never prosecuted at all.

In fact, the rape Ms. Miller recounted never happened.

First, not a shred of evidence aside from Ms. Miller's own testimony proves that the vicious rape Ms. Miller described took place. Ms. Miller claimed to have visited a hospital immediately after the offense, but no independent confirmation of her story exists. S.F. Vol. XXXII:136. She also waited "several days" to report the offense. *Id.* Ms. Miller gave several conflicting accounts of what she told the police about this alleged assault, and what reason they gave for reducing the charge against Mr. Washington to a misdemeanor. *See* Exhibit 32 (state trial exhibit reflecting reduction of charges to Class A misdemeanor); S.F. XXXII:180-84. Ms. Miller was also involved in a relationship with Mr. Washington which was not explored at trial. S.F. XXXII:181.

Further, Ms. Miller's credibility and reputation for peaceful and law-abiding character could

156

have been shattered had counsel only performed some meaningful investigation of this alleged

incident.  The undersigned counsel has obtained a portion of the District Attorney's case file on

Mr. Washington's capital murder conviction.  In that case file is a set of three photographs of Ms.

Miller, which were apparently taken in order to help a member of the prosecution team identify

her.  These photographs of Ms. Miller are all mug shots taken during three separate arrests of Ms.

Miller in the early 1980s.  *See* Exhibit 33 (mug shots).  Ms. Miller was convicted of theft in 1983

and 1984.  *See* Exhibit 34 (copy of certified copy of Ella Miller's Harris County criminal history

report).  This relevant impeachment evidence was never brought to the jury's attention.  *See* S.F.

XXXII:179-188.  Theft, because it involves dishonesty, is considered *per se* to be a crime of

moral turpitude.  *Robertson v. State*, 685 S.W.2d 488, 492 (Tex. App. – Fort Worth 1985).

Therefore, these convictions could have, and should have, been used to impeach Ms. Miller's

credibility.

The jury also *never learned* that Ms. Miller was a convicted murderer.  The database of the

Texas Department of Public Safety confirms that Ms. Miller has *eight* aliases and *four* alias dates

of birth.  See Exhibit 35 (records relating to Ella Miller's murder conviction) at 1-2 (detail of

public database listing of TDPS criminal history background information).  The listing describes

her as having been convicted of Murder Without Malice, punished by a five year prison term.  *Id.*

A search of Harris County Criminal records revealed that Ella Mae Miller was indeed convicted of

murder and sentenced to 2-5 years in prison on February 3, 1961 in Harris County, Texas.  *Id.* at

3 (Minutes, Case No. 93,147).[56]  The minutes are contradictory, listing her twice as having been

---

[56] Her age is listed as 23 (*Id.* at 4), which would place her date of birth within the range of alias dates of
birth listed on the TDPS sheet.  The following facts establish that the Ella Miller who testified at Mr.
Washington's capital murder trial is the same Ella Mae Miller who was convicted of murder: (1) the date of birth

157

convicted of "murder *with* malice" and only once as having been convicted of murder without malice. *Id.*

Assuming Ms. Miller was actually convicted of murder with malice, this meant that she had, after some deliberation, intentionally murdered another human being. "Malice," as that term was used in Texas' old murder statutes, meant "the intentional doing of a wrongful act towards another," or a killing committed with "with sedate, deliberate mind on the part of the murderer, and in pursuance of a formed design to kill the person killed." *Cain v. State*, 59 S.W. 275, 277 (Tex. Crim. App. 1900). Nor had Ms. Miller's conduct been reformed in the intervening years: not only was she still committing crimes (specifically, theft), she admitted on the witness stand to carrying several unlicenced weapons on her person. S.F. Vol. XXXII:165 (carrying butcher knife on street); *Id.* at 174 (carrying .32 cal. revolver).

Evidence of Ms. Miller's murder conviction could certainly have been used to impeach her credibility. *See Polk v. State*, 865 627, 630-31 (Tex. App. -- Fort Worth 1993, pet. ref'd) (approving use of defendant's 25-year-old conviction for murder without malice to impeach his credibility in indecent exposure trial). In fact, the case for admission of Ms. Miller's conviction as impeachment is much stronger than in *Polk*, since, unlike the defendant in that case, (1) Ms.

---

listed for Ella Miller on the JIMS records of the State's witnesses located in the District Attorney's file on this prosecution (*see infra* Part III.B.1) is November 17, 1937; (2) one of the alias dates of birth listed for Ella Mae Miller in the TDPS printout concerning the murder conviction is "19371117" (Exhibit 35, at 1); (3) the term of confinement listed on the DPS printout, 5 years, corresponds exactly to the upper range of the term of confinement listed in the 1961 Harris County records; (4) the description of the crime of which Ms. Miller had been convicted, Murder Without Malice, is identical to one of the listings in the 1961 Harris County records; and (5) Ms. Miller's age as listed on the Motion for Probation in the Harris County records (Exhibit 35 at 4) is 23, which is within days of the age she would have been according to at least one of her alias dates of birth. Taken together, the similarities between the Ella Miller who testified at trial and the Ella Miller who was convicted of murder in 1961are so overwhelming that no other reasonable explanation exists for them than that they are one and the same person, and Petitioner so alleges.

Miller's conviction appears to have actually been for murder *with* malice, a more serious crime; and (2) Polk was sentenced only to probation, which he successfully completed, whereas Ms. Miller was sentenced to prison.  Two factors that led the court to admit the testimony in *Polk* are present here.  First, the court stressed that Polk's testimony, coupled with the lack of other corroboration, made his trial a "swearing match," greatly increasing the importance of his credibility.  *Id.* at 630.  Second, the presumption that impeaching witnesses with remote convictions unfairly besmirches reformed wrongdoers for long-ago misbehavior did not apply to Polk, who had recently been convicted of other crimes.  *Id.* at 631.

As the prosecutor admitted, after conceding that he had no proof of rape other than Ms. Miller's account, "I believe it's a fact question for the jury to decide on whether the defendant committed that offense or not."  S.F. Vol. XXXII:137.  Under that theory, the judge allowed Ms. Miller's testimony.  Trial counsel never contacted Ms. Miller prior to trial to attempt to verify her story.  Nor did he contact Albert Brooks.  The jury never learned that Ms. Miller had a criminal record for murder and crimes involving moral turpitude.  They also never learned Alfred Brooks, who Ms. Miller adamantly asserts was present during the whole incident, does not remember *anything* like what she describes happening, and describes the alleged conduct described by Ms. Miller as inconsistent with what he knew of Mr. Washington's character. *See* Exhibit 7 (Affidavit of Alfred Brooks).

> **b.  Counsel failed to inform the jury that the juvenile reform institution from which the Petitioner allegedly "escaped" was notorious for abusive conditions at the time the Petitioner was incarcerated there.**

During the punishment phase, Alan Belcher, a former caseworker at the Gatesville School for

159

Boys, testified that in 1974, Mr. Washington, then fifteen, had "run away" from an outing at the Gatesville School.  S.F. Vol. XXXII:83-84.  The prosecution took pains to emphasize that this incident was classified as an "escape," thus suggesting Mr. Washington's ability to escape from secure confinement.  *Id.* at 84; *see also* S.F. Vol. XXXIV:57 (Closing argument: "Now, I'm not talking about a tunnel under the wall, climbing over the wall escape, but the fact of the matter is that this defendant *was in the custody of a correctional officer . . . [and] left the custody of that correctional officer.*") (emphasis added).  On cross-examination, it became clear that Mr. Washington's "escape" merely involved a brief absence from an overnight camping outing.  *Id.* at 89.

The jury should have been informed that shortly after Mr. Washington was placed there, the Gatesville School was ordered closed by a federal district court because the brutal and abusive conditions at the school violated the Eighth Amendment:

> Dwain Place, Superintendent of the Gatesville State School for Boys, described his philosophy with respect to control and discipline as follows: "We don't have any punishment for discipline.  We may have punishment for control.  If you want to call it punishment, we use force for control . . . ."  Although incident reports have recorded certain instances of brutality, the supervisory staff and, specifically, Superintendent Place, have taken no action whatsoever to eliminate the uses of excessive force.  Thus, in a special incident report dated May 30, 1973, the investigating staff member, Carroll Duke, concluded that a correctional officer had struck R.C. several times without justification.  The only action taken against the correctional officer was a verbal reprimand; there was no recommendation for firing or referral for criminal prosecution.  In another incident, while a group of boys from the Hackberry Subschool of Gatesville were returning from a field trip by bus, one, Robertson, a teacher, in the presence of other teachers and correctional officers, struck, kneed, kicked, and punched W.H. and G.P. numerous times for pretending to fight in the bus.  The boys in no way threatened the teacher or sought to fight back.  W.H.'s eardrum was badly injured -- 'with a hole going straight through it.'  At the instruction of Robertson, W.H. falsified his report of the incident, stating that the injury was an accident.  A concerned teacher intern witnessing the beating reported it to another teacher.  The teacher told him, 'If you stay around the school long enough you better get used to it, because you'll see plenty and worse.'  Several witnesses testified that

160