Correctional Officer Schultz used excessive force against students on numerous occasions. One of his innovations included placing a boy's head between his, Schultz's, own legs and then running in place. Another of his variations was to stand on a boy's stomach.

The frequent use of certain forms of brutality has given rise to a jargon peculiar to the Gatesville inmates and staff. A 'peel' is administered by forcing a boy to bend over, then striking him hard on the back with a fist or open hand. A 'tight' is applied by forcing a boy to bend down, holding his own ankles and toes, then striking him on the buttocks with the handle or straw end of a broom. A boy is subjected to 'brogueing' when he is kicked in the shins. Such punishment has been meted out for 'wearing pants too low;' 'losing a baseball game;' 'leaving shoes out;' or 'leaving cards out.'

Gatesville incident reports, like those at Mountain View, are frequently never filed, and when filed, are often falsified. Victims do not report incidents of brutality to caseworkers or other staff, because such procedures are not explained to them. Retaliation for filing a report has included the assignment of extra duty to the complainant or his transfer to Mountain View for an eighteen-month stay.

*Morales v. Turman*, 383 F. Supp. 53, 75-76 (E.D. Tex. 1974) (footnotes omitted), *rev'd*, 535 F.2d 864 (5th Cir. 1976), *rev'd*, 430 U.S. 322 (1977).  The Court found that the institutional culture at the school was so pervasive with brutality, violence, and indifference that it was actively harming its charges, and that the only reasonable means of addressing the situation was to close it:

The court finds from the heavy preponderance of the evidence that two institutions, Gatesville State School for Boys and Mountain View State School for Boys, are places where the delivery of effective rehabilitative treatment is impossible, and that they must not be utilized any longer than is absolutely necessary as facilities for delinquent juveniles. The court is mindful of the drastic nature of a pronouncement that any physical facility is unfit simply because of its history; but the pages of testimony by expert witnesses in the record of this case, affirming the near-impossibility of eradicating brutality and indifference in locations where they have secured so firm a foothold, have convinced the court-- against its own misgivings-- that no relief short of complete abandonment of those institutions can insure that the mistreatment of juveniles is halted.

*Id.* at 121.  This information, being a published, bound judgment entered twelve years prior to Mr. Washington's trial, was clearly available to defense counsel, and would have helped the jury put Mr. Belcher's testimony into perspective.  Assuming the jury agreed with the prosecution's

dubious characterization of this incident as an escape, they were entitled to know precisely what it was Mr. Washington was escaping from.  The failure to investigate conditions at Gatesville, which were a matter of public record, was deficient performance.

The knowledge that Gatesville was a brutal, backward institution where no meaningful rehabilitation and treatment took place would first of all have made Mr. Washington's escape, if that is what it was, more understandable.  In addition, the fact that the defendant was confined in an institution notorious for the brutal, abusive treatment of its juvenile charges has obvious mitigating value.

### c. Trial counsel failed to take adequate steps to prevent the trial of the petitioner in a hostile and intimidating courtroom atmosphere.

A juror and Mike Goberman, a lawyer who informally assisted lead trial counsel, both remember that the victims' associates (probably friends and family members) behaved in a manner so threatening and intimidating that they had to be removed from the courtroom.  Juror Ted Hamilton remembers the victims' associates mumbling and glaring extremely intensely at Mr. Washington, as does Goberman. Exhibit 31 (Affidavit of Gerald Bierbaum) at ¶8; Exhibit 16 (Affidavit of Mike Goberman) at ¶3.  The courtroom atmosphere became so tense at one point (Mr. Hamilton remembers it as being the last day of the punishment phase of the trial) that the victims' associates had to be forcibly removed from the courtroom.  *Id.*

Because of lead trial counsel's inexcusable and unprofessional failure to have *any* proceedings relating to the hostile courtroom environment transcribed for appellate review (*see supra* Part III.A.6.c)  it is impossible to know with certainty many important facts about this incident: what the victims' associates said in the courtroom, how long they were permitted to stay there, what

factors prompted the judge to remove them from the courtroom, or whether the judge performed

the analysis required under *Waller v. Georgia*, 467 U.S. 39 (1984), in order to justify removing

members of the public from a public criminal trial.

Two of the jurors who sat on Mr. Washington's trial remember an interview held between

some jurors, the defense lawyer, and the judge immediately after Mr. Washington's death penalty

trial.  During this interview, the defense lawyer gave a stunning description of the influence the

victims' associates had on the course of Mr. Washington's trial.  Trial defense counsel stated that

Mr .Washington declined to testify because he was certain that he would be assassinated by

associates of the victims no matter what the outcome of the trial was, and felt he might actually be

safer in prison.  Bierbaum Aff. at ¶5, ¶9.  Further, and even more spectacularly, trial defense

counsel told the jurors at the end of the trial, in the presence of the judge, that *Mr. Washington's*

*own brother had been murdered by associates of the victims specifically in order to prevent his*

*testifying on Mr. Washington's behalf.  See infra* Part III.F.

Trial counsel believed that his client's ability to present a defense to the charges against him

had been crippled by intimidation and murder by associates of the victim, yet he did absolutely

nothing whatsoever to investigate or prevent this intimidation.  He did not ask the court to

convene a hearing into the circumstances of Mr. Washington's brother's death, nor did he request

a continuance until the circumstances of Mr. Washington's brother's death could be determined,

nor did he enter into the record a proffer of the testimony Mr. Washington's brother could have

given, nor did he request security for potentially vulnerable defense witnesses.  In fact, he never

mentioned anything about these incidents during any portion of the trial which was transcribed.

The only step he took to insulate Mr. Washington from the effects of the victims' associates on

163

his right to a fair trial was apparently to ask to have them removed from the trial courtroom, and

he did not even manage to ensure that those critical proceedings were transcribed.  If trial counsel

had a good-faith basis for his beliefs concerning the effect of the victim's associates on his client's

right to a fair trial, he was unquestionably obligated to put these concerns in the record and

request, at the very least, the remedies suggested above.  His failure to do so constitutes a breach

of his duty of loyalty to his client and ineffective performance.  Equally troubling is the

recollection of Juror Hamilton that this conversation, with its stunning revelations, took place in

front of the trial judge, who appears to have done nothing about it.

### d. The deficient performance of counsel at the punishment phase was prejudicial.

The impeachment of the testimony identified above could have greatly impacted Mr.

Washington's jury.  Although the State introduced evidence of many unadjudicated offenses

against Mr. Washington during the punishment phase of his trial, a great deal of this testimony

was obviously suspect.

First, two witnesses, Linda Desso and Ben Linton, testified during the punishment phase of

the trial about an alleged assault committed against them by Mr. Washington.  Ms. Desso alleged

that Mr. Washington hit her in the head with a shotgun and fired the gun between her feet during

a botched drug deal.  S.F. XXXII:240-248.  No charges were ever filed as a result of this

incident.  On cross-examination, Harris implied that Ms. Desso lived in a hotel that was

frequented by prostitutes.  *Id.* at 249.  He also asked Ms. Desso whether she had ever been

convicted of possession of marijuana, to which she responded "not to my knowledge."  Mr.

Linton testified that he had just met Ms. Desso "the same day."  Ms. Desso did admit to having

164

been arrested for "carrying a weapon," but claimed she could not remember whether she had ever been convicted for that offense.  S.F. XXXII:251.

A certified copy of Ms. Desso's Harris County criminal history report is attached as Exhibit 36.  Ms. Desso has seven aliases, and had a lengthy criminal record at the time of Mr. Washington's trial, including three convictions for unlawful carrying of a weapon, one conviction for theft, six convictions for prostitution, three convictions for possession of marijuana, and one conviction for driving under the influence of a controlled substance.[57]  A Houston Police Department Criminal History Report on Ms. Miller bears a warning in capital letters situated prominently at the top of the Report: "CAUTION ----> SUSPECT IS KNOWN TO CARRY A WEAPON."  It also reveals that she has an "FBI #."[58]  Not only was Ms. Desso/Ward an armed career criminal, her account of the crime was unconvincing.  She and Mr. Linton disagreed on important details, such as who was driving the truck when the offense occurred, and what happened immediately after the incident.  S.F. Vol. XXXII:247 (Desso says Linton was driving truck, says she "passed out" after being hit in head); S.F. Vol. XXXII:260 (Linton says Desso was driving truck; and that she drove off in it after incident).

The State also presented Robert Tennard, an inmate at Harris County Jail, who testified that himself and Mr. Washington got into an argument over Mr. Washington spending too much time on the telephone, and that "we started fighting" over this incident.  S.F. Vol. XXXIII:441.  However, at the time, Mr. Tennard was imprisoned in Harris County Jail after having been

---

[57] Ms. Desso, without objection from the defense, claimed to have reformed her lifestyle as of the time of the trial, and said she was studying the Bible in order to become a Jehovah's Witness. S.F. XXXII:254. However, she has had several convictions for theft and possession of marijuana since that time. Exhibit 36, at 3-4.

[58] For a fuller explanation of open records litigation by which Mr. Washington came to possess these documents, see *infra* Part III.B.1.

165

convicted of capital murder and sentenced to death for a double stabbing homicide, and had previously been convicted of rape. *See Tennard v. State*, 802 S.W.2d 678 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1259 (1991). Another convict, Oliver Ray Palmer, who testified for the State about threats Mr. Washington allegedly made toward him. *Id.* at 454. Mr. Palmer had been convicted of burglary and car theft. *Id.* at 447.

To counter the testimony introduced by the state concerning belligerent behavior Mr. Washington displayed toward prison guards, the defense introduced the testimony of Walter Pink, Jr., a lawyer and minister. S.F. Vol. XXXIII:469. Mr. Pink testified that, while visiting another inmate, he had witnessed Mr. Washington confined in a cell in which excrement was overflowing in the toilet. *Id.* at 470. Mr. Washington asked the guards to move him to a cleaner cell, because he was feeling ill. *Id.* at 471. Two deputies ordered Mr. Washington to stop complaining, but he continued to ask to be moved. *Id.* Eventually, two deputies entered his cell, grabbed him, said "if you can't hush we're going to make you hush," and "began to stomp, kick, and abuse him." *Id.* at 472. Mr. Pink told the guards to stop, and the guards took Mr. Washington to "a different area where nobody else could view" what was happening to him. S.F. Vol. XXXIII:473. Mr. Pink confirmed that the Harris County Jail keeps track of individual prisoners in a centralized system, so that the incident would have gone on his permanent jail record. *Id.* at 475.

Given this context, the above ineffective assistance of counsel at the punishment phase was prejudicial. First, the failure to investigate the Ella Miller incident was key. Constitutional error which taints a key element of the State's case in aggravation can be prejudicial even when substantial other aggravating evidence exists. *See, e.g., East v. Johnson*, 123 F.3d 235, 238 (5th

166

Cir. 1997) (finding that *Brady* evidence that would have destroyed credibility of "a key witness

for the prosecution on the future dangerousness issue" was material despite remaining untainted

evidence of spousal abuse, theft, attempted burglary, jail misconduct, forcible sodomy of a five

year old boy, "an altercation with a prison guard while East was awaiting sentencing" and

conviction for underlying capital crime, which involved stabbing death of elderly woman). As in

*East*, the prosecution emphasized the Ella Miller incident in its jury argument:

> Miss Miller told you how she knew the defendant and back in 1978 she would have been
> about a 40-year-old woman at the time. How the defendant approached her, took her back
> to a vacant building, how the defendant raped her, held a knife to her, ordered a second
> individual, man with him, to do the same. Miss Miller told you that man didn't. That the
> man kept begging the defendant to leave her alone. That the defendant held that knife to
> Miss Miller's privates as she said and later said, "I should kill the bitch" and then beat her
> in the face, and in a week or two later how the defendant threatened to kill her if she
> testified. Now, we know Miss Miller is a fifth ward resident, knows relatives of the
> defendant.

> You can also see from the judgment that the defendant was convicted in April of 78,
> approximately two months after the crime. The same time period where Miss Miller
> moved out of town and it's just as reasonable an inference that the reason for the
> reduction is because we didn't have a witness. You can't prosecute a case without a
> victim and a witness.

> Trial counsel: Your Honor, I'm going to object to him -- going to object to his last
> statement. He's going outside the record.

> THE COURT: Stay within the record, Mr. Stabe.

> MR. STABE: And you heard the clerk tell you that the defendant was, in fact, initially
> charged with aggravated robbery as well as the assault, but you saw Miss Miller, she has
> had her day in court and you judge whether to believe her or not.

S.F. Vol. XXXIV:59-60; *cf. East*, 123 F.3d at 238 (noting that prosecutor thought testimony of

discredited witness was "important" because he mentioned it "eight times" during closing).

The jury was required to find that any extraneous offenses committed by the defendant be

167

proven "beyond a reasonable doubt" before they could consider them as evidence against the defendant. Tr. at 227 (punishment phase charge).  Because of defense counsel's failure to adequately investigate the Miller incident, the jury was deprived of three devastating pieces of impeachment evidence: the fact that she was a convicted murderer, her recent theft convictions, and the denial of Alfred Brooks.[59]  This information, coupled with the lack of any corroboration of the crime and the fact that the charge was reduced to a minor misdemeanor, would have destroyed her credibility, and would have changed the picture of the punishment phase of the case.  In addition, counsel's failure to investigate the Gatesville School and to provide the jury with an accurate picture of the abusive institution from which Mr. Washington allegedly "escaped" allowed the State to argue for death by capitalizing on an episode in Mr. Washington's boyhood which, if investigated properly, could have been presented to the jury as mitigating evidence.  But for these errors, there is a reasonable probability that the outcome of the punishment phase would have been different.  *Strickland*, 466 U.S. at 694.

In addition, trial counsel failed to properly investigate the case, due to a conflict of interest caused by his unethical funding arrangement.  Because this failure to investigate "adversely affected" Mr. Washington's case at the punishment phase, Mr. Washington also is entitled to relief under the *Cuyler* standard. *See supra* Part III.A.3.d (discussing lower prejudice standard under *Cuyler* when actual conflict of interest exists).

### e.  The state trial court's findings of fact and conclusions of law are incorrect.

---

[59] The defense apparently did attempt to do criminal records background checks on some state witnesses, but failed to adequately match the names to the crimes.  In a hearing held outside the jury's presence, the defense accused Ida Thomas, a social worker who operated a Fifth Ward social service agency, of being an embezzler.  S.F. Vol. XXII:103-04.  She denied the allegation.  *Id.*

As argued previously, *see supra* Part II.B, the court's findings of fact and conclusions of law are entitled to no deference from this court.  Mr. Washington was denied the resources necessary for adequate factual development of his claims, and the findings and conclusions were drafted by the district attorney and signed by the court without adequate opportunity for review. In particular, the state court's conclusions that "Trial counsel rendered reasonably effective assistance of counsel during his representation of the applicant during the punishment phase of trial," *see* Findings and Conclusions, at 13 ¶ 4, and that applicant had failed to demonstrate that "there is a reasonable probability that, absent the errors, . . . the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *see id.* at 12 ¶ 61, are unsupported by the record.  As argued above, trial counsel's failure to impeach State's witnesses Ella Miller and Alan Belcher was deficient performance, and had counsel properly impeached the witnesses, there is a "reasonable probability" that the outcome would have been different, because the centerpiece of the state's punishment phase case – the testimony of Ella Miller – would have been discredited.  During the punishment phase deliberations in Mr. Washington's case, the jury sent a note to the judge requesting to review Ms. Miller's testimony, *see* S.F. XXXIV:68, clearly indicating that they considered her testimony to be significant to the decision of whether or not to sentence Mr. Washington to death.

**8. Trial counsel, despite receiving information immediately after trial which would have alerted a reasonably competent attorney to the presence of prejudicial juror misconduct which would have guaranteed his client a new trial, took absolutely no action to protect his client's rights.**

The jury which deliberated on Mr. Washington's guilt or innocence was, of course, instructed

169

not to discuss his failure to take the stand and testify. *See* Tr. at 229-232. However, a juror who served on Mr. Washington's jury declared that "we all [the jury] questioned why he [Mr. Washington] hadn't" taken the witness stand. Exhibit 31 (Affidavit of Gerald Bierbaum) at ¶4. One juror affirmed that she had convicted Mr. Washington literally *precisely because* "he hadn't taken the witness stand." *Id.* at ¶3.[60]

Ordinarily, of course, the defense might not be expected to assume that jurors had committed misconduct. Here, though, the situation was completely different. At least *two* jurors remember approaching trial counsel *immediately after the trial*, and one remembers specifically quizzing him on the subject of why Mr. Washington did not take the stand in his own defense! Bierbaum Aff. at ¶¶3-4, ¶9. Given this inquiry, a reasonably competent criminal defense attorney would have immediately inquired of these jurors whether they discussed Mr. Washington's failure to testify, and whether those discussion affected their verdict.

A reasonable criminal defense attorney would have been interested in this information because Texas law is extremely solicitous of the rights of criminal defendants to fair, unbiased jury deliberations. Texas law, unlike federal law, secures to defendants the right to present evidence that the juries which convicted them committed certain kinds of serious misconduct during their deliberations. TEX RULE CRIM. EVID. 606(b) provides that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify as to any matter relevant to the

---

[60] The same juror indicated that she had taken parole into account during her sentencing deliberations, once again in violation of the jury charge. *Id.* at ¶6. The juror indicated that she would have sentenced Mr. Washington to "life in prison" had she been sure that he would not have become eligible for parole. *Id.*

170

validity of the verdict or indictment.  Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

*Compare* FED. R. EVID. 606(b) (preventing consideration of jurors' testimony concerning anything but improper outside influence).  TEX. R. APP. PRO. 30(b)(3) states that a verdict shall be set aside "[w]here the verdict has been decided by lot or in any other manner than by a fair expression of opinion by the jurors."  Rule 30(b)(8) requires a new trial  "[w]here the court finds the jury has engaged in such misconduct that the accused has not received a fair and impartial trial."  These rules describe what makes a verdict "invalid," and thus are key to determining whether a juror's testimony or affidavit will be admissible.   The Court of Criminal Appeals has held that an affidavit which establishes the *Sneed* elements of a claim that a juror misstated the law in a manner harmful to the defendant is indeed "relevant to the validity of the verdict" and is therefore admissible under Rule 606(b).  *Lewis*, 911 S.W.2d at 11; *Buentello v. State*, 826 S.W.2d 610, 614 (Tex. Crim. App. 1992) (discussion of parole law which violates *Sneed* admissible under Rule 606(b)).  *Accord Rasbury v. State*, 832 S.W.2d 398, 402 (Tex. App.-- Fort Worth 1992, pet. ref'd) (holding that juror's testimony that verdict was influenced by fellow juror's incorrect factual assertion concerning self-defense law established that juror had been "denied a fair and impartial trial," and therefore was relevant to the validity of the verdict).

Evidence that a defendant's failure to testify was discussed during jury deliberations, and that "a particular juror considered appellant's failure to testify as a circumstance against him" (1) is admissible in new trial proceedings; and (2) warrants *per se* reversal of the defendant's conviction on the grounds that a defendant whose jury took his failure to testify as a circumstance against him has been denied a fair and impartial trial.  *Reyna v. State*, 846 S.W.2d 498, 501-502 (Tex.

171

App. -- Corpus Christi 1993, no pet.) (citing cases).

Had trial counsel only made routine inquiries of the juror *who approached him immediately after the trial and asked him why his client had not testified*, he would have found out that the jury that sentenced Mr. Washington had discussed his failure to testify and at least one juror had held it against him. He would therefore have had grounds for a timely and certainly successful Motion for New Trial, and would have secured for his client the invaluable right to a tolerably fair proceeding in which jurors followed their oaths. His performance was deficient and prejudicial not only in a technical outcome-determinative sense, but also in the sense that it denied his client the right to a fair and impartial trial. The Petitioner alleges that trial counsel failed to follow up on this information both out of inexcusable incompetence and because defense counsel labored under a conflict of interest in that any action which would have extended his representation of the Petitioner would have subjected him to terrible financial hardship. *See supra* Part III.A.3 (describing financial conflict of interest). Therefore, the harm flowing from trial counsel's inexcusable failure to follow up on an obvious lead that the jury had violated its oath must be evaluated under the *Cuyler* standard.

### 9. Ineffective Performance – Cumulative Deficiencies

In this case, prejudice results not only from trial counsel's individual errors, but also from the cumulative impact of his multiple deficiencies. *Stouffer v. Reynolds*, 1999 WL 14046 *7 (10th Cir. Jan. 15, 1999) (although no single omission by counsel establishes deficient representation, "cumulatively, each failure underscores a fundamental lack of formulation and direction in presenting a coherent defense"); *Harris by and through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (prejudice may result from cumulative impact of counsel's deficiencies); *Drake v.*

172

*Clark*, 14 F.3d 351, 355 (7th Cir. 1994) (cumulative impact of individual acts or omissions may be substantial enough to establish *Strickland* prejudice); *United States v. DeWolf*, 696 F.2d 1, 4 (1st Cir. 1982) (cumulative effect of counsel's failure to object to a number of clearly erroneous rulings could demonstrate ineffective assistance).

As detailed throughout, trial counsel committed serious errors in investigation, at voir dire, and at the guilt/innocence and punishment stages of trial. His unethical fee arrangement with Mr. Washington created a conflict of interest which prejudiced Mr. Washington. *See supra* Part III.A.3. His failure to adequately investigate his client's case resulted in his inability to present an available and credible defense theory, as well as his failure to expose crucial inconsistencies in Mr. Kidane's testimony, to highlight for the jury evidence contradicting the State's theory, and to elicit favorable information from the State's witnesses. *See supra* Part III.A.5. His failure to obtain independent expert evaluation of the State's evidence against his client prevented him from demonstrating to the jury that Mr. Tareh's wound size indicated that the wound had *not* been inflicted by a .38 or .357 caliber weapon, as the State had argued, but rather from a smaller caliber weapon such as the .25 carried by Mr. Kidane. *See supra* Part III.A.5.d. During voir dire, trial counsel failed to adequately challenge or rehabilitate potential jurors, failed to use his peremptory strikes to challenge jurors who indicated a bias in favor of the prosecution, failed to preserve meritorious claims of error including a challenge under *Batson v. Kentucky* to the State's race-based peremptory challenges, and failed to object to the State's improper questioning and misstatements of the law. *See supra* Part III.A.4. Once the trial was underway, counsel forfeited his opportunity to present the jury with an opening statement, failed to object to improper testimony, failed to ensure that bench conferences were placed in the record, failed to object to

victim-impact testimony, failed to cite relevant legal doctrines, and gave a closing argument which was so incoherent as to have relinquished his client's crucial chance to marshal the evidence and persuade the jury of reasonable doubt.  *See supra* Part III.A.6.  At the punishment phase, he both failed to bring out relevant impeachment evidence concerning a key State's witness, and failed to inform the jury of the conditions at the juvenile reform institution from which Mr. Washington had "escaped."  *See supra* Part III.A.7.  Once the trial concluded and Mr. Washington had been sentenced to death, counsel was alerted to, but failed to act upon, information of prejudicial juror misconduct which would have guaranteed Mr. Washington a new trial.  *See supra* Part III.A.8.

Trial counsel's many individual errors have been identified in this petition so as to better illustrate their cumulative impact, and trial counsel's overall deficient performance.  Apart from their individual prejudicial effect to Mr. Washington's defense, the cumulative impact of these multiple, serious errors by trial counsel was to render Mr. Washington's trial fundamentally unfair and to leave the jury with the impression that he had no viable defense. *Compare Stouffer*, 1999 WL 14046 at *6-*7 (remanding for an evidentiary hearing on petitioner's claim of ineffective assistance of counsel due to cumulative failures of counsel, including failure to properly support available defense theory, poorly conducted direct examination, failure to assert and explicate challenges for cause during voir dire, cross-examination which highlighted testimony which was damaging to the defense, failure to deliver an opening statement at either phase of the trial, and a "rambling, incoherent, and irrelevant" closing argument"); *Harris*, 64 F.3d at 1438 (ineffective assistance found based on cumulative impact of counsel's deficiencies, which included failure to adequately investigate and prepare for trial, to consult with his client, to raise evidentiary challenges, to conduct proper voir dire, to raise and preserve meritorious issues, and to make an

effective closing argument). These deficiencies were especially prejudicial given the weakness of the State's case against Mr. Washington, and the prosecutor's concession that the jury's decision would simply depend on whether or not they found Mr. Kidane to be credible. *See* S.F. Vol. XXX:9. When trial counsel's errors are considered cumulatively, there is a reasonable probability that, absent these errors, the jury would have had a reasonable doubt as to Mr. Washington's guilt and the propriety of the death sentence. *See Strickland*, 466 U.S. at 695; *Stouffer*, 1999 WL 14046 at *6-*7; *Harris*, 64 F.3d at 1438.

### B. The State deprived Mr. Washington of due process of law when it withheld material evidence in violation of *Brady v. Maryland* and knowingly allowed false testimony to be presented to the jury in violation of *Giglio v. United States* and *Napue v. Illinois*.

The prosecution in Mr. Washington's case suppressed material evidence from Mr. Washington's counsel, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The suppressed evidence included crucial impeachment evidence regarding Yemane Kidane, whom the prosecutor identified as his key witness. S.F. Vol. XXX:9 (at closing argument, prosecutor states "Mr. Kidane is the only eyewitness to all the events that took place and I submit to you it's going to come down to: Do you believe Mr. Kidane or not?"). The state also suppressed impeachment evidence regarding a key punishment phase witnesses, Ella Miller. Moreover, in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), the State knowingly presented testimony to the jury that was false or created a false impression, and did not correct the testimony. In particular, the State created a false impression concerning its firearms expert's evaluation of the caliber of the bullet used to kill Mr. Tareh, and presented false testimony concerning Mr. Washington's alleged change of clothing.

### 1. The State withheld from the defense criminal convictions of its witnesses, in violation of *Brady v. Maryland*.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Subsequent decisions have abandoned the prerequisite of a defense request for exculpatory evidence before an accused may benefit from the Court's decision in *Brady*. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Moreover, the Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis. *Id.* at 677; *Giglio v. United States*, 405 U.S. 150, 154 (1972). Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: 1) the prosecution suppressed favorable evidence; and, 2) the evidence was material to either the guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Kyles v. Whitley*, 115 S.Ct. 1555, 1565 (1995); *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir), *cert. denied*, 513 U.S. 1060 (1994); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 115 S.Ct. at 1565 ; *Bagley*, 473 U.S. at 682; *Blackmon*, 22 F.3d at 564; *Adams*, 768 S.W.2d at 290. The *Kyles* Court's recent decision clarifies four significant aspects of materiality analysis under *Brady*. First, to demonstrate materiality, Petitioner is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 115 S.Ct. at 1566-1567. The inquiry is more properly

176

whether the suppressed evidence undermines confidence in the jury's decision. *Id.* at 1566.

Second, materiality analysis *"is not a sufficiency of the evidence test."* *Id.* (emphasis added). The

Supreme Court clearly stated, "[a] defendant need not demonstrate that after discounting the

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left

to convict [or return a sentence of death]." *Id.* One demonstrates a *Brady* violation by "showing

that the favorable evidence could reasonably be taken to put the whole case in such a different

light as to undermine confidence in the verdict." *Id.* (footnote omitted); *see also Lindsey v. King*,

769 F.2d 1034, 1042 (5th Cir. 1985) (suppressed impeachment evidence may have consequences

for the case far beyond discrediting the witness's testimony). Third, harmless error analysis is not

applicable to *Brady* violations. *Kyles*, 115 S.Ct. at 1566. The *Kyles* Court stated, "once a

reviewing court applying *Bagley* has found constitutional error there is no need for further

harmless error review." *Id.* Finally, materiality must be assessed "in terms of the suppressed

evidence considered collectively, not item by item." *Kyles*, 115 S.Ct. at 1567.

A key witness presented by the state at the punishment phase – convicted murdered and thief

Ella Miller – had criminal convictions that could have been used to impeach her testimony against

Mr. Washington. *See supra* Part III.A.7.a. However, the State concealed this vital impeachment

material from the defense. The criminal history of a State witness is indisputably *Brady* material,

and the State is presumed to have knowledge of, and a duty to disclose, any criminal history

information available through "routine" checks. *East v. Scott*, 55 F.3d 996, 1003 (5th Cir. 1995)

("[T]he prosecution should bear the burden of obtaining and disclosing the criminal history of its

witnesses 'in the interests of inherent fairness'") (citing *United States v. Auten*, 632 F.2d 478 (5[th]

Cir. 1980)).

177

During representation of Mr. Washington in federal habeas corpus proceedings, the undersigned counsel officially requested access to the Harris County District Attorney's case file on the capital murder prosecution of Mr. Washington. Exhibit 19 (Open Records Litigation) at 0-1 (Letter from Andrew Hammel to Scott Durfee, General Counsel, Harris County District Attorney's Office, (June 10, 1998)). The District Attorney's Office voluntarily disclosed some of the materials in the file to the undersigned counsel, but requested a determination from the Attorney General's Office of Texas that other portions of the trial were confidential documents which could be withheld from public inspection. *Id.* at 2-5 (Letter from Joni M. Vollman, Assistant General Counsel, to the Hon. Dan Morales, Attorney General of Texas (June 25, 1998)). Specifically, the District Attorney requested that the Attorney General find that "criminal history reports and TCIC [Texas Crime Information Clearinghouse]/NCIC [National Crime Information Clearinghouse] information" be withheld from the undersigned counsel because it is protected by statutory guarantees of confidentiality. The District Attorney attached a "representative sample" of this information to the request for confidentiality as Exhibit C. *Id.*

The undersigned counsel advised the Attorney General that the District Attorney had allowed trial counsel to review portions of the State's case file prior to trial, and that under well-established Open Records precedent, *any confidentiality guarantees which applied to such information had been waived by their disclosure to previous counsel for the defendant. Id.* at 9 (Letter from Andrew Hammel to the Hon. Dan Morales (July 6, 1998)). Counsel for the District Attorney's Office responded to this letter, urging the Attorney General to find that the previous disclosure did not waive confidentiality guarantees because disclosure of the information constituted a "good faith" attempt to "ensure compliance with constitutional guarantees." *Id.* at

178

42 (Letter from Joni Vollman to Dan Morales (July 13, 1998)).

The Attorney General ruled that the "district attorney must not release the contents of Exhibit C to the requestor." *Id.* at 46 (Letter from June Harden, Assistant Attorney General, Open Records Div., to Joni M. Vollman (Sept. 15, 1998)). However, in an apparent oversight, the Attorney General included a copy of Exhibit C in a letter addressed to the undersigned counsel. *Id.* at 78. The undersigned counsel have not reproduced Exhibit C or D owing to the Attorney General's determination that the information contained in them is confidential.[61] Exhibit C consists of nine pages of Harris County Justice Information Management System printouts concerning potential and actual witnesses at Mr. Washington's trial. The seventh page relates to Ella Miller. The JIMS Report (and a handwritten note by the prosecutor) lists her date of birth as 11/17/37, and shows the two theft convictions recorded in her public criminal history report, which is found in Exhibit 34. A handwritten note on this JIMS Report reads: "6-4-86 checked J.I.M.S & found following information on Miller." Exhibit C also contains a "Houston Police Department Criminal History Report" concerning witness Linda Desso/Pamela Ward.

Therefore, the prosecution certainly had actual knowledge of Ms. Miller's theft convictions, and had, under *Auten*, constructive knowledge of her murder conviction. The prosecution had a duty to disclose this impeachment material to the defense. There is no evidence that the prosecution discharged this duty: first, there is no evidence the State affirmatively handed over to the defense counsel the information about Ms. Miller readily available from their own databases. Given the District Attorney's efforts to preserve the confidentiality of the J.I.M.S reports twelve

---

[61] Should this Court desire, the undersigned counsel will submit this information under seal as a supplemental exhibit.

years after the case was closed,  it also does not appear that the actual criminal record information itself was present in the portions of the State's file which trial counsel was permitted to review.[62]

The testimony of Ms. Miller was unquestionably important to the jury's penalty-phase verdict: not only did they specifically request to review it, but it still stands out in the minds of several jurors over thirteen years after they heard it.  *See supra* Part III.A.7.a.  As the State admitted, the utter lack of corroboration meant that the only evidence of the supposed rape was Ella Miller's own account.  *Id.*  Further, their charge forbade them to consider any unadjudicated extraneous offenses unless they were satisfied beyond a reasonable doubt that the offenses had occurred.  *See supra* Part III.A.7.d.  As the jury deliberated, and as they focused on the alleged vicious sexual assault of Ms. Miller, they had every reason to believe that she had *never committed a crime*.  Surely their evaluation of her credibility and persuasiveness would have been radically altered by knowledge that she was a twice-convicted thief and murderer.  Coupled with the admitted evidence that Ms. Miller regularly carried unlicensed deadly weapons and Alfred Brooks' eyewitness denial of the forcible rape (which should have been admitted), it is clear that the State's suppression of Ms. Miller's convictions violated *Brady* because "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 115 S.Ct. at 1565. The harm analysis is set out more fully in Parts II.7.a & II.7.c, *supra*.

---

[62] The Petitioner is aware that the State is not required to supply the defendant with exculpatory material that defense counsel could have located with due diligence. *See, e.g., Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1061 (1998). *East*, however, establishes that the due diligence requirement does not appear to apply to the prosecution witnesses' criminal histories.  Because of the uncertainty concerning whether and in what form the State made this information available to the defense, the Petitioner also alleges, *supra* Part III.A.7.a, that, if trial counsel is found to be responsible for locating criminal history information on the state's witnesses, his failure to locate the information and bring it to the jury's attention constitutes deficient performance which prejudiced the defendant.

### 2. The State knowingly allowed false testimony to be presented to the jury in violation of *Giglio v. United States* and *Napue v. Illinois*.

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.), *cert. denied*, 117 S. Ct. 487 (1996) (citing *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Cordova v. Collins*, 953 F.2d 167 (5th Cir. 1992), *cert. denied*, 502 U.S. 1067 (1992)). Due process also is violated when the prosecution allows the jury to be presented with a materially false impression. *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *United States v. O'Keefe*, 128 F.3d 885, 897 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1525 (1998). "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979), *cert. denied*, 450 U.S. 1002 (1981).

In order to obtain relief, Mr. Washington must show that (1) the testimony in question was actually false, (2) the state knew it was false and (3) the testimony was material. *See Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998), *cert. denied*, 118 S. Ct. 2338 (1998); *O'Keefe*, 128 F.3d at 893; *Faulder*, 81 F.3d at 519. "False evidence is 'material' only "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir.1996), *cert. denied*, 117 S.Ct. 773 (1997). It is immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness. *O'Keefe*, 128 F.3d at 893; *Barham*, 595 F.2d at 241-42. Even if there is sufficient evidence in the

case to support a guilty verdict, it is the jury, and not judges, that is the body given the constitutional responsibility to decide guilt or innocence. *Barham*, 595 F.2d at 242.

Habeas relief is warranted if there is a reasonable likelihood that the false testimony could have affected the jury's determination. *Bagley*, 473 U.S. at 678-79 & n.9; *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir.), *cert. denied*, 119 S.Ct. 359 (1998).[63] Moreover, relief is warranted for false evidence that affects the jury at the punishment phase, as well as evidence that affects the guilt/innocence phase.[64]

The prosecutor in Mr. Washington's case had a duty to correct the false testimony of its witnesses, at the time that the false evidence first appeared. *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977). This duty is placed on prosecutors because their client, the State of Texas, has a strong interest in ensuring that the ends of justice are served:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

---

[63] This standard is "considerably less onerous" than the standard for relief under *Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* standard requires a showing of a reasonable probability that the result of the proceeding would have been different if the evidence in question had been disclosed to the defense. A "reasonable probability" is defined as a probability sufficient to undermine confidence in the outcome of the proceeding. *See Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (citing *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985)).

[64] *See, e.g., Moody*, 139 F.3d at 484 (discussing *Napue/Giglio* claim regarding allegedly false expert testimony at punishment phase on subject of future dangerousness); *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1998) (discussing claim regarding allegedly false testimony by punishment phase witness). Because Texas law requires the jury to be unanimous when voting for death, "the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of *one juror* could have been changed with respect to the imposition of the sentence of death." *Kirkpatrick*, 992 F.2d at 497 (discussing Louisiana law) (emphasis added).

182

*Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds, Stirone v. United States*, 361 U.S. 212 (1960).  Prosecutors violate a defendant's rights when they capitalize on false testimony that has been elicited.  The Fifth Circuit recently declared:

> [E]ven when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument, or the defense is unable to utilize the information, or when the government thereafter asks misleading questions.  Thus, materiality is a method of maintaining the equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function.

*O'Keefe*, 128 F.3d at 894-95 (citations omitted).

### 3.   The State presented false testimony to the jury concerning the caliber of the bullets that killed Mr. Tareh and wounded Mr. Kidane.

The prosecution introduced evidence at Mr. Washington's trial that the gun used to kill Mr. Tareh, and to shoot Mr. Kidane, was a .38 or .357 caliber weapon.  This testimony permitted the State to foreclose the possibility that Mr. Kidane, perhaps during a struggle, had shot Mr. Tareh with the .25 caliber weapon in his possession.  S.F. Vol. XXVII:471 (Mr. Kidane had a .25 caliber automatic in his pocket during the robbery).  This was especially important given Mr. Kidane's testimony that he had fired his .25 caliber weapon twice on the night of the offense.  S.F. Vol. XXVII:413-15.[65]

HPD Firearms Examiner C.E. Anderson testified that the bullet that killed Mr. Tareh, as well as the bullet that wounded Mr. Kidane, was a .38 or .357 caliber bullet.  S.F. Vol. XXVIII:542. He based his conclusion on "the shape of [the bullet] and the size and the measurements of the

---

[65] Mr. Kidane did not divulge this information to police during his initial interview immediately after the crime.  At trial, Mr. Kidane did admit that he had fired his gun twice that night, but claimed that he had fired into the air outside his store, and had done so because he was frightened of his assailant.  S.F. Vol. XXVII:413-15.

183

lans [sic] and grooves." *Id*.  Although the State presented Officer Anderson's testimony as reliably

establishing the caliber of the bullets in question, the jury was misled: Officer Anderson had

provided no adequate basis for his conclusion.  His testimony does not refer to *any* measurements

or data which were sufficient to support his conclusion about the bullets' caliber.  *See* Exhibit 17

(Singer Affidavit), at ¶ 5 (ballistics expert states that "Officer Anderson's testimony . . . does not

adequately explain the basis for his opinion as to the bullet's caliber").  The testimony elicited by

the State was misleading, in violation of Mr. Washington's right to due process of the law.  *See*

*Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Alcorta v.*

*Texas*, 355 U.S. 28, 31 (1957); *United States v. O'Keefe*, 128 F.3d 885 (5th Cir. 1997).[66]

Officer Anderson's misleading testimony was key to the State's case.  As the prosecutor

surely realized, Mr. Kidane's credibility was undercut by the inconsistent accounts he had given

the police.  *See supra* Part III.A.5.b.  He had admitted to having a .25 caliber weapon in his

possession -- and firing it -- on the night of the incident.  S.F. Vol. XXVII:471.  There were

indications that his store, Mike's Food Mart, was a center for drug dealing, although this fact was

never investigated or presented by Mr. Washington's counsel.  *See supra* Part III.A.5.b.  Given

that Mr. Kidane was the only surviving eyewitness and the linchpin of the State's case, the State

undoubtedly recognized the need to resolve any doubts that might have been triggered by his

reluctance to admit firing his gun.  The prosecutor had Officer Anderson testify that there was no

---

[66] Officer Anderson also testified that he had narrowed down the possible manufacturers of the weapon that fired the bullets in question. S.F. Vol. XXVIII:542-43 (manufacturers narrowed down to Astra, American Arms Corporation, Charter Arms, or Taurus for a .38 Special, and Astro, Derringer F.I.E. or High Hunter for a .357 Magnum).  As presented by Mr. Washington during state habeas, this testimony also was misleading.  *See* Exhibit K to State Habeas Petition (Affidavit of William D. Devan), at ¶ 2(since Charter Arms weapons and Taurus weapons have different lands and grooves, these two weapons could not be in the same group "when identifying a group of revolvers from which a particular .38 bullet was fired.").

possibility that the wounds could have been caused by a .25 caliber weapon. S.F. XXVIII:545. The State also had Officer Anderson testify that the bullets recovered from both Mr. Tareh's body and Mr. Kidane's definitely were .38 or .357 caliber bullets. S.F. XXVIII:542. No mention was made that the State had previously informed trial counsel that the bullets were so mutilated that the caliber could not be determined. *See supra* at 116 (discussing change in State's position regarding caliber).

In fact, however, there is evidence that a .38 or .357 caliber weapon did *not* inflict the wounds that Mr. Tareh and Mr. Kidane had suffered. Dr. Lloyd White, Medical Examiner for Nueces County, Texas, has reviewed the evidence presented by the State, and in particular the autopsy report for Mr. Tareh and hospital records for Mr. Kidane.[67] Mr. Tareh's autopsy report states as follows:

> The [gunshot] wound measured 3/16 inch in diameter with a margin of abrasion measuring 1/16 inch in width. The wound was also partly surrounded with powder stippling on the anterior side measuring 1-1/2 inches in width. There was no soot around the wound of inside the wound track. [sic] The missile . . . was recovered in the left frontal lobe.

Exhibit 26 (Autopsy Report). As Dr. White states in his affidavit, a wound measuring 3/16 of an inch in diameter is very unusual for a wound inflicted by a .38 or .357 caliber weapon:

> [I]t would be very unusual for a .38 or .357 caliber bullet to cause a wound that is only 3/16 of an inch in diameter. Rather, I would expect the wound from a .38 or .357 caliber bullet to be approximately twice that size, or 3/8 of an inch.
>
> The size of the wound to Mr. Tareh's temple is typical for a wound inflicted by a .25 caliber bullet.

---

[67] As stated previously, trial counsel did not seek any expert evaluation of the evidence in Mr. Washington's case, and requested no financial assistance from the trial court to do so, either because he did not comprehend the importance of the information or because his unorthodox funding arrangement with Mr. Washington created a conflict of interest. *See supra* Part III.A.3.b. In state habeas, Mr. Washington's counsel made repeated requests for expert assistance, but was consistently denied.

Exhibit 5 (White Affidavit), at ¶¶ 4-5 .   In other words, while it would be surprising for a .38 or .357 caliber weapon to have inflicted the fatal wound, the wound is a typical size for one inflicted by a .25 caliber weapon – *the type of weapon Mr. Kidane had in his possession and admitted to having fired twice that evening*.  Moreover, several other factors observed by Dr. White also cast doubt on whether a .38 or .357 could have inflicted Mr. Tareh's wound:

> If the wound to Mr. Tareh's temple had been inflicted by a .38 or .357 caliber weapon, I would expect to see more fragmentation of the skull than was seen in Mr. Tareh's case.
>
> If Mr. Tareh's wound was caused by a .38 or .357 caliber bullet fired from a gun at close range, I would expect to see more soot and more stippling surrounding the wound.
>
> The bullet that killed Mr. Tareh was retrieved from his brain during the autopsy.  If the bullet had been a .38 or .357 caliber bullet, I would expect to find at least an incomplete exit, or injury to the skull on the side opposite to the entrance.  It would be very unusual for the .38 or .357 bullet to have a loss of energy sufficient to cause it to stop in the brain.
>
> If the bullet that killed Mr. Tareh was a .25 caliber bullet, I would expect it to have stopped in Mr. Tareh's brain, as did the bullet observed at autopsy.

Exhibit 5 (White Affidavit), at ¶¶ 6-9.

The wound to Mr. Kidane, which Officer Anderson testified was also inflicted by a .38 or .357 caliber bullet, measured only *0.1 centimeter*.  *See* Exhibit 27 (hospital treatment records of Mr. Kidane) at 1.  As Dr. White states in his affidavit, "If this measurement of 0.1 centimeter is correct, Mr. Kidane's entrance wound is inconsistent with a wound inflicted by a .38 or .357 caliber bullet."  Exhibit 5 (White Affidavit), at ¶ 11.   While it would have been "very unusual" for a .38 or .357 to have inflicted Mr. Tareh's wound, the chances are much slimmer, or even nonexistent, that Mr. Kidane's wound could have been caused by such a large bullet.  Furthermore, given that both wound sizes are improbable, the chances are lower still that, as argued by the State, Mr. Washington inflicted *both* wounds with a .38 or .357 caliber weapon.

186

Trial counsel did not investigate this aspect of the case, rendering his assistance to Mr. Washington ineffective. *See supra* Part III.A.5.d. However, even if trial counsel had known of the falsity of the State's presentation, his knowledge would not excuse the State's misconduct. *See O'Keefe*, 128 F.3d at 894-95 (due process violated even when defense aware of the falsity); *United States v. Barham*, 595 F.2d 231, 242-43 & n. 17 (5th Cir. 1979) (due process violated by prosecutor's conduct even though defense counsel's oversight was "inexcusable"). "While defense counsel can certainly be charged with knowledge of his files, he cannot be held responsible for the manner in which the Government prosecutes its case." *Barham*, 595 F.2d at 243 n. 17.

The false impression that Officer Anderson's testimony created for the jury violated Mr. Washington's due process rights. *See Giglio*, 405 U.S. 150; *Napue*, 360 U.S. 264. Moreover, the State compounded the constitutional violation by capitalizing Officer Anderson's false testimony. *See O'Keefe*, 128 F.3d at 894-95. The prosecution entered into evidence a weapon to allow Mr. Kidane to demonstrate how the defendant brandished his firearm. Although the weapon was entered only for "demonstrative" purposes, Mr. Kidane repeatedly affirmed that in its size and shape (although not in color), it resembled the weapon the defendant used. S.F. Vol. XXVII:388-92. This demonstrative weapon was a .38 caliber revolver. Exhibit 17 (Singer Affidavit), at ¶ 6 (identifying weapon as Colt "Cobra" .38 spl. caliber revolver). Given that the bullet wound to Mr. Tareh's temple was more consistent with a .25 caliber weapon than a .38, and that Mr. Kidane fired a .25 caliber weapon during the incident, Officer Anderson's misleading testimony is of supreme importance, and strikes at the heart of the State's case against Mr. Washington. Since there is a "reasonable likelihood" that this false testimony could have affected

the jury's determination of guilt, habeas relief is warranted.  *Bagley*, 473 U.S. at 678-79 & n.9;

*Moody*, 139 F.3d at 489.

### 4. The State argued to the jury that the Petitioner had changed clothes without any good-faith basis in the evidence to do so.

The State proffered *no* forensic evidence linking Mr. Washington to the crime.   In fact,

although a chemist for the Houston Police Department laboratory, Ms. Raydon Hilleman, took

the stand during the trial and testified as to numerous tests she had performed, she was able to

point to no evidence that was inculpatory of Mr. Washington.  *See* Exhibit 17 (Singer Affidavit),

at ¶ 3 (expert in forensic evidence states that "[t]he testimony of Ms. Raydon Hilleman . . .

contained absolutely no information that inculpated Mr. Washington");  Exhibit H to State Habeas

Petition (Affidavit of Larry Fletcher), at ¶¶ 4, 7-9, 11.

The State tried to explain this weakness in its case by arguing that Mr. Washington had foiled

police by changing into fresh clothes and washing away all trace evidence:

> The fact that Miss Hilleman examined this gray clothing the defendant was wearing when
> he was arrested, found no blood, I think everyone probably would have been surprised and
> shocked as all get out to find blood on that gray jumpsuit because we know the defendant
> was not wearing that gray jumpsuit when he robbed and shot Mr. Tareh and Mr. Kidane.
> He had on a blue jumpsuit. He changed his clothes before he returned back to the scene.
> So, you wouldn't expect there to be any blood on this gray jumpsuit.

S.F. Vol. XXX: 12-13.  The prosecutor's argument about Mr. Washington's clothes rested

heavily on the testimony of Mr. Kidane, who testified that when Mr. Washington robbed the store

"[h]e was wearing kind [sic] of jumping suit . . . . Light blue – blue. Light. . . . Blue one-piece

jumping suit.  It was one-piece."  S.F. XXVII:400; *id.* at 403-04.

In fact, the State's presentation of this testimony by Mr. Kidane was knowing presentation of

false testimony. Although Mr. Kidane's testimony at trial was unwavering that Mr. Washington

188

had worn a blue jumpsuit while committing the crime, he in fact had told police on the night of the offense that Mr. Washington had worn a "blue grey" jumpsuit. Exhibit 21 (HPD Reports), at 2.012. This earlier statement by Mr. Kidane robbed his distinction between Mr. Washington's two outfits of any persuasive power.  The statement made closer in time to the event being recalled is inherently more reliable.  In this case, Mr. Kidane's identification of the first jumpsuit as "blue grey" was made within hours of the offense, while his testimony that the jumpsuit was blue was nearly a year later. *See Monroe v. Blackburn*, 607 F.2d 148, 152 (5th Cir. 1979) (when a trial witness who testifies to a crucial issue failed to mention the crucial facts to the police, the statement to the police "is impeachment evidence of the sort that goes directly to a substantive issue and could be used in urging that the in-court testimony has been 'improved' by the erroneous addition of what the prosecution needed to support its theory.")

As with the false testimony regarding the bullets in this case, the prosecutor capitalized on Mr. Kidane's false testimony during his closing argument, S.F. Vol. XXX:12-13, in violation of Mr. Washington's due process rights. *O'Keefe*, 128 F.3d at 894-95; *Barham*, 595 F.2d at 242-43 & n. 17.  Trial counsel did not make appropriate use of Mr. Kidane's statement to impeach him.  However, even if trial counsel had known that this earlier inconsistent statement by Mr. Kidane existed, the State's presentation of false testimony would not be excused. *O'Keefe*, 128 F.3d at 894-95; *Barham*, 595 F.2d at 243 n.17.[68]

---

[68] Claude Johnson also was presented by the State to testify that Mr. Washington was wearing a blue jumpsuit earlier in the day on December 19th, but changed into a gray jumpsuit.  However, Mr. Johnson was quite unsure of his testimony and became confused on the stand.  S.F. XXVI:217-18. Moreover, even if Mr. Johnson had given unequivocal testimony in support of the State's position, the impeachment of Mr. Kidane on this point would be of unquestionable value to the defense. *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) ("positive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and [] the destruction by cross-examination of the credibility of one of two crucial witnesses – even if the other remains untouched – may have consequences for the case extending far beyond the discrediting of his own testimony").

### 5.  The state court's findings of fact and conclusions of law on this claim are incorrect.

The state court made 18 separate findings of fact under the heading "Brady Claims."  As argued previously, the court's findings of fact and conclusions of law were in fact ghost-written by the district attorney's office and are entitled to no deference from this court.  *See supra* Part II.B.  In particular, however, Mr. Washington notes that the following fact finding is unsupported by or contradicted by the evidence:

The district attorney drafted a finding that stated that "[Officer] Anderson's testimony, even if incorrect with respect to the names of possible manufacturers is not harmful since no weapon was recovered and linked to the applicant."  Findings and Conclusions, at 14 ¶5.  Although the Court is correct that no weapon was recovered and linked to Mr. Washington, the Court's implication that Officer Anderson's testimony was not inculpatory is clearly incorrect.  As argued above, Officer Anderson's misleading testimony as to the caliber of the bullet that killed Mr. Tareh allowed the State to foreclose the possibility that Mr. Kidane had fired the fatal shot, thus seriously prejudicing Mr. Washington's defense.  There is a "reasonable likelihood" that this misleading testimony could have affected the jury's determination of guilt.  *Bagley*, 473 U.S. at 678-79 & n.9; *Moody*, 139 F.3d at 489.

### C.  The Petitioner is now incompetent to be executed.

Mr. Washington's lengthy confinement on death row has rendered him mentally incompetent to be executed.

In *Ford v. Wainwright*, 477 U.S. 399 (1986), the United States Supreme Court held that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner

190

who is insane." *Id.* at 410.  In a concurring opinion, Justice Powell concluded that the State may

not constitutionally execute those who, because of a mental illness, do not rationally understand

"the fact of their impending execution and the reason for it."  477 U.S. at 422 (Powell, J.,

concurring).  The Fifth Circuit has held that Justice Powell's concurrence made the plurality

opinion in *Ford* a majority and has adopted his standard as controlling the determination of a

person's competency to be executed.  *Barnard v. Collins*, 13 F.3d 871, 876 n.2 (5th Cir.), *cert.*

*denied*, 510 U.S. 1102 (1994).

    *Ford* recognizes the extreme "inhumanity and cruelty" of executing a man "who has no

comprehension of why he has been singled out and stripped of his fundamental right to life" and

"has no capacity to come to grips with his own conscience or deity."  477 U.S. at 409.  Justice

Powell explained that:

> The more general concern of the common law – that executions of the insane are simply
> cruel – retains its vitality.  It is as true today as when Coke lived that most men and
> women value the opportunity to prepare, mentally and spiritually, for their death.
> Moreover, today as at common law, one of the death penalty's critical justifications, its
> retributive force, depends on the defendant's awareness of the penalty's existence and
> purpose.  Thus, it remains true that executions of the insane both impose a uniquely cruel
> penalty and are inconsistent with one of the chief purposes of executions generally.
>
>                            ****
>
> If the defendant perceives the connection between his crime and his punishment, the
> retributive goal of the criminal law is satisfied.  And only if the defendant is aware that his
> death is approaching can he prepare himself for his passing.  Accordingly, I would hold
> that the Eighth Amendment forbids the execution only of those who are unaware of the
> punishment they are about to suffer and why they are to suffer it.

477 U.S. at 422-23 (Powell, J., concurring).

    As the communications sent by Mr. Washington to the state habeas corpus court amply attest,

Mr. Washington is sincerely convinced that his confinement and sentence of death were the result

of a conspiracy between the trial judge, the prosecutors, the defense attorneys, the police, and various trial witnesses to fabricate evidence against him. Mr. Washington continues to believe that prominent defense attorneys have conspired with District Attorneys in order to ensure that his appeals are sabotaged and that the original conspiracy against him will not be uncovered. *See* Prisoner Civil Rights Complaint & More Definite Statement, *Washington v. Scott*, No. 93-CV-2982 (S.D. Tex. Oct. 9, 1993 & Dec. 27, 1993). After Mr. Washington advised the state habeas corpus court that he wished to fire his state habeas corpus lawyer, that lawyer submitted a Motion to Determine Competence of Petitioner and Appoint Guardian Or, In the Alternative, Motion for Withdrawal (January 2, 1995). The state habeas court, without holding a hearing or making factual inquiries or findings of any kind, denied Mr. Washington's motion to fire his state habeas counsel and determine competence. *See* Applicant's Motion to Determine Applicant's Right to Represent Himself at 1 (Sept. 30, 1997).

In order to preserve Mr. Washington's right to claim relief under *Ford v. Wainwright*, counsel hereby alleges that Mr. Washington presently suffers from a mental illness which prevents him from understanding the "connection between his crime and punishment" as required by *Ford*.[69] The nature of Mr. Washington's condition, and its relation to his ability to understand the connection between his crime and punishment, is evident from the above-referenced pleadings Mr. Washington has filed in state and federal court. If additional proof is needed, Mr. Washington requests the appointment of a qualified mental health expert to conduct an examination of Mr. Washington with reference to the *Ford* factors.

---

[69] Of course, this allegation is based on the assumption that Mr. Washington, in fact, has not been the target of a wide-ranging conspiracy to fabricate evidence, as he believes. If, upon further investigation, it is determined that he is the victim of such a conspiracy, there would be no reason to doubt his competence.

192

The Petitioner is aware that this claim is premature, as Mr. Washington's execution is not imminent. The Petitioner raises this claim in order to preserve his right to later file a challenge to Mr. Washington's competency to be executed, should he be denied habeas relief. Typically, *Ford* claims are raised in successive habeas petitions, because they only become ripe when execution is imminent, by which time an inmate has usually exhausted his federal habeas remedies. This has created a constitutional conundrum in the interpretation of the AEDPA, because § 2244(b) of the AEDPA, which strictly limits successive habeas petitions, does not appear to permit *Ford* claims. *Stewart v. Martinez-Villareal*, 118 S. Ct. 1618, 1621 (1998). In *Stewart*, the Supreme Court held that the inmate's pre-execution *Ford*-based petition was not a "successive petition" within the meaning of the AEDPA because the inmate had included the *Ford* claim in his initial habeas petition several years earlier, and it had been dismissed as "premature." *Id.* at 1622. Therefore, the Court reasoned, the inmate's second submission of the claim was not a successive application but rather an attempt to re-plead the premature claim immediately before his execution, when it would be ripe for review. *Id.* The Court cautioned:

> This case does not present the situation where a prisoner raises a Ford claim for the first time in a petition filed after the federal courts have already rejected the prisoner's initial habeas application. Therefore, we have no occasion to decide whether such a filing would be a "second or successive habeas corpus application" within the meaning of AEDPA.

*Id n.* *. The Fifth Circuit has indicated that § 2244(b) prevents consideration of a *Ford* claim brought for the first time in a successive habeas corpus application. *In re Davis*, 121 F.3d 952 (5th Cir. 1997). Because a question as to Mr. Washington's competency to be executed now exists and may become more acute in the future, counsel must raise this claim now in order to avoid the distinct possibility that it will forever be waived if this is not done. If this Court does

193

not feel an immediate inquiry into the Petitioner's competency is in order, the Petitioner hereby

requests that this Court dismiss Mr. Washington's *Ford* claim without prejudice as premature.

### D. The Petitioner's extended stay on death row has been solely attributable to State action, and constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

The torturous effects of the "death row phenomenon" – that is, the psychologically

devastating effects of a lengthy stay on death row – have been widely noted by jurists during the

last three decades.[70]  Similar views have been expressed by legal commentators and mental health

---

[70] *See, e.g., Elledge v. Florida*, 119 S. Ct. 366 (1998) (Breyer, J., dissenting from denial of certiorari); *Lackey v. Texas*, 514 U.S. 1045, 1045-47 (1995) (opinion of Stevens, J., respecting denial of certiorari) (citing cases); *Free v. Peters*, 50 F.3d 1362, 1363 (7th Cir.), *cert. denied*, 514 U.S. 1034 (1995) (Cudahy, J., dissenting) (citing cases); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in the denial of certiorari) (recognizing that the mental pain suffered by a condemned prisoner awaiting execution "is [a] significant form of punishment" that "may well be comparable to the consequences of the ultimate step itself [*i.e.*, the actual execution]"); *Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("In the history of murder, the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon.");  *Furman v. Georgia*, 408 U.S. 238, 288-89 (1972) (Brennan, J., concurring) ("[W]e know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death."); *People v. Anderson*, 493 P.2d 880, 6 Cal.3d 628, 649 (Cal. 1972) ("The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to the execution during which the judicial and administrative procedures essential to due process of law are carried out.  Penologists and medical experts agree that the [protracted] process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."), *cert. denied*, 406 U.S. 958 (1972); *Suffolk County District Attorney v. Watson*, 411 N.E.2d 1274, 1289-95 (Mass. 1980) (Liacos, J., concurring) (vivid and detailed description of the type of psychological pain and torture that a condemned person experiences while awaiting execution); id. at 1287 (Braucher, J., concurring) (arguing that capital punishment is unconstitutional under Massachusetts Constitution in part because "it will be carried out only after agonizing months and years of uncertainty"); *Commonwealth v. O'Neal*, 339 N.E.2d 676, 680-81 (Mass. 1975) (Tauro, C.J., concurring) ("The convicted felon suffers extreme anguish in anticipation of the extinction of his existence."); *State v. Richmond*, 886 P.2d 1329, 1994 WL 699008, at *3 (Ariz. Dec. 15, 1994); *Hopkinson v. State*, 632 P.2d 79, 209-11 (Wyo. 1981), (Rose, C.J., dissenting in part), *cert. denied*, 455 U.S. 922 (1982)  (recognizing "the dehumanizing effects of long imprisonment pending execution"); *State v. Ross*, 646 A.2d 1318, 1379 (Conn. 1994) (Berdon, J., dissenting) (same), *cert. denied*, 513 U.S. 1165 (1995); *Soering v. United Kingdom*, 11 Eur. Hum. Rts. Rep. 439, 28 I.L.M. 1063 (1989) (European Court of Human Rights refused to extradite a German national from UK to Virginia to face capital murder charges because of anticipated time that he would have to spend on death row if sentenced to death); *Vatheeswaran v. State of Tamil Nadu*, 2 S.C.R. 348, 353 (India 1983) (criticizing the "dehumanizing character of the delay" in carrying out an execution); *Sher Singh et al. v. The State of Punjab*, 2 S.C.R. 582 (India 1983) ("Prolonged delay in the execution of a death sentence is unquestionably an important consideration for determining whether the sentence should be allowed to be executed."); *Catholic Comm'n for Justice & Peace in Zimbabwe v. Attorney General*, No. S.C. 73/93 (Zimb. June 24, 1993) (reported in 14 HUM. RTS. L. J. 323 (1993)).

194

experts.[71]

Mr. Washington has now been on death row for thirteen years.  The overwhelming bulk of his many years on death row was attributable to the time Texas courts took to decide one automatic, mandatory direct appeal and one state habeas corpus application.  Mr. Washington's direct appeal took two years to resolve, and his one state habeas petition nearly nine years.  Such a delay, according to Chief Justice Rehnquist, makes "a mockery of our criminal justice system," which "undermine[s] the integrity of the entire criminal justice system." *Coleman v. Balkcom*, 451 U.S. 949, 958-59 (1981) (Rehnquist, J., dissenting from denial of certiorari).

### 1.  The British Privy Council's Landmark Decision in *Pratt & Morgan*.

Mr. Washington's Eighth Amendment arguments are strongly supported by a recent landmark decision in a capital appeal rendered by the Judicial Committee of the Privy Council of the United

---

[71] *See, e.g.*, Schabas, *Execution Delayed, Execution Denied*, 5 CRIM. L. FORUM 180 (1994) [available on WESTLAW]; Lambrix, *The Isolation of Death Row* in FACING THE DEATH PENALTY 198 (M. Radelet ed. 1989); Millemann, *Capital Post-Conviction Prisoners' Right to Counsel*, 48 MD. L. REV. 455, 499-500 (1989) ("There is little doubt that the consciousness of impending death can be immobilizing. . . . This opinion has been widely shared by [jurists], prison wardens, psychiatrists and psychologists, and writers.") (citing authorities); Mello, *Facing Death Alone*, 37 AMER. L. REV. 513, 552 & n.251 (1988) (same) (citing studies); Wood, *Competency for Execution: Problems in Law and Psychiatry*, 14 FLA. ST. U. L. REV. 35, 37-39 (1986) ("The physical and psychological pressure besetting capital inmates has been widely noted .... Courts and commentators have argued that the extreme psychological stress accompanying death row confinement is an eighth amendment violation in itself or is an element making the death penalty cruel and unusual punishment.") (citing authorities); Stafer, *Symposium On Death Penalty Issues: Volunteering for Execution*, 74 J. CRIM. L. 860, 861 & n.10 (1983) (citing studies); Holland, *Death Row Conditions: Progression Towards Constitutional Protections*, 19 AKRON L. REV. 293 (1985); Johnson, *Under Sentence of Death: The Psychology of Death Row Confinement*, 5 LAW & PSYCHOLOGY REVIEW 141, 157-60 (1979); Hussain & Tozman, *Psychiatry on Death Row*, 39 J. CLINICAL PSYCHIATRY 183 (1979); West, *Psychiatric Reflections on the Death Penalty*, 45 AMER. J. ORTHOPSYCHIATRY 689, 694-95 (1975); Gallemore & Parton, *Inmate Responses to Lengthy Death Row Confinement*, 129 AMER. J. PSYCHIATRY 167 (1972); Bluestone & McGahee, *Reaction to Extreme Stress: Impending Death By Execution*, 119 AMER. J. PSYCHIATRY 393 (1962); Note, *Mental Suffering Under Sentence of Death: A Cruel and Unusual Punishment*, 57 IOWA L. REV. 814, 830 (1972); G. Gottlieb, *Testing The Death Penalty*, 34 S. CAL. L. REV. 268, 272 & n.15 (1961); A. Camus, *Reflections on the Guillotine* in RESISTANCE, REBELLION & DEATH 205 (1966) ("As a general rule, a man is undone waiting for capital punishment well before he dies."); F. Dostoyevsky, THE IDIOT 47-48 (D. Magarshack trans. 1955); Duffy & Hirshberg, EIGHTY-EIGHT MEN AND TWO WOMEN 254 (1962) ("One night on death row is too long, and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination.  It has always been a source of wonder to me that they didn't all go stark, raving mad.") (quoting former warden of California's San Quentin Prison).

Kingdom (the "Privy Council"),[72] which involved a factual situation similar to Mr. Washington's case.  See *Pratt & Morgan v. The Attorney General of Jamaica*, 33 I.L.M. 364 (Privy Council Appeal No. 10 of 1993, Nov. 2, 1993) (en banc).

In *Pratt*, an appeal by two condemned men on Jamaica's death row, the Privy Council, sitting *en banc* for the first time in five decades, unanimously held that carrying out the death sentences of the two men would be "torture," and "inhuman" and "degrading" punishment.  The Privy Council did not hold that capital punishment was cruel and unusual *per se*, but instead focused on the fact that the condemned men had been on death row for a protracted period of time (fourteen years) and, furthermore, that the men had been read execution warrants on three separate occasions, only to have their scheduled executions stayed shortly before the sentences were to be carried out.

The rationale of the case was summarized in the opening paragraph:

> The appellants . . . were arrested 16 years ago for murder . . .   On 15th January 1979 they were convicted of murder and sentenced to death. . . .   On three occasions the death warrant has been read to [Pratt and Morgan] and they have been removed to the condemned cells immediately adjacent to the gallows. . . .   *The statement of these bare facts is sufficient to bring home to the mind of any person of normal sensitivity and compassion the agony of mind that these men must have suffered as they have alternated between hope and despair in the 14 years that they have been in prison facing the gallows.*

*Pratt & Morgan*, 33 I.L.M. at 365 (emphasis added).  As the Privy Council further stated:

> There is an instinctive revulsion against the prospect of [executing] a man after he has been held under sentence of death for many years.  What gives rise to this instinctive revulsion?  The answer can only be our humanity; we regard it as an inhuman act to keep a man facing the agony of execution over a long extended period of time.

---

[72] The Privy Council is the highest appellate court for Commonwealth nations.  The jurists who sit on the Privy Council are likewise members of England's highest domestic appellate court, the House of Lords ("the Law Lords").

196

*Id.* at 380.

*Pratt & Morgan* also surveyed the history of English common law regarding the subject of lengthy imprisonment of a condemned man on death row and the repeated setting of execution dates in a single case.  The Privy Council concluded that neither practice was condoned historically at common law.  *See, e.g., id.* at 367 ("It is difficult to envisage any circumstance in which in England a condemned man would have been kept in prison for years awaiting an execution."); *id.* at 369 (noting the "common law practice that execution followed as swiftly as practical after sentence"); *see also Riley v. Attorney General of Jamaica*, 1 AC 719, 3 All ER 469 (Privy Council 1983) (Lord Scarman, dissenting, joined by Lord Brightman) ("[T]here is a formidable case for suggesting that execution after inordinate delay would have infringed the prohibition against cruel and unusual punishment to be found in Section 10 of the Bill of Rights of 1689....") (majority opinion overruled by *Pratt & Morgan*).[73]  *See also Lackey*, 514 U.S. at 1045 (a delay of 17 years, "if it ever occurred, certainly would have been rare in 1789, and thus the practice of the Framers would not justify the denial of petitioner's claim").  *Pratt & Morgan*, along with U.S. and international authorities discussed herein, offers a firm legal basis for Mr. Washington's Eighth Amendment claim challenging the State's right to execute the death sentence in this case.[74]

---

[73] As Justice Scalia has recognized, "[t]here is no doubt" that Section 10 of the English Bill of Rights of 1689 "is the antecedent" of the cruel-and-unusual-punishments clause of our Eighth Amendment.  See *Harmelin v. Michigan*, 501 U.S. 957, 966 (1991) (opinion of Scalia, J.).

[74] Hundreds of American courts and jurists have been guided by the decisions of the Privy Council, the highest expositor of law in the United Kingdom, whose common law has greatly shaped our own law.  *See, e.g., United States v. Raddatz*, 447 U.S. 667, 679 (1980) (citing a Privy Council decision with approval); *Kilbourn v. Thompson*, 103 U.S. 168, 186 (1881) (same); *see also Fisher v. United* States, 328 U.S. 463, 486-88 (1946) (Frankfurter, J., dissenting) ("This Court in reviewing a conviction for murder . . . ought not be behind . . . the Privy Council ....") (discussing Privy Council decisions).

## 2. Eighth Amendment Authority Supporting Mr. Washington's Claim

Mr. Washington's thirteen year stay on death row – including nearly *nine years* in state habeas proceedings – violates the Eighth Amendment under both the standards in place in 1789, and under modern standards.  Recent Eighth Amendment decisions have, as a threshold matter, focused on whether a challenged punishment was considered unacceptable at the time of the adoption of our Bill of Rights.  *See, e.g., Stanford v. Kentucky*, 109 S. Ct. 2969, 2974 (1989) (in rejecting claim that the execution of 16 and 17 year olds is cruel and unusual, the Court noted that the punishment was not "`one of those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted'") (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).  If a punishment was considered cruel and unusual in 1789, then the Court's Eighth Amendment analysis goes no further; it is cruel and unusual today.  *See Ford*, 477 U.S. at 405-06.  Unquestionably, the Framers of the Constitution considered long delays between sentencing and execution cruel and unusual.  *Elledge v. Florida*, 119 S. Ct. 366 (1998) (Breyer, J., dissenting from denial of certiorari) (collecting sources, including petition seeking commutation of a death sentence in part because of a lengthy five-month delay).

The Privy Council's review of English common law establishes that a protracted stay on death row would never have been tolerated at common law under any circumstances.  Likewise, in the United States in the eighteenth and nineteenth centuries, executions routinely took place within one year of conviction.  *See* Dwight Arons, *Can Inordinate Delay Between a Death Sentence and Execution Constitute Cruel and Unusual Punishment*, 29 SETON HALL L. REV. 147, 179-81 (1998). Although elaborate appeals in capital cases (leading to frequent re-trials) are a relatively recent phenomenon – largely a function of the Supreme Court's post-*Furman* Eighth Amendment

198

capital jurisprudence – the necessary delay occasioned by such appeals cannot constitutionally extend to the point where the State keeps a person on death row for well over a decade solely because of delay in adjudicating ordinary appeals, as in this case.[75]  Such an inordinate delay – which would never have been permitted at common law – is by itself a sufficient reason to prohibit the State of Texas from carrying out Mr. Washington's scheduled execution. The Eighth Amendment requires no more.  *See Ford v. Wainwright*, 477 U.S. 399, 405 (1989) ("There is now little room for doubt that the Eighth Amendment's ban on cruel and unusual punishment embraces, at a minimum, those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted").

Assuming that a particular type of punishment was permitted at the time that the Bill of Rights was adopted – or, in this case, assuming that the post-*Furman* requirement of meaningful appellate review in capital cases somehow alters the common law requirement described above – a second, more difficult question arises: whether a punishment that may have been acceptable to the Framers of the Constitution nonetheless now violates modern society's civilized standards. *See, e.g., Campbell v. Wood*, 18 F.3d 662 (9th Cir.) (en banc), *cert. denied*, 511 U.S. 1119 (1994) (hanging not a cruel and unusual punishment).  The Supreme Court has interpreted the reach of the Amendment in a "flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171 (1976); *see also Weems v. United States*, 217 U.S. 349, 373 (1910) ("a principle, to be vital, must be capable of wider application than the mischief which gave it birth").  In recent times, the

---

[75] Relying on other international law cases, the Privy Council in Pratt held that even if an inordinate delay between trial and execution is attributable to *discretionary* appeals filed by the condemned person, the government nevertheless has no right to carry out an execution if the delay resulted from legitimate, non-frivolous appeals. *See, e.g., Pratt & Morgan*, at 380-84 (discussing cases).