Supreme Court has recognized that "the Eighth Amendment's proscriptions are not limited to those practices condemned by the common law in 1789." *Ford*, 477 U.S. at 406. Rather, the Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). As the concepts of dignity and civility evolve, so too do the limits of what is considered cruel and unusual. Such factors include the practices among the majority of the states in this country and international practices. *See, e.g., Stanford v. Kentucky*, 492 U.S. 361, 369 (1989); *Coker v. Georgia*, 433 U.S. 584 (1977); *Enmund v. Florida*, 458 U.S. 782 (1982).

International law and practice is particularly relevant for purposes of this claim. The weight of international authority – including *Pratt & Morgan*, a recent unanimous decision by the highest court in a fellow common-law jurisdiction – strongly supports Mr. Washington's contention that his execution would violate the Eighth Amendment. The Texas courts took twelve years to provide Mr. Washington with one direct appeal and one state habeas corpus appeal. Moreover, the reasons for the delay are relevant:

> It may be appropriate to distinguish . . . among delays resulting from (a) a petitioner's abuse of the judicial system by escape or repetitive, frivolous filings; (b) a petitioner's legitimate exercise of his right to review; and (c) negligence or deliberate action by the State.

*Lackey*, 514 U.S. at 1045 (Stevens, J., respecting denial of certiorari). In this case, the unusual length of these state habeas proceedings, during which Mr. Washington was subject to death row confinement, was in no way due to delay by Mr. Washington. In fact, Mr. Washington promptly filed multiple requests for discovery and for an evidentiary hearing in 1990, but the district court inexplicably waited nearly *four years* before providing any rulings on these motions. Moreover,

200

the State asked for multiple extensions for its filings, and simply ignored the due date to file its

Proposed Findings of Fact and Conclusions of Law, finally submitting the filing over *two years*

past the deadline, without providing any explanation for its default. *See supra* Part II.C.3.  It

cannot be gainsaid that keeping a condemned man on death row for nearly a decade and a half

impugns fundamental human dignity when there is no legitimate state interest justifying the

inordinate delay.  Indeed, "[a]fter such a delay, an execution may well cease to serve the

legitimate penological purposes that otherwise provide a necessary constitutional justification for

the death penalty." *Elledge*, 119 S. Ct. at 367 (Breyer, J., dissenting from denial of certiorari).

The State's interest in both retribution and deterrence becomes "minimal." *Lackey*, 514 U.S. at

1045 (Stevens, J., respecting denial of certiorari).  "'A penalty with such negligible returns to the

State would be patently excessive and cruel and unusual punishment violative of the Eighth

Amendment.'" *Id.* (quoting *Furman v. Georgia*, 408 U.S. 238, 312 (White, J., concurring in

judgment).

   Other well-established Eighth Amendment principles of broad application also are relevant to

this Court's analysis.  The Eighth Amendment "embodies `broad and idealistic concepts of

dignity, civilized standards, humanity and decency'" against which forms of punishment must be

measured. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation omitted).  It "expresses the

revulsion of civilized man against barbarous acts -- the `cry of horror' against man's inhumanity to

his fellow man." *Robinson v. California*, 370 U.S. 660, 676 (1962) (Douglas, J., concurring).

   The Eighth Amendment's restrictions on the ability of a state to impose certain types of

punishment "aim . . . to protect the condemned from [unnecessary] fear and pain . . . or to protect

the dignity of society itself from the barbarity of exacting mindless vengeance." *Ford v.*

*Wainwright*, 477 U.S. 399, 410 (1986).  At its core, the Eighth Amendment stands to safeguard "nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). In the particular context of capital punishment – where the infliction of some incidental pain is obviously unavoidable – the Supreme Court's Eighth Amendment analysis of what is "cruel and unusual" turns on whether unnecessary or gratuitous pain is part of the punishment.  As the Court stated in *State ex. rel. Francis v. Resweber*, 329 U.S. 459 (1947):

> The traditional humanity of modern Anglo-American law forbids the infliction of *unnecessary pain* in the execution of the death sentence.  Prohibition against the wanton infliction of pain has come to our law from the [English] Bill of Rights [of 1689]. . . . Mr. Francis' suggestion is that because he once underwent the psychological strain of preparation for electrocution, now to require him to undergo this preparation again subjects him to a lingering or cruel and unusual punishment.... [The Constitution does not protect against] the *necessary suffering* involved in any method employed to extinguish life humanely.  The fact that an *unforeseen accident* prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution.  There is no purpose to inflict *unnecessary pain* nor any *unnecessary pain* involved in the proposed execution.  The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block.

Id. at 463-64 (emphasis added).

As a result of the State's delay, Mr. Washington has endured a needlessly lingering form of torturous psychological punishment that, if the State has its way, will culminate in a lethal injection.  *See Gregg v. Georgia*, 428 U.S. 153, 170-71 (1976) (unnecessarily lingering form of execution is unconstitutional under the Eighth Amendment) (citing *In re Kemmler*, 136 U.S. 436, 447 (1890)).  Mr. Washington has been given a life sentence and a death sentence.  The fact that Petitioner is challenging the lingering *psychological* anguish resulting from his excessively lengthy stay on death row and repeated execution dates – and is not alleging *physical* torture – does not

foreclose an Eighth Amendment claim.[76]  It is well-established that the infliction of extreme mental

anguish can be a form of unconstitutional torture.[77]

   The Petitioner is aware that the Fifth Circuit has rejected this claim.  *E.g. White v. Johnson,*

79 F.3d 432, 439 (5th Cir.), *cert. denied,* 117 S. Ct. 275 (1996).  However, several members of

the Supreme Court have expressed their strong belief that unnecessarily long confinement

awaiting execution constitutes cruel and unusual punishment:

> The petitioner in this case has spent more than 23 years in prison under sentence of death.
> His claim -- that the Constitution forbids his execution after a delay of this length -- is a
> serious one.  The Eighth Amendment forbids punishments that are "cruel" and "unusual".
> Twenty-three years under sentence of death is unusual -- whether one takes as a
> measuring rod current practice or the practice in this country and in England at the time
> our Constitution was written.

*Elledge,* 119 S. Ct. 366 (Breyer, J., dissenting from denial of certiorari).  In the event that the

_____

   [76] In *Pratt & Morgan*, the British Privy Council focused exclusively on the *mental* torture inflicted on two condemned men on Jamaica's death row.  See *Pratt and Morgan*, slip op., at 1-2 (describing "the agony of mind that these men must have suffered as they have alternated between hope and despair in the 14 years that they have been in prison facing the gallows.  It is unnecessary to refer to the evidence describing . . . the *emotional and psychological impact of this experience,* for it only reveals that which is to be expected.").

   [77] *See, e.g., Trop v. Dulles,* 356 U.S. at 102 (expatriation as penalty for desertion "subjects the individual to a fate of ever-increasing fear and distress"); *Hudson v. McMillian,* 503 U.S. 1 (1992) (Blackmun, J., concurring) ("I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes [under the Eighth Amendment].  If anything, our precedent is to the contrary."); *Furman v. Georgia,* 408 U.S. 238, 271-73 (1972) (Brennan, J., concurring) ("[T]he Framers also knew []that there could be exercises of cruelty other than those which inflicted bodily pain or mutilation."); *see also Smith v. Aldingers,* 999 F.3d 109, 110 n.4 (5th Cir. 1993) (collecting recent cases holding that mental or psychological torture can violate the Eighth Amendment); *cf. In re Medley,* 134 U.S. 160, 172 (1890) (recognizing the "immense mental anxiety" that a condemned man experiences when the authorities intentionally refuse to inform him of the precise date of his scheduled execution, and referring to it as "one of the most *horrible feelings* to which he can be subjected") (emphasis added).

   Admittedly, *In re Medley* was an *ex post facto* case.  However, its century-old recognition of the "immense" and "horrible" *mental* anguish that a condemned man feels when he does not know the date of his execution – which the Supreme Court recognized as a form of "punishment" implicating the *ex post facto* clause – is instructive here.  See *Lackey, supra.*  Petitioner does not allege that particular type of mental anxiety caused by his confinement on Texas's death row; however, he does contend that the mental anguish that he has faced has been equally or more "immense" and "horrible."  Therefore, to permit the State to carry out an execution after requiring Mr. Washington to endure such torturous conditions for nearly two decades would unquestionably violate the Eighth Amendment.

Supreme Court addresses this issue, the Petitioner pleads it here in order to preserve it for review.

**E. The Petitioner's right to due process of law was violated by the irrelevant and inflammatory in-court identification of the deceased by the deceased's tearful widow.**

**1. The evidence.**

The surviving victim, Yemane Kidane, while testifying, confirmed that the man who worked

for him at Mike's Food Market was named Kifelmariam Tareh.  S.F. Vol. 27:366, 370.  Mr.

Kidane also confirmed that Kifelmariam Tareh was killed in the shooting incident at Mike's Food

Market on December 19, 1985:

[By the State]

> Q. Mr. Kidane, I am going to show you what's been marked for identification as State's Exhibit No. 35 and ask if you can identify that person?
>
> A. Yeah, I can identify.
>
> Q. And who is that individual?
>
> A. Mr. Tareh.

*Id.* at 422.

A short while later, *still during the guilt-innocence phase of the case*, the State called Mr.

Tareh's widow, Tiberh Tsegai, to the stand.  The defense requested a hearing outside the jury's

presence to "ascertain the relevance of this witness's testimony to the state."  S.F. Vol.

XXVIII:553.  The prosecution responded that it was calling her "to testify concerning the

deceased and identification concerning the deceased." *Id.* at 554.  When asked to elaborate, the

State said the witness would identify the deceased and "testify[] to basically place the deceased as

far as a little bit about *background of the deceased* as far as his marital status and employment

204

and that type of information." *Id.* The state never argued how placing the deceased's widow on the witness stand to redundantly confirm his identity and provide "background" would help the jury determine Mr. Washington's guilt. The judge asked the prosecution whether there had "been an identification witness up until now," to which the State untruthfully replied "No." *Id.* Mr. Kidane's identification of the victim was easily sufficient under Texas law. Texas law does not require a relative to identify a murder victim, nor does it require the name of the victim to be proven by some form of official documentation. *White v. State*, 647 S.W.2d 71, 74 (Tex. App. – Tyler 1983, no writ) (testimony of investigating officer and of defendant alone sufficient to establish identity of murder victim).

The court held a pretrial hearing to determine the admissibility of the widow's testimony. When she was asked to identify her husband, she began crying. *Id.* at 559. The defense protested: "[T]he only affect [sic] this lady's testimony will have on this jury is the emotional, prejudicial affect and bias is to see a grieving widow, Your Honor." *Id.* The judge made Ms. Tsegai promise to try not to cry on the witness stand. *Id.* The defense then pointed out that the identity of the victim was not in dispute: "Identification has already been established. Mr. Kidane has established the identity of the deceased. We never attacked identity. Identity is not an issue here." *Id.* at 560. The defense reminded the court that Mr. Kidane had identified a picture of the deceased, and obviously knew him extremely well from having worked in the same store with him, day after day, for months. *Id.* The state, again deceptively, argued to the judge that "Mr. Kidane did not know the deceased's full name." *Id.*[78]

---

[78] The prosecutor appears to be referring to a portion in the record in which Mr. Kidane stated that Mr. Tareh preferred to be known as "Brahani." *Id.* at 422. However, the prosecution knew that Mr. Kidane knew Mr. Tareh's full name, since he himself had asked Mr. Kidane the following questions just the day before:

Ms. Tsegai then, moments after she had stopped crying, while her eyes were red and rimmed with tears, took the stand, testified that she and her husband had been married in 1982, identified him by means of a photograph, and stated that she had to return to Dallas after testifying. *Id.* at 564-66. She also brought a social security card that had the deceased's name on it. Her identification testimony was *precisely the same* as Mr. Kidane's – she identified the deceased from a photograph. Other victim-impact testimony was also admitted at the guilt phase, including Mr. Kidane's identification of the deceased as a "good worker" (S.F. Vol. XXVII:438) and a doctor's long, graphic, and unnecessarily detailed description of the emergency surgery performed on Mr. Kidane after his injury. *See supra* Part III.A.6.d.

### 2. This evidence was introduced by the State in knowing violation of its duty to provide the defendant with a fair trial and had a significant impact on the jury.

"[W]hen a state trial court's evidence rulings deny a habeas petitioner fundamental constitutional protections, [the federal court's] duty requires it to enforce the constitution's guarantees by granting the petition for a writ of habeas corpus." *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998). In Mr. Washington's case, the state court's ruling allowing the inflammatory and irrelevant testimony of Ms. Tsegai amounted to a denial of "fundamental

---

| Q. | At Mike's Food Market, did you have an employee by the name of Kifelmariam Tareh? |
|----|----|
| A. | Yes. |

S.F. Vol. 27:366.

| Q. | Was Kifelmariam Tareh still working at that time? |
|----|----|
| A. | Yes. |

S.F. Vol. XXVII:370.

fairness" in violation of the due process clause.  *See id.*

Courts have long recognized the inflammatory unfairness of using relatives of a murder victim to prove identity:

> A verdict is an intellectual task to be performed on the basis of the applicable law and facts.  It is difficult to remain unmoved by the understandable emotions of the victim's family and friends, even when the testimony is limited to identifying the victim.  Thus, the law insulates jurors from the emotional distraction which might result from a verdict based on sympathy and not on the evidence presented.
>
> Here, none of the relatives' testimony was necessary to establish the identity of the victims.  It is apparent that such testimony was impermissibly designed to evoke the sympathy of the jury.

*Jones v. State*, 569 So.2d 1234 (Fla. 1990), *cert. denied*, 510 U.S. 836 (1993); *see also Welty v. State*, 402 So.2d 1159, 1162 (Fla. 1981) (citing "well-established rule . . . that a member of the deceased victim's family may not testify for the purpose of identifying the victim where nonrelated, credible witnesses are available to make such identification").

Because such testimony is so powerful and emotionally charged, and its harmful effects so difficult to gauge, many courts have held that its improper admission warrants *per se* reversal:

> 'Where testimony in a murder case respecting the fact that the deceased has left a spouse and a family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence.'

*People v. Logan*, 586 N.E.2d 679, 739-40 (Ill. App. 1991) (citing *People v. Bernette*, 197 N.E.2d 436, 443 (Ill. 1964)).  The Kansas Supreme Court has recognized that the harm analysis, if any, must be influenced by (1) whether the testimony was approved by the judge, thereby giving the jury the impression that it was probative; and (2) the extent to which the State purposely introduced the inflammatory testimony solely to damage the defendant's right to a fair trial:

207

Here, the district attorney not only had [the victim's widow] testify, but also in her opening statement, over the defense's objection, told the jury in great detail what [the widow's] testimony would be. The testimony was patently irrelevant and deliberately presented for the obvious purpose of inflaming the jury against the defendant. . . . .

[T]he State intentionally injected the irrelevant and highly prejudicial testimony of [the victim's widow] into this trial. Her testimony was not relevant to any of the charges, but was offered and admitted by the court as if it were. . . . .

Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended to infuriate and inflame the jury against the defendant.

*State v. Donesay*, 265 Kan. 60, 88-89 (Kan. 1998).

Texas, as well, has long recognized the uniquely inflammatory nature of such evidence, and has reversed criminal convictions based on the admission of such evidence. *Allen v. State*, 278 S.W. 201 (Tex. Crim. App. 1925) (admission of testimony that decedent left behind wife and five children aged six to sixteen irrelevant and immaterial as tending only to arouse jury's sympathy and prejudice them against the defendant); *Goolsby v. State*, 15 S.W.2d 1052 (Tex. Crim. App. 1929) (testimony that wife and baby left without support as a result of defendant's bad acts inadmissible); *Ainsworth v. State*, 56 S.W.2d 457 (Tex. Crim. App. 1933) (reversible error to permit son of decedent to testify that his mother was left with eight children and that they were poverty-stricken); *Elizondo v. State*, 94 S.W.2d 457 (Tex. Crim. App. 1936) (reversible error for prosecutor to ask defendant how many children he made orphans of when he killed the decedent); *Eckels v. State*, 220 S.W.2d 175 (Tex. Crim. App. 1949) (error to admit testimony that decedent had a wife and five children); *Cavarrubio v. State*, 267 S.W.2d 417 (Tex. Crim. App. 1954) (error to admit testimony as to number of children decedent's widow had); *Cadenhead v. State*, 369 S.W.2d 44 (Tex. Crim. App. 1963) (reversible error to admit testimony

208

by mother of decedent that he was the sole support of her and her husband). The Court of Criminal Appeals has held that testimony from the decedent's widow in a capital murder case that he was a peaceful, hardworking man, who had been married for twenty-two years and left behind five children, was not relevant to any of the special issues presented to the jury and because it was elicited for no other purpose than to inflame the jury and to arose their sympathy, the defendant's death sentence had to be set aside. *Armstrong v. State*, 718 S.W.2d 686 (Tex. Crim. App. 1985).

Every harmful element recognized by these courts is present here. First, the prosecution introduced the testimony solely to inflame and infuriate the jury. The prosecution admitted at first that it intended to call Ms. Tsegai in part to provide some irrelevant "background" about the victim. Its fall-back position that her testimony was somehow needed to identify the victim was disingenuous, to say the least. Second, the court sanctioned the presentation of this evidence. Third, the testimony was admitted during the guilt phase, completely eliminating any possibility of its relevance. The Supreme Court has carefully maintained the distinction between the punishment phase of a capital case – in which amorphous moral intuitions are at play – and the guilt phase. *See Payne v. Tennessee*, 501 U.S. 808 (1991). Finally, the inflammatory victim-impact evidence was emphasized during the State's guilt-phase summation, when the prosecution reminded the jury that Mr. Kidane was a "good employee" and remarked, with bitter sarcasm, that his immigrant's hopes of a "land of opportunity" had been dashed by the defendant.

The findings of fact and conclusions of law prepared by the District Attorney's Office and signed verbatim by the judge recited that the "good employee" and "land of opportunity" remarks were "proper" and were "reasonable deduction[s] from the evidence." Findings and Conclusions at 11 ¶52. However, the Court of Criminal Appeals singled this finding out and *specifically*

*refused to adopt it. See* Exhibit 1 (Court of Criminal Appeals opinion, January 14, 1998, denying habeas relief), at 2 n.1.

Another aggravating factor concerns the alternative means the prosecution had to prove identity. As the Supreme Court has recently acknowledged, the fairness of permitting the state to prove a fact in a particularly prejudicial manner is determined by the existence of alternative, less prejudicial means of proving the same fact. In *Old Chief v. United States*, 117 S. Ct. 644 (1997), the defendant, charged with being a felon in possession of a firearm, offered to stipulate to the fact that he had, in fact, been convicted of a felony. *Id.* at 650. The court allowed the state to reject the stipulation and prove the name and nature of the felony. *Id.* The Supreme Court held that this was error under FED. R. EVID. 403. Although the Court recognized that the defendant "may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it," the Court held that a judge should "apply some discount to the probative value of an item of evidence when faced with a less risky alternative proof going to the same point." *Id.* at 652, 651. To refrain from doing so would give a party free rein to prove its case "in whatever way would produce the maximum unfair prejudice consistent with relevance." *Id.* at 652. The key fact under the *Old Chief* analysis is that Mr. Kidane was not only available to testify as to the deceased's identity, he *actually identified him* (and added in some of his own victim-impact testimony concerning what a "good worker" Mr. Tareh was). Mr. Kidane's testimony alone was more than sufficient, considering the defense's stipulation to the deceased's identity.

For these reasons, the admission of Ms. Tsegai's testimony – especially in light of the myriad other errors affecting the trial – had a substantial and injurious effect on the fairness of Mr. Washington's trial. The trial court did not adjudicate the claim regarding the admission of Ms.

210

Tsegai's testimony. *See generally* Findings and Conclusions. Therefore, this Court must review the claim *de novo*. *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1845 (1998). There are likewise no fact findings relevant to the claim that trial counsel was ineffective for failing to object to the "good employee" and "land of opportunity" remarks. The findings of fact and conclusions of law prepared by the District Attorney's Office and signed verbatim by the judge recited that the "good employee" and "land of opportunity" remarks were "proper" and were "reasonable deduction[s] from the evidence." Findings and Conclusions at 11 ¶52. However, the Court of Criminal Appeals singled this finding out and *specifically refused to adopt it*. *See* Exhibit 1 (Court of Criminal Appeals opinion, January 14, 1998, denying habeas relief), at 2 n.1. The legal conclusions relevant to this claim merely assert that counsel "rendered reasonably effective assistance" without specifying any reasons for that conclusion. Findings and Conclusions, at 13, ¶¶ 2-4. Because trial counsel chose not to address the claims of ineffectiveness for failure to object in his affidavit, and because habeas counsel was prevented by the state court from gaining additional insight into trial counsel's strategy, the record as it stands provides no evidence of a legitimate strategic or tactical reason for failing to object to this inflammatory, improper testimony and evidence. The fact finding that the testimony and evidence was proper is so obviously wrong that the CCA rejected it.

It is a truism that Due Process is violated by the State's intentional presentation of irrelevant, inflammatory evidence. *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (noting that presentation of highly inflammatory testimony unrelated to legitimate guilt-phase issues can be "'so extremely unfair that its admission violates 'fundamental conceptions of justice.'"); *Donnelley v. DeChristoforo*, 416 U.S. 637, 647-48 (1974) (due process can be violated by

211

needlessly inflammatory prosecutorial argument or introduction of inflammatory evidence);

*Sinclair v. United States*, 279 U.S. 749, 765 (1929) ("'The jury is an essential instrumentality --

an appendage -- of the court, the body ordained to pass upon guilt or innocence.  Exercise of calm

and informed judgment by its members is essential to proper enforcement of law."); *Snowden*, 135

F.3d at 739 ("Witness credibility is the sole province of the jury. . . . [A]llowing expert testimony

to boost the credibility of the main witness against Snowden – considering the lack of other

evidence of guilt – violated his right to due process by making his criminal trial fundamentally

unfair").  Moreover, a defense attorney's failure to object to manifestly irrelevant, inflammatory

victim-impact evidence which taints the jury's finding of guilt constitutes ineffective assistance of

counsel.  *Westley v. Johnson*, 83 F.3d 714, 722 (5th Cir. 1996) (finding failure to exclude victim-

impact testimony deficient performance in 1985 Harris County capital murder trial), *cert. denied*,

117 S. Ct. 773 (1997); *Vela v. Estelle*, 708 F.2d at 964 (finding ineffective performance and

prejudice when defense counsel, among other errors, inexcusably failed to object to "improper

and prejudicial . . . good character" testimony offered during guilt phase of Texas murder case);[79]

*Lyons v. McCotter*, 770 F.2d 529, 533 (5th Cir. 1985) ("To pass over the admission of prejudicial

and arguably inadmissible evidence may be strategic; to pass over the admission of prejudicial and

clearly inadmissible evidence, as here, has no strategic value."), *cert. denied*, 474 U.S. 1013

(1986).  In Mr. Washington's case, the State's presentation of Ms. Tsegai's inflammatory

testimony, and the trial court's rulings admitting the testimony, were a denial of the fundamental

---

[79] Although *Vela* was decided before *Strickland*, it applies a very similar analysis. *Id.* at 965 (noting that counsel is presumed competent, that defendant bears burden of proving ineffectiveness, that reviewing court must avoid "20/20 hindsight" when reviewing counsel's performance, and requiring proof of "actual and substantial" prejudice).

fairness guaranteed by the Due Process Clause, and warrant habeas relief.

### F. Mr. Washington's Due Process rights were violated by the atmosphere of pervasive intimidation that marked his trial.

Two independent courtroom observers – juror and Mike Goberman, a lawyer who informally assisted lead trial counsel, independently recall that, for at least some portion of the trial, relatives and associates of the two victims in this case displayed threatening behavior in court towards Mr. Washington.  Mr. Hamilton remembers that:

> on the last day of either the guilt-innocence or punishment phase of the trial (most likely the punishment phase), the courtroom was completely full of uniformed police officers, plainclothes officers, and people who appeared to be friends and family members of the victims.  He remembered that this made a distinct impression on him, because (1) the courtroom had been much less crowded until that day; and (2) the atmosphere in the courtroom was tense and threatening, and physical violence appeared possible.  He remembered that the Ethiopians were speaking loudly and glaring at Mr. Washington, and that they had to be removed from the courtroom.

Exhibit 31 (Bierbaum Affidavit), at ¶8.  Assisting defense counsel Mike Goberman remembers this as well.  Exhibit 16 (Goberman Affidavit), at ¶3.  He remembers that "their demeanor was extremely intimidating and threatening," and that there appeared to be "a real possibility that they might cause an outburst or try to harm Mr. Washington."  *Id.*

Even more troublingly, defense counsel apparently believed that Mr. Washington's own brother had been *murdered* by associates of the victims *specifically in order to prevent his testimony.*  Bierbaum Aff. at ¶9.[80]  Two jurors independently recalled that defense counsel told them after trial that Mr. Washington was so convinced that he would be assassinated by associates

---

[80] The undersigned counsel learned of this information only very recently, and are attempting to determine what was the basis for defense counsel's belief that Mr. Washington's brother was murdered by associates of the victims.  In his affidavits, defense counsel claimed that one of Mr. Washington's brothers had approached him on Mr. Washington's behalf and helped him prepare the case, and that that brother had since died.  *See* 1990 Aff. at ¶2, 1991 Aff. at ¶7.  To the extent that trial counsel's affidavits are credible, they provide some corroboration.

213

of the victims – whether he were convicted or acquitted – that he did not feel there was any point in testifying and putting forward his side of the case. *Id.* at ¶¶5, 9.

It has been settled Supreme Court law for decades that a fair trial cannot be had when the atmosphere in a courtroom is hostile, tense and pregnant with possible violence. *Frank v. Mangum*, 237 U.S. 309 (1915); *Moore v. Dempsey*, 261 U.S. 86 (1923). A defendant must show either actual or inherent prejudice to prevail on a claim of denial of a fair trial. *Woods v. Dugger*, 923 F.2d 1454, 1457 (11th Cir. 1991) (citing *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Irvin v. Dowd*, 366 U.S. 717 (1961)). The presence and threatening, intimidating conduct of the victims' friends and relatives were inherently prejudicial because they presented an "'unacceptable risk'" to Mr. Washington's right to a fair trial. *Flynn*, 475 U.S. at 570 (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976)). A risk becomes unacceptable when there is a "probability of deleterious effects." *Estelle*, 425 U.S. at 504-05. Furthermore, although a showing of actual prejudice is not required in order to establish denial of a fair trial, *Flynn*, 475 U.S. at 570, Mr. Washington was actually prejudiced by the hostile in-court (and, apparently, out-of-court) hostile intimidation of the victims' associates in two ways. First, is genuine fear for his life affected his decision to testify and tainted his ability to present a defense to the jury. Further, if defense counsel's assertion to the jurors that Mr. Washington's brother was actually assassinated by the victims' associates in order to prevent his testimony is well-founded, Mr. Washington was deprived of the ability to proffer his brother's testimony by the unlawful violent conduct of the victims' associates.

Mr. Washington was thus denied his right to a fair trial as guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. Central to the right to a fair trial is

214

the principle that "one accused of a crime is entitled to have his guilt or innocence determined *solely on the basis of the evidence introduced at trial* . . . ." *Holbrook v. Flynn*, 475 U.S. at 567 (*quoting Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)) (emphasis added). "[C]ertain practices pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.'" *Flynn*, 475 U.S. at 568 (quoting *Estelle v. Williams*, 425 U.S.501, 503-04 (1976)). Due process requires that the courts prevent "'the intrusion of factors into the trial process that tend to subvert its purpose.'" *Woods v. Dugger*, 923 F.2d at 1456-57 (quoting *Estes v. Texas*, 381 U.S. 532, 560 (Warren, C.J., concurring). "[T]he more inflammatory the facts the greater the need to adhere to the procedural guarantees that ensure constitutional fairness in the context of criminal trials." *Lowery v. Collins*, 988 F.2d 1364, 1373 (5th Cir. 1993).

Although each impermissible factor, standing alone, may be insufficient to render a verdict constitutionally unfair, each factor must be "viewed in the context of the complete trial." *Woods*, 923 F.2d at 1459. In other words, the totality of the circumstances must be examined to evaluate the fairness of the trial. *Id.* at 1457 (citing *Sheppard v. Maxwell*, 384 U.S. 333, 352 (1966).[81]

Here, the threatening, intimidating in-court demeanor of the victims' associates (1) was perceptible to the jury; and (2) came at a critical moment in the case – the final day of the punishment phase. Although it appears that the trial judge removed some of the victims' associates from the courtroom, it is impossible to tell when they were removed owing to trial defense counsel's inexcusable failure to preserve any of this vital information on the record.

---

[81]Moreover, when there is an "unacceptable risk" that a defendant's trial processes have been subverted, a harmless error analysis is not applicable. *See Woods*, 923 F.2d at 1460. This reflects the reasoning of the U.S. Supreme Court in *Irvin*, 366 U.S. at 722, in which the important threshold issue for the Court was whether the defendant was afforded a fair trial, not whether he was innocent. *See also Satterwhite v. Texas*, 486 U.S. 249, 256 (1988).

215

Further, according to defense counsel, the victims' associates actually killed with the specific goal in mind of crippling Mr. Washington's ability to put forward a defense. Coupled with the myriad other errors tainting the prosecution of Mr. Washington, *see supra* Part III.A & III.B, the totality of the circumstances show that Mr. Washington's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the hostile courtroom atmosphere caused by the in- and out-of-court demeanor of the victims' relatives and associates.

### G. Mr. Washington is actually innocent and therefore his execution would be a "fundamental miscarriage of justice."

The State presented evidence at trial that Mr. Washington had brandished a .38 or .357 caliber weapon in Mike's Food Market on the night Mr. Tareh was killed. S.F. Vol. XXVII:388-89; Exhibit 17 (Singer Affidavit), ¶ 6. However, evidence in the trial record, which trial counsel utterly failed to investigate or exploit, demonstrates that Mr. Tareh's wound size was only 3/16 inch in diameter -- a size highly unusual for a wound inflicted by a .38 or .357 caliber weapon, and more consistent with a .25 caliber. *See supra* Part III.A.5.d. *See* Exhibit 26 (Autopsy Report, Kiflemariam Tareh) (State's Exhibit 33-A at trial); Exhibit 27 (Discharge Summary, Yemane Kidane) (part of State's Exhibit 42 at trial). If in fact Mr. Tareh had been killed by a .38 or .357 caliber weapon, as argued by the prosecutor, one would expect to see more fragmentation of Mr. Tareh's skull, more soot and stippling surrounding the wound, and at least an incomplete exit wound; however, none of these indicators of a .38 or .357 caliber bullet were present. Exhibit 5 (White Affidavit), at ¶¶ 6-9. The physical evidence in this case therefore points to Mr. Washington's innocence of the crime for which he was sentenced to death.

The execution of one who is actually innocent of capital murder is a "fundamental miscarriage

216

of justice." *See Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Procedural barriers must yield so

as to allow the constitutional claims of an innocent person to be heard on the merits.  *See id.* (a

petitioner otherwise subject to procedural barriers may have his federal constitutional claim

considered on the merits if he makes a proper showing of actual innocence); *Smith v. Murray*, 477

U.S. 527, 537-38 (1986) ("in appropriate cases the principles of comity and finality that inform

the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally

unjust incarceration") (internal quotation marks and citations omitted).

### H. The cumulative impact of the flaws in Mr. Washington's trial robbed Mr. Washington's state trial of fundamental due process.

In every stage of this capital murder case, including investigation, trial, and state habeas

proceedings, Mr. Washington has been deprived of his constitutional rights.  The utterly

ineffective assistance rendered by Mr. Washington's trial counsel caused a failure of the

adversarial justice system throughout the investigation, pretrial proceedings, voir dire, and trial of

his capital murder case.  Trial counsel accepted the case based upon an unethical fee arrangement,

creating a conflict of interest that prejudiced Mr. Washington.  Counsel's failure to investigate the

State's case against his client squandered his opportunity to find witnesses and evidence to

support the account of events told by his client, and ensured that an available defensive theory

would not be presented to the jury.  During voir dire, counsel failed to strike for cause jurors who

were biased in favor of the prosecution.  He did not object when the prosecution used its

peremptory strikes to seat an all-white jury in violation of *Batson v. Kentucky*, nor did he object

to the State's improper definitions and hypotheticals during voir dire which improperly lessened

the prosecution's burden of proof.  Once the trial began, due largely to his failure to conduct any

investigation into the facts of the case, counsel not only neglected to provide the jury with a theory to counter that of the prosecution, but missed his opportunity to call the jury's attention to the multiple inconsistencies in the account of Mr. Kidane, the only eyewitness, and failed to even explore the evidence of the victims' wound sizes which pointed to his client's innocence of the crime.   He gave no opening argument whatsoever, failed to object to improper testimony presented by the State, failed to cite relevant legal doctrines in support of his client's positions, and gave a closing argument that was confusing and disorganized.   Mr. Washington was quickly convicted of capital murder, and then was sentenced to death after a punishment phase in which trial counsel failed to properly investigate the facts, to impeach the State's witnesses with available evidence, and to present relevant mitigating information about his client's background. Once the trial had concluded and Mr. Washington had been sentenced to death, trial counsel learned of prejudicial juror misconduct that would have guaranteed Mr. Washington a new trial, but did absolutely nothing to act upon the information.  If Mr. Washington had been represented by counsel who had tested the State's case and ensured that the trial was a proper adversarial contest, there certainly is a reasonable probability that the outcome of the trial would have been different.

As if the defense's case were not sufficiently hindered by trial counsel's incompetent representation, the adversarial framework was further undermined when the prosecution withheld material and exculpatory evidence from the defense.   The State withheld evidence that Ella Miller, a key witness who testified against Mr. Washington at the punishment phase, and whose testimony the jury asked to review during deliberations, was a convicted murderer and thief. Given that Ms. Miller's testimony that Mr. Washington had raped her was entirely uncorroborated

218

and rode solely on her credibility, the opportunity to impeach her credibility with her substantial criminal record would have significantly altered the prosecution's case that the death penalty was a more appropriate punishment for Mr. Washington than a life sentence.   The prosecution sponsored false testimony on the critical issue of the caliber of the bullet that killed Mr. Kidane, helping to gloss over evidence that indicated Mr. Washington's innocence.  The State also presented the inflammatory and irrelevant testimony of Mr. Tareh's widow, knowing that her tearful testimony would have a vivid – and impermissible – impact on Mr. Washington's jury.

During state habeas proceedings, Mr. Washington's counsel was not given the tools and opportunity to properly investigate and present these constitutional claims.  To the contrary, all of his requests for investigative assistance, expert evaluation, and experienced co-counsel were repeatedly denied by the state habeas court.  When trial counsel filed an affidavit with the court that lent strong support to Mr. Washington's claims of ineffective assistance of counsel, the state habeas judge participated in *ex parte* contact with the State and helped orchestrate the appearance of a second, radically different affidavit that was drafted for trial counsel by lawyers for the State. When the state habeas court finally rendered a decision in the case, denying Mr. Washington any relief, the decision was made by a new judge who had not presided over the trial and had no opportunity to assess the credibility of trial counsel and others.  Moreover, the judge did nothing more than sign the State's proposed findings of facts and conclusions of law, without requiring that the State's proposal first be served upon the defense, and without having had a proper opportunity to review the document.  Despite the roughshod nature of these proceedings, they took over *nine years* to be completed, due to the State's repeated request for extensions, its utter disregard for court-imposed deadlines (for which it was never penalized despite filings that were

219

as much as two years late), and the court's inexplicable, multiple year delays in rendering its decisions. Because of this State action, Mr. Washington not only lost his opportunity to bring a federal habeas action under pre-AEDPA law, but also has been subjected to an extended stay on death row that violates his Eighth Amendment right to be free of cruel and unusual punishment.

Taken together, the cumulative constitutional errors violate due process, and mandate a granting of Petitioner's writ. *See Derden v. McNeel*, 978 F.2d 1453 (5ᵗʰ Cir. 1992) (en banc), *cert. denied*, 508 U.S. 960 (1993); *see also* Rachel A. Van Cleave, *When is an Error Not an "Error"? Habeas Corpus and Cumulative Error Analysis*, 46 BAYLOR L. REV. 59 (1993).

220

## PRAYER FOR RELIEF

WHEREFORE, Mr. Washington prays that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2. Grant him discovery and an evidentiary hearing at which he may present evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing;

3. Grant undersigned counsel a reasonable period of time, not less than fifty days, to prepare and file such amendments to this petition as may be necessary to raise all available constitutional challenges to Mr. Washington's conviction and death sentence in this proceeding.

4. Direct that under Habeas Corpus Rule 7 the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the volume of exhibits filed with this Petition.

5. In the event that this Court chooses to dismiss this Petition for failure to exhaust state remedies, protect the Petitioner's right to meaningful federal habeas review either by entering an order specifically holding this cause in abeyance pending exhaustion pursuant to *Brewer v. Johnson*, 139 F.3d 491 (5th Cir. 1998); and/or entering an order specifically finding that the federal statute of limitations contained in the AEDPA will be equitably tolled for the entire duration of the time it takes Petitioner to prepare and file a petition for writ of habeas corpus in state court.[82]

6. Grant such other relief as law and justice require.

Respectfully submitted,

---

[82] As explained *supra* Part II.B., the Petitioner maintains that the exhaustion requirement is excused as to any claims or facts contained in this Petition which were not presented to the state courts. Nevertheless, in an abundance of caution, the Petitioner requests the measures set out in the text to ensure that meaningful, substantive review of his many meritorious claims is not damaged by the operation of either state or federal statutes of limitations.

221

Andrew Hammel
Attorney-in-Charge
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00796698

Elizabeth Detweiler
Staff Attorney
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00793614

TEXAS DEFENDER SERVICE
412 Main Street, Suite 1150
Houston, TX  77002
TEL: (713) 222-7788
FAX: (713) 222-0260

222

## CERTIFICATE OF SERVICE

I hereby certify that on the 25 day of February , 1999, I served a true, correct, and complete copy of Petitioner's Amended Petition for Writ of Habeas Corpus and Exhibit Volume thereto by depositing same in United States Postal Service Regular Mail addressed to:

Christina Thompson
Assistant Attorney General
Capital Litigation Division
Office of the Attorney General
P.O. Box 12548
Capitol Station
Austin, Texas 78711

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIE TERION WASHINGTON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | C.A. No. H-99-0140 |
| | § | |
| | § | |
| | § | |
| GARY JOHNSON, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

State of Texas          }
                        } ss
County of Harris        }

**AFFIDAVIT OF VERIFICATION**

  I, Andrew Hammel, counsel for the Petitioner in the above entitled matter, upon oath state that I have read the foregoing Petition for Writ of Habeas Corpus, seeking federal habeas corpus relief pursuant to 28 U.S.C. *et seq.*, I am familiar with its contents, and to the best of my knowledge and belief, the matters set forth therein are true and correct.

Andrew Hammel
Tx. Bar No. 00796698
Member, U.S.D.C., Southern District

Subscribed and sworn to before me this 24th day of _____ 19 9.

Notary Public

My Commission Expires: ____10-17-2000____