IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

MAY 1 2 1999 **GS**

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| WILLIE TERION WASHINGTON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | C.A. No. H-99-0140 |
| | § | |
| | § | |
| | § | |
| GARY JOHNSON, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

## MOTION FOR DISCOVERY

**I.      Introduction.**

In *Bracy v. Gramley*, 520 U.S. 899 (1997), the United States Supreme Court set out a

clear, straightforward framework for considering habeas petitioners' discovery requests.  A court

should first determine whether the petitioner has alleged the elements of the claim he wishes to

prove, then determine whether he has made "specific allegations" that support the particular

discovery request.  If the petitioner has properly alleged the claim and asked for probative

evidence, he has shown "good cause" for discovery and the court should permit it.  *Id.* at 905-

906.

A petitioner whose specific allegations, if proven, would entitle him to legal relief is

entitled to access to the fact-development procedures necessary to establish his claims.  *See, e.g.*,

*East v. Scott*, 55 F.3d 991, 1001-1002 (5th Cir. 1995) (discovery warranted because information

clearly relevant to petitioner's facially sufficient due process claim).  Mr. Washington has already

alleged the elements of his ineffective assistance, *Brady*, and *Giglio/Napue* claims in his Amended

Petition.  In the remainder of this Motion, Mr. Washington will demonstrate the likely existence of

additional evidence in support of those claims, and will supply the necessary "specific allegations"

to demonstrate "good cause" for discovery under Habeas Rule 6(a).

**II.     Requested Discovery**

       **A.     Bullets.**

      As recounted in the Amended Petition, *see* Amended Petition Parts III.A.5.d & III.B.3,

the prosecution at Mr. Washington's trial argued that Mr. Washington had used a .38 or .357

caliber weapon to kill Mr. Tareh and wound Mr. Kidane.  Mr. Kidane, who was shot in the jaw

but survived and testified, was found shortly after the crime in possession of a .25 caliber weapon,

which had been fired twice.  The prosecution entered two bullets into evidence, representing that

they were the bullets that had killed Mr. Tareh and wounded Mr. Kidane.  A witness for the

prosecution, Firearms Examiner C.E. Anderson of the Houston Police Department, stated that

these bullets certainly came from a .38 or .357 caliber weapon.  Mr. Kidane, the surviving victim,

testified that the lighting in the store was very good and that he had ample opportunity to observe

the barrel of the weapon being pointed at him.  The prosecution had Mr. Kidane brandish a .38

caliber revolver in front of the jury to demonstrate the robber's actions, and Mr. Kidane

specifically declared that the .38 resembled in size and style the weapon used during the crime.

      Other evidence raised questions about the caliber of the bullets.  Mr. Tareh's autopsy

revealed that the wound in his temple was only 3/16 inch in diameter, with a 1/16 inch margin of

abrasion.  Mr. Kidane's hospital records stated that the entrance wound to his jaw was only 0.1

centimeter in diameter.  Officers who responded to the scene observed that Mr. Tareh appeared to

have been killed with a small caliber gun.  Trial counsel brought none of this information to the attention of the jury, did not request the appointment of an expert by the trial court, and did not seriously challenge Officer Anderson's testimony.  This inconsistency in the State's case could have been discovered with little investigation.  An expert reviewing the evidence for purposes of these proceedings has concluded as follows:

> [I]t would be very unusual for a .38 or .357 caliber bullet to cause a wound that is only 3/16 of an inch in diameter.  Rather, I would expect the wound from a .38 or .357 caliber bullet to be approximately twice that size, or 3/8 of an inch.
>
> The size of the wound to Mr. Tareh's temple is typical for a wound inflicted by a .25 caliber bullet.

Exhibit 5 to Amended Petition (Affidavit of Lloyd White, M.D., Ph.D.), at ¶¶ 4-5.  Other factors observed by Dr. White also raise questions about whether a .38 or .357 could have inflicted Mr. Tareh's wound:

> If the wound to Mr. Tareh's temple had been inflicted by a .38 or .357 caliber weapon, I would expect to see more fragmentation of the skull than was seen in Mr. Tareh's case
>
> If Mr. Tareh's wound was caused by a .38 or .357 caliber bullet fired from a gun at close range, I would expect to see more soot and more stippling surrounding the wound.
>
> The bullet that killed Mr. Tareh was retrieved from his brain during the autopsy.  If the bullet had been a .38 or .357 caliber bullet, I would expect to find at least an incomplete exit, or injury to the skull on the side opposite to the entrance.  It would be very unusual for the .38 or .357 bullet to have a loss of energy sufficient to cause it to stop in the brain.
>
> If the bullet that killed Mr. Tareh was a .25 caliber bullet, I would expect it to have stopped in Mr. Tareh's brain, as did the bullet observed at autopsy.

Exhibit 5 (White Affidavit), at ¶¶ 6-9.  There were, multiple observations that would have raise a genuine doubt as to whether Mr. Tareh had actually been shot by a .38 or .357 caliber weapon.

In addition, the prosecution revised its conclusions concerning the bullet's caliber midway in its pretrial preparation.  Although at one point the State's ballistics expert had said told trial

counsel that they had no way to determine the caliber of the bullets, the State later changed its position to argue that the bullets were certainly either .38 or .357 caliber.  This unexplained change in theories would have alerted a reasonably diligent defense attorney to the importance of the issue of the bullet caliber.  Trial counsel did not challenge this change of position by the State, request a more detailed explanation of it, or request a hearing or discovery into the specific reasons for the State's change in position.

In state habeas, the court denied Mr. Washington access to the bullets and denied appointment of a forensic expert.  Access to the bullets for independent testing is relevant to Mr. Washington's ineffective assistance claim based on failure to investigate the actual caliber of the bullets, and also to his *Giglio/Napue* claim that the State knowingly presented misleading testimony by Officer Anderson created a misleading impression by encouraging Mr. Kidane to brandish a .38 caliber revolver before the jury.

Evidence undermining the state's ballistics theory would have been crucial.  This crime occurred in a high-crime neighborhood, at a store well-known as a place to buy illegal narcotics. The only gun known with certainty to have been at the crime scene was the .25 caliber revolver found in Mr. Kidane's possession after the crime, which Mr. Kidane admits to having fired at some time during the incident.  Defense counsel's guilt-phase closing suggests that he apparently had some unstated basis for believing that the store owners possessed at least one other weapon besides the .25.  The police originally wrote in their reports that Mr. Kidane's weapon had not recently been fired, but was forced to admit this was a mistake.  Mr. Kidane's story concerning the events of December 19th, 1985 changed materially and inexplicably during the various accounts he gave of the crime.  In this context, any evidence which could have undermined the

State's unequivocal position that the bullets could not possibly have been less than .357 caliber would have raised serious doubts as to the accuracy of Mr. Kidane's account of the crime.

The bullets are in the custody of the Harris County Sheriff's Department.  Conversations the undersigned counsel have had with representatives of the Harris County District Attorney's Office and with other counsel who have requested physical evidence for testing in postconviction proceedings have established that the Sheriff's Office has a firm policy of not releasing physical evidence for testing in such cases absent a court order.

### B.    The remainder of the District Attorney's case file.

Mr. Washington has, through Open Records Act litigation, obtained and reviewed a portion of the Harris County District Attorney's case file on his capital murder prosecution. However, other portions of the case file have been withheld by the District Attorney's Office. Many of these portions were withheld because the District Attorney asserted that they contained work product of the prosecutor.  Because the prosecutor's knowledge and state of mind are necessary to a proper presentation of Mr. Washington's claims, Mr. Washington seeks a court order granting him leave to conduct discovery of the remainder of the State's file on Mr. Washington's capital murder conviction and death sentence, as well as his earlier convictions.

As discussed in the Amended Petition, Part III.A.4.c, the jury that tried Mr. Washington, who is African American, was all-white.  Mr. Washington has alleged that the prosecutor, Bob Stabe, struck five qualified minority venirepersons with peremptory challenges, resulting in an all-white jury.  Just months before Mr. Washington's trial, Mr. Stabe had tried a Harris County rape case and had used his peremptory challenges to remove all African Americans from the jury. *Whitsey v. State*, 796 S.W.2d 707, 716-17 (Tex. Crim. App. 1989) (concluding that the the

prosecutor's explanations for peremptory challenges often relied on impermissible "group

bias[es]," and that "the prosecutor exercised peremptory challenges *based solely on race*")

(emphasis added).  Developments which take place between trial and habeas proceedings which

retroactively lend credibility to a petitioner's allegations can be considered in the determination of

whether a petitioner has shown "good cause" for discovery. *Maxwell v. Gilmore*, 1999 WL

130331, at *14-*15 (N.D. Ill. March 9, 1999) (petitioner entitled to discovery on coerced-

confession allegations when intervening legal developments, including a successful § 1983 police

brutality suit, had significantly bolstered his claim by establishing "widespread (and indeed

systematic)" beating and torture of suspects in local police substation where petitioner had been

interrogated).

       In holding that Mr. Stabe had exercised the peremptory challenges in a racially

discriminatory manner, the CCA relied heavily on Mr. Stabe's handwritten notes. *See id.* at 711-

16.  The findings of the CCA in *Whitsey* strongly suggest that the prosecution's case file in Mr.

Washington's case will contain information concerning the race of the prospective jurors, as well

as his reasons for striking them.  Mr. Washington's state postconviction counsel repeatedly

requested access to the District Attorney's trial file in this case, but all such requests were denied.

Using a change in the law brought about by intervening legislation, the undersigned counsel

requested and received access to most of the District Attorney's file on Mr. Washington's capital

murder prosecution.

       The District Attorney specifically refused, on work-product grounds, to disclose any of

Mr. Stabe's handwritten notes. *See* Amended Petition Exhibit 19, at 3 (Letter from Assistant

General Counsel Joni M. Vollman to Hon. Daniel C. Morales regarding Public Information Act

requests of Willie Terion Washington (June 25, 1998)).  The District Attorney's office specifically admitted that some of the information it wished to conceal from the undersigned counsel were "jury questionnaires and information cards, which contain handwritten notes of prosecutors and 'reflects the mental impressions or legal reasoning of an attorney representing the state.'"  *Id.* Thus, evidence concerning the prosecutor's motivation for his peremptory challenges certainly exists.  The undersigned counsel allege that these handwritten notes, which the District Attorney has so far successfully concealed from the defense, will establish that Mr. Stabe, as in the *Whitsey* case, intentionally discriminated on the basis of race when selecting Mr. Washington's jury.

The remainder of the District Attorney's case file, including handwritten notes by any and all trial prosecutors, are relevant to other claims.  The withheld portions of the file may include information about why the prosecution's theory of the bullet caliber changed, what efforts were undertaken to investigate the criminal backgrounds of the State's witnesses, which would be relevant to the Petitioner's *Brady* and false impression claims.

**C.      Official records of the race of all jurors, both seated and stricken.**

Mr. Washington has alleged that the jury which tried him was all-white, based on (1) the recollection of co-counsel Mike Goberman that no African Americans served on Mr. Washington's jury; (2) the absence of any jurors with Hispanic surnames; and (3) the results of a search of an online DPS database.  Should further proof be needed to support his allegation discussed above that Mr. Washington's trial prosecutor used his peremptory challenges in a racially discriminatory fashion, Mr. Washington requests access to the official Department of Public Safety (DPS) records for all seated jurors and all potential jurors who were stricken from the venire.  These DPS records will conclusively demonstrate the race of each juror.

Alternatively, the undersigned counsel requests authorization for investigative funding to interview each relevant juror to establish the juror's race, should the State contest Mr. Washington's characterizations of the jurors' races. Mr. Washington has alleged both a *Batson* claim and a claims based on trial counsel's failure to invoke *Batson* procedures and require Mr. Stabe to state a race-neutral explanation for his challenges, if possible.

State habeas counsel requested necessary funding and assistance to support Mr. Washington's *Batson* claim. *See* Amended Petition, Exhibit 3, Tab B (First Pre-Habeas Petition Motion for Discovery and Appointment of Expert Assistance), at 4. When the state habeas court questioned him about his request for jury lists to support his *Batson* claim, counsel explained that he was "trying to get enough facts to prepare a competent initial pleading." Amended Petition, Exhibit 3, Tab D (Motions Hearing, October 6, 1989), at 24. The state court denied him access to the information. *Id.*

### D.   Records of the Houston Police Department or Harris County Sheriff regarding drug activity at Mike's Food Mart or nearby during 1986.

Trial counsel failed to present an available defensive theory on behalf of Mr. Washington: the botched drug deal defense. *See* Amended Petition, Part III.A.5.g. Trial counsel dismissed this defensive theory before conducting investigation to test its strength. One piece of this theory, which was not adequately pursued by trial counsel, was the reputation of Mike's Food Mart (owned by surviving victim Yemane Kidane) as a place where narcotics were sold and drug users hung out. Several neighborhood residents were available to provide information about the store's reputation. *See* Exhibit I to State Habeas Petition (Affidavit of Sam Roy), at 3; Exhibit G to State Habeas Petition (Affidavit of Franklin Hart), at ¶ 4; Amended Petition Exhibit 6 (Mary Drakes Affidavit), at ¶ 4. These witnesses had no discernible motive to lie on Mr. Washington's behalf,

or to invent testimony about the reputation of Mike's Food Market. These witnesses'

recollection that alcoholics and drug addicts hung around Mike's Food Market regularly is

corroborated by Yemane Kidane's 1986 conviction for allowing alcohol to be consumed on the

premises of the store. *See* Amended Petition Exhibit 30 (copy of certified copy of Harris County

criminal history report).

Trial counsel failed to investigate the drug activity at Mike's Food Mart, and the state

habeas court denied counsel's attempts to gather factual support for the botched drug deal

defense. Mr. Washington now requests any and all records of the Houston Police Department or

Harris County Sheriff regarding drug activity at Mike's Food Mart in 1986, so as to further

support his claim that a viable defensive theory could have been presented if trial counsel had

conducted adequate investigation.

### E.   Depositions of persons with knowledge of trial and postconviction proceedings.

Mr. Washington requests leave to depose persons with knowledge relevant to his legal

claims and procedural arguments, including, but not limited to the following persons:

#### 1.   Trial counsel Reo Harris, Jr.

Throughout postconviction proceedings, dozens of claims of ineffectiveness have been

lodged against trial counsel Reo Harris, Jr. These claims include knowingly accepting

employment without adequate financial resources, conflict of interest, inadequate investigation,

inadequate pretrial preparation, repeated failure to object to inadmissible evidence and improper

argument, failure to invoke *Batson*, and many other allegations of deficiency. The only factual

development permitted by the state court consisted of two affidavits filed by Mr. Harris. These

affidavits contradicted one another and left key questions unresolved. State habeas counsel

requested that the court grant an evidentiary hearing or deposition at which Mr. Harris could be
confronted in person and cross-examined about the many allegations of deficiency in this complex
case.  The request was denied.

> **2.      State postconviction counsel Gary Reger, state postconviction trial
> judge the Hon. Pat Lykos, and Harris County assistant district
> attorney Shirley Cornelius.**

Gary Reger, a partner at the Beaumont, Texas law firm of Orgain, Bell & Tucker, L.L.P.,
represented Mr. Washington in state postconviction proceedings.  Mr. Reger specialized in
commercial law and had no criminal or trial experience.  He agreed to represent Mr. Washington
only after hearing an urgent solicitation for legal help for those on death row.  He repeatedly
requested access to expertise, resources and evidence necessary to effective representation of Mr.
Washington.  All requests except for discovery of Mr. Kidane's medical records were denied.

Mr. Reger also conversed with Shirley Cornelius, the assistant district attorney who
represented the state in postconviction proceedings.  Mr. Reger has filed an affidavit in which he
describes conversations with Ms. Cornelius in which Ms. Cornelius indicated that she had
repeatedly discussed the merits of Mr. Washington's claims with Judge Lykos while the habeas
petition was still pending before Judge Lykos' court.  *See* Amended Petition, Exhibit 3, at ¶29.
Mr. Washington has further alleged, on his own personal information and belief, that Judge Lykos
abandoned her neutral judicial role by (1) while discussing the case *ex parte* with counsel for the
state, expressing or endorsing an opinion that Reo Harris' first affidavit was unsatisfactory
(specifically because it admitted questionable pretrial preparation and questionable ethical
conduct); and (2) in response to the perceived deficiencies of the first affidavit, issuing an order
requiring Mr. Harris to create and submit another affidavit.  Mr. Washington has alleged that the

existence and content of these *ex parte* conversations rendered Mr. Washington's postconviction

proceedings fundamentally unfair and unreliable and require this Court to disregard the fact

findings and conclusions entered by the state trial court.  The due process violations also make an

evidentiary hearing mandatory.  The specific characterizations of the discussions between Ms.

Cornelius and Judge Lykos derive from conversations the undersigned counsel has had with a

witness who is reluctant to specifically describe the allegations in a public proceeding without

being compelled to do so by court order.

 The requirement of absolute judicial neutrality is perhaps the most fundamental component

of due process:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal
> in both civil and criminal cases.  This requirement of neutrality in adjudicative
> proceedings safeguards the two central concerns of procedural due process, the
> prevention of unjustified or mistaken deprivations and the promotion of
> participation and dialogue by affected individuals in the decisionmaking
> process. . . .  The neutrality requirement helps to guarantee that life, liberty, or
> property will not be taken on the basis of an erroneous or distorted conception of
> the facts or the law. . . .  At the same time, it preserves both the appearance and
> the reality of fairness, "generating the feeling, so important to a popular
> government, that justice has been done," . . . by ensuring that no person will be
> deprived of his interests in the absence of a proceeding in which he may present his
> case with assurance that the arbiter is not predisposed to find against him.

*Porter v. Singletary*, 49 F.3d 1483, 1487 (11ᵗʰ Cir. 1995) (quoting *Marshall v. Jerrico, Inc.*, 446

U.S. 238, 242 (1980) (citations omitted)).  The *Porter* court observed that "the impartiality of the

judiciary is the most central concept of the Canons of [Judicial] Ethics."  *Id.* at 1488 n.10.  Mr.

Washington has alleged, based on the undersigned counsel's own information and belief, that

Judge Lykos (1) engaged in *ex parte* conversations with the prosecution concerning the merits of

Mr. Washington's postconviction petition; (2) in those *ex parte* conversations, advised the State

that (or confirmed the state's judgment that) the contents of Mr. Harris' first affidavit would harm

the state's effort to rebut Mr. Washington's ineffectiveness challenges; and (3) used the power of her office to order Mr. Harris to submit another affidavit.  A judge violates her duty of neutrality when she gives legal advice to a prosecutor or "actively seeks out the presentation of additional evidence in a case." *Sparks v. State*, 1999 WL 168471, at *4 (Fla. Ct. App. 1ˢᵗ Dist., March 30, 1999); *see also Hunter v. United States*, 62 F.2d 217, 220 (5ᵗʰ Cir. 1932) ("A trial judge should never assume the role of prosecuting attorney and lend the weight of his great influence to the side of the government.").

In order to bolster these allegations, Mr. Washington has offered a sworn affidavit from state postconviction counsel in which he affirms that the content of conversations he had with Ms. Cornelius left him with the clear impression that Ms. Cornelius had several *ex parte* conversations with Judge Lykos concerning the merits of the case.  Further, state postconviction counsel has declared that Ms. Cornelius expressed dismay at the contents of Mr. Harris's first affidavit and tried to have it removed from the court record.  *See* Amended Petition, Exhibit 3, at ¶20 (state habeas counsel recalls that Ms. Cornelius urged him to agree to strike trial counsel's first affidavit because "it would appear racist [for state habeas counsel] to criticize the glaring problems with the form and substance of the affidavit").  Mr. Washington is clearly entitled to discovery on the due process violations he has alleged.  The adequacy of state factfinding procedures and the applicability of procedural bars is an appropriate subject of discovery.  *Coleman v. Zant*, 708 F.2d 541, 547-48 (11ᵗʰ Cir. 1983) (discovery permitted to assist petitioner in showing that state court factfindings were not adequate).

Live depositions of all named parties, or hearing testimony from them, are essential to full development of the facts of this claim.  *Teague v. Scott*, 60 F.3d 1167, 1172 (5ᵗʰ Cir. 1995)

(denial of discovery is abuse of discretion when "discovery is necessary to fully develop the facts of a claim").

> **3.      Jurors and other persons in court during Mr. Washington's trial.**

Mr. Washington has alleged, based on a sworn affidavit from trial cocounsel and on observations of jurors, that his state court trial was tainted by a hostile courtroom atmosphere. Specifically, Mr. Washington has alleged that relatives and friends of the victims in this case filled the courtroom on at least one day of his trial.  Apparently, most of these relatives and friends were from Africa, as were the two victims in this case.  The Africans stared intently at Mr. Washington and made threatening comments and/or gestures toward him.  The possibility of violence in the courtroom became so real that trial cocounsel requested that the observers be removed from the courtroom.

Mr. Washington has also alleged that trial counsel rendered ineffective assistance of counsel by failing to interview the jurors after one juror asked him why Mr. Washington did not testify during the trial.  Mr. Washington has alleged that had trial counsel followed up on this troubling remark, he would have learned that the jurors discussed Mr. Washington's failure to testify and that at least one juror based her guilty verdict primarily on Mr. Washington's failure to testify.  Under Texas law, this evidence would have been admissible and sufficient to warrant a retrial.  Mr. Washington requests leave to depose court personnel, trial co-counsel, and/or selected jurors to prove these claims.

## III.    Conclusion

For the foregoing reasons, Mr. Washington respectfully requests leave to conduct discovery as he has established "good cause" for his requests.

Respectfully submitted,


Andrew Hammel
Attorney-in-Charge
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00796698

Elizabeth Detweiler
Staff Attorney
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00793614

TEXAS DEFENDER SERVICE
412 Main Street, Suite 1150
Houston, TX  77002
TEL    : (713) 222-7788
FAX    : (713) 222-0260

## CERTIFICATE OF CONFERENCE

I hereby certify that on or about the 20 day of April, 1999, I conferred with counsel for the Respondent on this motion.  She told me that she would oppose the motion.

Andrew Hammel

## CERTIFICATE OF SERVICE

I hereby certify that on the 12 day of May 1999, I served a true and correct copy of the foregoing pleading by depositing it with Federal Express for standard overnight delivery to counsel for Respondent:

Ms. Christina Thompson
Assistant Attorney General
Office of the Attorney General
209 W. 14th Street
Price Daniel, Sr. Building, 8th Floor
Austin, Texas  78701