

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

NOV 1 9 1999  EE

Michael N. Milby, Clerk of Court

| | |
|---|---|
| WILLIE TERION WASHINGTON, §<br>§<br>Petitioner, §<br>§<br>§<br>-VS- §<br>§<br>§<br>§<br>GARY JOHNSON, Director, Texas §<br>Department of Criminal Justice, §<br>Institutional Division, §<br>§<br>Respondent. § | C.A. No. H-99-0140 |

---

**SUPPLEMENTAL BRIEFING ON INADEQUACY OF STATE COURT FACT
FINDINGS AND SUPPLEMENTAL MOTION FOR DISCOVERY AND AN
EVIDENTIARY HEARING**

TO THE HONORABLE DAVID HITTNER, UNITED STATES DISTRICT JUDGE:

Petitioner Willie Terion Washington filed his Amended Petition for Writ of Habeas Corpus

(Dkt. #34) on February 25, 1999 ("Amended Petition"). He filed Motions for an Evidentiary Hearing

and for Discovery. Dkt. #40, 41, 51. Now, based on newly-available information and research,

Petitioner presents supplemental briefing on the inadequacy of the state postconviction fact-finding

process and requests additional discovery based on this information.

**I.      Concise Summary**

As the undersigned counsel have advised this Court in a previous Motion (Dkt #59), a hearing

was held in the 284th District Court of Montgomery County, Texas on September 20, 1999,

concerning Judge Pat Lykos' conduct in presiding over the initial phase of state postconviction

proceedings in Mr. Washington's case. Motion to Recuse, *State v. Gibbs*, No. 18,387-CR

(Transcript attached as Exhibit 2; cited as "Tr."). During this hearing, Judge Lykos and Assistant



District Attorney Shirley Cornelius admitted to conduct which constitutes improper *ex parte* contact concerning the substance of Mr. Washington's postconviction claims.   Judge Lykos also admitted *ex parte* contact with Reo Harris, Mr. Washington's trial attorney–and an important fact witness in state postconviction proceedings.   Gary Reger, Mr. Washington's state habeas counsel, was never invited to attend or even informed of any of these contacts until much later.   These *ex parte* conversations concerned the substance of Mr. Washington's claims of ineffective assistance of counsel, and Mr. Harris' response to those claims.

However, Judge Lykos' misconduct goes beyond these *ex parte* conversations.   While sitting as Judge of the 180th District Court and presiding over Mr. Washington's state habeas petition, Judge Lykos simultaneously campaigned for the Republican nomination for Attorney General of Texas, Texas' highest law-enforcement post.   She campaigned as a law-and-order former police officer, and made many statements which would have caused a reasonable observer to doubt her ability to impartially adjudicate pending criminal matters.   In fact, she actively exploited her judicial office, calling attention to specific death penalty cases–possibly including Mr. Washington's–over which she had presided.   She exploited these cases knowing that many of them had come before her or would shortly come before her in postconviction appeals.   Judge Lykos' political aspirations constitute an extra-judicial source of bias towards condemned habeas applicants which rendered Mr. Washington's state postconviction proceedings fundamentally unfair.

## II.     *Ex parte* contacts.

### A.     Facts developed at the September 20, 1999 hearing.

Four witnesses were subpoenaed to testify at the recusal hearing: Reo Harris, Gary Reger, Judge Pat Lykos, and Shirley Cornelius.   All subpoenas were successfully served except the one addressed to Mr. Harris.   At least four attempts were made to serve the subpoena on Mr. Harris, but those attempts were unsuccessful.   Tr. at 13.   The first to take the stand was Gary Reger, Mr. Washington's state postconviction counsel.   Tr. at 15-44.   His testimony largely tracked the events

described in his earlier Declaration, which was Exhibit 3 to Mr. Washington's Amended Petition. Specifically, he recalled conversations with Shirley Cornelius, the Assistant District Attorney who represented the State in Mr. Washington's postconviction proceedings, in which Cornelius described *ex parte* conversations she had with Judge Lykos. *See id.* Mr. Reger did not recall receiving an order calling for a second affidavit, and was never informed of any of the events which produced it until much later. *Id.* at 22, 24. Mr. Reger recalled the glaring differences between Mr. Harris' two affidavits and his unsuccessful attempts to find out what was responsible for them. *Id.* at 26 (affidavits were as different as "night and day"); *id.* at 33 (Mr. Reger asked for factual development in order to attempt to resolve differences between the two affidavits).

Next to testify was Shirley Cornelius. She remembered that Reo Harris had told her that he typed up the first affidavit himself. *Id.* at 54. After reading the first affidavit, Ms. Cornelius decided to ask Judge Lykos to order Mr. Harris to produce another affidavit:

> I was in Court on another matter and . . . when the matter finished, [Judge Lykos] asked if I had received a copy of the affidavit because [it] goes to the Clerk's Office and then is sent to everyone. And I told her that I had, but that I was going to be requesting another affidavit from him because he did not address all the issues in the Court order. And she said "I will."
>
> And I explained to her how in Harris County we normally handle those affidavits and I try -- essentially what we do is we get the Court Order, and we oftentimes call the lawyer and say, "Would you come in with the Court Order, look at the State's file and refresh your memory, tell us about it, we'll type it up for you. Dictate it to us." That way we know all the issues are handled. . . . I *told her what my intention was of doing, that I had a phone call in for Reo Harris to come into my office and to sit down and for us to go through the issue together.*

*Id.* at 47-48. Judge Lykos assured Ms. Cornelius that "when she saw [Mr. Harris next] she would ask him to *call me*, or something along those lines." *Id.* at 49. In fact, Mr. Harris did later appear at the District Attorney's office, and together they created Mr. Harris' second affidavit. *Id.* at 50-51. Cornelius declared that she revealed to Mr. Reger the entire chain of events surrounding the creation of the second affidavit only *after* the second affidavit had been created and filed. *Id.* at 54. Ms.

Cornelius essentially took control of the process leading to the second affidavit:

> Q.    So if indeed a second affidavit was filed, that [order] must have come from the judge?
>
> A.    No. The first order said that he was to respond to the allegations of ineffective assistance contained in the writ. They may have been itemized out, I'm not even sure, in the order. And since the first affidavit did not respond to all the allegations, then the order had not been met with, had not bee[n] complied with.
>
> Q.    Who made that decision?
>
> A.    *I did.* It's–if Reo had balked, and said "I'm not going to do another one", then I suppose I would have requested the Court to reissue an order.

*Id.* at 54-55.

Judge Lykos testified next. She confirmed that she had ordered Harris to file a second affidavit, purportedly because the first one "wasn't in proper form, and further it was unresponsive." *Id.* at 66. She recalled "summon[ing Harris] to come to Court" *at Cornelius' behest. Id.* At this hearing, she told Harris that his first affidavit was unsatisfactory. *Id.* at 66-67. She admitted that she did not secure Reger's presence at any of these *ex parte* meetings, never informed him of them or obtained his approval of them, and never filed a written order requesting a supplemental affidavit from Harris. *Id.* at 71. When asked whether she felt that Mr. Washington's attorney "had a right to be present" during the Judge's *ex parte* conversations with Cornelius and Harris concerning the first affidavit, Judge Lykos sounded a defensive note:

> This was not a hearing. It was just simply I summoned Mr. Reo for the two reasons I previously stated, as I would the State's attorney if I felt that that was the same situation.
>
> * * *
>
> I don't even know if I knew of the existence of Mr. Reiger[1] [sic]. . . . I mean, if a

---

[1] As of February 1991, when these events occurred, Judge Lykos had already held one preliminary hearing
(continued...)

> lawyer files something that's not in the proper form, I order them to redo it. There's
> no harm to any side because whatever is filed is distributed to the relevant parties.
> This is not anything having to do with the substance of anything. This is not ruling
> without the benefit of the other side.

*Id.* at 71-72, 73-74. When asked whether she was concerned to find "substantial differen[ces]"
between the two affidavits, Judge Lykos, apparently thinking that she had ordered a hearing on the
merits in the case, responded that the defense should have raised such issues at a "hearing." *Id.* at
75. Mr. Washington was denied a hearing in state court.

Several aspects of this testimony are notable. First, Judge Lykos initiaed the *ex parte* contact
with Ms. Cornelius by asking her whether she had received Mr. Harris' first affidavit. Second, Judge
Lykos ceded a considerable amount of control over factual development in Mr. Washington's state
postconviction proceeding *to Ms. Cornelius*: upon merely being informed that Cornelius was
dissatisfied with Harris' initial affidavit, Judge Lykos immediately agreed to "summon" Harris and
order him to provide another one. Judge Lykos did so knowing full well that Cornelius intended to
use Judge Lykos' verbal order to prod Reo Harris into actually appearing at the District Attorney's
office and collaborating on an affidavit "together." Reger was deliberately excluded from these
events and denied timely notice of them.

**B.      The contacts to which Judge Lykos admitted constituted unethical, *ex parte*
         communications with a party's counsel and with a critical fact witness
         concerning the substance of the issues presented by Mr. Washington's habeas
         petition.**

Canon 3(8) of the Texas Canons of Judicial Conduct specify that "A judge shall not initiate,
permit or consider *ex parte* communications or other communications made to the judge outside the
presence of the parties between the judge and a party, an attorney, . . . or any other court appointee

---

[1](...continued)
at which Mr. Reger personally appeared before her as counsel for Mr. Washington, and had received many
pleadings (including a Motion for Appointment) on Mr. Washington's behalf identifying Reger as Mr.
Washington's counsel.

concerning the merits of a pending or impending judicial proceeding." *Id.* This prohibition on *ex parte* communications does not apply to "communications concerning *uncontested* administrative or *uncontested* procedural matters." *Id.* at 3(8)(a) (emphasis added). A judge may confer separately with the parties to "mediate or settle" matters, but only with prior notice to all parties, and only if the court "thereafter" hears no contested matters *ex parte*.

Judge Lykos attempted to characterize the *ex parte* contact as intended only to secure compliance with her order, but this argument fails. First, Mr. Washington's counsel, Gary Reger, *vigorously* contested the second affidavit when it was filed, even moving to strike it. Had Reger been afforded the "right to be heard according to law," *see* Canon 3(8), in the hearings that led to the creation of the second affidavit, he would have strongly objected to them. First, he would have disputed the need for the second affidavit, because Reger believed that Harris was "telling the truth" in much of the first affidavit because Harris's admission of seventeen hours of pretrial preparation jibed with Reger's conclusion that Harris had "basically done nothing" nothing to prepare for trial. Tr. at 27. Second, it seems safe to say that Reger would never have consented to a procedure in which the judge knowingly permitted one party exclusive access to a critical fact witness without notice to the opposing side, and knowingly permitted that party to collaborate with the witness in the "creation" of critical evidence. As his state-court pleadings reveal, Mr. Reger maintained that the proper means of investigating trial counsel's preparation and trial strategy was a "full and fair" hearing into Mr. Washington's claims, meaning full discovery, depositions of relevant witnesses (including Mr. Harris), followed by a full and fair evidentiary hearing.[2]

The vague assertions by Judge Lykos and Ms. Cornelius that Mr. Reger did not need to be

---

[2] He requested such factual development repeatedly during state-court proceedings. *See* Amended Petition, Exhibit 3 (Declaration of Gary Neale Reger), at Exhibit F (First Post-Habeas Petition Motion for Discovery, at 2 (requesting discovery related to ineffective-assistance of counsel claims, including deposition of trial counsel, in light of petitioner's allegations of inadequate preparation and trial counsel's lack of cooperation with defense. In fact, he pointed specifically to the need to resolve the "contradictions and fundamental differences" between Reo Harris' affidavits in re-urging his motion for discovery. Tr. at 30, 33 (referring to Reger Dec., Exhibit H, at 2).

apprised of the creation of the second affidavit because it merely remedied the "improper form" or "unresponsiveness" of the first one (Tr. at 50, 73), are also unconvincing.[3]  First, the question of whether the first affidavit was incomplete or unresponsive was *itself* a contested, substantive factual issue upon which Mr. Reger was entitled to be heard.  As both Mr. Reger and the undersigned counsel have argued, the first affidavit should be considered the *most* reliable and authoritative statement of many aspects of trial counsel's preparation and strategy, since trial counsel wrote it himself.  Tr. at 54; Amended Response (Dkt. #53) at 9-10 (suggesting that implausibility and and irrelevance of material in second affidavit resulted from coaching by District Attorney's Office).

Second, Judge Lykos admitted that her *ex parte* conversation with trial counsel concerned the "content" of his first affidavit.  Tr. at 67.  It is well-settled that one of the most vital witnesses in the ineffective-assistance context is the original trial attorney whose performance is being questioned. *See, e.g., Mattheson v. King*, 751 F.2d 1432, 1439-40 (5th Cir. 1985) (relying heavily on trial counsel's testimony during state postconviction hearing in analyzing ineffective-assistance claims), *cert dism'd*, 475 U.S. 1138 (1986).  Judge Lykos could hardly have justified ordering Mr. Harris to complete another affidavit–or explained what she wanted to see in it–without describing what was wrong with his first one.  Judge Lykos thus surely addressed the substance of Mr. Washington's claims in her discussion with Mr. Harris.[4]  Mr. Washington's counsel had every right to be privy to this critical conversation, to inform Judge Lykos of his stance on the adequacy of the first affidavit, and to argue forcefully for a "full and fair" hearing as decribed above.

In a further attempt to justify their *ex parte* conversations, both Judge Lykos and Ms.

---

[3] Notably, although both Ms. Cornelius and Judge Lykos seemed to have unusually good recall of events which happened almost nine years ago, neither witness was able to remember a *single* specific subject which was not adequately addressed by Mr. Harris's first affidavit.  Tr. at 44-56 (Ms. Cornelius mentions that affidavit "didn't address all the allegations" several times, but never describes exactly which allegations were inadequately addressed); *id.* at 68 (Judge Lykos cannot recall specifics of any deficiencies in first affidavit).

[4] Of course, it is possible that Judge Lykos did not address substantive issues because she viewed her role as simply forcing Harris to cooperate with Cornelius, who would in turn make sure all ineffectiveness allegations were "addressed."  If this is the case, it reflects an even more wholesale abdication of judicial neutrality.

Cornelius protested that their only motive in secretly coordinating the creation of another affidavit was to ensure a complete and adequate factual record concerning Mr. Washington's claims. *See, e.g. id.* at 50.   The record belies these assertions.  Had Judge Lykos been sincerely concerned about creating a complete and reliable record, she had an excellent tool at her disposal–a state habeas evidentiary hearing.  Indeed, Judge Lykos, in 1991, had *already* found as a matter of law that Mr. Washington's case presented material, contested fact issues–the crucial gateway determination required to justify a hearing under Texas law at that time.  *See* Tr. at 70; TEX. CODE CRIM. PROC. ANN. ART. 11.07(2)(c) (Vernon's 1994).  However, she refused Mr. Reger's persistent requests for discovery, depositions, and a hearing.

A judge who was concerned about the completeness and accuracy of the factual record in a pending habeas matter would also surely have bothered to at least *read* the affidavit she had specifically ordered created.  Judge Lykos did not.  Tr. at 67.  Nor did Judge Lykos acknowledge the obvious substantive differences between the two affidavits.  Tr. at 67-68.  Indeed, she said she imagined that such differences must have been resolved at an evidentiary hearing.  Tr. at 75.  Judge Lykos never ordered a hearing, even though multiple sufficient motions for discovery and an evidentiary hearing were before her by 1991.  Finally, Judge Lykos does not appear to have realized that, even after two affidavits had been submitted, there were still material factual issues that had yet to be addressed.  *See* Amended Petition at 20, 62-63; Response at 75.

*Ex parte* contact is likely to be considered improper and harmful if one party "stand[s] to obtain a tactical advantage" from the communication.  JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 5.02 (2d. ed. 1995).  *Ex parte* contact may, for instance, provide "certain attorneys with one-sided access to the court, while denying the other counsel the opportunity either to object or to respond." *Id.* at § 5.03 (citing cases and orders); *see also Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969) (it is a "gross breach of the appearance of justice" and "dangerous procedure" to permit prosecutor "private access to the ear of the court" because "[n]o matter how

impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case"); In re *Aulik*, 429 N.W.2d 759, 765-67 (Wis. 1988) (by announcing his thoughts on a pending case *ex parte* to one side of a pending case and accepting their input, judge "violated the elemental rule of fair play" and "effectively gave an advantage" to that side).

Judge Lykos conferred such an illegitimate tactical advantage on the state.  She knowingly approved a situation in which the bulk of the court-ordered fact-finding concerning trial counsel's preparation and strategy happened behind closed doors, in collusion with a party to the litigation, in proceedings which were knowingly concealed from counsel for the Petitioner.  Counsel for Mr. Washington was knowingly kept "out of the loop" by both prosecutor and judge during the creation of the second affidavit, and thus not permitted to even protest the unfair methods used to procure it. Finally, by failing to grant any further factual development, Judge Lykos ensured that the myriad fanciful and contradictory assertions in the second affidavit (described in Amended Response at 6-14) would never be subjected to any meaningful adversarial testing.  Taken together, these circumstances demonstrate unequal treatment and a clear bias in favor of the State of Texas.

**C.      Judge Lykos' conduct violated due process and prejudiced Mr. Washington.**

Although state postconviction processes are not governed by the full panoply of constitutional protections which attach to criminal trials, they must satisfy basic standards of basic due process. *Welch v. Beto*, 355 F.2d 1016, 1020 (5th Cir.), *cert. denied*, 385 U.S. 839 (1966).  *Ex parte* proceedings so clearly violate "bedrock" standards of fairness that they violate even "minimal" due process. *Ford v. Wainwright*, 477 U.S. 399, 429-31 (1986) (O'Connor, J., concurring) (although state is held to "few requirements" in proceedings governing competency to be executed, Florida process which allows only for *ex parte* consideration of request by Governor violates fundamental due process); *see also Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard.").

More specifically, *ex parte* proceedings which materially affect a case rob the affected party of two fundamental components of due process: the right to notice and an opportunity to be heard. *Yohn v. Love*, 76 F.3d 508, 525 (3rd Cir. 1996) (reversing conviction when defense attorney excluded from conversation trial judge had with State Supreme Court Justice which resulted in trial court's reversal of evidentiary ruling); *State v. Jacobs*, 751 S.W.2d 776, 781 (Mo. Ct. App. 1988) (conviction reversed when trial court's *ex parte* conversation with defense witness may have led witness to discontinue testimony). As the *Jacobs* court observed, a "judicial interrogation" of a material witness without defense counsel present "gives the appearance of a star chamber proceeding." *Id.* at 780. Because "[d]ue process is not so much concerned with the result, but with the procedure followed in reaching that result," an *ex parte* contact which affects the integrity of a proceeding can violate due process even if the contact does not directly dictate its outcome. *Yohn*, 76 F.3d at 517 (reversing conviction because of *ex parte* proceedings that influenced trial court's evidentiary ruling notwithstanding possibility that revised ruling was correct).

The results of a proceeding tainted by due process violations must be ignored. *Id.; see also* Amended Petition at 41. Fact-findings created by state criminal proceedings which violate due process are not binding on federal courts. *Townsend v. Sain*, 372 U.S. 293, 313 (1963); *McAffee v. Procunier*, 761 F.2d 1124, 1128 (5th Cir. 1985) (allegation that sentencing judge relied on extra-record information which the defendant had no opportunity to deny or explain states due process violation). To be binding on later federal courts, state-court habeas fact-findings must be the product of "full and fair" hearings. *See, e.g.*, 1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRAC. & PROC. § 20.3e, at 807 n.121 (citing cases).

Mr. Washington was prejudiced by Judge Lykos' actions. Although Judge Lykos did not personally ultimately deny relief to Mr. Washington, the importance of trial counsel's second affidavit to the ultimate conclusion of the case cannot be overstated. *Ex parte* communications "need not go to the ultimate merits in order to run afoul" of the prohibition on *ex parte* communication. SHAMAN

-10-

ET AL, *supra*, at § 5.02. The trial court, in its findings of fact and conclusions of law (self-servingly ghostwritten by the prosecutor), repeatedly found Harris' second affidavit credible, and relied on it to reject many of Mr. Washington's claims. *See generally id.* Because Mr. Washington was denied virtually all relevant discovery and an evidentiary hearing on the merits of his claims, court-ordered factual development ended with the creation of the second affidavit. Judge Lykos' actions therefore essentially doomed Mr. Washington's chances for relief.

Habeas petitioners are entitled to invoke factual-development procedures in federal court not only to explore substantive claims, but also to establish a reliable factual record concerning relevant procedural issues. *See, e.g.*, Motion for Discovery (Dkt. #41), at 12. Now that Mr. Washington has supplemented his original showing with sworn testimony confirming many of his allegations concerning state postconviction proceedings, there can be no question that he has shown "good cause" for discovery under Rule 6(a) of the Rules Governing § 2254 Cases to authorize discovery required to discover the scope of the due process violation Mr. Washington suffered in state postconviction. *See* Motion for Discovery at 10-13, Schedule of Requested Discovery (Dkt. #56), Depositions – Part II.

**III.   Judge Lykos' decision to exploit death penalty verdicts handed down in her court for political gain while postconviction appeals involving those cases were pending before her destroyed any appearance of impartiality and established a strong incentive to deny relief to the applicants regardless of the merits of their claims.**

As the Supreme Court has observed, the reality and appearance of "political justice" are incompatible with the assumption of a system of laws not men. Ours is an era in which members of the judiciary often are called upon to adjudicate cases squarely presenting hotly contested social or political issues. The state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect.

*Morial v. Judiciary Comm'n of La.*, 565 F.2d 295, 301 (5th Cir. 1977) (citing *U.S. Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 564-65 (1973)).

While conducting an investigation in an unrelated case, the undersigned counsel discovered

that the Hon. Pat Lykos, while still sitting as Judge of the 180th District Court, ran for the Republican nomination for the office of Attorney General of Texas.  On November 23, 1993, Judge Lykos "kicked off her campaign at the home of a murder victim whose assailant was tried in her court." Christy Hoppe, *Runoff Decisions Near in AG, Judge Races*, DALLAS MORNING NEWS, April 10, 1994, at 41A; Clay Robison, *Aiming for Attorney General*, HOUSTON CHRON., November 24, 1993, at A20.  According to Houston Chronicle articles describing this same event, Judge Lykos "vowed to lead a crusade to 'take back our streets'" during this gathering. Clay Robison, *Attorney General*, February 27, 1994 (Voters' Guide, page 3).  At this press conference, Judge Lykos accused the then-current Attorney General, Dan Morales, of "surrender[ing] to convicts and their lawyers" in prison litigation. Robison, *Aiming*, *supra*.  These statements were only the first of many law-and-order pronouncements from a candidate running for the state's highest law enforcement office in a campaign focused almost exclusively on crime–all issued by a sitting judge who was responsible for neutrally and impartially adjudication criminal cases. *See infra*.

Judge Lykos's campaign paid over $100,000 to media companies, and ran television, radio, and other ads during the primary and the primary runoff.[5]  According to persons who have seen the advertisements, Judge Lykos proclaims a law-and-order outlook, and specifically refers to the death penalty.  Some viewers recalled that in a television advertisement, she referred specifically to *death penalty cases which had been prosecuted in her court when she was a judge*, and showed images of persons who had been sentenced in her court.  Exhibit 4 (Affidavit of Bryce Benjet) at ¶2.  The undersigned counsel have made diligent efforts to obtain these advertisements from various state

---

[5] *See, e.g.*,  Exhibit 3 (Texas Ethics Commission campaign finance records from Judge Lykos' 1994 campaign for Republican nomination for Attorney General) at 15 (payments of thousands of dollars to two advertising/consulting groups for "Media Advertising" and $65.00 to "KTRK-TV" in Houston for "Fee relative to media adds [sic]"); *id*. at 16 (payment of $19,302.34 to Jim Culberson for "Advertising, etc."); *id*. at 23 ($2,331.27 to Culberson for "TV Production & Printing"); *id*. at 24 ($24,215 to Culberson for "Design and Printing"); *id*. at 28 ($7000.00 to Culberson for "Advertising [and] TV Production"); *id* at 34 ($48,001.22 to Alexander Group Communications (AGC) for "TV/Radio Buy"); *id*. at 47 ($19,693.34 to AGC for "TV/Radio").

agencies, private companies, and media outlets, but have not been able to do so, and will not be able to do so without a court order. *See* Benjet Dec. at ¶5, 7-10. Judge Lykos was asked about the advertisements during the recusal hearing, but the State's objection to the question was sustained. Tr. at 64.

The only person or persons who may have access to these advertisements is Judge Lykos herself, or the media firms she retained to assist her in the 1994 Attorney General primary, Alexander Group Communications (AGC), Jim Culberson, and Love Advertising. Lykos paid approximately $100,000 to AGC. *See* n.5, *supra*. The partnership has since dissolved. Benjet Dec. at ¶7. Although members of AGC could not be located, an employee of another retained advertising consultant, Love Advertising (*see* Exhibit 3 at 15) indicated that if they have retained copies of the judge's advertisements, they will not voluntarily disclose them to the undersigned counsel absent permission from Judge Lykos. Benjet Dec. at ¶7.

The public record confirms that Judge Lykos was willing to exploit death verdicts handed down in her court for partisan political gain. The clearest example is the press conference at which Judge Lykos kicked off her campaign. In 1989, Judge Lykos presided over the trial of Willis Jay Barnes, who was convicted of capital murder during the course of burglary for the killing of Ms. Helen Greb, who was eighty-four years old at that time. *Barnes v. Johnson*, 160 F.3d 218, 219 (5th Cir. 1998); John Makeig, *Coke Addict Gets Death for Killing*, HOUSTON CHRON., March 24, 1989, at A25 (describing trial of Willis Jay Barnes in Judge Lykos' court). The home at which Judge Lykos launched her primary bid was Ms. Greb's.[6] She declared at this conference that "crime is the whole reason behind her candidacy." Horvit & Herman, *supra*. She declared that Mr. Barnes' case, "which

---

[6] The fact that this was Ms. Greb's home is made virtually certain by virtue of the fact that the Lykos campaign issued a press release on Nov. 23, 1993 in which she described this case as a "Valentine's Day capital murder." Mark Horvit & Ken Herman, *Politicians on Anti-Crime Bandwagon*, HOUSTON POST, January 9, 1994, at A25. Ms. Greb was indeed killed on February 14, 1988. *Barnes*, 160 F.3d at 219. She was also eighty-four years old, the same age as the victim described in earlier articles. *See* Robison, *Attorney General*, *supra*.

landed in her courtroom, compelled her to run for the office of attorney general." *Id.* Judge Lykos used martial rhetoric in the press release accompanying the press conference: "This is a crusade [against crime]. We're going to take back Texas the way we won World War II, house by house, block by block." *Id.*

The Court of Criminal Appeals of Texas denied Mr. Barnes relief on direct appeal on September 22, 1993. *Barnes*, 160 F.3d at 221. State postconviction applications in Texas cases are filed initially with the criminal district court in which the defendant was convicted, and are initially reviewed by the judge of that court. *See* TEX. CODE CRIM. PROC. ANN. art. 11.07 §§ (b) & (c) (Vernon's Supp. 1995) (clerk shall transfer writ "to the court in which the conviction being challenged was obtained" and "it shall be the duty of the convicting court" to decide petition). Thus, at the very time Judge Lykos was making these incendiary pronouncements, she could reasonably have anticipated that Mr. Barnes, at any time, could have filed an application for post-conviction relief *in her court* and that *she personally* would be called upon to decide the case.[7] She consciously placed herself in the position of potentially having to decide whether to grant relief to a person whose *very case* she was currently exploiting for political gain. This conduct violated several canons of judicial ethics and placed the judge in a position in which her impartiality was open to question.[8] Judge Lykos, at this time, was also presiding over the capital postconviction appeal of Willie Terion Washington. As observed above, Judge Lykos may, in her campaign literature, have actually used Mr. Washington's specific case or image in order to bolster her tough-on-crime credentials.

---

[7] As it happens, Mr. Barnes elected to seek certiorari review of the Court of Criminal Appeals' decision, delaying the start of his postconviction proceedings until 1995, after Judge Lykos had left the bench.

[8] For instance, if Mr. Barnes filed a habeas petition with meritorious claims in her court, Judge Lykos would have felt a strong pre-existing incentive not to grant relief. What would she say to Ms. Greb's family—who had been kind enough to allow her to use their deceased mother's house to launch her campaign—if she had granted relief to Mr. Barnes? What if the victim's family, outraged by the grant of relief, decided to withdraw their endorsement of Judge Lykos and publicly criticize her as being soft on crime? Doubtless these considerations would have occurred to Judge Lykos had she been called upon to decide Mr. Barnes' claims—and this was a very real possibility.

The dangers inherent in a judge campaigning for a non-judicial elective office while still presiding on the bench are evident. In 1973, the American Bar Association revised its Code of Judicial Conduct, and included a provision requiring judges to resign immediately upon becoming a candidate in any non-judicial election. The "sound reasons for the resignation requirement" were the "avoidance of the appearance of impropriety or of trading on the prestige and dignity of the judicial office, and the fear of involving the court in political controversy." E. WAYNE THODE, REPORTER'S NOTES TO CODE OF JUDICIAL CONDUCT 97 (1973); *see also Morial*, 565 F.2d at 303 (noting the "appearance of abuse which might enshroud even an upright judge's decisions during the course of a hard-fought election campaign"). In 1999, Texas adopted this Canon. Obviously, the closer the overlap between the nature of the office being sought and the nature of the judge's duties, the greater the potential for abuse. *See, e.g., Mahoning County Bar Ass'n v. Franko*, 151 N.E.2d 17, 25-29 (Ohio 1958) (judge disbarred for seeking District Attorney's office while on the bench; in order to curry favor with voters, judge had pointed to his lenient sentencing policy for minor traffic offenses and implied that he would continue it as prosecuting attorney).

Even with great effort, it would have been virtually impossible for Judge Lykos to avoid an appearance of impropriety and simultaneously run a vigorous, partisan campaign for Attorney General as a law-and-order Republican. However, the evidence suggests that Judge Lykos made no effort whatsoever to avoid partiality, and in fact actively exploited her judicial office. Even from the limited information available from public sources, it is evident that Judge Lykos made improper pronouncements concerning criminal-justice issues, and intentionally drew publicity to at least one specific death sentence over which she had presided (and which she could have been asked to review at any time). These statements and actions were improper.[9] More surely await discovery, given that

---

[9] Persons seeking judicial office routinely run afoul of ethical constraints by exploiting the death penalty for partisan political gain. For instance, the New York Commission on Judicial Conduct, interpreting a provision substantially the same as Texas', censured a sitting judge for giving a speech to a law enforcement group which

(continued...)

the 1994 Attorney General race was essentially a hard-fought contest to see who could be tougher on crime. *See, e.g.*, Horvit & Herman, *supra* (oberving that "rhetoric [was] flying high" in the race and describing it as having "taken on a crimebuster tone").[10] The undersigned counsel believe that full discovery of Judge Lykos' campaign literature will reveal further abuses, possibly including specific references to Mr. Washington's case in her campaign literature, and will amply demonstrate the depth's of Judge Lykos' improper behavior and the magnitude of her stake in the death sentences in which she had participated.

Judge Lykos actively campaigned for the nomination post until mid-April, 1994. *See* Mary Lenz, *Wittig Wins Chance to Challenge Morales After Defeating Lykos*, HOUSTON POST,

---

[9](...continued)
criticized capital defense attorneys and disparaged "technicalities" in the State's death penalty law. *See* Disciplinary Proceedings of the State of New York Commission on Judicial Conduct, *reported at* NEW YORK L.J., July 13, 1998, at 7. The Commission observed that the judge's pointed comments went far beyond permissible speaking, writing or teaching, and "cast reasonable doubt on his ability to be impartial in [a pending capital] case [in his court]." *Id.* A Commission appointed by the Ohio Supreme Court reprimanded and fined a judicial candidate for, among other things, promising that she "will be a tough Judge that supports the death penalty and isn't afraid to use it" and that she "favors the death penalty for convicted murderers." In re *Brick*, 705 N.E.2d 422, 425 (Ohio 1999). A reasonable observer, the Commission observed, would conclude that, while on the bench, the prospective judge might well distort capital proceedings in order to hand down death sentences and thus deliver on her campaign rhetoric. *Id.* at 426; *see also* SHAMAN ET AL., *supra* at § 11.09 (detailing cases in which judges were sanctioned for promising voters that they would be "tough on drunk drivers" or had a "strict sentencing philosophy" because such statements "could be interpreted as a pledge that the candidate will take a particular approach in deciding cases"). Justice Stevens has observed that "a campaign promise to be 'tough on crime' or to 'enforce the death penalty' is evidence of bias that should disqualify a candidate from sitting in criminal cases." Justice John Paul Stevens, Opening Assembly Address, American Bar Association Annual Meeting, Aug. 3, 1996. Judge Lykos' misconduct is even more evident than in the cases cited above. In many of those cases, the statements were made only by persons seeking judicial office, and did not refer to any specific case. Judge Lykos, on the other hand, was a sitting judge during her campaign, and was then personally responsible for fairly and impartially deciding the fate of many indigent condemned petitioners.

[10] One candidate vowed to lower the age of death-eligibility to 13, another highlighted a rape-killing by a parolee and declared that criminals have "taken charge of the streets," Judge Lykos compared the "war" on crime to World War II, and the incumbent, Dan Morales, observed that he had "fought hard" to enforce sentences and aid crime victims. Horvit & Herman, *supra*. This lurid anti-crime rhetoric is ironic, given that the day-to-day operation of the Texas Attorney General's office is overwhelmingly devoted to civil matters. *Id.* (observing political consultant's advice that, because of public's overwhelming focus on crime, all candidates for office should prominently identify themselves as "tough on crime" no matter what position they are running for).

Wednesday, April 13, 1994, at A20.[11] During this entire time, Mr. Washington's state postconviction petition was pending in her court.   Judge Lykos almost certainly began planning this complex endeavor long before–perhaps years before–she actually announced her candidacy.   Her conduct demonstrates that she viewed death sentences with which she could claim association as desirable accessories in her appeal to a crime-weary public.  Her willingness to exploit specific cases which she could reasonably have anticipated presiding over indicates that she was willing to sacrifice the appearance of impartiality in her quest for partisan office.

Judge Lykos' behavior in other capital postconviction cases supports this hypothesis.  To the undersigned counsels' knowledge, Judge Lykos has never authored or adopted findings of fact and conclusions of law recommending relief in a death penalty case over which she presided in postconviction.  Indeed, during Mr. Washington's 1989 hearing, she routinely expressed scorn or frustration with proper postconviction claims and procedures, which she attacked as attempts to "retry" settled convictions, and denied Mr. Washington access to vital court-ordered factfinding mechanisms.  *See* Amended Petition at 16-17.

In other capital habeas cases, Judge Lykos has presided over habeas hearings which were fraught with irregularities.  In *Thomas v. State*, No. 346,945-A (180th Dist. Ct, Harris Count, Tex. Oct. 8, 1992), Judge Lykos ordered counsel to appear at a hearing on August 28, 1992, on "pending motions."  Exhibit 5 (*Thomas* hearing excerpts) at 47.  Over the objection of Thomas' counsel, Judge Lykos, *during the hearing*, suddenly decided to expand its scope into a full evidentiary hearing on the merits of Thomas' claims.  *Id.* at 42.  Thomas's lawyer, a respected civil litigator who had flown in from New York,  protested that the Judge's staff had affirmatively assured him the hearing would be only preliminary.  *Id.* at 49.   He thus had no opportunity to prepare for a full hearing on the merits

---

[11] Judge Lykos's desire for high-ranking law enforcement posts did not stop with the Attorney General's race.  In 1995, while an active Visiting Judge, she beat out several other contenders and ended up as one of two hopefuls vying for the opportunity to replace Johnny Klevenhagen, the retiring Sheriff of Harris County.  Joe Stinebaker, *Officials Ready with Appointee for Sheriff*, HOUSTON CHRON., June 16, 1995, at A1.

and was not prepared to go forward. *Id.* at 49-50, 54. Judge Lykos ignored his protestations, as she ignored Texas law requiring three days' notice to the parties before a hearing in a habeas case. *See* TEX. CODE CRIM. PROC. ART. 11.07 § 4 (Vernon's 1994). Judge Lykos made her attitude toward postconviction proceedings clear: "We have just simply got to come to the realization that a trial is a trial and it rises and falls on its own merits. And to, a decade later, try to reconstruct what occurred, to try to put a different slant on what occurred is manifestly unfair." *Id.* at 65. She also advised Thomas' attorneys that their ineffectiveness allegations would be defamatory if made outside the courtroom context. *Id.* at 52.

After these observations, Judge Lykos sent a bailiff out to track down Thomas' trial attorneys and force them to testify concerning his ineffective-assistance and competency claims at her impromptu hearing. Once they were located, Judge Lykos allowed the parties to question them for brief period, then questioned both witnesses at length–often longer than either party. Exhibit 5 at 91-111. Her marathon examinations undermined Thomas' claims. She asked "softball" questions to Thomas' trial lawyers to allow them to bolster their performance,[12] and helped the State refute Thomas' *Brady*[13] and competency[14] claims. Her questions were frequently loaded and leading; they were virtually identical to the questions the State would have been expected to ask.

Judge Lykos eventually denied Thomas all relief. Chief Judge Norman Black of the United States District Court for the Southern District of Texas later concluded that Judge Lykos had violated Mr. Thomas' rights by forcibly medicating him with antipsychotic drugs during his trial in violation

---

[12] Her questions included: "Would you elaborate on -- I believe your testimony was this is the most involved that you ever been in a case up until this date, being today?", Exhibit 5 at 103, and "Do you have any independent recollection of how many hours you spent investigating Mr. Thomas' case?". Exhibit 5 at 102.

[13] Judge Lykos addressed the *Brady* claims by questioning trial counsel about his access to the State's file and his knowledge of other documents which the State may have possessed. Exhibit 5 at 96-97.

[14] Judge Lykos elicited testimony from trial counsel refuting Mr. Thomas' claims of incompetence by injecting, "and I believe the State presented evidence, that of malingering?" Exhibit 5 at 107.

of *Riggins v. Nevada,* 504 U.S. 127 (1992). *See* Exhibit 6 (Order granting relief). This Court later upheld Judge Black's determination against the Respondent's challenge under FED. R. CIV. P. 59(e). *See* Exhibit 7.

Judge Lykos' conduct in the capital postconviction proceedings involving death row inmate Karla Faye Tucker were equally irregular. Judge Lykos first denied Tucker an evidentiary hearing, but the Court of Criminal Appeals reversed her decision and ordered a hearing on a claim that the prosecution had permitted James Leibrant, a crucial witness against Tucker, to conceal the fact that he received favorable treatment in return for his testimony. Exhibit 8 (Hearing Excerpts, *Karla Faye Tucker v. State,* No. 21,159-01 (180th Dist. Ct., Harris County, Tex. July 30, 1992)), at 4. Before Mr. Leibrant was called to testify, Judge Lykos appointed him counsel to advise him concerning perjury. *Id.* at 50. Judge Lykos then personally admonished Leibrant in a hostile and intimidating manner. *Id.* at 52-53 (judge explains potential criminal sentence for perjury, points out that he could be imprisoned "not less than 25 years nor more than life" under repeat-offender statute).

Judge Lykos examined Leibrant for *110 pages* of transcript over *two days* – longer than both Tucker's counsel and counsel for the State combined. Judge Lykos mainly impeached him by focusing on his criminal history, *id.* at 126-128, 187; prior inconsistent statements, *id.* at 177-184, 243; his past and alleged present drug use, *id.* at 191-193; and his communications with habeas counsel. *Id.* at 201-212. She accused Leibrant of being on drugs right there, as he testified. He denied the charge, prompting this exchange:

> The Court:    I want this gentleman taken into custody and we will have a drug test administered after this proceeding is over.
>
> Q.    (By the Court) Do you want to change your testimony now, sir?
>
> A.    No.

*Id.* at 192-93. Nothing in the record indicates that Mr. Leibrant was intoxicated. As a further act of intimidation, Mr. Leibrant, who had appeared at the hearing voluntarily, was arrested at the

conclusion of the days proceedings and held in jail for the night "to assure his appearance tomorrow and to undergo urinalysis." *Id.* at 218. Numerous courts have, of course, condemned the practice of judges threatening witnesses with perjury and conducting substantial witness examination themselves.[15] The overall impression left by a review of the *Tucker* and *Thomas* hearings[16] is of a judge who considers habeas proceedings an illegitimate attempt to undermine settled convictions, and who wrests control over the presentation of evidence in order to undermine the petitioner's claims and establish the state's defenses. This conduct demonstrates pre-existing bias arising from an extra-judicial source: Judge Lykos' desire to bolster her tough-on-crime image by preserving death sentences for later political exploration.

Mr. Washington is entitled to discovery of Judge Lykos' campaign materials as set out in the Supplemental Schedule of Requested discovery attached as Exhibit 1. *See, e.g., Bracy v. Gramley*, 520 U.S. 899 (1997) (when federal petitioner articulates a plausible theory of judicial bias and supports theory with specific allegations and facts tending to bolster it, he has shown "good cause" for discovery under Rule 6(a)).

Respectfully submitted,

---

[15] In *Webb v. Texas*, 409 U.S. 95 (1972) (per curiam), a judge denied a defendant due process when he, as Judge Lykos did here, singled out one witness and admonished that witness at length about the penalties for perjury and possible enhancements of those penalties in view of the witness' criminal history. Disapproval of lengthy, substantive judicial examinations of witnesses is similarly strong. *See, Morrison v. State*, 845 S.W.2d 882, 886 n.10 (Tex. Crim. App. 1992) (Texas is "second to none" in its disapproval of the nonadversarial practice of trial judge' examination of witnesses.); *accord Milo v. State*, 214 S.W.2d 618 (Tex. Crim. App.1948); *Jackson v. State*, 318 S.W.2d 98 (Tex. Crim. App. 1958); *Rodreguez v. State*, 8 S.W.2d 149 (Tex. Crim. App. 1928).

[16] The undersigned counsel have attached only excerpts of these hearings. Full copies will be provided to this Court or to the Respondent upon request.

Andrew Hammel
Attorney-in-Charge
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 00796698

Bryce Benjet
Staff Attorney
Member, U.S.D.C., Southern Dist.
Tx. Bar No. 24006829

**TEXAS DEFENDER SERVICE**
412 Main Street, Suite 1150
Houston, TX  77002
TEL    : (713) 222-7788
FAX    : (713) 222-0260

## CERTIFICATE OF CONFERENCE

The Respondent has already indicated in pleadings submitted to this Court that he opposes all discovery in this case.  *See* Dkt. #45.

## CERTIFICATE OF SERVICE

I hereby certify that on the 19 day of November 1999, I served a true and correct copy of the foregoing pleading by depositing it with United States Postal Service Regular Mail to counsel for Respondent:

Mr. Matthew Wymer
Assistant Attorney General
Office of the Attorney General
209 W. 14th Street
Price Daniel, Sr. Building, 8th Floor
Austin, Texas  78701

_____
Andrew Hammel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **WILLIE TERION WASHINGTON,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| -VS- | § | **C.A. No. H-99-0140** |
| | § | |
| | § | |
| | § | |
| **GARY JOHNSON, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

## ORDER GRANTING DISCOVERY

Pending before the Court is Petitioner Willie Terion Washington's **Supplemental Briefing on Inadequacy of State Court Factfindings and Supplemental Motion For Discovery and an Evidentiary Hearing.**  Having considered the arguments of the parties, it is **ORDERED** that Petitioner's motion is **GRANTED**.

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WILLIE TERION WASHINGTON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | C.A. No. H-99-0140 |
| | § | |
| | § | |
| | § | |
| GARY JOHNSON, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

## SUPPLEMENTAL SCHEDULE OF REQUESTED DISCOVERY

TO THE HONORABLE DAVID HITTNER, UNITED STATES DISTRICT JUDGE:

For the reasons set out in the accompanying Motion, Mr. Washington submits that he has shown "good cause" for discovery pursuant to Rule 6 of the Rules Governing § 2254 cases and petitioners this Court for leave to take additional discovery. This document is intended to supplement Mr. Washington's original Schedule of Requested Discovery (Dkt. #56), and all definitions contained in that document are hereby incorporated by reference.

**Discovery Relating to Judge Lykos' Political Campaigns.**

    a.    **Documents**

Mr. Washington seeks discovery of the following documents relating to any and all political campaigns in which Judge Lykos was a candidate in either a primary or general election from 1986, when Mr. Washington's trial ended, to January of 1995, when Judge Lykos left the state bench, including Judge Lykos' 1993-94 campaign for the Republican nomination for Attorney General of Texas.

        i.    Complete and unaltered copies of all television, radio and print advertisements.

       ii.    Complete and unaltered copies of all audio or video recordings or transcriptions of campaign appearances, including but not limited to speeches, press conferences, interviews, or debates.

iii.   Representative samples of all promotional and campaign material, including but not limited to brochures, pamphlets, mass mailings, issue guides, written or electronic correspondence or documents, buttons, written copies of speeches, press releases, bumper stickers, yard signs, and plans for billboard or poster advertisements.

iv.   All memoranda and written or electronic correspondence or documents concerning campaign strategy, ethics, demographics or positioning generated by the campaign or any consultants or advertisers retained by the campaign in any capacity.

v.   A list of all financial or in-kind contributions to the campaign.

vi.   A list of all groups or persons who endorsed Judge Lykos.

**b.   Depositions**

Mr. Washington seeks leave to serve subpoenas *duces tecum* and take depositions of the following individual, who were all associated with Judge Lykos' 1993-1994 Republican primary campaign:

i.   Family members or ex-partners or employees of Jim Culberson, media consultant.

ii.   Relevant Staff Members and/or present or former partners of Love Advertising, Inc.

iii.   Relevant Staff Members and/or former partners of Alexander Group Communications, Inc.

iv.   Relevant Staff Members and/or present or former partners of Blakemore & Assocs., Inc.

v.   Relevant Staff Members and/or present or former partners of Carol Reed Assocs., Inc.

vi.   Relevant Staff Members and/or present or former partners of R.J. Bodisch & Assocs., Inc.

vii.   Keener Gaines, Treasurer.

viii.   Penny Wiggins, Philip Christian, Geyer Dybesland, Marilyn Barrow: Staff Members.